# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA,

      v.

OLIVER SCHMIDT,

          Defendant.

Criminal No. 16-CR-20394

The Honorable Sean F. Cox

**DEFENDANT OLIVER SCHMIDT'S MOTION FOR REVOCATION OF THE MAGISTRATE JUDGE'S <u>DETENTION ORDER</u>**

Under 18 U.S.C. § 3145(b) and upon the accompanying Memorandum of Law in Support of Defendant's Motion for Revocation of the Magistrate Judge's Detention Order ("Memorandum"), Defendant Oliver Schmidt respectfully moves the Court to (i) revoke the Detention Order dated January 12, 2017 issued by Magistrate Judge William C. Turnoff of the United States District Court for the Southern District of Florida, and (ii) release the Defendant pursuant to 18 U.S.C. § 3142(c) subject to the least restrictive conditions, or combination of conditions, that will reasonably assure the appearance of the Defendant before this Court, including some or all of the following:

- Surrender of passport and pledge not to seek new travel documents.

- Waiver of right to contest extradition.  *See* Memorandum, Ex. DD (Form of Extradition Waiver).

- Home incarceration at a house owned by a friend in the Detroit area, with electronic and GPS monitoring.

- Heightened reporting to Pretrial Services as directed.

- Multiple co-signers with moral suasion.

- A bond secured by assets that exceed the liquid net worth of the Defendant and his wife:

  o $433,000 in real property representing Mr. Schmidt's and his wife's equity in their seven U.S. rental apartments.

  o $110,000 in real property posted by Florida-based friends.

  o Additional cash posted by a co-signer, if necessary.

  o $500,000 loaned to Mr. Schmidt by Volkswagen AG's D&O insurance carrier, for which he would be personally liable.

  o A substantial sum of cash from Mr. Schmidt's and his wife's life savings.

- Any other conditions that the Court deems to be just and proper.

As required under Local Criminal Rule 12.1(a), Defendant Oliver Schmidt's counsel sought concurrence for the requested relief, but the government declined to concur.

Respectfully submitted,

Dated:  February 24, 2017          BUTZEL LONG

By: /s/ David F. DuMouchel
    David F. DuMouchel (P25658)
    George B. Donnini (P66793)
    150 West Jefferson Avenue, Suite 100
    Detroit, Michigan 48226
    313.225.7000
    dumouchd@butzel.com
    donnini@butzel.com

RICHARDS KIBBE & ORBE LLP

By: /s/ David B. Massey
    David B. Massey (*admission pending*)
    Matthew M. Riccardi (*admission pending*)
    Paul J. Devlin (*admission pending*)
    200 Liberty Street, 29th Floor
    New York, NY 10281
    212.530.1800
    dmassey@rkollp.com
    mriccardi@rkollp.com
    pdevlin@rkollp.com

    *Attorneys for Defendant Oliver Schmidt*

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA,

      v.

OLIVER SCHMIDT,

          Defendant.

Criminal No. 16-CR-20394

The Honorable Sean F. Cox

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR REVOCATION OF THE MAGISTRATE JUDGE'S DETENTION ORDER

## <u>Table of Contents</u>

**Page**

PRELIMINARY STATEMENT ......................................................................1

FACTUAL BACKGROUND...........................................................................5

    A.    Mr. Schmidt Has Deep and Long-Standing Ties to the U.S. ..............5

    B.    Mr. Schmidt Had Late and Episodic Involvement with
           Emissions Issues...................................................................................6

    C.    Mr. Schmidt Has Cooperated Fully with the Investigations...............9

PROCEDURAL BACKGROUND....................................................................9

ARGUMENT .................................................................................................11

I.      LEGAL STANDARDS ........................................................................11

II.     IF RELEASED, MR. SCHMIDT WILL APPEAR ...................................12

    A.    German Citizenship Does Not Make Mr. Schmidt A "Serious"
           Flight Risk. ..........................................................................................13

    B.    Mr. Schmidt's Actions Show That There Are Conditions That
           Will "Reasonably Assure" His Appearance.......................................16

    C.    Mr. Schmidt Has Significant U.S. Ties and Will Have Great
           Personal and Financial Incentives To Appear...................................19

    D.    The Charges and Potential Sentence Do Not Warrant Detention. ......20

    E.    The Case's Complexity Weighs In Favor Of Release. .......................23

    F.    Germany Is No Refuge for Mr. Schmidt.............................................23

III.    CONDITIONS ROUTINELY IMPOSED WILL REASONABLY
      ASSURE MR. SCHMIDT'S APPEARANCE............................................24

CONCLUSION ..............................................................................................25

## Table of Authorities

**Page(s)**

**Cases**

*Truong v. United States*,
439 U.S. 1326 (1978) ...........................................................12, 14, 18

*United States v. Abboud*,
42 F. App'x. 784 (6th Cir. 2002) .......................................................15

*United States. v. Al'Saqqa*,
No. 13-8530, 2014 WL 252035 (S.D. Fla. Jan. 7, 2014) ....................15

*United States v. Bagios*,
11-MJ-6030 (S.D. Fla. 2011)..............................................................14

*United States v. Benhamou*,
10-MJ-02424 (S.D.N.Y. 2010) ...........................................................15

*United States v. Bodmer,*
No. 03-CR-947, 2004 WL 169790 (S.D.N.Y. Jan. 28, 2004) ..........14, 18, 23, 24

*United States v. Bohn*,
330 F. Supp. 2d 960 (W.D. Tenn. 2004) .............................................15

*United States v. Bridges*,
No. 14-20007, 2014 WL 840275, slip op.
(E.D. Mich. March 4, 2014)................................................................22

*United States v. Cilins*,
No. 13-CR-315, 2013 WL 3802012 (S.D.N.Y. July 19, 2013)..........15

*United States v. Epstein*,
155 F. Supp. 2d 323 (E.D. Pa. 2001)...................................................15

*United States v. Fata*,
No. 13-30484, 2013 WL 4084765 (E.D. Mich. Aug. 13 2013) ............12, 14, 22

*United States v. Fata*,
No. 13-CR-20600, slip op. (E.D. Mich. Oct. 11, 2013) .....................14

*United States v. Gardner*,
   No. 16-cr-20135, 2016 WL 2731189
   (E.D. Mich. May 11, 2016)............................................................................20

*United States v. Hansen*,
   108 Fd. App'x. 331, 332 (6th Cir. 2004)......................................................13

*United States v. Hanson*,
   613 F. Supp. 2d 85 (D.D.C. 2009).................................................................12

*United States v. Hazime*,
   762 F.2d 34 (6th Cir. 1985) ..........................................................................23

*United States v. Hitselberger*,
   909 F. Supp. 2d 4 (D.D.C. 2012)....................................................................17

*United States v. Johnson*,
   No. 07-CR-30292, 2007 WL 1712541
   (E.D. Mich. June 13, 2007)............................................................................20

*United States v. Karni*,
   298 F. Supp. 2d 129 (D.D.C. 2004)................................................................15

*United States v. Khashoggi*,
   717 F. Supp. 1048 (S.D.N.Y. 1989) ..............................................................16

*United States v. Koubriti*,
   No. 01–80778, 2001 WL 1525270 (E.D. Mich. Oct. 16, 2001).........................15

*United States v. Liang*,
   No.16-cr-20394 (E.D. Mich. Jan. 11, 2017)....................................................7

*United States v. Liang*,
   No. 16-cr-20394 (E.D. Mich. Sept. 9, 2016) ...................................................21

*United States v. Ng*,
   No. 15-CR-706 (S.D.N.Y. 2015).....................................................................15

*United States v. Orta*,
   760 F.2d 887 (8th Cir. 1985) .........................................................................12

*United States. v. Qazi*,
   No. 12-60298, 2012 WL 7050588 (S.D. Fla. Dec. 19, 2012) ..........................15

*United States v. Schmidt*,
   No. 17-mj-02017 (S.D. Fla. Jan. 12, 2017) .......................................17

*United States v. Stone*,
   608 F.3d 939 (6th Cir. 2010) ...............................................11, 20, 22

*United States v. Walls*,
   No. CR 2-06-192, 2008 WL 213886 (S.D. Ohio Jan. 23, 2008).......................12

*United States v. Walton*,
   No. 13–20512, 2013 WL 5539604
   (E.D. Mich. Oct. 8, 2013) ...............................................12, 17, 24

## Statutes

18 U.S.C. § 3142.........................................................passim

18 U.S.C. § 3145.............................................................1

18 U.S.C. § 3553............................................................21

U.S.S.G. § 1B1.3............................................................21

U.S.S.G. § 2B1.1............................................................22

U.S.S.G. § 3B1.2............................................................21

## PRELIMINARY STATEMENT

In this *de novo* review of the Southern District of Florida Magistrate Judge's order pursuant to 18 U.S.C. § 3145(b), Oliver Schmidt respectfully seeks pre-trial release on strict conditions. Because there are conditions that will "reasonably assure [his] appearance[,]" such relief is warranted. 18 U.S.C. § 3142(b). The Government cannot overcome the statutory presumption of pre-trial release. *Id.* Mr. Schmidt has long-standing ties to the U.S., including property ownership and a network of close friends whom he visits annually. He has no criminal history or other indicia of flight risk other than his German nationality. The Government offers no evidence that he would or could flee to Germany.

All evidence indicates that Mr. Schmidt would appear as required. He has repeatedly submitted himself to the authority of the U.S. Government. When he learned of this investigation he took an extraordinary step: He affirmatively volunteered to meet with the FBI and DOJ without counsel or preparation of any kind. After that, he met with FBI agents in Detroit to collect reimbursement for this interview. Once he engaged counsel, he volunteered to meet with the Government again. He entered the U.S. with his wife for a Christmas vacation with full knowledge that he could be arrested as a result of the investigation. He sat for multiple interviews with German authorities and representatives of his

employer, Volkswagen AG ("VW").  More than forty friends and family members have submitted letters attesting that they believe Mr. Schmidt will appear.

This Court and others have routinely released similarly-situated foreign defendants whose countries will not extradite citizens, both with and without the Government's consent.  In fact, Mr. Schmidt has much stronger U.S. ties—and has a far greater track record of submission to U.S. authority—than many foreign defendants who were granted pre-trial release in these cases, as described below.

Mr. Schmidt fully understands that he would suffer dire personal and professional consequences if he failed to appear.  By fleeing, Mr. Schmidt and his wife would forfeit very substantial property that they propose to post as security. Friends and family who post assets would also suffer.  He would lose, and be forced to repay, $500,000 that VW's D&O insurance carrier will lend to him to post as additional collateral.  With this loan, Mr. Schmidt can offer bail security that exceeds his net worth.

Mr. Schmidt would find no refuge in Germany.  Because of the indictment in this case, on January 20, 2017, German authorities changed his status from "witness" to "defendant" in an ongoing criminal investigation relating to the same diesel emissions issues.  If he fled from the U.S., then German authorities would likely detain him there, where he faces the risk of substantial jail time.

The alleged conspiracy began approximately eight years before Mr. Schmidt is alleged to have joined it. The case against Mr. Schmidt arises primarily from statements he made to U.S. regulators in a small number of meetings about highly technical issues. There is substantial exculpatory evidence about these meetings and related facts, including advice of counsel.

Mr. Schmidt cannot meaningfully use this exculpatory evidence and other defenses if he is detained. His defense will require the analysis of millions of pages of technical documents and communications in German (many of which have been translated incorrectly). He will have to be closely involved in this work, and there is no way that he can meaningfully do so if he remains detained. It is fundamentally unfair to put Mr. Schmidt to the choice of which Constitutional right to assert, and which to give up. He can insist on his right to a speedy trial in order to be free if acquitted, or he can remain in custody where his ability to provide meaningful assistance to his own defense is severely hampered, while counsel analyzes untold documents without his full participation. This is not only patently unfair but also unconstitutional—and, of course, totally unnecessary.

Given the strength of these factors in his favor, and the strong track record of this District in supervising defendants on pre-trial release, Mr. Schmidt respectfully submits that the Government cannot overcome the statutory presumption favoring pre-trial release. The Government all but demands that his

appearance be "guaranteed," but a guarantee is not required under the statute. Instead, even where there is a "serious risk that [the defendant] will flee," the statute requires an individualized assessment of conditions that will "reasonably assure" his appearance.  18 U.S.C. §§ 3142(f)(2)(A) & 3142(b).

Here, the strict conditions that we propose will reasonably assure his appearance:  home confinement with electronic monitoring and GPS; requirement to live in a friend's house in the Detroit metropolitan area; passport surrender; a substantial bond secured by property and cash that exceeds Mr. Schmidt's liquid net worth; among other conditions described in our Motion.  Def's Mot. for Revocation of the Magistrate Judge's Detention Order 1-2.

By refusing to consent to Mr. Schmidt's release under these strict conditions, the Government is taking a troubling position.  If a white-collar defendant with long-standing ties to the U.S., a defensible case, a proven record of submitting to U.S. authority, and a willingness to post cash and property that exceed his net worth cannot be released on strict conditions in this District because he is the citizen of a non-extradition country, then no defendant from more than eighty such countries could ever be released pre-trial.  The Government should not be permitted to rewrite the Bail Reform Act to include a presumption against the release of such defendants.

4

## FACTUAL BACKGROUND

Mr. Schmidt is a forty-eight year-old mid-level manager at VW. He is a German citizen with unusually strong and long-standing ties to the U.S. He had no role in the design or implementation of the defeat device at issue, and he has cooperated fully with multiple investigations relating to this matter.

### A.   Mr. Schmidt Has Deep and Long-Standing Ties to the U.S.

Mr. Schmidt's deep and long-standing ties to the U.S. arise from his two decades of regular travel here, his employment history in Michigan and California, and the property that he and his wife have purchased in Florida.

Mr. Schmidt first traveled to the U.S. in 1998. He and his wife have traveled here regularly since 2000. Each year since 2008, they have celebrated Christmas with a group of close friends in the Miami area. In 2010, Mr. Schmidt and his wife were married on the showroom floor of a friend's VW dealership in Florida.

Significantly, Mr. Schmidt spent five years—one fourth of his career at VW—living and working in the U.S. During those years, he and his wife formed close personal and professional relationships in Michigan, Florida, and California. Many of these friends have written letters of support and attended court appearances in this case. Two close friends in Florida have agreed to post assets worth approximately $110,000 in total.

As a result of their close ties to, and fondness for, the U.S., Mr. Schmidt and his wife have long planned to retire in Florida. Accordingly, over the years, they

5

have bought seven apartments in the Miami area, which they rent to tenants. The appraised value of these properties is approximately $433,000 net of mortgages. This constitutes approximately one half of the liquid net worth of Mr. Schmidt and his wife. The value of their U.S. real estate far exceeds that of their house in Germany, which is valued at approximately $188,000. *See* Exs. B, M-S.

### B. Mr. Schmidt Had Late and Episodic Involvement with Emissions Issues.

Mr. Schmidt has worked for VW since 1997. He has never been a VW "executive," contrary to the Government's claim.[1] His background is in gasoline engines, not diesel, and project management. He had nothing to do with the design of diesel engines or the engine control unit software at issue in this case.

In 2012, Mr. Schmidt asked VW to assign him to the U.S. because he and his wife wanted to live here. The only suitable position available was to lead Volkswagen Group of America's ("VWGOA") Engineering and Environment Office ("EEO") in Auburn Hills. Leading the EEO was not considered prestigious, but taking this job allowed Mr. Schmidt and his wife to relocate to Michigan. Unlike his predecessors in the EEO role, Mr. Schmidt did not supervise VWGOA's emissions test center in California.

---

[1] Mr. Schmidt's pay grade is approximately four levels below that of a VW executive, and he did not have the rank or signing authority of an executive. His base pay has not changed since 2011.

After Mr. Schmidt's EEO tenure ended in February 2015, he returned to Germany. He was slated to become the principal deputy to Heinz-Jacob Neusser, the head of powertrain development at VW. But contrary to the Government's claim, he never assumed the principal deputy role that had been offered to him. Second Superseding Indictment at ¶ 27, *United States v. Liang*, No.16-cr-20394 (E.D. Mich. Jan. 11, 2017).

Mr. Schmidt first learned of the study that raised questions about VW's diesel emissions in or about April 2014. This University of West Virginia study, known as the "ICCT Study," concluded that certain VW diesel cars emitted higher levels of NOx than permitted under relevant regulations when tested in "on-road" conditions. These vehicles had passed all the required U.S. regulatory certification testing conducted in a laboratory.

Other than discussing the matter with colleagues and encouraging them to take the issue seriously, Mr. Schmidt had little immediate involvement with responding to the issues raised by the ICCT Study. It was decided in Germany to replicate the ICCT Study to determine whether it was flawed. Mr. Schmidt had no role in that decision or in the re-testing.

After VW completed this testing, Mr. Schmidt, then employed as head of EEO, was instructed to facilitate a meeting between the relevant VW experts and the U.S. regulators. He did as instructed and attended a meeting in October 2014.

A VW employee based in Germany led the meeting by telephone. Mr. Schmidt did not participate substantively in the meeting or the preparation for it.

During the October 2014 meeting, it was decided to recall the relevant VW vehicles and update the engine control unit software to remedy the emissions problems. Thereafter, VW created a task force to study and correct these emissions issues and answer regulators' questions. Notably, VW did not include Mr. Schmidt in this task force, as he was not a diesel expert.

Upon returning to Germany in February 2015, Mr. Schmidt had little to do with the diesel emissions issues. However, in or around mid-2015, Mr. Schmidt was instructed to help with VW's discussions with U.S. regulators, as he had established good relationships with them during his time in Michigan. From in or about mid-2015 through September 2015, Mr. Schmidt was part of the team tasked with communicating with the U.S. regulators. During this time, he learned from his colleagues about problems with the engine software and various other complex emission control technologies in different vehicle models. Mr. Schmidt's participation in these meetings was guided, at times, by internal legal advice, and given his lack of relevant technical expertise, he relied on explanations given by diesel experts. Internally, he advocated for transparency with regulators. When communicating with regulators, he relayed information that he believed was accurate based on the facts and technical details as he understood them at the time.

8

### C.   Mr. Schmidt Has Cooperated Fully with the Investigations.

Mr. Schmidt has fully cooperated with each and every investigation related to this matter, including those conducted by the DOJ, German authorities, and VW.

In November 2015, Mr. Schmidt affirmatively contacted the FBI and sat for an interview with the FBI and DOJ in London.  Extraordinarily, he did so without any preparation or legal counsel.  In December 2015, Mr. Schmidt met with FBI agents in Detroit, where he could have been arrested, to collect his expense reimbursement for the London interview.  As recently as November 2016, Mr. Schmidt offered (through counsel) to meet again with the Government.

Mr. Schmidt also sat for three interviews with German authorities, including two without counsel.  He agreed to be interviewed again in Germany on December 15, 2016, but this meeting was postponed when he became ill with shingles.

 Mr. Schmidt has attended at least six interviews with VW representatives, including five without legal counsel or preparation.  These interviews include one with Internal Audit and five with law firms representing the VW Advisory Board.  The most recent interview, in November 2016 with the Advisory Board's outside counsel, lasted nearly twelve hours.  As of the date of this filing, Mr. Schmidt remains a VW employee in good standing.

### PROCEDURAL BACKGROUND

Mr. Schmidt's arrest does not appear to have been a high priority for the Government.  He was not named in the original Indictment, returned on June 1,

2016, or the First Superseding Indictment, returned on September 7, 2016.  In November 2016, he volunteered to meet with the Government but was rebuffed. Only after the Government was contacted in December 2016 by Mr. Schmidt's counsel on the eve of his annual Christmas vacation in Florida did the Government apparently decide to take advantage of his travel and charge him.  Even though Mr. Schmidt understood that he could be charged, he still traveled to the U.S. for his vacation—clear evidence of his willingness to submit to U.S. jurisdiction and authority and belying any suggestion that he is a flight risk.

He crossed the U.S. border multiple times before the Government arrested him.  He arrived on December 17, 2016, transited to the Caribbean for further vacation, and then returned to Miami on December 24, 2016.  The Government charged him by Complaint on December 30, 2016.  Clearly not concerned that he would flee, the Government waited until January 7, 2017 to arrest him at the Miami airport, as he prepared to return to Germany.

At Mr. Schmidt's initial appearance in the Southern District of Florida on January 9, 2017, the Government sought detention.  After initial argument, Magistrate Judge William C. Turnoff urged the parties to "work something out" with respect to release conditions.  Ex. C at C-24.

10

On January 11, 2017, a grand jury in this District returned the Second Superseding Indictment, charging Mr. Schmidt and other individuals based in Germany with Clean Air Act violations, wire fraud, and conspiracy.

On January 12, 2017, Federal Pretrial Services in Miami recommended that Mr. Schmidt be released on conditions. The Government refused to agree.

On January 12, 2017, Magistrate Judge Turnoff held a detention hearing. Ex. D at D-4. Mr. Schmidt's wife, five friends, and four representatives from the German consulate attended. *Id.* at D-40. After argument, Magistrate Judge Turnoff ordered detention. He did so, however, while remarking that Mr. Schmidt's counsel had made a "very colorable record," "another judge could rule differently," and specifically noting that Mr. Schmidt would be entitled to a *de novo* hearing "immediately" in Michigan. *Id.* at D-43, D-45.

## ARGUMENT

### I.   LEGAL STANDARDS

"The default position of the law . . . is that a defendant should be released pending trial." *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010). Under the Bail Reform Act, a defendant should be released on the "least restrictive . . . condition, or combination of conditions," that will "reasonably assure" his appearance and the safety of the community. 18 U.S.C. § 3142(c)(1)(B). Pre-trial detention is appropriate only in specific limited circumstances, including a case that involves "a serious risk that [the defendant] will flee." 18 U.S.C. §

11

3142(f)(2)(A).  It is the Government's burden to prove, "by a preponderance of the evidence, that the defendant is a flight risk[.]"  *United States v. Walton*, No. 13–20512, 2013 WL 5539604, at *5 (E.D. Mich. Oct. 8, 2013) (Cox, J.).  In determining whether there are "conditions of release that will reasonably assure the appearance of the defendant," courts consider the following factors: (1) the nature of the offense; (2) the weight of the evidence; (3) the history and characteristics of the person; and (4) the nature and seriousness of any danger posed.  18 U.S.C. § 3142(g); *Walton*, 2013 WL 5539604, at *5.  Notably, the legal standard "is one of reasonable assurances, not absolute guarantees." *United States v. Walls*, No. CR 2-06-192, 2008 WL 213886, at *1 (S.D. Ohio Jan. 23, 2008) (*quoting United States v. Orta*, 760 F.2d 887, 897 n. 4 (8th Cir. 1985)).  "[O]pportunities for flight … hardly establish any inclination … to flee." *Truong v. United States*, 439 U.S. 1326, 1329–30 (1978) (Brennan, J. sitting as Circuit Justice).  Review of a magistrate judge's detention order is *de novo*.  *United States v. Fata*, No. 13-30484, 2013 WL 4084765, at *5 (E.D. Mich. Aug. 13 2013) (Cox, J.).

## II.    IF RELEASED, MR. SCHMIDT WILL APPEAR

The Bail Reform Act's factors weigh strongly in favor of Mr. Schmidt's release.  Where "there is no strong circumstantial evidence indicating [an intent] to flee the United States," pre-trial release with conditions is appropriate.  *United States v. Hanson*, 613 F. Supp. 2d 85, 90 (D.D.C. 2009) (ordering defendant released despite deep Chinese ties).

12

### A. German Citizenship Does Not Make Mr. Schmidt A "Serious" Flight Risk.

The Government contends that Mr. Schmidt is a flight risk because he is a German national facing serious charges, and Germany will not extradite its own citizens. That argument amounts to a *de facto* presumption that the citizens of every country that will not extradite to the U.S. should be detained. There are approximately 80 countries that fit this description. Ex. F at F-47. This is not the law. Rather, the law requires that the Government affirmatively prove, by a preponderance of the evidence specific to a given defendant, that there is "a serious risk that [the defendant] will flee." 18 U.S.C. § 3142(f)(2)(A).

The Sixth Circuit, this Court, and other courts have rejected the Government's very argument. In *United States v. Hansen*, the Sixth Circuit affirmed the release of a Danish defendant—back to Denmark—because "[t]he bail statute does not … require that foreign defendants be detained simply because their return cannot be guaranteed through extradition." 108 Fd. App'x. 331, 332 (6th Cir. 2004). In *United States v. Fata*, this Court ordered the defendant released on bond with conditions despite the fact that the defendant: (i) had "significant ties to another country to which he could flee—Lebanon" (which does not have an extradition treaty with the U.S.); (ii) had "extraordinary financial assets, including

liquid assets, that could be used to flee this jurisdiction;" and (iii) posed a "serious risk to persons in the community."   2013 WL 4084765, at *6.[2]

Mr. Schmidt presents a far easier case.  Mr. Fata had multiple millions at his disposal.  The Schmidts, who have far less, are willing to post security exceeding their liquid net worth.  And unlike Mr. Fata, who prescribed unnecessary and damaging medical procedures to unknowing patients, Mr. Schmidt poses no danger to the community, as the Government concedes.

Other courts have reached the same conclusion.  In *Truong,* Justice Brennan, sitting as Circuit Justice, reversed the post-conviction detention order of a Vietnamese national and ordered him released on bail pending appeal, rejecting the Government's contention that, should "the applicant flee to Vietnam, the United States would have no means to procure his return."  439 U.S. at 1329.  Similarly, in *United States v. Bodmer*, the court concluded that the mere fact that the defendant could, in theory, flee home to Switzerland "cannot be a basis for denying bail, because if taken to its logical conclusion, no Swiss national would ever be eligible for bail."  No. 03-CR-947, 2004 WL 169790, at *2 (S.D.N.Y. Jan. 28, 2004).  And in *United States v. Bagios*, 11-MJ-6030 (S.D. Fla. 2011), the Court held that it

---

[2] The Honorable Paul Borman subsequently ordered Fata detained because he had "significant" resources in a "maze of financial entities" and because his wife, who had been his CFO, could independently finance his flight to Lebanon.  *United States v. Fata*, No. 13-CR-20600, slip op. at 7 (E.D. Mich. Oct. 11, 2013) (Borman, J.).

could not detain a Greek citizen "solely because of [the defendant's] status as a foreign national without ties to the country." Ex. G at G-59:7-8.

In these and other cases, courts have released the defendants, often over the Government's objections, on conditions that could be imposed here.[3] *See also* Ex. H (listing 22 cases involving foreign nationals and individuals with substantial ties to non-extradition countries and their release conditions). *See also United States v. Ng*, No. 15-CR-706 (S.D.N.Y. 2015) (Ex. I at I-20:22) (releasing "wildly wealthy" Chinese defendant, connected to Chinese government; bribery; virtually no U.S. ties); *United States v. Benhamou*, 10-MJ-02424 (S.D.N.Y. 2010) (Ex. J at J-24, J-25) (releasing wealthy French doctor despite the Government's argument that "in practice [the treaty] has meant that France has not extradited any of its nationals"; insider trading; no meaningful U.S. ties); *United States v. Karni*, 298 F. Supp. 2d 129, 132 (D.D.C. 2004) (releasing South Africa-based Israeli defendant; violating

---

[3] By contrast, where courts have found extradition-related concerns to support a finding of pre-trial detention, such findings were based on additional factors not present in this case such as (1) great foreign resources, *United States v. Cilins*, No. 13-CR-315, 2013 WL 3802012 (S.D.N.Y. July 19, 2013); *United States v. Epstein*, 155 F. Supp. 2d 323 (E.D. Pa. 2001); (2) the defendant's demonstrated danger to the community, *United States. v. Al'Saqqa*, No. 13-8530, 2014 WL 252035 (S.D. Fla. Jan. 7, 2014); *United States. v. Qazi*, No. 12-60298, 2012 WL 7050588 (S.D. Fla. Dec. 19, 2012); and (3) evidence demonstrating a particularized intent or unique ability to flee the jurisdiction, *United States v. Abboud*, 42 F. App'x. 784, 785 (6th Cir. 2002); *United States v. Koubriti*, No. 01–80778, 2001 WL 1525270, at *6 (E.D. Mich. Oct. 16, 2001). None of these additional factors is present as to Mr. Schmidt.

15

nuclear weapons sanctions; no U.S. ties); *United States v. Bohn*, 330 F. Supp. 2d 960, 960 (W.D. Tenn. 2004) (releasing Vanuatu citizen charged with money laundering); *United States v. Khashoggi*, 717 F. Supp. 1048, 1050-52 (S.D.N.Y. 1989) (releasing "enormously wealthy" Saudi defendant; charged with helping head of state conceal stolen assets; virtually no U.S. ties).

Plainly, the Government's contention that Mr. Schmidt's German citizenship warrants pre-trial detention is inconsistent with this Court's—and other courts'—application of the Bail Reform Act and the presumption of pre-trial release. It is also inconsistent with the language of the Bail Reform Act, as the only reference to a defendant's citizenship is contained in 18 U.S.C. § 3142(d)(1)(B), which is inapplicable here. Because Congress declined to enumerate citizenship and/or nationality as a "factor to be considered" under subsection (g), the Court should decline the Government's invitation to make Mr. Schmidt's German citizenship dispositive on the question of the propriety of his release, particularly where the other considerations weigh strongly in favor of pre-trial release.

## B.   Mr. Schmidt's Actions Show That There Are Conditions That Will "Reasonably Assure" His Appearance.

Mr. Schmidt's actions demonstrate that there are conditions that will "reasonably assure" his appearance. 18 U.S.C. § 3142(b). He has a proven track record of addressing this matter by, among other things, submitting to at least nine interviews conducted by authorities of the U.S., Germany, and VW. Most notably,

16

he contacted the FBI and sat for an interview with prosecutors without counsel or
preparation of any kind in November 2015.  He met three times with German
authorities and five times with VW representatives, most recently for almost 12
hours in November 2016.

Mr. Schmidt's willingness to submit to the physical jurisdiction of the U.S.
multiple times since learning of the present investigation is further evidence that he
will appear.  He did so twice in December 2015 (in Detroit to meet with FBI agents
and in Miami for Christmas vacation), and again in December 2016 and January
2017, even though he knew he could be arrested.  His willingness to travel to the
U.S. in the face of possible arrest is the opposite of what one would expect from a
defendant who intends to flee, distinguishing Mr. Schmidt from defendants who
present a serious risk of flight.  *See United States v. Hitselberger*, 909 F. Supp. 2d
4, 9 (D.D.C. 2012) ("That he was willing to travel to a United States military base
also strongly suggests that he was not attempting to evade American authority.")

The Government contends that Mr. Schmidt cannot be trusted because he
allegedly lied during his Government interview and deleted documents in violation
of a litigation hold notice.  Government's Mot. for Pre-Trial Detention at 2, 5,
*United States v. Schmidt*, No. 17-mj-02017 (S.D. Fla. Jan. 12, 2017).  The
Government has offered no evidence to support these allegations, let alone carried
its burden of establishing flight risk "by a preponderance of the evidence."

*Walton*, 2013 WL 5539604, at *5.  Mr. Schmidt has ample defenses to these allegations, including reasonable reliance on instructions from VW's legal and IT departments.  Moreover, the allegation that Mr. Schmidt lied during his November 2015 Government interview is contested.

Even if these allegations were true, they are beside the point.  Neither one relates in any way to Mr. Schmidt's readiness to submit to the authority of this Court.  And, with all due respect to the Government, the issue of trust is not between it and Mr. Schmidt but between this Court and Mr. Schmidt.

In addition, forty-four family members, friends, and co-workers have attested in letters "to his character and to [Mr. Schmidt's] reliability as a bail risk." *Truong*, 439 U.S. at 1329 (citing this as a factor in favor of release).  Ex. K.  Two such friends have offered to post property for bail in which they have equity of $110,000.  Exs. B, T-U.  His father has offered to post a meaningful amount of his life savings.  Ex. K at K-3.  Another friend will allow Mr. Schmidt and his wife to rent his house in the Detroit area if he is released on bail.  Ex. K at K-11.  The house is equipped with a land line for electronic monitoring.  *Id.*

Mr. Schmidt's actions, and the supporting statements of these forty-four who have known Mr. Schmidt for years, plainly outweigh the prosecutors' subjective belief that he cannot be trusted (by them).  *Bodmer*, 2004 WL 169790, at *3 (ordering release despite Government's argument that defendant is a flight risk).

### C.   Mr. Schmidt Has Significant U.S. Ties and Will Have Great Personal and Financial Incentives To Appear.

Mr. Schmidt has significant ties to the U.S. and little drawing him back to Germany.  He has no children, and his wife is in the process of seeking employment in the Detroit area to be close to him.  Ex. K at K-2.  He worked in the U.S. for many years, and he and his wife have vacationed in Florida with close friends every year since 2008.  They married in Florida and have long planned to retire there.  He frequently travels to the U.S. for business and pleasure.  Indeed, knowing that he could be arrested, he still came for his annual vacation this past Christmas.  He and his wife have invested about half of their liquid net worth in Florida, where they own seven rental properties.  Their net equity in the properties totals $433,000.

Mr. Schmidt and his wife are prepared to post their savings (approximately $415,000 in German and U.S. bank accounts (*see* Exs. B, V), except for a reasonable sum needed to cover their living expenses.  Their other non-U.S. assets cannot be used to finance flight.  A house in Germany, worth $188,000, is illiquid.  Mr. Schmidt and his wife cannot access their retirement funds, worth $159,000 and $96,000 respectively, at this time.  He has no undisclosed cash reserves or other assets to finance flight.

If the bond terms proposed below are accepted, fleeing would financially ruin Mr. Schmidt and his wife and hurt his family and friends who have posted

19

security.  He would be liable for the $500,000 loan made to him for bail.  He would be unemployable because he Would be followed wherever he goes by an Interpol Red Notice and the countless photographs of him published in papers around the world in connection with this case.  *See* Ex. Y.  Without a passport, he would not be able to get to Canada, let alone Germany.  Ex. Z at Z-3, Z-10.  If he somehow escaped to Canada, he would be detained there.  *Id.* at Z-9.

### D.    The Charges and Potential Sentence Do Not Warrant Detention.

The charges against Mr. Schmidt, while serious, do not necessitate pre-trial detention.  They do not involve crimes of violence, minors, or controlled substances, where courts typically order pre-trial detention.  *See Stone*, 608 F.3d at 947-48; *United States v. Gardner*, No. 16-cr-20135, 2016 WL 2731189, at *2 (E.D. Mich. May 11, 2016) (Drain, J.); *United States v. Johnson*, No. 07-CR-30292, 2007 WL 1712541, at *1 (E.D. Mich. June 13, 2007) (Binder, J.).  He has no criminal history.

The Government's claim, that Mr. Schmidt is effectively facing a life sentence because his Sentencing Guidelines range would be "off the charts"—is plainly constructed to keep him detained.  Transcript of Detention Hearing Proceeding, No. 17-mj-02017 at 34 (S.D. Fla. Jan. 12, 2017).  As the Government well knows, if he is convicted, the actual sentence will almost certainly be far less.  The prosecutors agreed to cap the sentence of co-defendant James Liang at five years.  Liang admitted that he was a key figure in designing and concealing the

defeat device beginning in 2006 for all 500,000 affected vehicles sold in the U.S. Liang Plea Agreement at 5-6, *United States v. Liang*, No. 16-cr-20394 (E.D. Mich. Sept. 9, 2016).  Thus, he is far more culpable than Mr. Schmidt is even alleged to be.  The need to avoid unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) will exert significant downward pressure on Mr. Schmidt's sentence, if any, regardless of the value of Mr. Liang's cooperation.

Even accepting the Government's allegations, Mr. Schmidt, unlike Mr. Liang, had nothing to do with the design or implementation of the defeat devices and had no involvement with these diesel issues before 2014, eight years after the conspiracy allegedly began.  Thus, his alleged role began years after the vast majority of the automobile model years at issue in the case were certified.  Even if the prosecutors' allegations are true, at most, Mr. Schmidt could share responsibility for the approximately 67,000 MY2015 Generation 3 vehicles sold in the U.S.  *See* Ex. AA.  These cars present far fewer issues than the other models because they can pass emissions testing without any cheating.  Ex. BB at BB-42:866.  Model year 2016 vehicles, the subject of Count 10, were never sold.  It would thus be grossly disproportionate to seek a sentence of Mr. Schmidt, with his slight role, that is greater than that of Mr. Liang.[4]

_____

[4] Mr. Schmidt cannot be responsible under the Sentencing Guidelines for conduct of members of the conspiracy that predates his alleged involvement.  *See* U.S.S.G. § 1B1.3 comment n. 2; *see also* U.S.S.G. § 3B1.2 (downward departure allowed

Putting that aside, the risk of a substantial sentence is not a reason to conclude that there are no conditions that can "reasonably assure" his appearance. 18 U.S.C. § 3142(b).  In *Fata*—a case of healthcare fraud where the defendant "provided … unnecessary treatments [to patients] that are essentially poison"—this Court ordered the defendant released on a substantial bond and with conditions, even though he "potentially face[d]" sentences of twenty years or life imprisonment.  2013 WL 4084765, at *5.

Finally, the case against Mr. Schmidt is circumstantial and highly defensible. The Government alleges that Mr. Schmidt's involvement is limited to allegedly assisting a cover-up starting in 2014, eight years after the conspiracy began.  That involvement primarily relates to Mr. Schmidt's participation in a small number of meetings.  The prosecutors' subjective belief that Mr. Schmidt knowingly made material misrepresentations during those meetings about highly technical issues outside of his area of expertise does not make the evidence against him strong.[5]

---

based on defendant's minimal participation in conspiracy).  Moreover, the Government's estimate also relies on an inflated loss amount—as if the affected cars have no value—when a reasonable estimate of any actual loss by consumers should be based on the far lower "cost of repairs to damaged property."  U.S.S.G. § 2B1.1 Application Note 3(C)(iii).  The purchasers of these cars will be compensated fully by VW.

[5] The weight-of-the-evidence factor, in any event, "'goes to the weight of the evidence of dangerousness, not the weight of the evidence of the defendant's guilt.'"  *United States v. Bridges*, No. 14-20007, 2014 WL 840275, slip op. at 4 (E.D. Mich. March 4, 2014) (Cox, J.) (quoting *Stone*, 608 F.3d at 948); *see also*

### E.   The Case's Complexity Weighs In Favor Of Release.

As described above, Mr. Schmidt's counsel cannot properly prepare his case if he is detained.  His counsel will have to review and understand millions of pages of highly technical, German-language documents.  They cannot do so without unrestricted time with Mr. Schmidt, who in turn will need free access through a computer to review the mass of documents online.  That will be impossible if he is detained because of typical detention facility rules that impede free attorney-client communication, limit visiting times, and restrict computer access.  This is an independent basis for release.  *Bodmer*, 2004 WL 169790, at *3 (ordering release where "voluminous" discovery required counsel's "uninterrupted access to [defendant]" to understand complicated financial transactions).

### F.   Germany Is No Refuge for Mr. Schmidt.

The Government has not—and cannot—explain how Mr. Schmidt could cross borders to exit the U.S. and enter Germany without a passport or money.  There is nothing in his record to suggest that he would or could obtain a fake passport or effectively use it given the wide publication of his arrest photograph.  A Red Notice would follow him everywhere.  If he attempted to flee through Canada, he would very likely be detained there, based on the opinion of a Canadian law expert.  Ex. Z at Z-9.  As in *Bodmer*, the Government's arguments

---

*United States v. Hazime*, 762 F.2d 34, 37 (6th Cir. 1985).)  Mr. Schmidt is not charged with violence or physical danger.  Accordingly, this factor favors release.

here are "based, in large part, on speculation[,] without any evidence." *Bodmer*, 2004 WL 169790, at *3.

Mr. Schmidt understands that Germany is no place of refuge for him. On January 20, 2017, as a result of his indictment here, German authorities issued a search warrant for Mr. Schmidt's home (Ex. CC) and he was named as a criminal defendant in the German investigation into the diesel emissions issues. Ex. E at E-2. As a defendant in Germany, he may be indicted, *id.* at E-5, and he may face as much as 15 years in prison. *Id.* at E-5. Moreover, if he were to escape to Germany, German authorities "would likely" incarcerate him pre-trial as a flight risk *because* of his flight from the U.S., based on the opinion of a German law expert. *Id.* at E-4. Mr. Schmidt thus has no incentive to flee the U.S., and the Government's primary basis to have him detained no longer exists.

## III.   CONDITIONS ROUTINELY IMPOSED WILL REASONABLY ASSURE MR. SCHMIDT'S APPEARANCE.

Although the evidence amply supports the conclusion that Mr. Schmidt is not a serious "flight risk," *Walton,* 2013 WL 5539604, at *5, as detailed in the Motion, Def's Mot. for Revocation of the Magistrate Ct.'s Detention Order 1-2, there are conditions that can be imposed to "reasonably assure" his appearance, 18 U.S.C. § 3142(b), including, without limitation, posting collateral in excess of Mr. Schmidt's and his wife's liquid net worth, home detention with electronic monitoring, and GPS.

Courts inside and outside this District routinely find that conditions like these serve as "reasonable assurance" that the defendant will not flee. *See, e.g.*, the 22 cases cited in Ex. H. Significantly, the defendants in these cases have not fled. Ex. H. It is extremely difficult to see how Mr. Schmidt could flee under these conditions, even if he were so inclined. This District, in particular, has an exemplary record of ensuring that released defendants appear for trial. *See, The Eastern District of Michigan: How Does It Consistently Achieve High Release Rates?,* 76 Fed. Probation 15 (Sept. 2012), Ex. EE.

## CONCLUSION

For these reasons, Mr. Schmidt respectfully requests that the Court revoke the Magistrate Court's detention order and release him subject to strict conditions.

BUTZEL LONG

/s/ David F. DuMouchel
David F. DuMouchel (P25658)
George B. Donnini (P66793)
150 West Jefferson Avenue, Suite 100
Detroit, Michigan 48226
313.225.7000
dumouchd@butzel.com
donnini@butzel.com

RICHARDS KIBBE & ORBE LLP

/s/ David B. Massey
David B. Massey (*admission pending*)
Matthew M. Riccardi (*admission pending*)
Paul J. Devlin (*admission pending*)
200 Liberty Street, 29th Floor
New York, NY 10281
212.530.1800
dmassey@rkollp.com
mriccardi@rkollp.com
pdevlin@rkollp.com

*Attorneys for Defendant Oliver Schmidt*

25

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 24, 2017, I electronically filed **DEFENDANT OLIVER SCHMIDT'S MOTION FOR REVOCATION OF THE MAGISTRATE JUDGE'S DETENTION ORDER** with the Clerk of the Court using the ECF System, which will send notification to the ECF counsel of record.

By: <u>/s/ David F. DuMouchel</u>
David F. DuMouchel (P25658)