# EXHIBIT  D

```
 1              IN THE UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF FLORIDA
 2
                          MIAMI DIVISION
 3
                CASE NO.:  17-mj-02017-WCT-1
 4

 5

 6

 7   UNITED STATES OF AMERICA,      )
                                    )
 8                  Plaintiff,      )
                                    )
     v.                             )
 9                                  )        January 12, 2017
     OLIVER SCHMIDT,                )
10                                  )
                Defendant.          )        Pages 1 - 47
11   _____/

12

13

14

15              DETENTION HEARING PROCEEDINGS

16        BEFORE THE HONORABLE WILLIAM C. TURNOFF
                UNITED STATES MAGISTRATE JUDGE
17

18

19

20

21   APPEARANCES:

22
     On behalf of the Plaintiff:
23
                         U.S. DEPARTMENT OF JUSTICE
24                       Criminal Division, Fraud Section,.
                         1400 New York Avenue, W, D.C. 20005
25                       BY:  BENJAMIN D. SINGER, ESQ.
```

1

APPEARANCES CONTINUED:

2

3  On behalf of the Defendant:

4                          RICHARDS KIBBE & ORBE, LLP
                           200 Liberty Street,
5                          New York, NY  10281
                           BY:  DAVID B. MASSEY, ESQ.
6

7

8                          KOBRE & KIM, LLP
                           2 South Biscayne Boulevard
9                          35th Floor,
                           Miami, FL 33131
10                         BY:  JOHN D. COURIEL, ESQ.

11

12  Transcribed By:

13                         BONNIE JOY LEWIS, R.P.R.
                           7001 SW 13 Street
14                         Pembroke Pines, FL  33023
                           954-985-8875
15                         caselawrptg@gmail.com

16

17

18

19

20

21

22

23

24

25

3

```
 1              (Thereupon, the following proceeding was held:)
 2              THE COURT:  United States versus Oliver Schmidt; Case
 3    Number 17-02017.
 4              MR. SINGER:  Good afternoon, Your Honor.  Ben Singer
 5    appearing on behalf of the Government.
 6              MR. MASSEY:  Good afternoon, Your Honor.  David
 7    Massey, Richards Kibbe and Orbe, for Mr. Schmidt.
 8              How are you?
 9              THE COURT:  Okay.  Nice to see you.  And it is Mr.
10    Couriel with you, correct?
11              MR. MASSEY:  That is correct.
12              THE COURT:  Mr. Schmidt, what is your name and age?
13              THE DEFENDANT:  Oliver Schmidt; 48.
14              THE COURT:  Okay.  All right.  This is on today for
15    detention hearing and removal hearing.
16              Let me hear, I guess, from either one of you.  Tell me
17    where we are and what you need me to do.
18              MR. SINGER:  Yes, Your Honor.
19              For the Government, just to recap where we were last
20    time, we had asked for detention and you have given us until
21    today.  You had asked for us to consult.  We have consulted.
22              Unfortunately, we are not able to reach an agreement.
23    The Government is still seeking detention and my understanding,
24    at least is that Defense counsel is still seeking release.
25              THE COURT:  Okay.
```

```
1              MR. SINGER:  We did file this morning -- and I am
2    happy to hand up a courtesy copy for Your Honor -- a motion in
3    support or a memorandum in support of detention.  You probably
4    haven't had a chance to read it.
5              THE COURT:  I have not.
6              MR. SINGER:  But I am happy --
7              THE COURT:  I did not know it existed.
8              MR. SINGER:  I am happy to hand it up and I am happy
9    to just argue it, Your Honor.
10             THE COURT:  That is fine.  And you have seen it, of
11   course, right, Counsel?
12             MR. MASSEY:  Yes, Your Honor.
13             THE COURT:  And my next question is, did I give this
14   matter a date for the removal hearing?
15             MR. SINGER:  I believe you set it for today.
16             THE COURT:  Right.
17             MR. MASSEY:  Your Honor, we waive removal.
18             THE COURT:  You waive removal.
19             Okay.  So let's start first with the waiver and, then,
20   we will get to detention.
21             Okay.  Mr. Schmidt, you understand -- is this an
22   indicted case, by the way?
23             MR. SINGER:  Now it is, Your Honor, yes.
24             THE COURT:  Now it is?
25             MR. SINGER:  It was indicted yesterday.
```

1          THE COURT:  And where was it indicted?

2          MR. SINGER:  In the Eastern District of Michigan, Your

3   Honor.

4          THE COURT:  I will wait until you are done.

5          MR. SINGER:  And Your Honor, just for the record, it

6   seems large --

7          THE COURT:  Is this the 39-page memo in support of

8   detention?

9          MR. SINGER:  No, Your Honor.

10          THE COURT:  I'm not criticizing.

11          MR. SINGER:  Not at all.

12          It's a ten-page memo, but the indictment is attached

13   to it for your records, Your Honor.

14          THE COURT:  Now, Mr. -- I will wait until counsel is

15   done.  Take your time and let me know when you are ready.

16          MR. MASSEY:  Your Honor, he doesn't have glasses with

17   which he can read the document.

18          THE COURT:  1.5 reading glasses?  Are you 1.5 reading

19   glasses?

20          THE DEFENDANT:  Yes.

21          THE COURT:  Here.  I'm from Philadelphia.  The judges

22   bribe the defendants.

23          MR. MASSEY:  Thank you.

24          THE COURT:  You can keep them, Mr. Schmidt.  I have,

25   like, ten pair up here.

1    THE DEFENDANT:  Awesome.

2    THE COURT:  Mr. Singer, you can practice another 40

3  years and you are not going to see that again.

4    MR. SINGER:  That may be right, Your Honor.

5    MR. MASSEY:  Your Honor, we're checking the waiver of

6  identity hearing.

7    THE COURT:  That is what you are explaining to him.

8  You are reading him the waiver form.

9    MR. MASSEY:  Yes.

10    THE COURT:  Explaining what is involved with waiving

11  the removal hearing, correct?

12    MR. MASSEY:  The preliminary hearing.  We are not

13  waiving the detention hearing.

14    THE COURT:  Yes, I understand.

15    And you have explained it to him and he has signed it,

16  right?

17    MR. MASSEY:  Right.

18    THE COURT:  And now, I will put it on the record.

19    MR. MASSEY:  Yes, Your Honor.

20    THE COURT:  You can hand that up to Mr. Alexander.

21  Make sure it is in order.

22    Okay.  Now, Mr. Schmidt, what just happened is, you

23  have a right to a hearing, at which time the Government would

24  have to establish that you are the person named in the

25  indictment in the Eastern District of Michigan and because it

1  is an indictment, they just have to prove the issue of

2  identity.

3         Do you follow me?

4         And then, if they could do that, you will be removed

5  to the Eastern District of Michigan.  Your lawyers indicated

6  that you wish to give up your right to that removal hearing.

7         THE DEFENDANT:  Yes.

8         THE COURT:  And to voluntarily go back to Michigan; is

9  that correct?

10        THE DEFENDANT:  Yes.

11        THE COURT:  And you discussed this carefully with your

12  lawyer and understand everything?

13        THE DEFENDANT:  Yes.

14        THE COURT:  And that's a voluntary decision on your

15  part, correct?

16        THE DEFENDANT:  Yes.

17        THE COURT:  I will note for the record there was a

18  delay here because counsel was going over the form with Mr.

19  Schmidt and I will put that on record.  I will accept the

20  waiver of removal hearing and order him removed to the Eastern

21  District of Michigan to answer this indictment.

22        Now, we will get to the issue of detention.  Do you

23  want to proceed here, Counsel?

24        MR. SINGER:  Yes, Your Honor.

25        THE COURT:  Okay.  Mr. Singer, make your proffer.

1           MR. SINGER:  Yes, Your Honor.

2           And some of this will be a little repetitive of what

3    happened last time, but we will put it on the record.

4           THE COURT:  It's all news to me because I am old.

5           MR. SINGER:  Very good, Your Honor.

6           Mr. Schmidt is a German citizen who was born, lives,

7    and works in Germany.  He was arrested here in Miami on January

8    7th.  He is here on vacation for several weeks.  He was

9    traveling back to Germany.  In fact, he was about to get on a

10   flight back to Germany when he was arrested.

11          Mr. Schmidt is charged because he was a Volkswagen

12   executive.  He was, in fact, a Volkswagen executive in charge

13   of its compliance with U.S. emission standards.

14          And the scheme in which Mr. Schmidt is charged is a

15   scheme to import and sell close to 600,000 vehicles here in the

16   U.S.  All of which violated U.S. law because they emitted

17   poisonous gases, particularly, nitrogen oxides into the

18   atmosphere.

19          And the defendants, including Mr. Schmidt, are charged

20   with knowing it and intentionally installing this special

21   software into the vehicle.  So that even though they were

22   polluting the atmosphere it would be hidden from U.S.

23   regulators.  And then, going about and concealing that fact for

24   close to a decade from U.S. regulators.

25          In particular, Mr. Schmidt, who had very good

 1  relations at the time with the principal of U.S. regulators

 2  here in the U.S., the EPA and the California Air Resource

 3  Board.  California has a particularly important spot -- this is

 4  a little bit of a tangent, but a particularly important spot in

 5  terms of emission regulations.

 6          It actually predated the EPA.  So the EPA and CARB

 7  share responsibilities in terms of regulating emission

 8  standards in the U.S.  They work very closely together.

 9          In any event, Mr. Schmidt, as head of the office in

10  Michigan that was responsible for complying with U.S.

11  emissions, Mr. Schmidt was the head of that office.  He dealt

12  with the EPA and CARB routinely.

13          And when there was an independent third party study

14  that was produced back in 2014, it identified huge

15  discrepancies between what the cars were supposed to be doing

16  on a test stand and what they were actually doing on the road.

17  Sometimes the cars, when tested, were emitting up to 35 times

18  the amount of NOx that they were supposed to.

19          THE COURT:  When they were tested by a non government

20  independent agency.

21          MR. SINGER:  An independent agency which did not --

22  see, another interesting thing about U.S. emission regulations,

23  which I learned, is that the testers at the EPA and CARB always

24  use the exact same tests every year.  And the industry knows it

25  and it doesn't make it that hard to cheat, unfortunately, and

1  that's what happened.  And so the independent testers used

2  different tests and found out that if it wasn't being driven

3  exactly the same --

4        THE COURT:  Well, just so I understand, and correct

5  me, but the tested cars when they were being officially tested,

6  there was software that could turn itself on and off.

7            Is that accurate or inaccurate?

8        MR. SINGER:  There's accurate, Your Honor.

9        THE COURT:  So when it was tested by the Government,

10  the software turned the emissions control on.

11        MR. SINGER:  That's exactly right, Your Honor.

12        THE COURT:  Okay.  And so it did not make any

13  difference what the Government's test was, what kind of test --

14  oh, you are saying the software was designed to deal with the

15  same test?

16        MR. SINGER:  Exactly, Your Honor.

17        THE COURT:  Okay.  All right.

18        MR. SINGER:  The software was designed to detect the

19  test and they knew what the test was going to be.

20        THE COURT:  Okay.

21        MR. SINGER:  But, in any event, after following this

22  third party test, the U.S. regulators started asking a lot of

23  questions to Volkswagen.  And Mr. Schmidt was directly involved

24  in the response to those questions.

25            And the Government has strong proof that Mr. Schmidt,

1   during that time period, knew that there was this illegal

2   software in the engine and met personally with high ranking

3   CARB officials and --

4           THE COURT:  CARB officials?

5           MR. SINGER:  CARB; California Air Resource Board

6   officials.

7           THE COURT:  Okay.

8           MR. SINGER:  And told them that there were

9   abnormalities or irregularities, but did not disclose the

10  intentional cheating.  And Mr. Schmidt helped continue to

11  conceal the cars, all while trying to sell more diesel vehicles

12  here in the U.S.

13          Yesterday the Government announced that it reached an

14  agreement with a company in this case.  The company has agreed

15  to pay 2.8 billion dollars as a result of its criminal conduct.

16  I think that gives you an idea of the magnitude of the loss and

17  the harm in this case.

18          The grand jury returned an indictment yesterday

19  against Mr. Schmidt and five other individuals, all of whom are

20  currently in Germany.  Mr. Schmidt is the only person that was

21  indicted who is here in the United States.

22          Mr. Schmidt was charged with one count of conspiracy

23  under 18 U.S.C. 371.  He was charged with two counts of false

24  statements under the Clear Air Act and he was charged with

25  eight counts of wire fraud.

1        Mr. Schmidt, in terms of statutory maximum, is looking

2   at 169 years in prison.  Obviously, he is unlikely to receive

3   exactly that sentence, but his guidelines are off the chart due

4   to the size of the scheme and his role in the scheme.

5        Needless to say, that provides Mr. Schmidt with a

6   powerful incentive not to stand trial on those charges.  The

7   Government's evidence consists of cooperating witnesses who can

8   personally identify Mr. Schmidt as participating in meetings

9   with the defeat device is openly discussed, in which hiding the

10  defeat device is openly discussed, in which the idea of being

11  indicted for this conduct is openly discussed.

12       Mr. Schmidt, there are also contemporaneous documents

13  to support all of that, many of which are e-mails that Mr.

14  Schmidt wrote, which the Government was able to obtain from the

15  company and from other sources.  So the proof against Mr.

16  Schmidt is also strong.

17       Again, Mr. Schmidt is a German citizen.  Under the

18  German version of the Constitution they will not extradite.  It

19  is not waivable.

20       If Mr. Schmidt were able to go back home where all of

21  his family resides, at least the family that he has any contact

22  with resides, he would not be able to be extradited.

23       We understand from the representations made, both at

24  the last hearing and other information we've obtained that Mr.

25  Schmidt does have some properties here in Florida.  He has

1  seven properties.  Our valuation of those properties, based on

2  an independent assessment, is that they are worth less than

3  $400,000 combined.

4          We have pictures of the properties, Judge, and I think

5  frankly the values of the properties kind of speak for

6  themselves, but we are happy to show you the pictures if you

7  want, to give you some idea of what kind of assets Mr. Schmidt

8  is actually pledging here.  What kind of skin in the game he

9  would have but --

10          THE COURT:  What kind of what?

11          MR. SINGER:  What kind of skin in the game that Mr.

12  Schmidt would have.  In other words if he left these properties

13  behind, I don't think he would be heartbroken.

14          Now, at the last hearing there was a case --

15          THE COURT:  I have think the emission control just

16  went off on your microphone.

17          MR. SINGER:  It did.  Maybe that's a signal.

18          But at the last hearing, Mr. Couriel brought up a case

19  involving a Swiss national.  You may remember this, the Raoul

20  Weil case.  And I was not familiar with that case at the

21  hearing, but I have gone back and looked at it.  And it was

22  represented to Your Honor as being similar to this case and in

23  some aspects it is.

24          It was a case here in the Southern District of Florida

25  in front of Judge Marra and Mr. Weil was charged in a large tax

 1  fraud scheme and Mr. Weil was a Swiss citizen, but there are

 2  some very important distinctions after that.

 3         Number one, Mr. Weil had executed an enforceable

 4  waiver so that if he went back to Switzerland he would have

 5  been extradited.

 6         Number two, Mr. Weil put up four million dollars in

 7  cash.  He put up a one million dollar secured bond.  His wife

 8  co-signed a nine million dollar personal surety bond and he had

 9  two U.S. citizens who pledged over $500,000 in secured assets.

10         In addition, Mr. Weil was charged with one count of

11  false statements that had a five-year statutory maximum.  That

12  was his maximum exposure in the case.

13         And finally, the Government did not contest the bond

14  as proposed.  So while it does have some similarities --

15         THE COURT:  -- exactly a point in the case right?

16         MR. SINGER:  Your Honor, I would say there are

17  significant differences.  And I actually spoke to defense

18  counsel on that case just to make sure I had my facts right

19  before representing it to you.

20         THE COURT:  Who was defense counsel?

21         MR. SINGER:  And individual named Aaron Marcu, who

22  also happens to represent Volkswagen in this matter.  He is a

23  very talented defense attorney.

24         In any event, Your Honor, we, in our memo that was

25  submitted to the Court, listed a number of cases walking

1  through why detention is appropriate here.  It is the only

2  means to secure Mr. Schmidt's appearance under the

3  circumstances.  And we respectfully submit that detention is

4  appropriate.

5          I was remiss on one point.  Counsel made a point last

6  time that Mr. Schmidt had tried to cooperate with the

7  Government in this case as a factor in militating against

8  detention.

9          And it is important to note that a bond is --

10  essentially being released on bond is essentially a matter of

11  trust, but there is some trust involved.  And I think a couple

12  of things should be noted in this regard.

13          Number one, the very crime that Mr. Schmidt is alleged

14  to have committed, and in particular his role, is lying to the

15  U.S. Government.  That is what he has alleged to have done.

16  That's what the Grand Jury returned an indictment about.

17          Number two, when Mr. Schmidt did meet with us, he

18  purported to be a cooperative, but what he did is he exculpated

19  himself and attempted to deceive the Government.

20          And at the time, counsel was correct.  It was very

21  early on in the investigation.  We didn't know if Mr. Schmidt

22  was telling the truth or not.

23          Subsequently , we've been able to talk to a number of

24  other witnesses and have been able to obtain documents that

25  shows that Mr. Schmidt, when he met with us, lied to us.

1    And third, just recently, we obtained evidence that

2  Mr. Schmidt, in fact, after this scandal broke, Mr. Schmidt

3  destroyed relevant documents, even though he had received a

4  litigation hold telling him explicitly not to destroy documents

5  and we obtained forensic evidence that shows that.

6    In short, Your Honor, I don't think Mr. Schmidt, under

7  the circumstances, is someone to be trusted to return given the

8  incentives he has to flee.

9    Thank you, Your Honor.

10    THE COURT:  Counsel, my compliments on your

11  preparation.  It was a very helpful presentation.

12    Let me ask you this.  You are requesting detention

13  under the Bail Reform Act?

14    MR. SINGER:  Yes, Your Honor.

15    THE COURT:  This is not this person's trial.

16    The only question before me are whether there are

17  conditions of release that I could set that would reasonably

18  assure his appearance in court as required.

19    And secondly, whether he is a danger to the community.

20  I do not think that factor is at play here.

21    Now, under the Bail Reform Act, what I understand you

22  are arguing under the factors of the Bail Reform Act you are

23  arguing these factors:

24    Nature of the crime, serious crime;

25    Strength of the Government's case.  Your argument is a

1  strong case;

2        The penalty he could face upon conviction, which if

3  substantial, could be an incentive to flee;

4        Four, ties or lack thereof to this country.  He's a

5  citizen of Germany, which does not have an extradition treaty;

6        Five, you are arguing, he has destroyed evidence.  For

7  that kind of conduct, which reflects upon his character.

8        Now, do you disagree or do you want to add anything by

9  my summarizing the applicable law to the facts in this case

10  under the Bail Reform Act?

11        MR. SINGER:  No, Your Honor.  I think you put the law

12  in better than I did.  Thank you.

13        THE COURT:  I doubt that, but Counsel.

14        MR. MASSEY:  Thank you, Your Honor.

15        There is really nothing new in Mr. Singer's

16  presentation today, as compared to Monday, even though he has a

17  written motion and he now has an indictment.

18        Your Honor as --

19        THE COURT:  He did save the Government money, though,

20  because it is printed on both sides, right?

21        MR. SINGER:  Yes, Your Honor.

22        MR. MASSEY:  Your Honor, as Pretrial has found here,

23  Mr. Schmidt is highly bailable under the Bail Reform Act.

24        The Government we believe -- and we will save this for

25  another day -- has overreached on the charge.  They have also

1  overreached on their bail argument.

2         Here's a man with no criminal record whatsoever, with

3  properties in the United States, seven properties of

4  substantial value as compared to his net worth, with many

5  friends in the United States.  Some of whom came last time and

6  some of whom are here today again and who came to the --

7         THE COURT:  We have people in court that are here to

8  support your client, correct?

9         MR. MASSEY:  Yes, Your Honor.

10         THE COURT:  May I have just a raise of hands to put

11  that on the record.  So I am seeing, one, two, three, four,

12  five, six; is that right?

13         We will put on the record I see six people here in

14  support of the client.  The reason I am saying that is because

15  we are making a record here and I want the record to reflect

16  that.

17         MR. MASSEY:  Thank you, Your Honor.

18         THE COURT:  You are free to call anybody you want, but

19  I want to put that on the record.

20         MR. MASSEY:  And if I could point out, also, Your

21  Honor, I am not sure that those six included the Consul of

22  Germany and two or three of her assistants; is that correct?

23         THE COURT:  Do we have the Consul of Germany and any

24  assistants?  Okay.  That was four of the six.

25         MR. MASSEY:  Thank you.

1          THE COURT:  Do we have a Consul in Miami?  No?  Yes?

2   Where is the Consulate located?

3          MR. MASSEY:  Your Honor, this is four people in

4   addition to the six.  There were four people seated in front of

5   the six.

6          THE COURT:  Okay.  I am telling you what I saw.  I saw

7   six hands raised.  I do not want to get into nitpicking.

8          MR. MASSEY:  Thank you.

9          THE COURT:  Now, there are people from the Consulate.

10  Is there a German Consul in Miami?

11         MR. MASSEY:  Yes.  There is a Consul General and a

12  Consulate in Miami.

13         THE COURT:  Okay.

14         MR. MASSEY:  And so, Your Honor, a person who came to

15  this country, knowing he was understand investigation, knowing

16  full well that he could be arrested and who has friends and

17  property here, should not be detained on the grounds that he is

18  a German national.  That really is the primary grounds on which

19  they are seeking detention.

20         And there certainly are conditions that can reasonably

21  assure his appearance here in Miami or in Detroit when we go to

22  Detroit.  He has a proven willingness to submit to United

23  States authority, which I will describe in detail.

24         And Your Honor, Mr. Singer accurately described the

25  law, but it is very important to note that what they're really

1  asking for is a shift of presumption.  The law, of course, has

2  a presumption of bail and that applies equally to Germans as to

3  anybody else.

4        But the position they are basically taking is one

5  taken to its logical conclusion would be that all Germans,

6  Swiss, French, Greek citizens, all countries that don't

7  extradite their own nationals.  I am sure there are many more.

8        If they are facing a white collar case with any kind

9  of jail time, or really frankly any kind of case with jail

10  time, they should be detained.

11       Courts have rejected that, as I will describe in a

12  minute, and Your Honor should reject that.

13       And I think the presence of the Consul General and

14  three of her assistants here should reflect this is a matter of

15  concern to the German government and I could certainly

16  understand why it is.

17       Your Honor, he talked about the Weil case and I will

18  talk about that, but there are many other precedents, including

19  some in this district, for releasing foreign nationals and

20  rejecting the argument that a person from Germany, Switzerland,

21  et cetera, non extraditable countries, should be detained

22  primarily on that basis.

23       One is Mr. Bagios; B-A-G-I-O-S, Christos Bagios.  As

24  it happens, my firm and Mr. Couriel's firm represented him here

25  in the Southern District of Florida.  Mr. Bagios, his bail

```
1   application was decided by Judge Rosenbaum.  And we can hand up
2   Judge Rosenbaum's decision in a transcript, which is very
3   squarely on all fours with this case.
4        That's one where he was a Greek national, Swiss
5   resident, no extradition from either one of those countries in
6   that case.  The Government said no ties to the U.S., no
7   friends, no family, no assets, and facing substantial jail
8   time.
9        What did Judge Rosenbaum say?  I don't want to punish
10  him for being a foreign national.  Closed quote.  Let him out.
11  He was bailed.
12       There is a case in the Southern District of New York,
13  which we will hand up in a West Law opinion, Mr. Bodmer;
14  B-O-D-M-E-R.  In a very big FCPA case in the Southern District
15  of New York.
16            THE COURT:  What is FCPA?
17            MR. MASSEY:  FCPA; Foreign Corrupt Practices Act.
18            THE COURT:  Okay.
19            MR. MASSEY:  In a case --
20            THE COURT:  That's sort of like CARB.  You guys use
21  these nomenclatures.
22            MR. MASSEY:  So Your Honor, the District Court in that
23  case squarely rejected the same argument that Mr. Singer is
24  making here that a foreign national in that case, a Swiss
25  national, because he couldn't be extradited from Switzerland
```

1  should be detained.

2  Judge Scheindlin in the Southern District of New York

3  found, quote, this argument alone -- the one I just made --

4  cannot be a basis for denying bail because if taken to its

5  logical conclusion no Swiss national would ever be eligible for

6  bail, closed quote.

7  And the Court also stressed the difference between

8  evidence and speculation.  And Your Honor, that is what we have

9  here in this case, speculation.  We have speculation that he

10  would flee based on what Mr. Singer believes are his incentives

11  and based on what Mr. Singer alleges is his conduct in the

12  past.

13  But, Your Honor, as in the Bodmer case, fleeing would

14  ruin Mr. Schmidt financially.  And he has shown, unlike in that

15  case where Bodmer was arrested in South Korea, has shown a

16  willingness to submit to the jurisdiction of the United States.

17  Just briefly on the Raoul Weil case, Your Honor.  That

18  case is comparable to this case.  I don't know Mr. Weil's net

19  worth.  That is a large bond, but as a percentage of his net

20  worth, Mr. Schmidt will be offering a large amount of money.

21  And as, of course, Your Honor knows, that's the test

22  and not the question of the absolute dollar value.

23  We have two friends who are willing to put up --

24  THE COURT:  That's a very good argument, by the way.

25  There are very good lawyers here.

1        MR. MASSEY:  Thank you.

2        THE COURT:  You are building a percentage of his net

3   worth as opposed to Weil who probably was much richer, right?

4   That's your argument?

5        MR. MASSEY:  Yes, Your Honor.

6        THE COURT:  Good argument.

7        MR. MASSEY:  Thank you.

8        And very significantly, Your Honor, Mr. Weil was

9   acquitted in this Court.  So the Government's position was he

10  should stay in jail for the year it would take for Mr. Marcu

11  and the law firm --

12       THE COURT:  I'm sorry.  When the bond was set was he

13  awaiting trial or was this post trial?

14       MR. MASSEY:  No, it was pretrial.

15       THE COURT:  Okay.  And then, he went on to be

16  acquitted?

17       MR. MASSEY:  Yes, he went on to be acquitted.

18       THE COURT:  And you are representing that your client

19  is going to go on to be acquitted?

20       MR. MASSEY:  Yes.

21       And Your Honor, very importantly, Mr. Singer argued

22  that Weil -- that it was agreed to, that the bail package was

23  agreed to in that case.  The Government didn't detest and seek

24  detention.

25       Well, that, Your Honor, of course, is because Mr. Weil

1  was arrested in Italy.  He waived extradition and it is very

2  common in these types of cases to make a deal where, in

3  exchange for waiving extradition, you come to the district and

4  you are going to be bailed when you get here, or the Government

5  guarantees that it will recommend bail and, of course, it is up

6  to the Judge.

7           So, in that case, Your Honor, Mr. Weil would have been

8  in jail here in the district for a year pending trial and then

9  get acquitted.  In a case where there was a huge amount of

10  discovery and it was quite complicated.

11          Kobre and Kim represented Mr. Weil, alongside Mr.

12  Marcu, and it was critical.  From speaking to the lawyers, I

13  know it was critical to his defense to be out on bail as it

14  will be to the defense of Mr. Schmidt.

15          There are many other cases, Your Honor, a couple that

16  they cite.  There are at least nine Swiss bankers in the

17  Southern District of Florida, the Eastern District of Virginia

18  that have been permitted to remain out on bail.  Many pending

19  sentencing.  Some cooperators.  Some not cooperators.

20          I guess if we brief all this further, we will all

21  collect all the cases, Your Honor, where courts have purely

22  rejected this basic principal that they're putting forward.

23          And Your Honor, one important thing.  Mr. Schmidt has

24  more significant ties to the United States than those

25  individuals did.  Mr. Bagios, Mr. Weil, et cetera, had very

1  little in the way of ties.  I should talk now about those ties.

2         Seven properties in the Miami area.  As a side note,

3  the Government with its investigation of this matter, which has

4  occupied the time and expense of many agents and many

5  prosecutors, as Your Honor heard on Monday, was only able to

6  find a single property in his name in the Miami area, which is

7  a little bit surprising and jarring.

8         And it gives us concern that they haven't found all of

9  the exculpatory information about Mr. Schmidt in the voluminous

10  record here to date, but I guess they found them now.  They are

11  easily findable.  There are seven properties.  I am sorry if

12  Mr. Singer didn't like the pictures, but there are two aspects

13  to this that are important.

14         One is that the value is approximately $400,000, as we

15  show in a table that we will hand up to Your Honor in a moment.

16  That is a little less than half of his net worth.

17         He is a German national who has worked and lived in

18  the U.S. for a total of about five years and decided on his own

19  to put up about half of his net worth, a little less, in

20  property in the U.S., rental property, that he would agree to

21  -- that would be essentially his retirement plan for him to

22  live in the United States down the road.

23         Mr. Schmidt was also married in Florida in 2010.  We

24  have photographs, which we can show Your Honor of him being

25  married in a Volkswagen dealership with all of his friends

1  around.  You can see an exit sign in the back so you can see it

2  was in the U.S.

3        THE COURT:  Sign and drive, right?

4        MR. MASSEY:  Yes, Your Honor.

5        And Mr. Schmidt has spent the Christmas holidays every

6  year since 2008 here in the United States with close friends,

7  some of whom are in the courtroom.

8        We have pictures from 2008, 2009, 2010, 2011, et

9  cetera.  All these years showing the friends that he has come

10  to visit each year, including this year, the year he came

11  knowing he was under investigation.  And last year, the year

12  that he came after having been interviewed by Government

13  agents.

14        He also met, not only met and reached out, as I said,

15  on Monday on his own.  Having heard that there was an

16  investigation, reached out.  He went to London without counsel,

17  without getting advice by Volkswagen lawyers, which is

18  completely unheard of for someone to do and submitted to the

19  authority of the U.S.

20        Then, met with agents a month later in Detroit to

21  collect money.  To reimburse his expenses.  Had he believed

22  that he had lied, why would he have done that and met agents.

23        In any event, he is submitting himself again to the

24  U.S. authority in Detroit.  He has no children pulling him back

25  to Germany.  His wife can certainly come and visit him here in

1  the United States under the proposal that we will make.

2         Your Honor, I have said this, but I want to stress how

3  much evidence shows that he is willing to submit to the

4  authority of the United States.  He came to the U.S.  He

5  crossed the border four times in December of '16 and January of

6  '17 and was going to cross the border for a fourth time knowing

7  that he was under investigation.

8         He, as I said, reached out --

9         THE COURT:  He crossed the border.  What do you mean?

10        MR. MASSEY:  What is that?

11        THE COURT:  You said he crossed the border.

12        MR. MASSEY:  Oh, he came -- there are two parts to his

13 vacation.  He came into Miami and flew out to Cuba to visit

14 because he never --

15        THE COURT:  I'm sorry.  Where did he come --

16        MR. MASSEY:  He came in from Germany into Miami.

17        THE COURT:  And then went where?

18        MR. MASSEY:  And then, went to Cuba for vacation.  He

19 had never been there before.

20        THE COURT:  I have had a lot of defendants in 30 years

21 that have gone to Cuba after their initial appearance in front

22 of me.

23        MR. MASSEY:  I understand that, Your Honor.

24        Mr. Schmidt had never been to Cuba and doesn't intend

25 to go back to Cuba.  He went to Cuba for vacation.  It is no

1  different from going to any other place.  It is now open and
2  available to --
3           THE COURT:  Better not say that in Miami.
4           MR. MASSEY:  Your Honor, he has no plans to flee to
5  Cuba and no ability to flee to Cuba any more than any other
6  place.  He won't have his passport.
7           He came back.  He wasn't fleeing to Cuba.  He came
8  back to spend time with all of his friends in the area.
9           THE COURT:  Back here to the Southern District of
10 Florida?
11          MR. MASSEY:  Yes, Your Honor.
12          Christmas and New Years, as he regularly does.
13          THE COURT:  Yes.
14          MR. MASSEY:  And was leaving on January 7th, at which
15 time, he was arrested.
16          He believed that knowing that he was under
17 investigation, he believed that if he was to be charged, he
18 wanted to face the charges and deal with the charges and not be
19 locked in sort of the nation of Germany.
20          As nice as the country is, he could never leave
21 Germany because all the countries around it, France, et cetera,
22 would have red notices and he would get picked up in those
23 countries and come back just as Mr. Weil did.
24          So that's the evidence that Your Honor should
25 consider.  His proven willingness to submit to U.S. authority,

1  rather than the speculation that the Government offers, which

2  is that based on his incentives, or Mr. Singer's perceptions of

3  his incentives, he wouldn't come back.

4          Now, the Government also has just claimed that he lied

5  in London and destroyed documents.  Neither of these points are

6  convincing.  We have many things to say about them on the

7  merits, which I will save for another day.

8          One reason they are not convincing is that the

9  Government didn't charge him with either one of those things.

10 They didn't charge him with destroying documents.

11         THE COURT:  Can I just ask a question about that?

12         MR. MASSEY:  Yes, Your Honor.

13         THE COURT:  But, yes, he has been indicted, correct?

14 This is not like a complaint where you're just in a holding

15 pattern.

16         MR. MASSEY:  Correct.

17         THE COURT:  He has been indicted.

18         MR. MASSEY:  Correct.

19         THE COURT:  And so, you're saying now that he has been

20 indicted and taken before the Grand Jury and they have not

21 included the obstruction of evidence charge?

22         MR. MASSEY:  Yes.

23         THE COURT:  That is your point?

24         MR. MASSEY:  The Government passed twice on the

25 opportunity to charge him with 1001 for lying in London and

1  with obstruction of justice for deleting documents.

2       THE COURT:  The Government has represented that he has

3  destroyed evidence?

4       MR. MASSEY:  Yes, Your Honor.

5       We dispute that.  Mr. Schmidt had advice from lawyers.

6  He had advice from IT at the time.

7       THE COURT:  Why does that ring a bell about the

8  alleged obstruction of e-mails?

9       Go ahead.

10       MR. MASSEY:  Your Honor, this is not a reason to

11  detain him.  These two questions of --

12       THE COURT:  Well, let's make the record clear.

13       I don't want to -- but if he is charged with

14  destroying e-mails, if there is a notice of investigation --

15  let me ask the Government.

16       Was there a subpoena or anything like that or --

17       MR. SINGER:  Your Honor, Volkswagen's legal counsel

18  issued a litigation hold which Mr. Schmidt was sent on

19  September 1st.

20       THE COURT:  I see.  Okay.

21       MR. SINGER:  And I could go into all the facts.

22       THE COURT:  Okay.

23       MR. MASSEY:  And we have responses to all those facts.

24       THE COURT:  You are denying that?

25       MR. MASSEY:  We're denying that he intentionally

1  destroyed --

2          THE COURT:  I see.

3          MR. MASSEY:  -- or deleted documents for the purposes

4  of keeping them away from the Government in the investigation.

5          THE COURT:  Okay.

6          MR. MASSEY:  Yes, Your Honor.

7          Briefly, Your Honor, on the strength of the evidence.

8  The evidence against Mr. Schmidt is not strong.  This is not as

9  important a factor, compared to his lack of criminal history

10  and his willingness to submit to U.S. authority.  This is a

11  very important and unusual point, Your Honor.

12          The law firm representing the advisory board of the

13  company has interviewed Mr. Schmidt four times.  Three times

14  without counsel.  One time with counsel, with me in Berlin for

15  almost 12 hours.  The last interview was in November of 2016.

16  That firm did not, apparently, or there is no -- he remains

17  employed by Volkswagen.

18          At least eleven other individuals, employees of

19  Volkswagen generally high level executives, unlike Mr. Schmidt

20  -- I will get to that in a second -- have been separated,

21  resigned, or dismissed starting with the CEO after and part of

22  the result of this investigation.

23          The law firm, as you know, recommend firing people and

24  here they have clearly done that.  Jones Day, the law firm, has

25  not recommended firing Mr. Schmidt.  He remains employed.  We

1  have confirmed that.  He still has his job, unlike these other

2  individuals.

3       Your Honor, he has also alleged to have joined the

4  conspiracy eight or nine years after it began.  So contrary to

5  what Mr. Singer said, he suggested to you that Mr. Schmidt was

6  part of a scheme to install the software and to do all that.

7       Mr. Schmidt, was nowhere near these diesel engines or

8  the certification process when this process began.  Most of the

9  model years that are at issue -- this is done model year by

10 model year as Your Honor read -- were long since passed by the

11 time Mr. Schmidt took the position in the United States that

12 they are addressing in the indictment.

13      He was not an expert on certification or diesel

14 engines.  He's a gasoline guy.  That's an important distinction

15 in Volkswagen.  You're a gas guy or a diesel guy.  He was a gas

16 guy.  He was a spokesperson to regulators.  And he relied in

17 good faith on what others told him and at times he relied on

18 instructions from lawyers.

19      The Government has cherry-picked quotes and they have

20 exaggerated his role.  And I could give a couple of examples of

21 that, Your Honor.

22      Mr. Singer has repeatedly said, both on Monday and

23 again today, that Mr. Schmidt was an executive.  Oliver was not

24 an executive, in the way we understand that term.  He was a

25 general manager.  He was two levels down from executive.

1        The executive level really starts at the vice

2   president level.  Mr. Schmidt reported to a director who

3   reported to the vice president.  He wasn't paid like a

4   director.  He did not have the authority of an investigative.

5   He didn't have the signing authority that you would associate

6   with an executive.

7        Again, this is the kind of information the Government

8   has access to and they get it wrong.  It doesn't give us much

9   confidence about their ability to find the exculpatory evidence

10  about Mr. Schmidt about which there is a great deal in this

11  voluminous record.

12       Briefly, with respect to one of the facts.  They talk

13  about a couple of meetings in August of 2015.  One of them is a

14  meeting on August 5th.  He went into a meeting on August 5th

15  with instructions from counsel.  I will leave it at that for

16  now.

17       On August 19th, they allege that Mr. Schmidt and

18  others developed a plan to lie at a key meeting, but then they

19  suggest that a confidential informant or CW number one sort of

20  saved the day and was the white knight here and told the truth

21  to the regulators.

22       What they leave out is that Mr. Schmidt was there for

23  that meeting.  He fully supported the telling of this sort of

24  disclosure that was made at that meeting.  He was part of a

25  group that agreed in advance about that disclosure at the

1  meeting.  So they have, again, omitted that important

2  exculpatory information.

3           Your Honor, I know I am taking a lot of time but --

4           THE COURT:  Take as much time as you need, Counsel.

5           MR. MASSEY:  -- this is very important to Mr. Schmidt.

6           Sentencing risk is something that I would like to talk

7  about for a second.  I think the Government, again, greatly

8  exaggerates that.

9           Of course this is a serious matter.  We don't dispute

10 that.  He understood that when he traveled here.  He understood

11 the risk of traveling here while a serious matter was being

12 investigated, but he is not facing a life sentence.

13          The guidelines, I mean, the notion that the guidelines

14 are off the charts reflect this mechanistic, oh, pull out

15 2(b)1.2.  I find it is ten billion dollars and so we're off the

16 charts.  We are in the realm of life.  There is no mandatory

17 minimum here.  There is no -- the idea that this could result

18 in a life sentence is preposterous, Your Honor.

19          Deterrence won't be a factor at sentencing.

20 Volkswagen has just pled guilty.  They paid four billion

21 dollars.  The Government has been made whole.  Cars have been

22 returned.  Consumers are being made whole.  He has no ability

23 to commit any kind of offense like this again and general

24 deterrence is completely satisfied.

25          He has also alleged to have joined, as I said earlier,

1   eight or nine years in.  So most of the model years that would

2   get them to this big number are model years that wouldn't be

3   attributable to him for purposes of relevant conduct

4   calculations under 1(b)1.3 of the guidelines because those

5   guidelines the commentary clearly says, as Your Honor knows,

6   conduct that is sort of water under bridge.

7          Like if you join a drug conspiracy that are dealing

8   five kilos a week, you join the next week, you are not tagged

9   with the five kilos from the previous weeks before you joined

10  even if you know about that weight.

11         Your Honor, the loss amount is also -- this figure is

12  also greatly exaggerated for another reason.  And that is that

13  they are basically taking -- as I think they are just taking

14  gross sales revenue on cars.

15         Like 600,000 cars and multiplying it by, I guess they

16  are averaging about $25,000, $30,000 for a car, but they're

17  treating it as though the customer has got inoperable cars, or

18  got a phantom and just had their money stolen and just lost

19  everything, like a Madoff kind of investment scam.

20         The measure of loss should be much less than that.

21  The measure of loss should be something like, you know, the

22  reduced value of the car compared to what it would have been,

23  or the inconvenience to the customer once the --

24         THE COURT:  I don't want to nitpick with you.  You are

25  making excellent arguments.

1        MR. MASSEY:  Thank you.

2        THE COURT:  And I would not argue that because what is

3   the value of these pollutants being put into the air?

4        MR. MASSEY:  There is a point.

5        You have a point, Your Honor and the Government has a

6   point, but that is not going to generate in an environmental

7   crime kind of case.  If you look at other pollutant cases or

8   environmental crime cases, they don't yield sentences that are

9   off the charts.

10       A few other factors, Your Honor.  Again, no criminal

11  history.  No evidence.  He doesn't have the ability or means to

12  flee.  No cash hoard.  No fake I.D.s.

13       THE COURT:  No means to flee.

14       MR. MASSEY:  Yes.

15       THE COURT:  Again, I am just letting you develop your

16  arguments.

17       MR. MASSEY:  Yes.

18       THE COURT:  Of course he's got the means to flee.

19       He has been traveling.  You said yourself, he has been

20  across the border to Cuba and Europe and he has to --

21       MR. MASSEY:  Well, he wouldn't have his passport.  He

22  wouldn't have his I.D.s.  They could take away his credit

23  cards.  They to take away his cash card.  They could give him

24  $100 in cash to buy, you know, food for the week or, something.

25       THE COURT:  Right.

1          MR. MASSEY:  We could agree to conditions like that.

2          But, in other cases, including the Bodmer case where

3   the Government loss, they allege that the 2.4 million dollars

4   that he had in net worth against which there was a bond of

5   about 1.5 that that wasn't all the money he had.  That he had a

6   lot more.

7          The Government here is not alleging that Mr. Schmidt

8   has a lot more.  I will come back to, in a minute, all the

9   assets that he has that are correctly described in Pretrial,

10   but there is no money stashed in the Swiss bank account that

11   the Government has sometimes argued as a basis for detention.

12          So, as I've said before, when you've got someone with

13   no passport, no more ability than you or I to, you know, walk

14   across the border from like upper peninsula of Michigan up

15   through Canada into the woods and knock on a door of a farm and

16   say can you help get me to Germany on a flight.

17          You cannot fly these days without a passport into

18   Europe.  It's just not possible.  He's not going to do it.

19   He's not going to try.  He knows he would get caught.  How long

20   do you think Mr. Schmidt would last in the woods in Canada?  I

21   don't think very long.  He's not going to try it, Your Honor.

22          THE COURT:  That is the first argument like that.  How

23   long would Mr. Schmidt last in the woods?

24          MR. MASSEY:  Two minutes, Your Honor.

25          THE COURT:  Okay.

1          MR. MASSEY:  There would be red notices all over the

2     place.  All over Europe.  All over continental Europe and

3     Canada.

4          It is pure speculation that he would flee as against

5     the demonstrated willingness that he has to submit to U.S.

6     authority through multiple interviews, meetings in the United

7     States, et cetera.

8          By the way, I forgot to mention, through counsel he

9     offered to meet with the Government again in November of 2016.

10    That offer was declined.  We would have flown here to do that

11    meeting.  They haven't asked, but he may be willing to meet.

12    Even now, they should have asked for a meeting rather than

13    arrest him.

14         So, Your Honor, the strong weight of the evidence is

15    in favor of release.  And there certainly are conditions that

16    can reasonably assure his appearance here or in Detroit.  If I

17    may, Your Honor, I would suggest some of those conditions.

18         The conditions that are in the Pretrial Services

19    Report where they recommend release are all fine for us.  He

20    would surrender I.D.s.  He would agree to waive extradition

21    from any country in the world.

22         There are some countries where that would be

23    effective.  I don't know if it would be effective in Germany.

24    Maybe not, but it would be sort of an affidavit on his part

25    that he would be sort of lying and contradicting if he

 1  eventually opposed extradition.

 2          The bond could be co-signed by two friends who are

 3  here in court and who were here on Monday.  They are also

 4  willing to put up some property, which I will come back to in a

 5  minute.

 6          THE COURT:  He has four friends here and two people

 7  from the Consulate; is that correct?

 8          MR. MASSEY:  Your Honor, I believe we have six friends

 9  and four from the Consulate.

10          THE COURT:  Could I once again have a raise of hands

11  to see everybody.  Consul and non consul that are here on

12  behalf of the -- okay.  Thank you very much.

13          MR. MASSEY:  Okay.  I counted ten hands, Your Honor.

14          THE COURT:  I counted nine but --

15          MR. MASSEY:  Including his wife.

16          So we will back to those properties, but we have

17  friends who will put skin in the game.

18          THE COURT:  What is this skin in the game stuff?

19  Where is this coming from?

20          MR. MASSEY:  I am just borrowing from Mr. Singer here.

21          THE COURT:  Okay.

22          MR. MASSEY:  Home detention at the home in the Miami

23  area of one of those close friends.

24          THE COURT:  All right.

25          MR. MASSEY:  We checked.  There is a landline,

1  electronic monitoring.  All of that.

2       Traveling limited as would be typical.  A date certain

3  for his appearance in Detroit would be satisfactory.  Daily

4  in-person meetings with Officer Peralta (phonetic) who

5  recommended release.

6       And then, if I may, Your Honor, talk about some of the

7  properties.  So we have something which we can hand up or I can

8  describe, but there is one property -- well, there are seven

9  properties with an unmortgaged -- with a total value we

10 estimate of $400,041.  There is a mortgage on one of them

11 yielding about -- I'm sorry -- $400,000 net of mortgage.  That

12 is apartments owned by Mr. Schmidt and his wife.

13      In addition, there are two friends who are willing to

14 put up apartments with estimated market value, post mortgage,

15 or net of mortgage of $116,000 and we think that is sufficient,

16 Your Honor.

17      As a percentage of Mr. Schmidt's net worth that would

18 be more than half of his net worth.  His own contribution to

19 that would be 40 percent of his net worth.  The amount of money

20 that he placed here in the U.S. to prepare for his retirement

21 here in the U.S.

22      In addition, Your Honor, there are bank accounts which

23 we can describe which are in the Pretrial Report.  There are

24 other assets.  His wife has assets.  He has a retirement fund.

25      He also has a German residence that is paid for, but

1  he could get an equity line of credit against it.  We have a

2  letter from the bank and we can hand all this up, Your Honor.

3       We would like to keep it under seal so that no one

4  knocks on the door of the property holders who are just

5  tenants.  I know an agent went out and knocked on the door of

6  one of these friends, which I found a little bit annoying.  I

7  didn't see much of a need for that, but I don't want agents or

8  people knocking on the doors of this property.

9       So, Your Honor, those are conditions that could

10  reasonably assure his appearance in Detroit.

11       THE COURT:  Thank you, Counsel.

12       And let me compliment you.  Your client is extremely

13  well represented and my professional compliments to you.  And

14  your client and his family and friends in the German Consulate

15  ought to know what an outstanding advocate and lawyer Mr.

16  Schmidt has.

17       MR. MASSEY:  Thank you, Your Honor.

18       THE COURT:  Your presentation has been very helpful,

19  persuasive in many respects, and you made an excellent record

20  in this case, which you can get a transcript of everything that

21  has occurred so far.  And that is one of the reasons I noted

22  the presence of Consul, and friends, and family on behalf of

23  Mr. Schmidt.

24       Government, I will assume that you have rebuttal, but

25  I will not allow it.  I do not think it is necessary, but to

1 protect in fairness to the Government so that later on you

2 cannot be criticized by not rebutting stuff, I am not going to

3 allow it because I do not think it is necessary.

4          Fair enough?

5          MR. SINGER:  Yes.

6          THE COURT:  Unless I am missing something tremendous

7 that you need to put on the record.

8          MR. SINGER:  I don't know how you are ruling, Your

9 Honor, but I will accept that.

10          THE COURT:  All right.  Now, as I indicated, this here

11 is a detention hearing under the Bail Reform Act.  Your client

12 is presumed to be innocent and that will be the case regardless

13 of what I do.

14          But, I have to apply the factors I am required to

15 consider by Congress under the Bail Reform Act.  And at the end

16 of the Government's presentation, I indicated the salient

17 factors that I assume were applicable in this particular case.

18          And that remains the case, although you have made a

19 very colorable record here, but I must note that the fact that

20 somebody is in a position where they could commit a very

21 serious white collar crime is not a pass because it was not a

22 serious crime of violence and somebody of a different station

23 in life.

24          This is what they call a white collar crime, but it is

25 a very serious crime.  And I am required to consider the

1   serious nature of the crime pursuant to the Bail Reform Act.

2           For purposes of this hearing he is presumed to be

3   innocent and indeed, you know, this is not the trial.  And

4   based on what I heard, he's got a colorable defense and he is

5   well represented.

6           But, the issue before me is whether there are

7   conditions of release that I could set that would reasonably

8   assure his appearance in court.  And by a preponderance of the

9   evidence, I conclude on this record, that there are not.

10          I am concerned that he is a citizen of a country which

11  does not have an extradition treaty.  This is not a reflection

12  on or any hostility to the great country of Germany, but just

13  that he is a citizen of a European country which does not have

14  an extradition treaty with the United States.

15          And there is no guarantee that a waiver would be

16  effective, although it is noted on the record that apparently

17  he is willing to sign one.

18          I do consider this a serious offense, which the fact I

19  am required to consider it under the Bail Reform Act.  Based on

20  the Government's proffer, I conclude there appears to be a

21  strong case against the Defendant, which is the factor I am

22  required to consider.

23          And while I would agree with you that he is not going

24  to get the death penalty in this case, it is a serious offense,

25  which probably has a serious potential sentencing which under

1  the law is an incentive to flee.

2          So while considering all the factors that I am

3  required to consider under the Bail Reform Act, those are the

4  same factors that I consider, which lead me to the conclusion

5  by a preponderance of the evidence that your client is a risk

6  of flight.  And there are no conditions of release that I could

7  set that would reasonably assure his appearance in court as

8  required.

9          Now, let me note this, I will order him pretrial

10  detained as a risk of flight without bond.  Now counsel, you

11  waive removal to the Eastern District of Michigan.  I believe

12  that the law remains that any appeal from what I have done;

13  lies with the District Court in the Eastern District of

14  Michigan.

15          Now, what you have done is you have made an excellent

16  record in this case.  Another judge could rule differently.  I

17  am doing the best I can by ruling as I am, but you may take me

18  immediately up to appeal to what I have done to the District

19  Court Judge in the Eastern District of Michigan.

20          You have a record, a full record here, and the judge

21  may want to do a *de novo* hearing.  That is the call of the

22  judge in the Eastern District of Michigan, which is the

23  outstanding lawyer that you and Mr. Couriel are, you know, I am

24  sure that time will not be a factor.  No time will be lost in

25  pursuing any appeal if you think it is appropriate.

1       In the meantime, you have a splendid lengthy record in

2  this case.  And as I indicated, your client is very well

3  represented.  This is not his trial.  It is merely a detention

4  hearing.

5       And Government, I compliment you and it is nice to see

6  the Department of Justice having somebody as capable and

7  competent as you presenting the case.  It is very helpful to

8  the Court.

9       MR. SINGER:  Thank you, Your Honor.

10       THE COURT:  Now, is there anything else that I need to

11  do in connection with this matter?

12       MR. MASSEY:  Your Honor, may I --

13       THE COURT:  Yes, anything you would like, Counsel.

14       MR. MASSEY:  We certainly do appreciate Your Honor's

15  thoughtfulness in this decision.  We, of course, will reargue

16  in Michigan.

17       THE COURT:  Of course.

18       MR. MASSEY:  We would ask if Your Honor would consider

19  doing something that would expedite his removal to Michigan,

20  such as ask the Government to do essentially a take-out order.

21  And have agents sort of take him out of the prison, fly him

22  independently, which is something they certainly have done

23  before and should be willing to do.

24       THE COURT:  You want me to do a take-out order?

25       MR. MASSEY:  Essentially, a take-out order and have

1  him go straight to the prison in Detroit and, then, proceed

2  from there.  We could be there next week if you are willing to

3  order that, Your Honor.  I think that would be very reasonable.

4         THE COURT:  Here's what I will do.

5         I have never issued an order to the Marshals other

6  than arrest somebody.

7         Do you follow me?

8         But I entered my order and he has waived removal.

9  Okay.  But Mr. Singer here, you know, is part of the Department

10  of Justice as is the Marshal.

11         Do you follow me?

12         MR. MASSEY:  Yes, Your Honor.

13         THE COURT:  So they are free amongst themselves with

14  your involvement, you know, whatever.  If you want to expedite

15  his transportation, or whatever, they are free to do that.

16         Do you follow me?

17         And you are free to discuss that with Mr. Singer or

18  anybody else and you put it on the record what your request is.

19         And you would call it, being the good lawyer that you

20  are, you want a speedy trial in this matter to prove your

21  client's innocence, correct?

22         MR. MASSEY:  Well, we would like to get up there as

23  quickly as possible, yes.

24         THE COURT:  And Mr. Singer, this is the last case.  I

25  leave and you guys can stay and chat.

```
1              That is something you can agree upon, you know,

2    between you, Mr. Singer, the Marshals and so forth and so on,

3    but I can't issue -- I mean, I am not inclined to issue an

4    order, unless Mr. Singer, would you like me to do something

5    that would be of assistance to you?

6              MR. SINGER:  No, Your Honor.

7              THE COURT:  Okay.  Is there anything else you would

8    like to put on the record, Counsel?

9              MR. MASSEY:  May I have one minute, Your Honor?

10             THE COURT:  Take your time.

11             MR. MASSEY:  No, thank you, Your Honor.

12             THE COURT:  All right.  Thank you all.  Good luck.  We

13   will be in recess.

14             MR. MASSEY:  Thank you.

15             (Thereupon, the proceedings concluded.)

16

17

18

19

20

21

22

23

24

25
```

48

CERTIFICATE

I hereby certify that the foregoing transcript is an accurate transcript of the audio recorded proceedings in the above-entitled matter.

01/13/17                        Bonnie Joy Lewis,
                         Registered Professional Reporter
                           CASE LAW REPORTING, INC.
                           7001 Southwest 13 Street,
                         Pembroke Pines, Florida 33023
                              954-985-8875