# EXHIBIT  F



# Extradition To and From the United States: Overview of the Law and Recent Treaties

**Michael John Garcia**
Legislative Attorney

**Charles Doyle**
Senior Specialist in American Public Law

March 17, 2010

**Congressional Research Service**

7-5700
www.crs.gov
98-958

**CRS Report for Congress**
*Prepared for Members and Committees of Congress*

# Summary

"Extradition" is the formal surrender of a person by a State to another State for prosecution or punishment. Extradition to or from the United States is a creature of treaty. The United States has extradition treaties with over a hundred nations, although they are many countries with which it has no extradition treaty. International terrorism and drug trafficking have made extradition an increasingly important law enforcement tool. This is a brief overview of the adjustments made in recent treaties to accommodate American law enforcement interests, and then a nutshell overview of the federal law governing foreign requests to extradite a fugitive found in this country and a United States request for extradition of a fugitive found in a foreign country.

Extradition treaties are in the nature of a contract and generate the most controversy with respect to those matters for which extradition may not be had. In addition to an explicit list of crimes for which extradition may be granted, most modern extradition treaties also identify various classes of offenses for which extradition may or must be denied. Common among these are provisions excluding purely military and political offenses; capital offenses; crimes that are punishable under only the laws of one of the parties to the treaty; crimes committed outside the country seeking extradition; crimes where the fugitive is a national of the country of refuge; and crimes barred by double jeopardy or a statute of limitations.

Extradition is triggered by a request submitted through diplomatic channels. In this country, it proceeds through the Departments of Justice and State and may be presented to a federal magistrate to order a hearing to determine whether the request is in compliance with an applicable treaty, whether it provides sufficient evidence to satisfy probable cause to believe that the fugitive committed the identified treaty offense(s), and whether other treaty requirements have been met. If so, the magistrate certifies the case for extradition at the discretion of the Secretary of State. Except as provided by treaty, the magistrate does not inquire into the nature of foreign proceedings likely to follow extradition.

The laws of the country of refuge and the applicable extradition treaty govern extradition back to the United States of a fugitive located overseas. Requests travel through diplomatic channels and the treaty issue most likely to arise after extradition to this country is whether the extraditee has been tried for crimes other than those for which he or she was extradited. The fact that extradition was ignored and a fugitive forcibly returned to the United States for trial constitutes no jurisdictional impediment to trial or punishment. Federal and foreign immigration laws sometimes serve as an alternative to extradition to and from the United States.

# Contents

Introduction ..................................................................................................................................... 1

Bars to Extradition ........................................................................................................................... 3
    No Treaty ..................................................................................................................................... 3
    No Treaty Crime ......................................................................................................................... 5
    Military and Political Offenses ................................................................................................... 7
    Capital Offenses ......................................................................................................................... 9
    Want of Dual Criminality .......................................................................................................... 9
    Extraterritoriality ..................................................................................................................... 12
    Nationality ................................................................................................................................ 13
    Double Jeopardy ....................................................................................................................... 14
    Lapse of Time ........................................................................................................................... 15
    Other Common Features .......................................................................................................... 16
        Expenses and Representation ............................................................................................. 16
        Transfer of Evidence ......................................................................................................... 17
        Transit ............................................................................................................................... 18

Constitutionality ............................................................................................................................ 18

Procedure for Extradition from the United States .......................................................................... 19
    Arrest and Bail ......................................................................................................................... 20
    Hearing ..................................................................................................................................... 21
    Review ...................................................................................................................................... 25
    Surrender .................................................................................................................................. 25

Extradition for Trial or Punishment in the United States .............................................................. 27
    Specialty ................................................................................................................................... 29

Alternatives to Extradition ............................................................................................................ 31
    Waiver ...................................................................................................................................... 31
    Immigration Procedures ........................................................................................................... 32
    Irregular Rendition/Abduction ................................................................................................ 33
    Foreign Prosecution ................................................................................................................. 34

# Appendixes

Appendix A. Countries with Which the United States Has a Bilateral Extradition Treaty ............ 35

Appendix B. Countries with Which the United States Has No Bilateral Extradition Treaty ......... 43

# Contacts

Author Contact Information ............................................................................................................ 44

# Introduction

"'Extradition' is the formal surrender of a person by a State to another State for prosecution or punishment."[1] Extradition to or from the United States is a creature of treaty. The United States has extradition treaties with over a hundred of the nations of the world, although there are many with which the United States has no extradition treaty.[2] International terrorism and drug trafficking have made extradition an increasingly important law enforcement tool.[3]

Although extradition as we know it is of relatively recent origins,[4] its roots can be traced to antiquity. Scholars have identified procedures akin to extradition scattered throughout history dating as far back as the time of Moses.[5] By 1776, a notion had evolved to the effect that "every state was obliged to grant extradition freely and without qualification or restriction, or to punish a wrongdoer itself" and the absence of intricate extradition procedures has been attributed to the predominance of this simple principle of international law.[6]

---

[1] Harvard Research in International Law, *Draft Convention on Extradition*, 29 AM. J. INT'L L. 21 (Supp. 1935). *See also* 1 RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 475 (1987)(RESTATEMENT). In the parlance of international law nations are identified as "states." In order to avoid confusion, the several states of the United States will be referred to as "the states of the United States." Interstate rendition, the formal surrender of a person by one of the states of the United States to another, is also sometimes referred to as extradition, but is beyond the scope of this report.

[2] A current list of countries with which the United States has an extradition treaty is found at **Appendix A**. A slightly less up-to-date listing is found at 18 U.S.C. § 3181 note. A list of countries with which the United States has no extradition treaty in force is found at **Appendix B**.

[3] Until the early 1970s, the United States received and submitted fewer than 50 extradition requests a year; by the mid 1980's the number had grown to over 500 requests a year, IV MICHAEL ABBELL & BRUNO A. RISTAU, INTERNATIONAL JUDICIAL ASSISTANCE: CRIMINAL (ABBELL & RISTAU) 11-18 (1990).

[4] Even the term "extradition" did not appear until the late 18th century. CHRISTOPHER L. BLAKESLY, TERRORISM, DRUGS, INTERNATIONAL LAW, AND THE PROTECTION OF HUMAN LIBERTY: A COMPARATIVE STUDY OF INTERNATIONAL LAW, ITS NATURE, ROLE, AND IMPACT IN MATTERS OF TERRORISM, DRUG TRAFFICKING, WAR, AND EXTRADITION 171 (1992). For a more extensive examination of the history of extradition, see Christopher L. Blakesly, *The Practice of Extradition from Antiquity to Modern France and the United States: A Brief History*, 4 B.C. INT'L & COMP. L. REV. 39 (1981); Harvard Research in International Law, *Draft Convention on Extradition*, 29 AM. J. INT'L L. 41-6 (Supp. 1935); M. CHERIF BASSIOUNI, INTERNATIONAL EXTRADITION: UNITED STATES LAW AND PRACTICE (BASSIOUNI) 1-7 (5th ed. 2007); ABBELL & RISTAU, *supra* footnote 3, at 3-11.

[5] Ramses II of Egypt and the Hittite king, Hattusili III, entered into a pact under which they promised to extradite fugitives of both noble and humble birth, *Treaty Between Hattusili and Ramesses II*, §§11-14, transliteration and translation in, S. Langdon & Alan H. Gardiner, *The Treaty of Alliance Between Hattusili, King of the Hittites, and the Pharaoh Ramesses II of Egypt*, 6 JOURNAL OF EGYPTIAN ARCHAEOLOGY 179, 192-94 (1920). Until fairly recently, nations seem have been happily rid of those who fled rather than face punishment. The Egyptian-Hittite treaty reflects the fact that extradition existed primarily as an exception to the more favored doctrines of asylum and banishment. Fugitives returned pursuant to the treaty received the benefits of asylum in the form of amnesty, "If one man flee from the land of Egypt, or two, or three, and they come to the great chief of Hatti, the great chief of Hatti shall seize them and shall cause them to be brought to Ramesse-mi-Amun, the great ruler of Egypt. But as for the man who shall be brought to Ramesse-mi-Amun, the great ruler of Egypt, let not his crime be charged against him, let not his house, his wives or his children be destroyed, let him not be killed, let no injury be done to his eyes, to his ears, to his mouth or to his legs ..." § 17, *id.* at 197.

[6] RESTATEMENT, *supra* footnote 1, *Introductory Note to Subchapter 7B* (citing GROTIUS, DE JURE BELLI AC PACIS, Vol.II, ch.21, §§ 3-4 (Scott ed. 1925)).

---

Whether by practice's failure to follow principle or by the natural evolution of the principle, modern extradition treaties and practices began to emerge in this country and elsewhere by the middle 18th and early 19th centuries.[7]

The first U.S. extradition treaty consisted of a single terse article in Jay's Treaty of 1794 with Great Britain, but it contained several of the basic features of contemporary extradition pacts. Article XXVII of the Treaty provided in its entirety:

> It is further agreed, that his Majesty and the United States, on mutual requisitions, by them respectively, or by their respective ministers or officers authorized to make the same, will deliver up to justice all persons, who, being charged with murder or forgery, committed within the jurisdiction of the other, provided that this shall only be done on such evidence of criminality, as, according to the laws of the place, where the fugitive or person so charged shall be found, would justify his apprehension and commitment for trial, if the offence had there been committed. The expense of such apprehension and delivery shall be borne and defrayed, by those who make the requisition and receive the fugitive.[8]

The United States has relied almost exclusively upon bilateral agreements as a basis for extradition.[9] However, the United States has entered into several multilateral agreements that may also provide legal authority for extradition. Such agreements take two forms. One form is a multilateral agreement that exclusively concerns extradition. The United States is currently a party to two such agreements: the 1933 Montevideo Convention on Extradition, which apparently has never served as a basis for extradition,[10] and the Extradition Agreement Between the United States and the European Union, which entered into force in February 2010.[11] The provisions of the U.S.-EU extradition treaty are implemented via bilateral instruments concluded between the United States and each EU Member State. These instruments amend or replace any provisions

---

[7] "By the latter part of the nineteenth century that [principle] had yielded to the view that delivery of persons charged with, or convicted of, crimes in another state was at most a moral duty, not required by customary international law, but generally governed by treaty and subject to various limitations. A network of bilateral treaties, differing in detail but having considerable similarity in principle and scope, has spelled out these limitations, and in conjunction with state legislation, practice, and judicial decisions has created a body of law with substantial uniformity in major respects. But the network of treaties has not created a principle of customary law requiring extradition, and it is accepted that states are not required to extradite except as obligated to do so by treaty." *Id.*

From the perspective of one commentator, "The history of extradition can be divided into four periods: (1) ancient times to the seventeenth century—a period revealing an almost exclusive concern for political and religious offenders; (2) the eighteenth century and half of the nineteenth century—a period of treaty-making chiefly concerning military offenders characterizing the condition of Europe during that period; (3) 1833 to 1948—a period of collective concern for suppressing common criminality; and (4) post 1948 developments which ushered in a greater concern for protecting human rights of persons and revealed an awareness of the need to have international due process of law regulate international relations," BASSIOUNI, *supra* footnote 4, at 5.

[8] 8 Stat. 116, 129 (1794).

[9] A list of countries with which the United States has bilateral extradition treaties is found at **Appendix A**.

[10] Inter-American Convention on Extradition, entered into force Jan. 25, 1935, 49 Stat. 3111. The Convention provides that it "does not abrogate or modify the bilateral or collective treaties, which at the present date are in force between the signatory States. Nevertheless, if any of said treaties lapse, the present Convention will take effect and become applicable immediately among the respective States...." *Id.*, art. 21. The United States has bilateral extradition treaties with each of the 11 other parties to the Convention, all but three of which were in effect prior to the Convention's entry into force.

[11] Extradition Agreement with the European Union, entered into force Feb. 1, 2010, S. TREATY DOC. 109-14.

---

contained in earlier treaties between the United States and individual EU Member States which conflict with the requirements of the multilateral agreement.[12]

The United States is also a party to several multilateral agreements that generally aim to deter and punish transnational criminal activity or serious human rights abuses, including by imposing an obligation upon signatories to prosecute or extradite persons who engage in specified conduct. Although these agreements are not themselves extradition treaties, they often contain provisions stating that specified acts shall be treated as extraditable offenses in any extradition treaty between parties.[13]

# Bars to Extradition

Extradition treaties are in the nature of a contract and by operation of international law, "[a] state party to an extradition treaty is obligated to comply with the request of another state party to that treaty to arrest and deliver a person duly shown to be sought by that state (a) for trial on a charge of having committed a crime covered by the treaty within the jurisdiction of the requesting state, or (b) for punishment after conviction of such a crime and flight from that state, provided that none of the grounds for refusal to extradite set forth in [the treaty] is applicable."[14]

Subject to a contrary treaty provision, federal law defines the mechanism by which the United States honors its extradition treaty obligations.[15] Although some countries will extradite in the absence of an applicable treaty as a matter of comity, it was long believed that the United States could only grant an extradition request if it could claim coverage under an existing extradition treaty.[16] Dicta in several court cases indicated that this requirement, however, was one of congressional choice rather than constitutional requirement.[17]

## No Treaty

Congress appears to have acted upon the assumption that a treaty was not required for extradition in 1996, when it authorized the extradition of fugitive aliens at the behest of a nation with which the United States has no extradition treaty.[18] That same year, Congress passed legislation to

---

[12] Extradition Agreement with the European Union, art. 3, entered into force Feb. 1, 2010, S. Treaty Doc. 109-14.

[13] *See, e.g.*, Bassiouni, *supra* footnote 4, at Appendix I (listing multilateral conventions containing provisions on extradition).

[14] Restatement, *supra* footnote 1, §475.

[15] 18 U.S.C. §§ 3181-3196.

[16] 18 U.S.C. § 3181 (1994) ("The provisions of this chapter relating to the surrender of persons who have committed crimes in foreign countries shall continue in force only during the existence of any treaty of extradition with such foreign government"); 18 U.S.C. § 3184 ("Whenever there is a treaty or convention for extradition between the United States and any foreign government ...") (1994).

[17] *E.g.*, United States v. Alvarez-Machain, 504 U.S. 655, 664 (1992) (citing Valentine v. United States *ex rel.* Neidecker, 299 U.S. 5, 8-9 (1935), as standing for the proposition that the "United States may not extradite a citizen in the absence of a statute or treaty obligation"). Moreover, if the United States has seized a person in foreign territory, it appears that it may surrender the person to the territory's sovereign for criminal prosecution, even in the absence of an extradition treaty or authorizing statute. *See* Munaf v. Geren, 553 U.S. __, 128 S.Ct. 2207, 2227 (2008) (surrender by U.S. military authorities of two U.S. citizens captured in Iraq to the Iraqi government "was not an extradition" requiring authorizing treaty or statute to occur).

[18] 18 U.S.C. § 3181(b)("The provisions of this chapter shall be construed to permit, in the exercise of comity, the (continued...)

---

implement international agreements made between the United States and the International Tribunals for Yugoslavia and Rwanda, which were entered into as executive agreements rather than treaties.[19] Pursuant to these agreements, the United States pledged to surrender to the requesting tribunal any person found within its territory who had been charged with or found guilty by the tribunal of an offense.[20]

The constitutional vitality of these efforts was put to the test shortly thereafter when the United States attempted to surrender a resident alien to the International Tribunal for Rwanda. Initially, a federal magistrate judge for the Southern District of Texas ruled that constitutional separation of powers requirements precluded extradition in the absence of a treaty.[21] The government subsequently filed another request for surrender with the district court, and the presiding judge certified the request, holding that an extradition could be effectuated pursuant to either a treaty or an authorizing statute.[22] In a 2-1 panel decision, the Fifth Circuit Court of Appeals upheld this ruling, concluding that "although some authorization by law is necessary for the Executive to extradite, neither the Constitution's text nor … [relevant jurisprudence] require that the authorization come in the form of a treaty."[23] The Supreme Court subsequently declined a petition for writ of certiorari to review the appellate court's ruling.[24]

---

(...continued)

surrender of persons, other than citizens, nationals, or permanent residents of the United States, who have committed crimes of violence against nationals of the United States in foreign countries without regard to the existence of any treaty of extradition with such foreign government if the Attorney General certifies, in writing, that—(1) evidence has been presented by the foreign government that indicates that had the offenses been committed in the United States, they would constitute crimes of violence as defined under section 16 of this title; and (2) the offenses charged are not of a political nature.").

[19] Under U.S. law, legally binding international agreements may take the form of treaties or executive agreements. In order for a treaty (but not an executive agreement) to become the "Law of the Land," the Senate must provide its advice and consent to treaty ratification by a two-thirds majority. U.S. CONST., art. VI, § 2. Executive agreements are legally binding agreements entered by the executive branch that are not submitted to the Senate for its advice and consent. For further discussion, see CRS Report RL32528, *International Law and Agreements: Their Effect Upon U.S. Law*, by Michael John Garcia.

[20] 18 U.S.C. § 3181 note, P.L. 104-132, §443, 110 Stat. 1280 (1996). *See also* Agreement on Surrender of Persons Between the Government of the United States and the International Tribunal for the Prosecution of Persons Responsible for Serious Violations of International Law in the Territory of the Former Yugoslavia, entered into force Feb. 14, 1996, TIAS 12570; Agreement on Surrender of Persons Between the Government of the United States and the International Tribunal for the Prosecution of Persons Responsible for Genocide and Other Serious Violations of International Humanitarian Law Committed in the Territory of Rwanda and Rwandan Citizens Responsible for Genocide and Other Such Violations Committed in the Territory of Neighboring States, entered into force Feb. 14, 1996, TIAS 12601.

[21] The magistrate judge wrote that:

The Constitution calls for the Executive to make treaties with the advice and consent of the Senate. Throughout the history of this Republic, every extradition from the United States has been accomplished under the terms of a valid treaty of extradition. In the instant case, it is undisputed that no treaty exists between the United States and the Tribunal. This is so even when, the Government insists, and the Court agrees, the Executive has the full ability and right to negotiate such at a treaty. The absence of a treaty is a fatal defect in the Government's request that the Extraditee be surrendered. Without a treaty, this Court has no jurisdiction to act, and Congress' attempt to effectuate the Agreement in the absence of a treaty is an unconstitutional exercise of power.

Surrender of Ntakirutimana, 988 F.Supp. 1038, 1042 (S.D. Tex. 1997).

[22] *In re* Surrender of Ntakirutimana, No. CIV. A. L-98-43, 1998 WL 655708 (S.D.Tex. Aug.6, 1998).

[23] Ntakirutimana v. Reno, 184 F.3d 419, 426 (5th Cir. 1999) The circuit court described the Supreme Court as having "repeatedly stated that a treaty or statute may confer the power to extradite,…." *Id.* (citing Valentine v. United States ex rel. Neidecker], 299 U.S. 5, 18 (1935); and quoting Grin v. Shine, 187 U.S. 181, 191 (1902)("Congress has a perfect right to provide for the extradition of criminals in its own way, with or without a treaty to that effect, and to declare that (continued...)

---

A question has occasionally arisen over whether an extradition treaty with a colonial power continues to apply to a former colony that has become independent, or whether an extradition treaty with a prior State remains in effect with its successor. Although the United States periodically renegotiates replacements or supplements for existing treaties to make contemporary adjustments, the United States has a number of treaties that pre-date the dissolution of a colonial bond or some other adjustment in governmental status.[25] Fugitives in these situations have sometimes contested extradition on the grounds that the United States has no valid extradition treaty with the successor government that asks that they be handed over for prosecution. These efforts are generally unsuccessful since successor governments have ordinarily assumed the extradition treaty obligations negotiated by their predecessors.[26]

# No Treaty Crime

Extradition is generally limited to crimes identified in the treaty. Early treaties often recite a list of the specific extraditable crimes. Jay's Treaty mentions only murder and forgery; the inventory in the1852 treaty with Prussia included eight others;[27] and 1974 treaty between the United States and Denmark identified several dozen extradition offenses:

> 1. murder; voluntary manslaughter; assault with intent to commit murder. 2. Aggravated injury or assault; injuring with intent to cause grievous bodily harm. 3. Unlawful throwing or application of any corrosive or injurious substances upon the person of another. with schemes intended to deceive or defraud, or by any other fraudulent means. 4. Rape; indecent assault; sodomy accompanied by use of force or threat; sexual intercourse and other unlawful sexual relations with or upon children under the age specified by the laws of both the requesting and the requested States. 5. Unlawful abortion. 6. Procuration; inciting or assisting a person under 21 years of age or at the time ignorant of the purpose in order that such person shall carry on sexual immorality as a profession abroad or shall be used for such immoral purpose; promoting of sexual immorality by acting as an intermediary repeatedly or for the purpose of gain; profiting from the activities of any person carrying on sexual immorality as a profession. 7. Kidnaping; child stealing; abduction; false imprisonment. 8. Robbery; assault with intent to rob. 9. Burglary. 10. Larceny. 11. Embezzlement. 12. Obtaining property, money or valuable securities: by false pretenses or by threat or force, by defrauding any governmental body, the public or any person by deceit, falsehood, use of the mails or other means of communication in connection. 13. Bribery, including soliciting, offering and accepting. 14. Extortion. 15. Receiving or transporting any money, valuable securities or other property knowing the same to have been unlawfully obtained. 16. Fraud

---

(...continued)

foreign criminals shall be surrendered upon such proofs of criminality as it may judge sufficient.") (internal citation omitted); and Terlinden v. Ames, 184 U.S. 270, 289 (1902) ("In the United States, the general opinion and practice have been that extradition should be declined in the absence of a conventional or legislative provision.")(internal citation omitted)).

[24] 528 U.S. 1135 (2000).

[25] For example, extraditions between the United States and Pakistan continue to be governed by the terms of the 1931 U.S.-U.K. Extradition Treaty, entered into force Jun. 24, 1935, 47 Stat. 2122.

[26] Hoxha v. Levi, 465 F.3d 554, 562-63 (3d Cir. 2006); Kastnerova v. United States, 365 F.3d 980, 986-87 (11th Cir. 2004); Then v. Melendez, 92 F.3d 851, 853-55 (9th Cir. 1996). *See generally* ABBELL & RISTAU, *supra* footnote 3, at 52-3, 180-81.

[27] 10 Stat. 964, 966 (1852)("murder, or assault with intent to commit murder, or piracy, or arson, or robbery, or forgery, or the utterance of forged papers, or the fabrication or circulation of counterfeit money, whether coin or paper money, or the embezzlement of public moneys").

---

by a bailee, banker, agent, factor, trustee, executor, administrator or by a director or officer of any company. 17. An offense against the laws relating to counterfeiting or forgery. 18. False statements made before a court or to a government agency or official, including under United States law perjury and subornation of perjury. 19. Arson. 20. An offense against any law relating to the protection of the life or health of persons from: a shortage of drinking water; poisoned, contaminated, unsafe or unwholesome drinking water, substance or products. 21. Any act done with intent to endanger the safety of any person traveling upon a railway, or in any aircraft or vessel or bus or other means of transportation, or any act which impairs the safe operation of such means of transportation. 22. Piracy; mutiny or revolt on board an aircraft against the authority of the commander of such aircraft; any seizure or exercise of control, by force or violence or threat of force or violence, of an aircraft. 23. An offense against the laws relating to damage to property. 24. a. Offenses against the laws relating to importation, exportation or transit of goods, articles, or merchandise. b. Offenses relating to willful evasion of taxes and duties. c. Offenses against the laws relating to international transfers of funds. 25. An offense relating to the: a. spreading of false intelligence likely to affect the price of commodities, valuable securities or any other similar interests; or b. making of incorrect or misleading statements concerning the economic conditions of such commercial undertakings as joint-stock companies, corporations, co-operative societies or similar undertakings through channels of public communications, in reports, in statements of accounts or in declarations to the general meeting or any proper official of a company, in notifications to, or registration with, any commission, agency or officer having supervisory or regulatory authority over corporations, joint-stock companies, other forms of commercial undertakings or in any invitation to the establishment of those commercial undertakings or to the subscription of shares. 28. Unlawful abuse of official authority which results in grievous bodily injury or deprivation of the life, liberty or property of any person, [or] attempts to commit, conspiracy to commit, or participation in, any of the offenses mentioned in this Article, Art. 3, 25 U.S.T. 1293 (1974).[28]

While many existing U.S. extradition treaties continue to list specific extraditable offenses, the more recent ones feature a dual criminality approach, and simply make all felonies extraditable (subject to other limitations found elsewhere in their various provisions).[29]

---

[28] Section 203 of P.L. 105-323 purports to require construction of an extradition treaty that permits extradition for kidnaping to also be interpreted to authorize extradition for parental kidnaping. The impact of § 203 remains to be seen.

[29] *E.g.*, Extradition Agreement with the European Union, art. 4(1), entered into force Feb. 1, 2010, S. TREATY DOC. 109-14 (applying in place of any provision in an earlier extradition agreement between the United States and an EU Member State which only authorized extradition only an exclusive list of offenses, and instead providing that "An offense shall be an extraditable offense if it is punishable under the laws of the requesting and requested States by deprivation of liberty for a maximum period of more than one year or by a more severe penalty"); Argentine Extradition Treaty, art.2(1), entered into force Jun. 15, 2000, S. TREATY DOC. 105-18, TIAS 12866;Paraguyan Extradition Treaty, art. II(1), entered into force Mar. 9, 2001, S. TREATY DOC. 106-4, TIAS 12995; Bolivian Extradition Treaty, art. II(1), entered into force Nov. 21, 1996, S. TREATY DOC. 104-22; French Extradition Treaty, art.2(1), entered into force Feb. 1, 2002, S. TREATY DOC. 105-13; Hungarian Extradition Treaty, art.2(1), entered into force Mar. 18, 1997, S. TREATY DOC. 104-5; Jordanian Extradition Treaty, art.2(1), entered into force July 29, 1995, S. TREATY DOC. 104-3; Italian Extradition Treaty, art. II(1), entered into force Sept. 24, 1984, 35 U.S.T. 3023. Where an official citation is unavailable for particular treaty, we have used the Senate Treaty Document citation along with the date upon which the treaty entered into force according the State Department. The most recent publicly available compendium of U.S. agreements is *Treaties In Force 2009*, available on Mar. 17, 2010, at http://www.state.gov/documents/organization/ 123746.pdf. Beginning with the 104th Congress, Senate Treaty Documents are available on the Government Printing Office's website, http://www.gpoaccess.gov/.

---

## Military and Political Offenses

In addition to an explicit list of crimes for which extradition may be granted, most modern extradition treaties also identify various classes of offenses for which extradition may or must be denied. Common among these are provisions excluding purely military and political offenses. The military crimes exception usually refers to those offenses like desertion which have no equivalents in civilian criminal law.[30] The exception is of relatively recent vintage.[31] In the case of treaties that list specific extraditable offenses, the exception is unnecessary since purely military offenses are not listed. The exception became advisable, however, with the advent of treaties that make extraditable any misconduct punishable under the laws of both treaty partners. With the possible exception of selective service cases arising during the Vietnam War period,[32] recourse to the military offense exception appears to have been infrequent and untroubled.

The political offense exception, however, has proven more troublesome.[33] The exception is and has been a common feature of extradition treaties for almost a century and a half. In its traditional form, the exception is expressed in deceptively simple terms.[34] Yet it has been construed in a variety ways, more easily described in hindsight than to predicate beforehand. As a general rule, American courts require that a fugitive seeking to avoid extradition "demonstrat[e] that the alleged crimes were committed in the course of and incidental to a violent political disturbance such as a war, revolution or rebellion."[35]

Contemporary extradition treaties often seek to avoid misunderstandings in a number of ways. They expressly exclude terrorist offenses or other violent crimes from the definition of political crimes for purposes of the treaty;[36] they explicitly extend the political exception to those whose

---

[30] *E.g.,* Extradition Treaty with Latvia, art. 4(4), entered into force Apr. 15, 2009, S. TREATY DOC. 109-15, art. 4(4) ("The executive authority of the Requested State may refuse extradition for offenses under military law that are not offenses under ordinary criminal law."); Italian Extradition Treaty, art. V(3), entered into force Sept. 24, 1984, 35 U.S.T. 3023 ("Extradition shall not be granted for offenses under military law which are not offenses under ordinary criminal law"). *See generally In re* Extradition of Suarez-Mason, 694 F.Supp. 676, 702-3 (N.D.Cal. 1988)(the military offense exception covers crimes like "mutiny and desertion which are outside the realm of ordinary criminal law"); BASSIOUNI, *supra* footnote 4, at 732-34; ABBELL & RISTAU, *supra* footnote 3, at 116-17, 212-13.

[31] MICHAEL ABBELL, EXTRADITION TO AND FROM THE UNITED STATES (ABBELL) §3-2(25)(No United States extradition treaty negotiated prior to 1960 contains an express military offense exception).

[32] Even there the political offense exception was thought more hospitable, except in the case of desertion. *See generally* David A. Tate, *Draft Evasion and the Problem of Extradition,* 32 ALB. L. REV. 337 (1968).

[33] *See generally* BASSIOUNI, *supra* footnote 4, at 650-732; RESTATEMENT, *supra* footnote 1, §476, *Comment g.* & *Reporters' Notes* 4-8; ABBELL & RISTAU, *supra* footnote 3, at 199-212; R. Stuart Phillips, *The Political Offense Exception and Terrorism: Its Place in the Current Extradition Scheme and Proposals for its Future,* 15 DICK. J. INT'L L. 337 (1997); Michelle N. Lewis, Note, *The Political Offense Exception: Reconciling the Tension Between Human Rights and International Public Order,* 63 GEO. WASH. L. REV. 585 (1995).

[34] Egyptian Extradition Treaty, art. III, entered into force Apr. 22, 1875, 19 Stat. 574 ("The provisions of this treaty shall not apply to any crime or offence of a political character").

[35] Kostotas v. Roche, 931 F.2d 169, 171 (1ˢᵗ Cir. 1991)(citing Eain v. Wilkes, 641 F.2d 504, 512 (7ᵗʰ Cir. 1981)). Ordinola v. Hackman, 478 F.3d 588, 596-97 (4ᵗʰ Cir. 2007); Vo v. Benov, 447 F.3d 1235, 1241 (9ᵗʰ Cir. 2006); Barapind v. Enomoto, 400 F.3d 744, 750 (9ᵗʰ Cir. 2005); Escobedo v. United States, 623 F.2d 1098, 1104 (5ᵗʰ Cir. 1980); Sindona v. Grant, 619 F.2d 167, 173 (2d Cir. 1980); Quinn v. Robinson, 783 F.2d 776, 807-9 (9ᵗʰ Cir. 1986); Ornelas v. Ruiz, 161 U.S. 689, 692 (1896).

[36] *E.g.,* Hungarian Extradition Treaty, art. 4(2), entered into force Mar. 18,1997, S. TREATY DOC. 104-5 ("For purposes of this Treaty, the following offenses shall not be considered to be political offenses: a. a murder or other willful crime against the person of a Head of State of one of the Contracting Parties, or a member of the Head of State's family; ... c. murder, manslaughter, or other offense involving substantial bodily harm; d. an offense involving kidnaping or any (continued...)

---

prosecution is politically or discriminatorily motivated;[37] and/or they limit the reach of their political exception clauses to conform to their obligations under multinational agreements.[38] Separately, several multinational agreements contain provisions that effectively incorporate enumerated offenses into any pre-existing extradition treaty between parties.[39] A few of these multilateral agreements also specify that enumerated activities shall not be considered political offenses for purposes of extradition.[40]

---

(...continued)

form of unlawful detention, including the taking of a hostage; e. placing or using an explosive, incendiary or destructive device capable of endangering life, of causing substantial bodily harm, or of causing substantial property damage; and f. a conspiracy or any type of association to commit offenses as specified in Article 2, paragraph 2, or attempt to commit, or participation in the commission of, any of the foregoing offenses"); Polish Extradition Treaty, art.5(2), entered into force Sept. 17, 1999, S. TREATY DOC. 105-14 (murder or other offense against heads of state or their families; murder, manslaughter, assault; kidnaping, abduction, hostage taking; bombing; or attempt or conspiracy to commit any of those offenses); Extradition Treaty with Luxembourg, art. 4(2), entered into force Feb. 1, 2002, S. TREATY DOC. 105-10, TIAS 12804 (virtually the same); Costa Rican Extradition Treaty, art. 4(2)(a), entered into force Oct. 11, 1991, S. TREATY DOC. 98-17 (violent crimes against a Head of State or a member of his or her family).

[37] Jamaican Extradition Treaty, art. III(2), entered into force July 7, 1991, S. TREATY DOC. 98-18 ("Extradition shall also not be granted if ... (b) it is established that the request for extradition, though purporting to be on account of the extraditable offence, is in fact made for the purpose of prosecuting or punishing the person sought on account of his race, religion, nationality, or political opinions; or (c) the person sought is by reason of his race, religion, nationality, or political opinions, likely to be denied a fair trial or punished, detained or restricted in his personal liberty for such reasons" ); Extradition Treaty with the Bahamas, art. 3(1)(c), entered into force Sept. 22, 1994, S. TREATY DOC. 102-17 ("Extradition shall not be granted when: ... the executive authority of the Requested State determines that the request was politically or racially motivated"); Extradition Treaty with Cyprus, art.4(3), entered into force Sept. 14, 1999, S. TREATY DOC. 105-16 (politically motivated); French Extradition Treaty, art.4(4), entered into force Feb. 1, 2002, S. TREATY DOC. 105-13 (prosecution or punishment on account of the fugitive's "race, religion, nationality or political opinions").

[38] Costa Rican Extradition Treaty, art.4(2)(b), entered into force Oct. 11, 1991, S. TREATY DOC. 98-17; Peruvian Extradition Treaty, art. IV(1)-(3), entered into force Aug. 25, 2003, S. TREATY DOC. 107-6; Korean Extradition Treaty, art. 4(2)(b), entered into force Dec. 20, 1999, S. TREATY DOC. 106-2, TIAS 12962; Indian Extradition Treaty, art.4(2), entered into force July 21, 1999, S. TREATY DOC. 105-30, TIAS 12873; Hungarian Extradition Treaty, art. 4(2), entered into force Mar. 18, 1997, S. TREATY DOC. 104-5 ("For purposes of this Treaty, the following offenses shall not be considered to be political offenses ... an offense for which both Contracting Parties have the obligation pursuant to a multilateral international agreement to extradite the person sought or to submit the case to their competent authorities for decision as to prosecution"). The State Department has noted that the list of crimes subject to such international agreements includes air piracy, aircraft sabotage, crimes of violence committed against foreign dignitaries, hostage taking and narcotics trafficking. *See* State Dept., Letter of Submittal for Hungarian Extradition Treaty, S. TREATY DOC. 104-5, at VI. Unless restricted in the Treaty, the list apparently also includes, *inter alia*, genocide, war crimes, theft of nuclear materials, slavery, torture, violence committed against the safety of maritime navigation or maritime platforms, theft or destruction of national treasures, counterfeiting currency and bribery of foreign officials. BASSIOUNI, *supra* footnote 4, at 714-28.

[39] *See* BASSIOUNI, *supra* footnote 4, at Appendix I (listing multilateral conventions containing provisions on extradition).

[40] *See, e.g.,* Convention on the Prevention and Punishment of the Crime of Genocide, art. VII, entered into force for the United States on Feb. 23, 1989, 78 U.N.T.S. 277, 28 I.L.M. 763 ("Genocide and the other acts enumerated…shall not be considered as political crimes for the purpose of extradition." ); International Convention for the Suppression of Terrorist Bombings, art. 11, entered into force for the United States on July 26, 2002, S. TREATY DOC. 106-6 ("None of the offences set forth…shall be regarded for the purposes of extradition or mutual legal assistance as a political offence or as an offence connected with a political offence or as an offence inspired by political motives. Accordingly, a request for extradition or for mutual legal assistance based on such an offence may not be refused on the sole ground that it concerns a political offence or an offence connected with a political offence or an offence inspired by political motives."); International Convention for the Suppression of the Financing of Terrorism, art. 14, entered into force for the United States on July 26, 2002, S. TREATY DOC. 106-49 (same).

## Capital Offenses

A number of nations have abolished or abandoned capital punishment as a sentencing alternative.[41] Several of these have preserved the right to deny extradition in capital cases either absolutely or in absence of assurances that the fugitive will not be executed if surrendered.[42] More than a few countries are reluctant to extradite in a capital case even though their extradition treaty with the United State has no such provision, based on opposition to capital punishment or to the methods and procedures associated with execution bolstered by sundry multinational agreements to which the United States is either not a signatory or has signed with pertinent reservations.[43] Additionally, "though almost all extradition treaties are silent on this ground, some states may demand assurances that the fugitive will not be sentenced to life in prison, or even that the sentence imposed will not exceed a specified term of years."[44]

## Want of Dual Criminality

Dual criminality exists when parties to an extradition treaty each recognize a particular form of misconduct as a punishable offense. Historically, extradition treaties have handled dual

---

[41] WILLIAM A. SCHABAS, THE INTERNATIONAL SOURCEBOOK ON CAPITAL PUNISHMENT, 239-45 (1997); ROGER HOOD, THE DEATH PENALTY: A WORLD-WIDE PERSPECTIVE, 240-47 (2d ed. 1996).

[42] *E.g.*, Extradition Agreement with the European Union, art. 13, entered into force Feb. 1, 2010, S. TREATY DOC. 109-14 (provision that may be applied in place or in absence of comparable requirement in existing extradition agreement between the United States and an EU Member State, stating that when "the offense for which extradition is sought is punishable by death under the laws in the requesting State and is not punishable by death under the laws in the requested State, the requested State may grant extradition on the condition that the death penalty shall not be imposed on the person sought, or if for prosecual reasons such condition cannot be complied with …, on the condition that the death penalty if imposed shall not be carried out.");Jordanian Extradition Treaty, art. 7, entered into force July 29, 1995, S. TREATY DOC. 104-3 ("when the offense for which extradition is sought is punishable by death under the laws in the Requesting State and is not punishable by death under the laws in the Requested State, the Requested State may refuse extradition unless the Requesting State provides such assurances as the Requested State considers sufficient that the death penalty, if imposed, shall not be carried out"). *See also* Argentine Extradition Treaty, art. 6, entered into force June 15, 2000, S. TREATY DOC. 105-18, TIAS 12866; Bolivian Extradition Treaty, art. IV(1), entered into force Nov. 21, 1996, S. TREATY DOC. 104-22; Hungarian Extradition Treaty, art. 7(1), entered into force Mar. 18, 1997, S. TREATY DOC. 104-5; South African Extradition Treaty, art. 5, entered into force June 25, 2001, S. TREATY DOC. 106-24; Costa Rican Extradition Treaty, art. 5, entered into force Oct. 11, 1991, S. TREATY DOC. 98-17. On the other hand, the capital punishment mutuality provision can redound to U.S. interests when another nation has a wider range of capital offenses than does the United States. *See, e.g.*, S. Comm. on For. Relat., Report on Extradition Treaty with Jordan, S. EXEC. REP. 104-2, at 9 (1995)("The United States delegation sought this provision because Jordan imposes the death penalty for some crimes that are not punishable by death in the United States"). Some capital punishment clauses do not apply in murder cases. *See, e.g.*, Extradition Treaty with the Bahamas, art. 7, entered into force Sept. 22, 1994, S. TREATY DOC. 102-17 ("When the offense for which extradition is sought is punishable by death under the laws in the Requesting State and is not punishable by death under the laws in the Requested State, the competent authority of the Requested State may refuse extradition unless: (a) the offense constitutes murder under the laws in the Requested State; or (b) the competent authority of the Requesting State provides such assurances as the competent authority of the Requested State considers sufficient that the death penalty will not be imposed or, if imposed, will not be carried out"); Extradition Treaty with Thailand, art. 6, entered into force May 17, 1991, S. TREATY DOC. 98-16; Extradition Treaty with Sri Lanka, art. 7, entered into force Jan. 12, 2001, S. TREATY DOC. 106-34.

[43] BASSIOUNI, *supra* footnote 4, at 621-38; ABBELL & RISTAU, *supra* footnote 3, at 117-19, 295-6; Anne Mori Kobayashi, Note, *International and Domestic Approaches to Constitutional Protections of Individual Rights: Reconciling the* Soering *and* Kindler *Decisions*, 34 AM. CRIM. L. REV. 225 (1996); Craig R. Roecks, Comment, *Extradition, Human Rights, and the Death Penalty: When Nations Must Refuse to Extradite a Person Charged with a Capital Crime*, 25 CAL. W. INT'L L. J. 189 (1994).

[44] 7 FOREIGN AFFAIRS MANUAL § 1613.4.

---

*Extradition To and From the United States: Overview of the Law and Recent Treaties*

criminality in one of three ways: (1) they list extraditable offenses and do not otherwise speak to the issue; (2) they list extraditable offenses and contain a separate provisions requiring dual criminality; or (3) they identify as extraditable offenses those offenses condemned by the laws of both nations. Today, "[u]nder most international agreements ... [a] person sought for prosecution or for enforcement of a sentence will not be extradited ... (c) if the offense with which he is charged or of which he has been convicted is not punishable as a serious crime in both the requesting and requested state...."[45]

Although there is a split of authority over whether dual criminality resides in all extradition treaties that do not deny its application,[46] the point is largely academic since it is a common feature of all American extradition treaties.[47] Subject to varying interpretations, the United States favors the view that treaties should be construed to honor an extradition request if possible. Thus, dual criminality does not "require that the name by which the crime is described in the two countries shall be same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries. It is enough if the particular act charged is criminal in both jurisdictions."[48] When a foreign country seeks to extradite a fugitive from the United States dual criminality may be satisfied by reference to either federal or state law.[49]

U.S. treaty partners do not always construe dual criminality requirements as broadly. In the past, some have been unable to find equivalents for attempt, conspiracy, and crimes with prominent federal jurisdictional elements (e.g., offenses under the Racketeer Influenced and Corrupt Organization (RICO) and Continuing Criminal Enterprise (CCE) statutes).[50] Many modern

---

[45] RESTATEMENT, *supra* footnote 1, §476. *See also* United States v. Saccoccia, 58 F.3d 754, 766 (1st Cir. 1995). Examples include the Italian Extradition Treaty, art. II(1), entered into force Sept. 24, 1984, 35 U.S.T. 3023 ("An offense, however denominated, shall be an extraditable offense only if it is punishable under the laws of both Contracting Parties by deprivation of liberty for a period of more than one year or by a more severe penalty ..."); Extradition Treaty with Belize, art. 2(1), entered into force Mar. 27, 2001, S. TREATY DOC. 106-38; Argentine Extradition Treaty, art. 2(1), entered into force June 15, 2000, S. TREATY DOC. 105-18, TIAS 12866; Extradition Treaty with Uruguay, art. 2, entered into force Apr. 11, 1984, 35 U.S.T. 3197 (with respect to enumerated offenses); Hungarian Extradition Treaty, art. 2(1), entered into force Mar. 18, 1997, S. TREATY DOC. 104-5; Jordanian Extradition Treaty, art. 2(1), entered into force Jul. 29, 1995; S. TREATY DOC. 104-3; Bolivian Extradition Treaty, art. II(1), entered into force Nov. 21, 1996, S. TREATY DOC. 104-22; Extradition Treaty with the Bahamas, art. 2(1), entered into force Sept. 22, 1994, S. TREATY DOC. 102-17; Extradition Treaty with Thailand, art. 2(1), entered into force May 17, 1991, S. TREATY DOC. 98-16; Costa Rican Extradition Treaty, art. 2(1), entered into force Oct. 11, 1991, S. TREATY DOC. 98-17.

[46] *In re* Extradition of Loharoia, 932 F.Supp. 802, 810 (N.D.Tex. 1996) ("The principle is a general policy of extradition, and arguably applies even absent explicit inclusion in the treaty in question. *See* Wright v. Henkel, 190 U.S. 40, 58 (1903); Bauch v. Raiche, 618 F.2d 843, 847 (1st Cir. 1980). On the other hand, there is authority suggesting that the principle does not apply unless it is expressly stated in the treaty. *See* Factor [v. Laubenheimer], 290 U.S. [276], at 287-90 [(1933)]").

[47] John T. Soma, Thomas F. Muther, Jr., & Heidi M.L. Brissette, *Transnational Extradition for Computer Crimes; Are New Treaties and Laws Needed?* 34 HARV. J. ON LEGIS. 317, 324 (1997).

[48] Collins v. Loisel, 259 U.S. 309, 312 (1922). *See also* United States v. Anderson, 472 F.3d 662, 664-65 (9th Cir. 2006); Gallo-Chamorro v. United States, 233 F.3d 1298, 1307 (11th Cir. 2000); DeSilva v. DiLeonardi, 125 F.3d 1110, 1113 (7th Cir. 1997); LoDuca v. United States, 93 F.3d 1100, 1112 (2d Cir. 1996); United States v. Saccoccia, 58 F.3d 754, 766 (1st Cir. 1995); *In re* Extradition of Platko, 213 F.Supp.2d 1229, 1236 (S.D.Cal. 2002). *See generally* Test of "Dual Criminality" Where Extradition to or From Foreign Nation Is Sought, 132 ALR FED 525 (1996 & Sept. 2009 Supp.) [hereinafter ALR].

[49] Jonathan O. Hafen, Comment, *International Extradition: Issues Arising Under the Dual Criminality Requirement*, 1992 BYU L. REV. 191, 207 ("The current state of the law appears to be that if the offense is considered criminal under federal law, the law of the asylum State, or under the law of the preponderance of States, the dual criminal requirement is satisfied"); ALR, *supra* footnote 48, at 539-40.

[50] The Racketeer Influenced and Corrupt Organization (RICO) provisions prohibit acquisition or operation of an (continued...)

---

extradition treaties contain provisions addressing the problem of jurisdictional elements[51] and/or making extraditable an attempt or conspiracy to commit an extraditable offense.[52] Some include special provisions for tax and customs offenses as well.[53]

---

(...continued)

interstate commercial enterprise through the patterned commission of various other "predicate" offenses, 18 U.S.C. §§ 1961-1966. The Continuing Criminal Enterprise (CCE) or drug kingpin provisions, 21 U.S.C. § 848, outlaw management of a large drug trafficking operation. Along with attempt, conspiracy and federal crimes with distinctive jurisdictional elements, they pose difficulties when they approximate but do not exactly matching the elements for extraditable offenses. They present a distinct problem, however, when they are based entirely on predicate offenses that are not themselves extraditable offenses. BASSIOUNI, *supra* footnote 4, at 531-537; Barbara Sicalides, Comment, *RICO, CCE, and International Extradition*, 62 TEMP.L. REV. 1281 (1989).

[51] *E.g.*, Extradition Agreement with the European Union, art. 4(2), entered into force Feb. 1, 2010, S. TREATY DOC. 109-14 (superceding certain types of extradition agreements between the United States and EU Member States so that, in extradition requests made between those countries, an offense shall be considered extraditable "regardless of whether the offence is one for which United States federal law requires the showing of such matters as interstate transportation, or use of the mails or of other facilities affecting interstate or foreign commerce, such matters being merely for the purpose of establishing jurisdiction in a United States federal court"); Protocol Amending U.S.-Israel Extradition Treaty, art. 1, entered into force Jan. 10, 2007, S. TREATY DOC.109-3 (replacing art. II of earlier treaty); Lithuanian Extradition Treaty, art. 2(3), entered into force Mar. 31, 2003, S. TREATY DOC. 107-4; Austrian Extradition Treaty, art. 2(4)(c), entered into force Jan. 1, 2000, S. TREATY DOC. 105-50, TIAS 12916; Extradition Treaty with Belize, art. 2(3)(b), entered into force Mar. 27, 2001, S. TREATY DOC. 106-38; Korean Extradition Treaty, art. 2(3)(c), entered into force Dec. 20, 1999, S. TREATY DOC. 106-2, TIAS 12962.

[52] *E.g.*, Extradition Agreement with the European Union, art. 4(1), entered into force Feb. 1, 2010, S. TREATY DOC. 109-14 (superceding certain types of extradition agreements between the United States and EU Member States so that, in extradition requests made between those countries, extraditable offenses shall be understood to include "an attempt or conspiracy to commit, or participation in the commission of, an extraditable offense"); Extradition Treaty with the Bahamas, art. 2(2), entered into force Sept. 22, 1994, S. TREATY DOC. 102-17 ("An offense shall also be an extraditable offense if it consists of an attempt or a conspiracy to commit, aiding or abetting, counselling, causing or procuring the commission of, or being an accessory before or after the fact to, an [extraditable] offense ..."); Extradition Treaty with Trinidad and Tobago, art. 2(2), entered into force Nov. 29, 1999, S. TREATY DOC. 105-21; Jordanian Extradition Treaty, art. 2(2), entered into force July 29, 1995, S. TREATY DOC. 104-3 ("An offense shall also be an extraditable offense if it consists of an attempt or a conspiracy to commit, or participation in the commission of, an [extraditable] offense ..."); Extradition Treaty with Luxembourg, art. 2(1), entered into force Feb. 1, 2002, S. TREATY DOC. 105-10, TIAS 12804; Extradition Treaty with the United Kingdom, art. 2(2), entered into force April 26, 2007, S. TREATY DOC. 108-23 ("An offense shall also be an extraditable offense if it consists of an attempt or a conspiracy to commit, participation in the commission of, aiding or abetting, counseling or procuring the commission of, or being an accessory before or after the fact.").

[53] *E.g.*, South African Extradition Treaty, art. 2(6), entered into force June 25, 2001, S. TREATY DOC. 106-24 ("Where extradition of a person is sought for an offense against a law relating to taxation, customs duties, exchange control, or other revenue matters, extradition may not be refused on the ground that the law of the Requested State does not impose the same kind of tax or duty or does not contain a tax, customs duty, or exchange regulation of the same kinds as the law of the Requesting State"); Extradition Agreement with the European Union, art. 4(3)(c), entered into force Feb. 1, 2010, S. TREATY DOC. 109-14 (applying in place of provisions contained in any earlier extradition treaty between the United States and an EU Member State that allowed for extradition only for a specified list of offenses); Austrian Extradition Treaty, art. 2(4)(B), entered into force Jan. 1, 2002, S. TREATY DOC. 105-50, TIAS 12916; Korean Extradition Treaty, art. 2(6), entered into force Dec. 20, 1999, S. TREATY DOC. 106-2, TIAS 12962; Polish Extradition Treaty, art. 3, entered into force Sept. 17, 1999, S. TREATY DOC. 105-14. *But see* Extradition Treaty with Luxembourg, art. 5(1), entered into force Feb. 1, 2002, S. TREATY DOC. 105-10, TIAS 12804 ("The executive authority of the Requested State shall have discretion to deny extradition when the offense for which extradition is requested is a fiscal offense [i.e., purely a tax, customs, or currency offense]."). Historically, offenses of a fiscal character were not extraditable. Such offenses are "gradually appearing in extradition treaties, but difficulty remains in satisfying the requirement of due criminality because of the problem of defining such offenses and determining their significance in the economic system of each particular country." BASSIOUNI, *supra* footnote 4, at 735-736.

---

## Extraterritoriality

As a general rule, crimes are defined by the laws of the place where they are committed. There have always been exceptions to this general rule under which a nation was understood to have authority to outlaw and punish conduct occurring outside the confines of its own territory. In the past, U.S. extradition treaties applied to crimes "committed within the [territorial] jurisdiction" of the country seeking extradition.[54] Largely as a consequence of terrorism and drug trafficking, however, the United States now claims more sweeping extraterritorial application for its criminal laws than recognized either in its more historic treaties or by many of today's governments.[55] Success in eliminating extradition impediments by negotiating new treaty provisions has been mixed. More than a few call for extradition regardless of where the offense was committed.[56] Yet perhaps an equal number of contemporary treaties permit or require denial of an extradition request that falls within an area where the countries hold conflicting views on extraterritorial jurisdiction.[57]

---

[54] ABBELL & RISTAU, *supra* footnote 3, at 64-7, 278-80.

[55] Even among countries with a fairly expansive view of the extraterritorial jurisdiction, there may be substantial differences between the perceptions of common law countries and those of civil law countries, Charles L. Blakesley, *A Conceptual Framework for Extradition and Jurisdiction Over Extraterritorial Crimes*, 1984 UTAH L. REV. 685 (1984).

[56] *E.g.*, Peruvian Extradition Treaty, art. II(3)(c), entered into force Mar. 25, 2003, S. TREATY DOC. 107-6 ("For the purposes of this Article, an offense shall be an extraditable offense, regardless of ... (c) where the offense was committed"); Bolivian Extradition Treaty, art. II(3)(b), entered into force Nov. 21, 1996, S. TREATY DOC. 104-22 ("To determine ... whether an offense is punishable under the laws in the Requested State, it shall be irrelevant ... where the act or acts constituting the offense were committed"); Jordanian Extradition Treaty, art. 2(4), entered into force July 29, 1995, S. TREATY DOC. 104-3 ("An offense described in this Article shall be an extraditable offense regardless of where the act or acts constituting the offense were committed"); Austrian Extradition Treaty, art. 2(6), entered into force Jan. 1, 2002, S. TREATY DOC. 105-50, TIAS 12916; Indian Extradition Treaty, art. 2(4), entered into force July 21, 1999, S. TREATY DOC. 105-30, TIAS 12873; Extradition Treaty with Luxembourg, art. 2(4), entered into force Feb. 1, 2002, S. TREATY DOC. 105-10, TIAS 12804.

[57] *E.g.*, Extradition Agreement with Malta, art. 2(4), entered into force Feb. 1, 2010, S. TREATY DOC. 109-17 ("If the offense has been committed outside the territory of the Requesting State, extradition shall be granted…if the laws of the Requested State provide for the punishment of an offense committed outside of its territory in similar circumstances. If the laws of the Requested State do not [so] provide…, the executive authority of the Requested State, at its discretion, may grant extradition…."); Hungarian Extradition Treaty, art. 2(4), entered into force Mar. 18, 1997, S. TREATY DOC. 104-5; Extradition Treaty with the Bahamas, art. 2(4), entered into force Sept. 22, 1994, S. TREATY DOC. 102-17 ("An offense described in this Article shall be an extraditable offense whether or not the offense was committed within the territory of the Requesting State. However, if the offense was committed outside the territory of the Requesting State, extradition shall be granted if the law of the Requested State provides for punishment of an offense committed outside of its territory in similar circumstances"); Italian Extradition Treaty, art. III, entered into force Sept. 24, 1984, 35 U.S.T. 3023 ("When an offense has been committed outside the territory of the Requesting Party, the Requested Party shall have the power to grant extradition if its laws provide for the punishment of such an offense or if the person sought is a national of the Requesting Party"); Extradition Treaty with Uruguay, art. 3, ¶2, entered into force Apr. 11, 1984, 35 U.S.T. 3197 ("... When the offense for which extradition has been requested has been committed outside the territory of the requesting Party, extradition may be granted if the laws of the requested Party provide for the punishment of such an offense committed in similar circumstances"); French Extradition Treaty, art. 2(4), entered into force Feb. 1, 2002, S. TREATY DOC. 105-13 ("Extradition shall be granted for an extraditable offense committed outside the territory of the Requesting State, when the laws of the requested Party authorize the prosecution or provide the punishment of that offense in similar circumstances").

# Nationality

The right of a country to refuse to extradite one's own nationals is probably the greatest single obstacle to extradition. The United States has long objected to the impediment[58] and recent treaties indicate that its hold may not be as formidable as was once the case. U.S. extradition agreements generally contain three types of nationality provisions:

> The first does not refer to nationals specifically, but agrees to the extradition of all persons. Judicial construction, as well as executive interpretation, of such clauses have consistently held that the word "persons" includes nationals, and therefore refusal to surrender a fugitive because he is a national cannot be justified.... The second and most common type of treaty provision provides that "neither of the contracting parties shall be bound to deliver up its own citizens or subjects...." [Congress has enacted legislation to overcome judicial construction that precluded the United States from surrendering an American under such provisions.[59]]….The third type of treaty provision states that "neither of the contracting parties shall be bound to deliver up its own citizens under the stipulations of this convention, but the executive authority of each shall have the power to deliver them up if, in its discretion, it be deemed proper do so."[60]

---

[58]RESTATEMENT, *supra* footnote 1, §475, *Reporters' Note* 4.

[59] The Supreme Court in Valentine v. United States *ex rel.* Neidecker, 299 U.S. 5, 8 (1936), held that a national exemption clause, which denied that the United States had any *obligation* to extradite American citizens, could not be construed to provide the Executive with authority to extradite such persons as a matter of discretion. Some 50 years later, Congress sought to reverse the result of this ruling with the enactment of 18 U.S.C. § 3196 ("If the applicable treaty or convention does not obligate the United States to extradite its citizens to a foreign country, the Secretary of State may, nevertheless, order the surrender to that country of a United States citizen whose extradition has been requested by that country if the other requirements of that treaty or convention are met"). There have been differing court rulings as to the interplay between 18 U.S.C. § 3196 and extradition treaties that contain national exemption clauses but lack provisions affirmatively granting parties' the discretionary authority to extradite their nationals. In Gouveia v. Vokes, 800 F.Supp. 241 (E.D.Pa. 1992), the district court interpreted § 3196 as amending the national exemption clause contained in the 1908 U.S.-Portugal extradition treaty, which provided that neither party was "bound to deliver up its own citizens or subjects" to the other. The *Gouveia* court interpreted § 3196 as a statutory amendment to the U.S.-Portugal treaty and other extradition agreements which contained national exemption clauses, and suggested that a statutory amendment to an extradition treaty would unconstitutionally infringe upon the President's treaty-making power. *Id.* at 258-259. However, the court avoided striking down § 3196 on constitutional grounds by construing the statute as non-retroactive in effect, thereby precluding its application to the case before it, which concerned a U.S. national whose extradition to Portugal had already been denied prior to the statute's enactment. On the other hand, in Hilario v. United States, 854 F.Supp.165 (E.D.N.Y. 1994), a different district court expressly rejected the reasoning of *Gouveia*, and found § 3196 to be constitutionally valid. Here again, the case centered on the relationship between § 3196 and the U.S.-Portugal treaty. The *Hilario* court held that § 3196 did not "override, alter, or amend any provision" of the treaty, because although the agreement did not require a party to surrender its nationals to the requesting State, "each signatory retains full sovereign discretion [to extradite its nationals] without any risk of breach." *Id.* at 169. The court also ruled that "the power to extradite can be conferred either by legislation or by treaty amendment," and interpreted § 3196 as permitting the extradition of U.S. nationals whose alleged criminal conduct and conviction predated the statute's enactment. *Id.* at 175-176. Subsequent rulings by other courts have also found § 3196 to be constitutionally valid. *See In re* Surrender of Ntakirutimana, No. CIV. A. L-98-43, 1998 WL 655708, at *15-16 (S.D.Tex. Aug.6, 1998) (favorably discussing *Hilario*); Ravelo Monegro v. Rosa, No. C98-1414, 1999 WL 38906, at *2 (N.D.Cal.,Jan. 28, 1999) ("the Court agrees with the *Hilario* court's determination that Congress' decision to use a statute to empower the Secretary of State to extradite U.S. citizens is consistent with the Treaty"). *See also* Sacirbey v. Guccione, 589 F.3d 52 (2d Cir. 2009)(recognizing § 3196 as authorizing Secretary of State to extradite U.S. citizen when underlying treaty gave Secretary discretion to refuse extradition of U.S. nationals); Lopez-Smith v. Hood, 121 F.3d 1322, 1325-326 (9th Cir. 1997)(section 3196 and a treaty provision stating that the parties "may" extradite their own nationals affords discretion to the Secretary of State).

[60] BASSIOUNI, *supra* footnote 4, at 739; ABBELL & RISTAU, *supra* footnote 3, at 67-71, 186-87, 280-81.

---

These three types of treaty provisions have been joined by a number of variants. A growing number go so far as to declare that "extradition shall not be refused based on the nationality of the person sought."[61] Another form limits the nationality exemption to nonviolent crimes.[62] A third bars nationality from serving as the basis to deny extradition when the fugitive is sought in connection with a listed offense.[63] Another variant allows a conflicting obligation under a multinational agreement to wash the exemption away.[64] Even where the exemption is preserved, contemporary treaties more regularly refer to the obligation to consider prosecution at home of those nationals whose extradition has been refused.[65]

# Double Jeopardy

Depending on the treaty, extradition may also be denied on the basis of a number of procedural considerations. Although the U.S. Constitution's prohibition against successive prosecutions for the same offense does not extend to prosecutions by different sovereigns,[66] it is common for

---

[61] Extradition Treaty with the United Kingdom, art. 3, entered into force Apr. 26, 2007, S. TREATY DOC. 108-23 ("Extradition shall not be refused based on the nationality of the person sought."); South African Extradition Treaty, art. 3, entered into force June 25, 2001, S. TREATY DOC. 106-24 (same). *See also* Argentine Extradition Treaty, art. 3, entered into force June 15, 2000, S. TREATY DOC. 105-18, TIAS 12866; Extradition Treaty with the Bahamas, art. 4, entered into force Sept. 22, 1994, S. TREATY DOC. 102-17; Extradition Treaty with Belize, art. 3, entered into force Mar. 27, 2001, S. TREATY DOC. 106-38 ("Extradition shall not be refused on the ground that the person sought is a national of the Requested State."); Jordanian Extradition Treaty, art. 3, entered into force July 29, 1995, S. TREATY DOC. 104-3 ("If all conditions in this Treaty relating to extradition are met, extradition shall not be refused based on the nationality of the person sought."); Italian Extradition Treaty, art. IV, entered into force Sept. 24, 1984, 35 U.S.T. 3023 ( "A Requested Party shall not decline to extradite a person because such a person is a national of the Requested Party."); Extradition Treaty with Uruguay, art. 4, entered into force Apr. 11, 1984, 35 U.S.T. 3197 (similar).

[62] *See* Bolivian Extradition Treaty, art. III(1), entered into force Nov. 21, 1996, S. TREATY DOC. 104-22 ("Neither Party shall be obligated to extradite its own nationals, except when the extradition request refers to ... (b) murder; voluntary manslaughter; kidnaping; aggravated assault; rape; sexual offenses involving children; armed robbery; offenses related to the illicit traffic in controlled substances; serious offenses related to terrorism; serious offenses related to organized criminal activity; fraud against the government or involving multiple victims; counterfeiting of currency; offenses related to the traffic in historical or archeological items; offenses punishable in both States by deprivation of liberty for a maximum period of at least ten years; or (c) an attempt or conspiracy, participation in, or association regarding the commission of any of the offenses described in subparagraphs (a) and (b)").

[63] Extradition Treaty with Malta, art. 3(1), entered into force Feb. 1, 2010, S. TREATY DOC. 109-17 (precluding fugitive's nationality from serving as the sole basis to refuse extradition in relation to 30 listed offenses); Bulgarian Extradition Treaty, art. 3(1), entered into force May 21, 2009, S. TREATY DOC. 110-12 (same).

[64] Bolivian Extradition Treaty, art. III(1)(a), entered into force Nov. 21, 1996, S. TREATY DOC. 104-22 ("Neither Party shall be obligated to extradite its own nationals, except when the extradition request refers to: (a) offenses as to which there is an obligation to establish criminal jurisdiction pursuant to multilateral international treaties in force with respect to the Parties").

[65] *E.g.*, Hungarian Extradition Treaty, art. 3(2), entered into force Mar. 18, 1997, S. TREATY DOC. 104-5 ("If extradition is refused solely on the basis of the nationality of the person sought, the Requested State shall, at the request of the Requesting State, submit the case to its authorities for prosecution"); Austrian Extradition Treaty, art. 3(2), entered into force Jan. 1, 2000, S. TREATY DOC. 105-50, TIAS 12916; Extradition Treaty with Cyprus, art. 3, entered into force Sept. 14, 1999, S. TREATY DOC. 105-16; Bolivian Extradition Treaty, art. III(3), entered into force Nov. 21, 1996, S. TREATY DOC. 104-22; Extradition Treaty with Thailand, art. 8(2), entered into force May 17, 1991, S. TREATY DOC. 98-16; Costa Rican Extradition Treaty, art. 8(3), entered into force Oct. 11, 1991, S. TREATY DOC. 98-17; Jamaican Extradition Treaty, art. VII, entered into force July 7, 1991,S. TREATY DOC. 98-18 (similar, but also requiring extradition if a fugitive is a national of both the Requesting and Requested State).

[66] Heath v. Alabama, 474 U.S. 82, 88 (1985) ("The dual sovereignty doctrine, as originally articulated and consistently applied by this Court, compels the conclusion that successive prosecutions by two States for the same conduct are not barred by the Double Jeopardy Clause."). *See also* BASSIOUNI, *supra* footnote 4, at 759 ("As the jurisprudence of the United States presently stands, the double jeopardy clause of the Fifth Amendment of the Constitution…does not (continued...)

---

extradition treaties to contain clauses proscribing extradition when the transferee would face double punishment and/or double jeopardy (also known as *non bis in idem*).[67] The more historic clauses are likely to bar extradition for a second prosecution of the "same acts" or the "same event" rather than the more narrowly drawn "same offenses."[68] The new model limits the exemption to fugitives who have been convicted or acquitted of the same offense and specifically denies the exemption where an initial prosecution has simply been abandoned.[69]

## Lapse of Time

Lapse of time or statute of limitation clauses are also prevalent in extradition treaties:

> Many [states] ... preclude extradition if prosecution for the offense charged, or enforcement of the penalty, has become barred by lapse of time under the applicable law. Under some treaties the applicable law is that of the requested state,[70] in others that of the requesting state;[71] under some treaties extradition is precluded if either state's statute of limitations has run.[72] ... When a treaty provides for a time-bar only under the law of the requesting state, or only under the law of the requested state, United States courts have generally held that time-

---

prevent extradition to another state unless the relevant treaty provides that double jeopardy shall apply.").

[67] BASSIOUNI, *supra* footnote 4, at 749-63; ABBELL & RISTAU, *supra* footnote 3, at 96-100, 192-98, 290-93.

[68] Italian Extradition Treaty, art. VI, entered into force Sept. 24, 1984, 35 U.S.T. 3023 ("Extradition shall not be granted when the person sought has been convicted, acquitted or pardoned, or has served the sentence imposed, by the Requested Party for the same act for which extradition is requested").

[69] E.g., Extradition Treaty with the United Kingdom, art. 5, entered into force Apr. 26, 2007, S. TREATY DOC. 108-23 ("1. Extradition shall not be granted when the person sought has been convicted or acquitted in the Requested State for the offense for which extradition is requested. 2. The Requested State may refuse extradition when the person sought has been convicted or acquitted in a third state in respect of the conduct for which extradition is requested. 3. Extradition shall not be precluded by the fact that the competent authorities of the Requested State: (a) have decided not to prosecute the person sought for the acts for which extradition is requested; (b) have decided to discontinue any criminal proceedings which have been instituted against the person sought for those acts; or (c) are still investigating the person sought for the same acts for which extradition is sought."); Bolivian Extradition Treaty, art. V(2), entered into force Nov. 21, 1996, S. TREATY DOC. 104-22 ("Extradition shall not be granted when the person sought has been convicted or acquitted in the Requested State for the offense for which extradition is requested. Extradition shall not be precluded by the fact that the authorities of the Requested State have decided to refrain from prosecuting the person sought for the acts for which extradition is requested or to discontinue any criminal proceedings which have been initiated against the person sought for those acts."). *See also* Extradition Treaty with Sri Lanka, art. 5, entered into force Jan. 12, 2001, S. TREATY DOC. 106-34; Extradition Treaty with Trinidad and Tobago, art. 5, entered into force Nov. 29, 1999, S. TREATY DOC. 105-21; Extradition Treaty with the Bahamas, art. 5, entered into force Sept. 22, 1994, S. TREATY DOC. 102-17; Jordanian Extradition Treaty, art. 5, entered into force July 29, 1995, S. TREATY DOC. 104-3. Some include language to avoid confusion over whether an American dismissal with prejudice is the same as an acquittal, Hungarian Extradition Treaty, art. 5(1), entered into force Mar. 18, 1997, S. TREATY DOC. 104-5 ("Extradition shall not be granted when the person sought has been convicted or acquitted or the case dismissed by court order with finding and final effect in the Requested State for the offense for which extradition is requested").

[70] E.g., Argentine Extradition Treaty, art. 7, entered into force June 15, 2000, S. TREATY DOC. 105-18, TIAS 12866 ; French Extradition Treaty, art. 9(1), entered into force Feb. 1, 2002, S. TREATY DOC. 105-13.

[71] E.g., Austrian Extradition Treaty, art. 7, entered into force Jan. 1, 2000, S. TREATY DOC. 105-50, TIAS 12916; Indian Extradition Treaty, art. 7, entered into force July 21, 1999, S. TREATY DOC. 105-30, TIAS 12873; Extradition Treaty with the Bahamas, art. 6, entered into force Sept. 22, 1994, S. TREATY DOC. 102-17; Hungarian Extradition Treaty, art. 6, entered into force Mar. 18, 1997, S. TREATY DOC. 104-5; Italian Extradition Treaty, art. VII, entered into force Sept. 24, 1984, 35 U.S.T. 3023.

[72] E.g., Extradition Treaty with Uruguay, art. 5, ¶ 2, entered into force April 11, 1984, 35 U.S.T. 3197.

---

bar of the state not mentioned does not bar extradition. If the treaty contains no reference to the effect of a lapse of time neither state's statute of limitations will be applied.[73]

Left unsaid is the fact that some treaties declare in no uncertain terms that the passage of time is no bar to extradition.[74]

In cases governed by U.S. law and in instances of U.S. prosecution following extradition, applicable statutes of limitation and due process determine whether pre-indictment delays bar prosecution[75] and speedy trial provisions govern whether post-indictment delays preclude prosecution.[76]

## Other Common Features

U.S. extradition treaties commonly contain a number of other features, including provisions concerning the allocation of extradition-related expenses between the parties; the appointment of legal representation for the requesting country in extradition hearings; the transfer of evidence along with the extradited person; and the transit of a fugitive through the territory of either of the parties to a third country.

### Expenses and Representation

U.S. extradition treaties, particularly the more recent ones, often have other less obvious, infrequently mentioned features. Perhaps the most common of these deal with the expenses associated with the procedure and representation of the country requesting extradition before the courts of the country of refuge. The distribution of costs is ordinarily governed by a treaty stipulation, reflected in federal statutory provisions,[77] under which the country seeking extradition accepts responsibility for any translation expenses and the costs of transportation after surrender,

---

[73] RESTATEMENT, *supra* footnote 1 §476, *Comment e. See also* BASSIOUNI, *supra* footnote 4, at 769-73; ABBELL & RISTAU, *supra* footnote 3, at 94-6, 187-90, 289-90.

[74] *E.g.*, Extradition Treaty with the United Kingdom, art. 6, entered into force Apr. 26, 2007, S. TREATY DOC. 108-23 ("The decision by the Requested State whether to grant the request for extradition shall be made without regard to any state of limitations in either State."); Jordanian Extradition Treaty, art. 6, entered into force July 29, 1995, S. TREATY DOC. 104-3 ("The decision whether to grant the request for extradition shall be made without regard to provisions of the law of either Contracting State concerning lapse of time"); Extradition Treaty with Belize, art. 8, entered into force Mar. 27, 2001, S. TREATY DOC. 106-38; Extradition Treaty with Cyprus, art. 7, entered into force Sept. 14, 1999, S. TREATY DOC.105-16.

[75] U.S.CONST. Amends. V, XIV; United States v. Lovasco, 431 U.S. 783, 789-90 (1977); United States v. MacDonald, 456 U.S. 1, 8 (1982); United States v. Gregory, 322 F.3d 1157, 1165 (9th Cir. 2002); United States v. Farmer, 312 F.3d 933, 936 (8th Cir. 2003).

[76] U.S.CONST. Amends. VI, XIV; Doggett v. United States, 505 U.S. 647, 651 (1992); Barker v. Wingo, 407 U.S. 514, 530 (1972); United States v. White Horse, 316 F.3d 769, 774 (8th Cir. 2003); United States v. Cope, 312 F.3d 757, 777-78 (6th Cir. 2003).

[77] 18 U.S.C. § 3195 ("All costs or expenses incurred in any extradition proceeding in apprehending, securing, and transmitting a fugitive shall be paid by the demanding authority. All witness fees and costs of every nature in cases of international extradition, including the fees of the magistrate, shall be certified by the judge or magistrate before whom the hearing shall take place to the Secretary of State of the United States, and the same shall be paid out of appropriations to defray the expenses of the judiciary or the Department of Justice as the case may be. The Attorney General shall certify to the Secretary of State the amounts to be paid to the United States on account of said fees and costs in extradition cases by the foreign government requesting the extradition, and the Secretary of State shall cause said amounts to be collected and transmitted to the Attorney General for deposit in the Treasury of the United States").

---

and the country of refuge assumes responsibility for all other costs.[78] Although sometimes included in a separate article, contemporary treaties generally make the country of refuge responsible for legal representation of the country seeking extradition.[79]

## Transfer of Evidence

Contemporary treaties regularly permit a country to surrender documents and other evidence along with an extradited fugitive. An interesting attribute of these clauses is that they permit transfer of the evidence even if the fugitive becomes unavailable for extradition. This may make some sense in the case of disappearance or flight, but seems a bit curious in the case of death.[80]

---

[78] Extradition Treaty with the United Kingdom, art. 20(2)-(3), entered into force Apr. 26, 2007, S. TREATY DOC. 108-23 ("2. The Requesting State shall bear the expenses related to the translation of documents and transportation of the person surrendered. The Requested State shall pay all other expenses incurred in that State by reason of the extradition proceedings. 3. Neither State shall make any pecuniary claim against the other State arising out of the arrest, detention, examination, or surrender of persons sought under this Treaty"); Hungarian Extradition Treaty, art. 20(2)-(3), entered into force Mar. 18, 1997, S. TREATY DOC. 104-5; Indian Extradition Treaty, art. 20(2)-(3), entered into force July 21, 1999, S. TREATY DOC. 105-30, TIAS 12873; French Extradition Treaty, art. 22(2), entered into force Feb. 1, 2002, S. TREATY DOC. 105-13; Jordanian Extradition Treaty, art. 19(2)-(3), entered into force July 29, 1995, S. TREATY DOC. 104-3; Costa Rican Extradition Treaty, arts. 20-21, entered into force Oct. 11, 1991, S. TREATY DOC. 98-17; Extradition Treaty with Thailand, art. 18, entered into force May 17, 1991, S. TREATY DOC. 98-16; Jamaican Extradition Treaty, art. XVII, entered into force July 7, 1991, S. TREATY DOC. 98-18 (also providing that requesting State may be subject to a claim due to special expenses or concerning third party interests in transferred property); Extradition Treaty with the Bahamas, art. 18(2)-(3), entered into force Sept. 22, 1994, S. TREATY DOC. 102-17; Italian Extradition Treaty, art. XXI, entered into force Sept. 24, 1984, 35 U.S.T. 3023. *But see* Bolivian Extradition Treaty, art. XVI(3)-(4), entered into force Nov. 21, 1996, S. TREATY DOC. 104-22 ("The Requesting State shall bear expenses related to the translation of documents and the transportation of the person sought….Neither Party shall make any pecuniary claim against the other arising from the arrest, detention, custody, examination, or surrender of a person sought under this Treaty")(note absence of language as to the responsibility for cost other than transportation or translation); Extradition Treaty with Uruguay, art. 18, entered into force Apr. 11, 1984, 35 U.S.T. 3197.

[79] Extradition Treaty with the United Kingdom, art. 20(1), entered into force Apr. 26, 2007, S. TREATY DOC. 108-23 ("The Requested State shall advise, assist, and appear on behalf of, the Requesting State in any proceedings in the courts of the Requested State arising out of a request for extradition or make all necessary arrangements for the same."); Jordanian Extradition Treaty, art. 19(1), entered into force July 29, 1995, S. TREATY DOC. 104-3 ("The Requested State shall advise, assist, appear in court on behalf of the Requesting State, and represent the interests of the Requesting State, in any proceedings arising out of a request for extradition"); Extradition Treaty with Luxembourg, art. 20(1), entered into force Feb. 1, 2002, S. TREATY DOC. 105-10, TIAS 12804; Extradition Treaty with Sri Lanka, art. 19(1), entered into force Jan. 12, 2001, S. TREATY DOC.106-34; Hungarian Extradition Treaty, art. 20(1), entered into force Mar. 18, 1997, S. TREATY DOC. 104-5; Extradition Treaty with the Bahamas, art. 18(1), entered into force Sept. 22, 1994, S. TREATY DOC. 102-17; Costa Rican Extradition Treaty, art. 20, entered into force Oct. 11, 1991, S. TREATY DOC. 98-17; Bolivian Extradition Treaty, art. XVI(1)-(2), entered into force Nov. 21, 1996, S. TREATY DOC. 104-22; Extradition Treaty with Uruguay, art. 18, entered into force Apr. 11, 1984, 35 U.S.T. 3197; Italian Extradition Treaty, art. XX, entered into force Sept. 24, 1984, 35 U.S.T. 3023; Jamaican Extradition Treaty, art. XVII(2), entered into force July 7, 1991, S. TREATY DOC. 98-18 ("The Requested State shall also provide for the representation of the Requesting State in any proceedings arising in the Requested State out of a request for extradition"); Extradition Treaty with Thailand, art. 18(2), entered into force May 17, 1991, S. TREATY DOC. 98-16.

[80] The typical clause provides that:

> All articles, instruments, objects of value, documents, and other evidence relating to the offense may be seized and, upon granting of extradition, surrendered to the requesting State. The property mentioned in this Article may be surrendered even when extradition cannot be granted or effected due to the death, disappearance, or escape of the person sought. The rights of third parties in such property shall be duly respected.

Costa Rican Extradition Treaty, art. 18, entered into force Oct. 11, 1991, S. TREATY DOC. 98-17. *See also* Bulgarian Extradition Treaty, art. 15, entered into force May 21, 2009, S. TREATY DOC. 110-12; South African Extradition Treaty, art.16, entered into force June 25, 2001, S. TREATY DOC. 106-24; Extradition Treaty with Trinidad and Tobago, art. 13, entered into force Nov. 29, 1999, S. TREATY DOC. 105-21; Jordanian Extradition Treaty, art. 15, entered into force July (continued...)

---

## Transit

A somewhat less common clause permits transportation of a fugitive through the territory of either of the parties to a third country without the necessity of following the treaty's formal extradition procedure.[81]

# Constitutionality

The Constitution provides that the judicial power of the United States extends to certain cases and controversies.[82] Historically, this has lead to discomfort whenever an effort is made to insert the federal courts in the midst of an executive or legislative process, such as the issuance of purely advisory opinions.[83] The fact that extradition turns on the discretion of the Secretary of State following judicial certification has led to the suggestion that the procedure established by the extradition statute is constitutionally offensive to this separation of powers. First broached by a district court in the District of Columbia,[84] subsequent courts have rejected the suggestion in large measure under the view that much like the issuance of a search or arrest warrant, the task is compatible with tasks constitutionally assigned to the judiciary.[85]

---

(...continued)

29, 1995, S. TREATY DOC. 104-3; Hungarian Extradition Treaty, art. 16(1), entered into force Mar. 18, 1997, S. TREATY DOC. 104-5; Extradition Treaty with the Bahamas, art. 16, entered into force Sept. 22, 1994, S. TREATY DOC. 102-17; Bolivian Extradition Treaty, art. XIV, entered into force Nov. 21, 1996, S. TREATY DOC. 104-22; Extradition Treaty with Uruguay, art. 16, entered into force April 11, 1984, 35 U.S.T. 3197; Italian Extradition Treaty, art. XVIII, entered into force Sept. 24, 1984, 35 U.S.T. 3023; Jamaican Extradition Treaty, art. XVI, entered into force July 7, 1991, S. TREATY DOC. 98-18; Extradition Treaty with Thailand, art. 16, entered into force May 17, 1991, S. TREATY DOC. 98-16.

[81] *E.g.*, Extradition Treaty with the Bahamas, art. 17, entered into force Sept. 22, 1994, S. TREATY DOC. 102-17 ("(1) Either Contracting State may authorize transportation through its territory of a person surrendered to the other State by a third State. A request for transit shall be made through the diplomatic channel and shall contain a description of the person being transported and a brief statement of the facts of the case. (2) No authorization is required where air transportation is used and no landing is scheduled on the territory of the Contracting State. If an unscheduled landing occurs on the territory of the other Contracting State, transit shall be subject to paragraph (1) of this Article. That Contracting State shall detain the person to be transported until the request for transit is received and the transit is effected, so long as the request is received within 96 hours of the unscheduled landing"). *See also* Extradition Agreement with the European Union, art. 12(1)-(2), entered into force Feb. 1, 2010, S. TREATY DOC. 109-14 (authorizing transit of fugitive through territory of EU Member State or U.S. in the absence of governing provision in an existing bilateral agreement between an EU Member State and the United States); Extradition Treaty with the United Kingdom, art. 19, entered into force Apr. 26, 2007, S. TREATY DOC. 108-23; Argentine Extradition Treaty, art. 18, entered into force June 15, 2000, S. TREATY DOC. 105-18, TIAS 12866; Korean Extradition Treaty, art. 17, entered into force Dec. 20, 1999, S. TREATY DOC. 106-2, TIAS 12962; Costa Rican Extradition Treaty, art. 19, entered into force Oct. 11, 1991, S. TREATY DOC. 98-17; Jordanian Extradition Treaty, art. 18, entered into force July 29, 1995, S. TREATY DOC. 104-3; Hungarian Extradition Treaty, art. 19, entered into force Mar. 18, 1997, S. TREATY DOC. 104-5; Bolivian Extradition Treaty, art. XV, entered into force Nov. 21, 1996, S. TREATY DOC. 104-22; Extradition Treaty with Thailand, art. 17, entered into force May 17, 1991, S. TREATY DOC. 98-16; Extradition Treaty with Uruguay, art. 17,, entered into force Apr. 11, 1984, 35 U.S.T. 3197; Italian Extradition Treaty, art. XIX, entered into force Sept. 24, 1984, 35 U.S.T. 3023.

[82] U.S. CONST. art. III, §2.

[83] Hayburn's Case, 2 U.S. (2 Dall.) 408 (1792); Muskrat v. United States, 219 U.S. 346 (1911); Felix Frankfurter, *A Note on Advisory Opinions*, 37 HARV. L. REV. 1002 (1924).

[84] Lobue v. Christopher, 893 F.Supp. 65 (D.D.C. 1995), *vac'd on juris. grounds,* 82 F.3d 1081 (D.C.Cir. 1996).

[85] *In re* Requested Extradition of Artt, 158 F.3d 462, 469-70 (9th Cir. 1998), *opinion withdrawn after grant of rehearing, In re* Artt, 248 F.3d 1197 (9th Cir. 2001); LoDuca v. United States, 93 F.3d 1100, 1105-10 (2d Cir. 1996); DeSilva v. DiLeonardi, 125 F.3d 1110, 1113 (7th Cir. 1997). *See also In re* Extradition of Seong-I, 346 F.Supp.2d 1149, (continued...)

---

# Procedure for Extradition from the United States

A foreign country usually begins the extradition process with a request submitted to the State Department[86] sometimes including the documentation required by the treaty.[87] When a requesting nation is concerned that the fugitive will take flight before it has time to make a formal request, it may informally ask for extradition and provisional arrest with the assurance that the full complement of necessary documentation will follow.[88] In either case, the Secretary of State, at his discretion, may forward the matter to the Department of Justice to begin the procedure for the arrest of the fugitive "to the end that the evidence of criminality may be heard and considered."[89]

---

(...continued)

1154-156 (D.N.M. 2004); Noel v. United States, 12 F.Supp.2d 1300, 1304-305 (M.D.Fla. 1998); *In re* Extradition of Lehming, 951 F.Supp. 505, 508-9 (D.Del. 1996); Sandhu v. Bransom, 932 F.Supp. 822, 826 (N.D.Tex. 1996); Werner v. Hickey, 920 F.Supp. 1257, 1259 (M.D.Cal. 1996); Allison Marston, Comment, *Innocence Abroad: An Analysis of the Constitutionality of International Extradition*, 33 Stan. J. Int'l L. 343 (1997).

[86] Vo v. Benov, 447 F.3d 1235, 1237 (9th Cir. 2006). "[T]hrough the diplomatic channel" seems to be the phrase favored most recently. *See, e.g.*, Bulgarian Extradition Treaty, art. 10, entered into force May 21, 2009, S. Treaty Doc. 110-12 ("Requests for extradition and supporting documents shall be transmitted through the diplomatic channel…."); Extradition Treaty with the United Kingdom, art. 8(1), entered into force Apr. 26, 2007, S. Treaty Doc. 108-23 ("All requests for extradition shall be made through the diplomatic channel"); Hungarian Extradition Treaty, art. 8(1), entered into force Mar. 18, 1997, S. Treaty Doc. 104-5; Polish Extradition Treaty, art. 9(1), entered into force Sept. 17, 1999, S. Treaty Doc. 105-14; Korean Extradition Treaty, art. 8(1), entered into force Dec. 20, 1999, S. Treaty Doc. 106-2, TIAS 12962; Extradition Treaty with the Bahamas, art. 8(1), entered into force Sept. 22, 1994, S. Treaty Doc. 102-17; Jordanian Extradition Treaty, art. 8(1), entered into force July 29, 1995, S. Treaty Doc. 104-3; Bolivian Extradition Treaty, art. VI(1), entered into force Nov. 21, 1996, S. Treaty Doc. 104-22; Italian Extradition Treaty, art. X(1), entered into force Sept. 24, 1984, 35 U.S.T. 3023; Extradition Treaty with Uruguay, art. 10, ¶1, entered into force April 11, 1984, 35 U.S.T. 3197.

[87] Jordanian Extradition Treaty, art. 8(2)-(4), entered into force July 29, 1995, S. Treaty Doc. 104-3 ("2. All requests shall contain: (a) documents, statements, photographs (if possible), or other types of information which describe the identity, nationality, and probable location of the person sought; (b) information describing the facts of the offense and the procedural history of the case; (c) the text of the law describing the essential elements of the offense for which extradition is requested; (d) the text of the law prescribing the punishment for the offense; and (e) the documents, statements, or other types of information specified in paragraph 3 or paragraph 4 of this Article, as applicable.; 3. A request for extradition of a person who is sought for prosecution shall also contain: (a) a copy of the warrant or order of arrest issued by a judge or other competent authority; (b) a copy of the charging documents; and (c) such information as would provide a reasonable basis to believe that the person sought committed the offense for which extradition is requested. 4. A request for extradition relating to a person who has been found guilty of the offense for which extradition is sought shall also contain: (a) a copy of the judgment of conviction or, if such copy is not available, a statement by a judicial authority that the person has been found guilty; (b) information establishing that the person sought is the person to whom the finding of guilt refers; (c) a copy of the sentence imposed, if the person sought has been sentenced, and a statement establishing to what extent the sentence has been carried out; and (d) in the case of a person who has been found guilty in absentia, the documents required in paragraph 3"). *See also* South African Extradition Treaty, art. 9(2)-(4), entered into force June 25, 2001; S. Treaty Doc. 106-24; Extradition Treaty with Luxembourg, art. 8(2)-(4), entered into force Feb. 1, 2002, S. Treaty Doc. 105-10, TIAS 12804; Hungarian Extradition Treaty, art. 8(2)-(4), entered into force Mar. 18, 1997, S. Treaty Doc. 104-5; Extradition Treaty with the Bahamas, art. 8(2)-(4), entered into force Sept. 22, 1994, S. Treaty Doc. 102-17; Bolivian Extradition Treaty, art. VI(2)-(6), entered into force Nov. 21, 1996, S. Treaty Doc. 104-22.

[88] Abbell, *supra* footnote 21, at §3-3(7).

[89] 18 U.S.C. § 3184 provides in part that:

Whenever there is a treaty or convention for extradition between the United States and any foreign government, or in cases arising under section 3181(b)[relating to the extradition from the United States of foreign nationals charged with, or convicted of, crimes of violence committed against Americans overseas, without reference to an extradition treaty], any justice or judge of the United States, or any magistrate authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State, may, upon complaint made

(continued...)

---

The United States Attorneys Manual encapsulates the Justice Department's participation thereafter in these words:

> 1. OIA [Office of International Affairs] reviews ... requests for sufficiency and forwards appropriate ones to the district [where the fugitive is found].
>
> 2. The Assistant United States Attorney assigned to the case obtains a warrant and the fugitive is arrested and brought before the magistrate judge or the district judge.
>
> 3. The government opposes bond in extradition cases.
>
> 4. A hearing under 18 U.S.C. § 3184 is scheduled to determine whether the fugitive is extraditable. If the court finds the fugitive to be extraditable, it enters an order of extraditability and certifies the record to the Secretary of State, who decides whether to surrender the fugitive to the requesting government. In some cases a fugitive may waive the hearing process.
>
> 5. OIA notifies the foreign government and arranges for the transfer of the fugitive to the agents appointed by the requesting country to receive him or her. Although the order following the extradition hearing is not appealable (by either the fugitive or the government), the fugitive may petition for a writ of habeas corpus as soon as the order is issued. The district court's decision on the writ is subject to appeal, and extradition may be stayed if the court so orders.[90]

## Arrest and Bail

Although United States takes the view that an explicit treaty provision is unnecessary,[91] extradition treaties sometimes expressly authorize requests for provisional arrest of a fugitive prior to delivery of a formal request for extradition.[92] Regardless of whether detention occurs

---

(...continued)

> under oath, charging any person found within his jurisdiction, with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty or convention ... issue his warrant for the apprehension of the person so charged, that he may be brought before such justice, judge, or magistrate, to the end that the evidence of criminality may be heard and considered.

*See also* Prasoprat v. Benov, 421 F.3d 1009, 1012 (9th Cir. 2005). *See generally* ABBELL & RISTAU, *supra* footnote 3, at 159-71. The requesting nation is usually represented in federal court by an Assistant United States Attorney or other Justice Department attorney. ABBELL, *supra* footnote 21, at §3-3(9); Jacques Semmelman & Karen Snell, *Defending the International Extradition Case*, THE CHAMPION 20, 21 (June, 2006).

[90] UNITED STATES ATTORNEYS MANUAL (USAM) § 9-15.700, available on Mar. 17, 2010, at http://www.usdoj.gov/usao/eousa/foia_reading_room/usam/title9/title9.htm.

[91] ABBELL, *supra* footnote 21, at §3-3(7).

[92] *E.g.*, Extradition Treaty with Thailand, art. 10(1)-(2), entered into force May 17, 1991, S. TREATY DOC. 98-16 ("In case of urgency, either Contracting Party may request the provisional arrest of any accused or convicted person. Application for provisional arrest shall be made through the diplomatic channel or directly between the Department of Justice ... and the Ministry of Interior in Thailand.... (2) The application shall contain: a description of the person sought; the location of that person, if known; a brief statement of the facts of the case including, if possible, the time and location of the offense; a statement of the existence of a warrant of arrest or a judgment of conviction against that person ... and a statement that a request for extradition of the person will follow"); Extradition Treaty with Estonia, art. 12, entered into force Feb. 1, 2010, S. TREATY DOC. 109-16; Protocol Amending U.S.-Israel Extradition Treaty, art. 7, entered into force Jan. 10, 2007, S. TREATY DOC.109-3 (replacing art. 11 of earlier treaty). Such provisions usually also call for the release of the fugitive upon the failure to submit a formal request within a designated period of time. *E.g.*, Extradition Treaty with Thailand, *supra*, art. 10(4) (60 days); Extradition Treaty with the United Kingdom, art. (continued...)

pursuant to provisional arrest, as a consequence of the initiation of an extradition hearing or upon certification of extradition, the fugitive is not entitled to release on bail except under rare "special circumstances."[93] This limited opportunity for pre-extradition release may be further restricted under the applicable treaty.[94]

# Hearing

The precise menu for an extradition hearing is dictated by the applicable extradition treaty, but a common check list for a hearing conducted in this country would include determinations that:

1. There exists a valid extradition treaty between the United States and the requesting state;

2. The relator is the person sought;

3. The offense charged is extraditable;

4. The offense charged satisfies the requirement of double criminality;

5. There is 'probable cause' to believe the relator committed the offense charged;

6. The documents required are presented in accordance with United States law, subject to any specific treaty requirements, translated and duly authenticated ... ; and

7. Other treaty requirements and statutory procedures are followed.[95]

---

(...continued)

12(4), entered into force Apr. 26, 2007, S. TREATY DOC. 108-23 (discretionary release after 60 days); Argentine Extradition Treaty, art. 11(4), entered into force June 15, 2000, S. TREATY DOC. 105-18, TIAS 12866 (60 days); Korean Extradition Treaty, art. 10(4), entered into force Dec. 20, 1999, S. TREATY DOC. 106-2, TIAS 12962 (two months); Hungarian Extradition Treaty, art. 11, entered into force Mar. 18, 1997, S. TREATY DOC. 104-5 (60 days); Extradition Treaty with the Bahamas, art. 10(4), entered into force Sept. 22, 1994, S. TREATY DOC. 102-17 (60 days) ; Jordanian Extradition Treaty, art. 11(4), entered into force July 29, 1995, S. TREATY DOC. 104-3 (60 days with a possible 30-day extension); Bolivian Extradition Treaty, art. VIII(4), entered into force Nov. 21, 1996, S. TREATY DOC. 104-22 (60 days); Italian Extradition Treaty, art. XII(4), entered into force Sept. 24, 1984, 35 U.S.T. 3023 (45 days); Extradition Treaty with Uruguay, art. 11, ¶1,entered into force Apr. 11, 1984, 35 U.S.T. 3197 (45 days).

[93] Wright v. Henkel, 190 U.S. 40, 61-3 (1903)(no bail following certification absent special circumstances); United States v. Kin-Hong, 83 F.3d 523, 524-25 (1st Cir. 1996) (no bail during pendency of extradition proceedings absent special circumstances); *In re* Requested Extradition of Kirby, 106 F.3d 855, 863 (9th Cir. 1996) (release on bail pending the completion of extradition hearings requires special circumstances); Borodin v. Ashcroft, 136 F.Supp.2d 125, 128-33 (E.D.N.Y. 2001); Hababou v. Albright, 82 F.Supp.2d 347, 349-52 (D.N.J. 2000). *See also In re* Extradition of Sacirbegovic, 280 F.Supp.2d 81, 83 (S.D.N.Y. 2003); *In re* Extradition of Molnar, 182 F.Supp.2d 684, 686-89 (N.D.Ill. 2002)(suggesting it may be easier to demonstrate special circumstances following provisional arrest rather than after a formal request has been presented); Parretti v. United States, 122 F.3d 758, 786 (9th Cir. 1997) (suggesting that the strong presumption against bail be abandoned), *opinion withdrawn upon the flight of the respondent*, 143 F.3d 508 (9th Cir. 1998); Nathaniel A. Persily, Note, *International Extradition and the Right to Bail*, 34 STAN. J. INT'L L. 407 (1998).

[94] *See, e.g.*, Costa Rican Extradition Treaty, art. 12, entered into force Oct. 11, 1991, S. TREATY DOC. 98-17 ("A person detained pursuant to the Treaty shall not be released until the extradition request has been finally decided, unless such release is required under the extradition law of the Requested State or unless this Treaty provides for such release").

[95] *In re* Extradition of Valdez-Mainero, 3 F.Supp.2d 1112, 1114-115 (S.D.Cal. 1998). *See also* ABBELL & RISTAU, *supra* footnote 3, at 172-241. Shorthand versions appear in *Cheung v. United States*, 213 F.3d 82, 88 (2d Cir. 2000)("The judicial officer's inquiry is confined to the following: whether a valid treaty exists, whether the crime charged is covered by the relevant treaty; and whether the evidence marshaled in support of the complaint for extradition is sufficient under the applicable standard of proof"); and *Vo v. Benov*, 447 F.3d 1235, 1237 (9th Cir. (continued...)

An extradition hearing is not, however, "in the nature of a final trial by which the prisoner could be convicted or acquitted of the crime charged against him.... Instead, it is essentially a preliminary examination to determine whether a case is made out which will justify the holding of the accused and his surrender to the demanding nation.... The judicial officer who conducts an extradition hearing thus performs an assignment in line with his or her accustomed task of determining if there is probable cause to hold a defendant to answer for the commission of an offense."[96]

The purpose of the hearing is in part to determine whether probable cause exists to believe that the individual committed an offense covered by the extradition treaty. The individual may offer evidence to contradict or undermine the existence of probable cause,[97] but affirmative defenses that might be available at trial are irrelevant.[98] The rules of criminal procedure and evidence that would apply at trial have no application.[99] Hearsay is not only admissible but may be relied upon exclusively;[100] the Miranda rule has no application;[101] initiation of extradition may be delayed

---

(...continued)

2006)("The authority of a magistrate judge serving as an extradition judicial officer is thus limited to determining an individual's eligibility to be extradited, which he does by ascertaining whether a crime is an extraditable offense under the relevant treaty and whether probable cause exists to sustain the charge"). *See also* United States v. Lin Kin-Hong, 110 F.3d 103, 110 (1st Cir. 1997).

[96] LoDuca v. United States, 93 F.3d 1100, 1104 (2d Cir. 1996)(internal quotation marks omitted)(quoting Benson v. McMahon, 127 U.S. 457, 463 (1888)); Collins v. Loisel, 259 U.S. 309, 316 (1922); and Ward v. Rutherford, 921 F.2d 286, 287 (D.C. Cir. 1990). *See also* Ordinola v. Hackman, 478 F.3d 588, 606 (4th Cir. 2007); Kastnerova v. United States, 365 F.3d 980, 987 (11th Cir. 2004); DeSilva v. DiLeonardi, 125 F.3d 1110, 1112 (7th Cir. 1997); *In re* Extradition of Molnar, 202 F.Supp.2d 782, 786 (N.D.Ill. 2002).

[97] Barapind v. Enomoto, 400 F.3d 744, 749 (9th Cir. 2005); Hoxha v. Levi, 465 F.3d 554, 561 (3d Cir. 2006). Additionally, a few courts have ruled that the United States is obligated to turn over any exculpatory evidence in its possession that would undercut a probable cause finding that the accused committed the offense for which he was charged in the requesting State. *See* Demjanjuk v. Petrovksy, 10 F.3d 338, 353 (6th Cir.1993), *cert. denied*, 513 U.S. 914 (1994); *In re* Extradition of Drayer, 190 F.3d 410, 415 (6th Cir.1999); *In re* Zhenly Ye Gon, Misc. No. 08-596(JMF), 2010 WL 169468 (D.D.C., Jan. 8, 2010).

[98] DeSilva v. DiLeonardi, 125 F.3d 1110, 1112 (7th Cir. 1997)(legal custodian defense to kidnaping charge)(citing Charlton v. Kelly, 229 U.S. 447 (1913), and Collins v. Loisel, 259 U.S. 309 (1922)); Lopez-Smith v. Hood, 121 F.3d 1322, 1324 (9th Cir. 1997)(due process bar to criminal trial of incompetent defendant); *In re* Extradition of Schweidenback, 3 F.Supp.2d 113, 117 (D.Mass. 1998)(evidence related to a defense is excludable); *In re* Extradition of Diaz Medina, 210 F.Supp.2d 813, 819 (N.D.Tex. 2002).

[99] Haxhiaj v. Hackman, 528 F.3d 282, 292 (4th Cir. 2008); Afanasjev v. Hurlburt, 418 F.3d 1159, 1164-165 (11th Cir. 2005); United States v. Kin-Hong, 110 F.3d 103, 120 (1st Cir. 1997); Then v. Melendez, 92 F.3d 851, 855 (9th Cir. 1996); *In re* Extradition of Fulgencio Garcia, 188 F.Supp.2d 921, 932 (N.D.Ill. 2002); F.R.CRIM.P. 54(b)(5), F.R.EVID. 1101(d)(3). Evidence offered to support an extradition request need only be authenticated. Barapind v. Enomoto, 400 F.3d 744, 748 (9th Cir. 2005); 18 U.S.C. § 3190 ("Depositions, warrants, or other papers or copies thereof offered in evidence upon the hearing of any extradition case shall be received and admitted as evidence on such hearing for all the purposes of such hearing if they shall be properly and legally authenticated so as to entitle them to be received for similar purposes by the tribunals of the foreign country from which the accused party shall have escaped, and the certificate of the principal diplomatic or consular officer of the United States resident in such foreign country shall be proof that the same, so offered, are authenticated in the manner required."); 22 C.F.R. § 92.40 (foreign extradition requests are authenticated by the U.S. chiefs of mission).

[100] Hoxha v. Levi, 465 F.3d 554, (3d Cir. 2006); Afanasjev v. Hurlburt, 418 F.3d 1159, 1165 (11th Cir. 2005); United States v. Kin-Hong, 110 F.3d 103, 120 (1st Cir. 1997)(citing Collins v. Loisel, 259 U.S. 309, 317 (1922)); *In re* Extradition of Platko, 213 F.Supp.2d 1229, 1237 (S.D.Cal. 2002).

[101] *In re* Extradition of Powell, 4 F.Supp.2d 945, 951-52 (S.D.Cal. 1998); Valenzuela v. United States, 286 F.3d 1223, 1229 (11th Cir. 2002)(noting that even compelled statements that incriminate the fugitive under the laws of the requesting country would be admissible in an extradition hearing). *Cf.* United States v. Balsys, 524 U.S. 666 (1998)(the Fifth Amendment does not prohibit compelled statements simply because they are incriminating under the laws of a foreign nation).

---

without regard for the Sixth Amendment right to a speedy trial or the Fifth Amendment right of due process;[102] nor does the Sixth Amendment right to the assistance of counsel apply.[103] Due process, however, will bar extradition of informants whom the government promised confidentiality and then provided the evidence necessary to establish probable cause for extradition.[104]

Moreover, extradition will ordinarily be certified without "examining the requesting country's criminal justice system or taking into account the possibility that the extraditee will be mistreated if returned."[105] This "non-inquiry rule" is a judicially created rule premised on the view that, "[w]hen an American citizen commits a crime in a foreign country, he cannot complain if required to submit to such modes of trial and to such punishment as the laws of that country may prescribe for its own people, unless a different mode be provided for by treaty stipulations between that country and the United States."[106]

---

[102] Yapp v. Reno, 26 F.3d 1562, 1565 (11th Cir. 1994); McMaster v. United States, 9 F.3d 47, 49 (8th Cir. 1993); Martin v. Warden, 993 F.2d 824, 829 (11th Cir. 1993); Bovio v. United States, 989 F.2d 255, 260 (7th Cir. 1993); Sabatier v. Daborwski, 586 F.2d 866, 869 (1st Cir. 1978); Jhirad v. Ferrandina, 536 F.2d 478, 485 n.9 (2d Cir. 1976); *In re* Extradition of Fulgencio Garcia, 188 F.Supp.2d 921, 932 (N.D.Ill. 2002)(internal citations omitted)("the Sixth Amendment right to a speedy trial and the Fifth Amendment right against undue delay are inapplicable to an extradition. Likewise, the Sixth Amendment right to effective counsel does not apply to extradition proceedings. The Supreme Court has found no constitutional infirmity where those subject to extradition proceedings have been denied an opportunity to confront their accusers. Finally, the Fifth Amendment guarantee against double jeopardy and the right to a Miranda warning are inapplicable to an extradition proceeding").

[103] DeSilva v. DiLeonardi, 181 F.3d 865, 868-69 (7th Cir. 1999).

[104] Valenzuela v. United States, 286 F.3d 1223, 1229-230 (11th Cir. 2002).

[105] *In re* Extradition of Cheung, 968 F.Supp. 791, 798-99 (D.Conn, 1997)("The rule of non-inquiry is well-established in the circuits and has been applied in extraditions to a panoply of nations. Martin v. Warden, 993 F.2d 824 (11th Cir. 1993)(Canada); Koskotas v. Rocke, 931 F.2d 169 (1stCir. 1991)(Greece); Quinn v. Robinson, 783 F.2d 776 (9th Cir. 1986 (U.K.); Eain v. Wilkes, 641 F.2d 504 (7th Cir. 1981)(Israel); Escobedo v. United States, 623 F.2d 1098 (5th Cir. 1980)(Mexico) ..."). *See also* Hoxha v. Levi, 465 F.3d 554, (3d Cir. 2006); Lopez-Smith v. Hood, 121 F.3d 1322, 1327 (9th Cir. 1997); United States v. Kin-Hong, 110 F.3d 103, 110 (1st Cir. 1997); United States v. Smyth, 61 F.3d 711, 714 (9th Cir. 1995)(explaining the exception in the U.K. Supplementary Treaty); Jacques Semmelman, *Federal Courts, the Constitution, and the Rule of Non-Inquiry in International Extradition Proceedings*, 76 CORNELL L. REV. 1198 (1991). *Gallina v. Fraser*, 278 F.2d 77 (2d Cir. 1960), declined to depart from the rule but observed that under some circumstance an extraditee might face "procedures or punishments so antipathetic to a federal court's sense of decency as to require re-examination" of the question. The courts appear to have rarely if ever encountered such procedures or punishments. *In re* Extradition of Marinero, 990 F.Supp. 1208, 1230 (S.D.Cal. 1997)("There is no legal support for a judicially created 'humanitarian exception' [of the type foreseen in *Gallina*] in an extradition proceeding"); *In re* Extradition of Sandhu, 886 F.Supp. 318, 322 (S.D.N.Y. 1993)("The 'Gallina exception' to the rule of non-inquiry has yet to be applied"); Corneljo-Barreto v. Seifert, 218 F.3d 1004, 1010 (9th Cir. 2000)("Our research failed to identify any case in which this [humanitarian exception] has been applied...."). In the 2008 case of Munaf v. Geren, 128 S. Ct. 2207, the Supreme Court declined to grant habeas relief to two U.S. citizens challenging their proposed surrender to the Iraqi government by U.S. military authorities in Iraq, despite arguments that they would likely face torture. Citing several prior cases involving the rule of non-inquiry, the Court stated that "the present context that concern is to be addressed by the political branches, not the judiciary." *Id.* at 2225. The Court noted the stated U.S. policy not to transfer persons to countries where torture was likely to result, and distinguished the case before it from "a more extreme case in which the Executive has determined that a detainee is likely to be tortured but decides to transfer him anyway." *Id.* at 2226.

[106] Martin v. Warden, 993 F.2d 824, 829-30 (11th Cir. 1993) (quoting Neely v. Henkel, 180 U.S. 109, 123 (1901)). *See generally* Mironescu v. Costner, 480 F.3d 664, 668-73 (4th Cir. 2007) (discussing origins and development of rule of non-inquiry).

Application of the rule of non-inquiry may be modified by treaty or statute.[107] For example, the U.N. Convention Against Torture (CAT) provides that no State Party "shall expel, return…or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture."[108] Following U.S. ratification of CAT, Congress enacted § 2422 of the Foreign Affairs Reform and Restructuring Act of 1998 (FARRA), which required all relevant federal agencies to adopt appropriate regulations to implement this policy.[109] Some fugitives have argued that the Secretary of State's decision to extradite following court certification and in the face of a challenge under CAT or FARRA is subject to judicial review under the Administrative Procedure Act or in habeas corpus proceedings. Thus far, most reviewing courts have found that CAT and its implementing legislation have carved a limited exception to the judicially created rule of non-inquiry.[110] However, the circuits have split on the issue of whether judicial review of CAT-based claims in extradition proceedings has nonetheless been barred by statute.[111]

---

[107] For example, unique irritants in the diplomatic relations between the United States and Great Britain stimulated the 1985 signing of a supplementary extradition treaty with singular characteristics. British Supplementary Extradition Treaty, entered into force Dec. 23, 1986, TIAS 12050. The Ninth Circuit described this supplementary treaty as "alter[ing] the extradition procedures in force under the 1977 [U.S.-U.K.] Treaty in three significant ways: (1) it limits the scope of the political offense exception; (2) it authorizes a degree of judicial inquiry into the factors motivating a request for extradition; and (3) it creates a limited right to appeal an extradition decision." *In re* Extradition of Artt, 158 F.3d at 465 (9th Cir. 1998), *redesignated In re* Artt, 248 F.3d 1197 (9th Cir. 2001)). *See also* British Supplementary Extradition Treaty, *supra*, at arts. 1, 3. The United States and the United Kingdom subsequently negotiated a more contemporary replacement, which entered into force in 2007, that transfers responsibility for determining whether an extradition request is politically motivated from the courts to the Executive. Extradition Treaty with the United Kingdom, entered into force Apr. 26, 2007, S. TREATY DOC. 108-23. For a more extensive discussion, see CRS Report RL32096, *Extradition Between the United States and Great Britain: The 2003 Treaty*, by Charles Doyle, available in abbreviated form as CRS Report RS21633, *Extradition Between the United States and Great Britain: A Sketch of the 2003 Treaty*, by Charles Doyle.

[108] Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT), art. 3, entered into force for U.S. on Oct. 21, 1994, S. TREATY DOC. 100-20.

[109] P.L. 105-277, § 2242; 112 Stat. 2681-822 (1998)

[110] *See, e.g.,* Mironescu v. Costner, 480 F.3d 664, 673 (4th Cir. 2007) (holding that common law rule of non-inquiry did *not* bar consideration of CAT-based claims in habeas proceedings, but still finding that consideration of such claims had nonetheless been barred by statute); Cornejo-Barreto v. Seifert, 218 F.3d 1004 (9th Cir. 2000) (CAT-implementing legislation superceded common law rule of non-inquiry, permitting habeas review of petitioner's claim that he would face torture if extradited). *But see* Sandhu v. Burke, 2000 WL 191707 (S.D.N.Y. Feb. 10, 2000) (unpublished) (finding that rule of non-inquiry precluded consideration of petitioner's CAT-based claims, as CAT was ratified under the understanding that it was non-self executing and FARRA did not authorize judicial enforcement of CAT's provisions).

[111] FARRA asserts that its declaration of policy and the accompanying enforcement responsibilities of federal agencies are not intended to create a basis for judicial review for CAT-based claims, except as part of the review of a final order of removal under the Immigration and Nationality Act. P.L. 105-277, § 2242(d). Whether or not this provision is intended to preclude judicial review of CAT-based claims in non-immigration proceedings is the subject of conflicting judicial opinion. *Compare* Kiyemba v. Obama, 561 F.3d 509 (D.C. Cir. 2009) (wartime detainees held at Guantanamo could not bring CAT- or FARRA-based challenges to their proposed military transfer to a foreign country, as Congress had precluded judicial review of such claims except as part of a final order of immigration removal); Mironescu v. Costner, 480 F.3d 664, 673 (4th Cir. 2007) (court could not review petitioner's CAT-based challenged to his extradition, as the language of FARRA "plainly conveys that although courts may consider or review CAT or FARR[A]…claims as part of their review of a final removal order, they are otherwise precluded from considering or reviewing such claims"); *with* Cornejo-Barreto v. Seifert, 218 F.3d 1004 (9th Cir.2000), *rejected by* 379 F.3d 1075 (9th Cir. 2004), *latter opinion vacated by* 389 F.3d 1307 (9th Cir. 2004) (*en banc*) (although FARRA precludes a facial challenge of CAT-implementing regulations promulgated by State Department, individual subject to an extradition order may seek judicial review based on the Administrative Procedure Act (APA), when his surrender would be contrary to U.S. laws and regulations implementing CAT). In 2008, the Supreme Court appeared to invoke the rule on non-inquiry in consideration of a habeas petition by two U.S. citizens held by U.S. military authorities in Iraq who (continued...)

---

## Review

If at the conclusion of the extradition hearing, the court concludes there is some obstacle to extradition and refuses to certify the case, "[t]he requesting government's recourse to an unfavorable disposition is to bring a new complaint before a different judge or magistrate, a process it may reiterate apparently endlessly."[112]

If the court concludes there is no such obstacle to extradition and certifies to the Secretary of State that the case satisfies the legal requirements for extradition, the fugitive has no right of appeal, but may be entitled to limited review under habeas corpus.[113] "[H]abeas corpus is available only to inquire whether the magistrate had jurisdiction, whether the offense charged is within the treaty and, by a somewhat liberal extension, whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty."[114] In this last assessment, appellate courts will only "examine the magistrate judge's determination of probable cause to see if there is 'any evidence' to support it."[115] As previously discussed, it may also be possible for a fugitive to raise a claim in a habeas proceeding that his extradition is barred under the Convention Against Torture and its implementing legislation.

## Surrender

If the judge or magistrate certifies the fugitive for extradition, the matter then falls to the discretion of the Secretary of State to determine whether as a matter of policy the fugitive should be released or surrendered to the agents of the country that has requested his or her extradition.[116]

---

(...continued)

claimed that their surrender to the Iraqi government would likely result in their torture. Munaf v. Geren, 128 S. Ct. 2207, 2225-2226 (2008). The Court noted that the habeas petitions did not assert claims under FARRA, but suggested in dicta that several issues would have to be addressed in the event that a FARRA claim was raised on remand, including the possibility that FARRA-based claims "may be limited to certain immigration proceedings." *Id.* at 2226, n. 6 (2008). On remand, the district court considered an amended habeas challenge by one of the petitioners that invoked FARRA as barring his surrender. The court held that FARRA limited "judicial review to claims challenging a final order of removal by immigration authorities-which is not the case here-...[and therefore] does not provide the petitioner a grounds for habeas relief." Omar v. Geren, 2009 WL 3069716, at *1 (D.D.C., Sept. 28, 2009).

[112] Gill v. Imundi, 747 F.Supp. 1028, 1039 (S.D.N.Y. 1990) (citing *In re* Doherty, 786 F.2d 491, 503 (2d Cir. 1986)). *See also In re* Extradition of Massieu, 897 F.Supp. 176, 179 (D.N.J. 1995); Hooker v. Klein, 573 F.2d 1360, 1365 (9th Cir. 1978) (citing, *inter alia*, Collins v. Loisel, 262 U.S. 426 (1923)); ABBELL & RISTAU, *supra* footnote 3, at 252-54.

[113] Ordinola v. Hackman, 478 F.3d 588, 598 (4th Cir. 2007); Vo v. Benov, 447 F.3d 1235, 1240 (9th Cir. 2006); Afanasjev v. Hurlburt, 418 F.3d 1159, 1163 (11th Cir. 2005); Sidali v. I.N.S., 107 F.3d 191, 195 (3d Cir. 1997) (citing Collins v. Miller, 252 U.S. 364, 369 (1920)); ABBELL & RISTAU, *supra* footnote 3, at 243-52.

[114] Ordinola v. Hackman, 478 F.3d 588, 598 (4th Cir. 2007)(quoting Fernandez v. Phillips, 268 U.S. 311, 312 (1925)). *See also* Valenzuela v. United States, 286 F.3d 1223, 1229 (11th Cir. 2002); Cornejo-Barreto v. Seifert, 218 F.3d 1004, 1009-10 (9th Cir. 2000); DeSilva v. DiLeonardi, 125 F.3d 1110, 1112 (7th Cir. 1997); Sidali v. I.N.S., 107 F.3d 191, 195 (3d Cir. 1997); Smith v. United States, 82 F.3d 964, 965 (10th Cir. 1996).

[115] United States v. Kin-Hong, 110 F.3d 103, 116-17 (1st Cir. 1997) (citing Fernandez v. Phillips, 268 U.S. 311, 312 (1925); Sidali v. I.N.S., 107 F.3d 191, 199-200 (3d Cir. 1997); Then v. Melendez, 92 F.3d 851, 854 (9th Cir. 1996); Valenzuela v. United States, 286 F.3d 1223, 1229 (11th Cir. 2002)). *See also* Noriega v. Pastrana, 564 F.3d 1290, 1295 (11th Cir. 2009), *cert. denied*, 130 S.Ct. 1002 (2010).

[116] United States v. Kin-Hong, 110 F.3d 103, 109 (1st Cir. 1997)("It is then within the Secretary of State's sole discretion to determine whether or not the relator should actually be extradited. *See* 18 U.S.C. § 3186 ('The Secretary of State *may* order the person committed under section 3184 ... of this title to be delivered to any authorized agent of such foreign government ... '"); Note, *Executive Discretion in Extradition*, 62 COLUMBIA LAW REVIEW 1313 (1962).

The procedure for surrender, described in treaty[117] and statute,[118] calls for the release of the prisoner if he or she is not claimed within a specified period of time,[119] often indicates how extradition requests from more than one country for the same fugitive are to be handled,[120] and frequently allows the fugitive to be held for completion of a trial or the service of a criminal sentence before being surrendered.[121] Extradition treaties may also provide that, in cases where a

---

[117] *E.g.*, Extradition Treaty with Thailand, art. 11(3), entered into force May 17, 1991, S. TREATY DOC. 98-16 ("If the extradition has been granted, surrender of the person sought shall take place within such time as may be prescribed by the laws of the Requested State. The competent authorities of the Contracting Parties shall agree on the time and place of the surrender of the person sought. If, however, that person is not removed from the territory of the Requested State within the prescribed time, that person may be set at liberty and the Requested State may subsequently refuse extradition for the same offense"); Bulgarian Extradition Treaty, art. 12, entered into force May 21, 2009, S. TREATY DOC. 110-12; Argentine Extradition Treaty, art. 12, entered into force Jun. 15, 2000, S. TREATY DOC. 105-18, TIAS 12866; Austrian Extradition Treaty, art. 14(2)-(4), entered into force Jan.1 , 2000, S. TREATY DOC. 105-50, TIAS 12916; Hungarian Extradition Treaty, art. 13, entered into force Mar. 18, 1997, S. TREATY DOC. 104-5; Costa Rican Extradition Treaty, art. 13, entered into force Oct. 11, 1991, S. TREATY DOC. 98-17; Jamaican Extradition Treaty, art. XI, entered into force July 7, 1991, S. TREATY DOC. 98-18; Extradition Treaty with the Bahamas, art. 11, entered into force Sept. 22, 1994, S. TREATY DOC. 102-17; Bolivian Extradition Treaty, art. IX, entered into force Nov. 21, 1996, S. TREATY DOC. 104-22; Jordanian Extradition Treaty, art. 12, entered into force July 29, 1995, S. TREATY DOC. 104-3; Italian Extradition Treaty, art. XIII, entered into force Sept. 24, 1984, 35 U.S.T. 3023.

[118] 18 U.S.C. § 3186 ("The Secretary of State may order the person committed under sections 3184 or 3185 of this title to be delivered to any authorized agent of such foreign government, to be tried for the offense of which charged. Such agent may hold such person in custody, and take him to the territory of such foreign government, pursuant to such treaty. A person so accused who escapes may be retaken in the same manner as any person accused of any offense").

[119] 18 U.S.C. § 3188 ("Whenever any person who is committed for rendition to a foreign government to remain until delivered up in pursuance of a requisition, is not so delivered up and conveyed out of the United States within two calendar months after such commitment, over and above the time actually required to convey the prisoner from the jail to which he was committed, by the readiest way, out of the United States, any judge of the United States, or of any State, upon application made to him by or on behalf of the person so committed, and upon proof made to him that reasonable notice of the intention to make such application has been given to the Secretary of State, may order the person so committed to be discharged out of custody, unless sufficient cause is shown to such judge why such discharge ought not to be ordered").

[120] *E.g.*, Extradition Agreement with the European Union, art. 10, entered into force Feb. 1, 2010, S. TREATY DOC. 109-14 (when the United States or an EU Member State receives competing extradition request from the other State and a third country, the requested State shall consider "all relevant factors" when determining which request to honor, including but not limited to "(a) whether the requests were made pursuant to treaty; (b) the places where each of the offenses were committed; (c) the respective interests of the requesting States; (d) the seriousness of the offenses; (e) the nationality of the victim; (f) the possibility of any subsequent extradition between the requesting States; and (g) the chronological order in which the requests were received from the requesting States" ); Extradition Treaty with Trinidad and Tobago, art. 12, entered into force Nov. 29, 1999, S. TREATY DOC. 105-21; Extradition Treaty with Thailand, art. 13, entered into force May 17, 1991, S. TREATY DOC. 98-16; Costa Rican Extradition Treaty, art. 15, entered into force Oct. 11, 1991, S. TREATY DOC. 98-17; Jamaican Extradition Treaty, art. XIII, entered into force July 7, 1991, S. TREATY DOC. 98-18; Extradition Treaty with the Uruguay, art. 14, entered into force Apr. 11, 1984, 35 U.S.T. 3197; Bolivian Extradition Treaty, art. X, entered into force Nov. 21, 1996, S. TREATY DOC. 104-22; Jordanian Extradition Treaty, art. 14, entered into force July 29, 1995, S. TREATY DOC. 104-3.

[121] *E.g.*, Jamaican Extradition Treaty, art. XII, entered into force July 7, 1991, S. TREATY DOC. 98-18 ("If the extradition request is granted in the case of a person who is being prosecuted or is serving a sentence in the territory of the Requested State for a different offence, the Requesting State shall, unless its laws otherwise provide, defer the surrender of the person sought until the conclusion of the proceedings against that person or the full execution of any punishment that may be or may have been imposed"); Extradition Treaty with Sri Lanka, art. 13(2), entered into force Jan. 12, 2001, S. TREATY DOC. 106-34; French Extradition Treaty, art. 16(2), entered into force Feb. 1, 2002, S. TREATY DOC. 105-13; Hungarian Extradition Treaty, art. 14, entered into force Mar. 18, 1997, S. TREATY DOC. 104-5; Extradition Treaty with Thailand, art. 12, entered into force May 17, 1991, S. TREATY DOC. 98-16; Costa Rican Extradition Treaty, art. 14, entered into force Oct. 11, 1991, S. TREATY DOC. 98-17; Bolivian Extradition Treaty, art. XI, entered into force Nov. 21, 1996, S. TREATY DOC. 104-22; Jordanian Extradition Treaty, art. 13, entered into force July 29, 1995, S. TREATY DOC. 104-3; Italian Extradition Treaty, art. XIV, entered into force Sept. 24, 1984, 35 U.S.T. 3023.

fugitive faces charges or is serving a criminal sentence in a country of refuge, he may be temporarily surrendered to a requesting State for purposes of prosecution, under the promise that the State seeking extradition will return the fugitive upon the conclusion of criminal proceedings.[122]

# Extradition for Trial or Punishment in the United States

The laws of the country of refuge and the applicable extradition treaty govern extradition back to the United States of a fugitive located overseas. The request for extradition comes from the Department of State whether extradition is sought for trial in federal or state court or for execution of a criminal sentence under federal or state law.[123]

The Justice Department's Office of International Affairs must approve requests for extradition of fugitives from federal charges or convictions and may be asked to review requests from state prosecutors before they are considered by the State Department.[124] Provisions in the United States Attorneys Manual and the corresponding Justice Department's Criminal Resource Manual sections supplement treaty instructions on the procedures to be followed in order to forward a request to the State Department.[125]

---

[122] *E.g.,* Extradition Agreement with the European Union, art. 9, entered into force Feb. 1, 2010, S. TREATY DOC. 109-14 (when preexisting agreement between EU Member State and United States lacks similar provision, allowing requested State to surrender the relator with the understanding that he will be kept in custody and returned under circumstances and conditions agreed upon by the two States); Peruvian Extradition Treaty, art. X(2), entered into force Aug. 25, 2003, S. TREATY DOC. 107-6; Second Protocol Amending Extradition Treaty with Canada, art. 1, entered into force Apr. 30, 2003, S. TREATY DOC. 107-11 (adding art. 7 *bis* to earlier treaty; Protocol Amending Extradition Treaty with Mexico, art. 1, entered into force May 25, 2001, S. TREATY DOC. 105-46, TIAS 12897 (adding art. 15(2)-(3) to earlier treaty).

[123] RESTATEMENT, *supra* footnote 1, § 478, *Comment e* ("Requests for extradition of persons from foreign states may be made only by the Department of State. If the offense with which the person is charged or of which he has been convicted is one under federal law, the application for extradition must be submitted by the prosecutor to the Department of Justice, which will review the documents and, if satisfied of their sufficiency, transmit them to the Department of State for forwarding to the requested state. If the offense is one under [the law of any of the states of the United States], the application must be submitted by or with the endorsement of the Governor of the State, and must be reviewed by the Department of Justice before transmission to the Department of State. If the State Department is satisfied that the conditions for extradition under the applicable treaty have been met, it will request extradition in the name of the United States, and, where appropriate, will arrange for representation of the United States at the proceedings in the requested state. When extradition proceedings in the foreign state have been completed and the person sought has been certified to be extraditable, the Secretary or [her] authorized deputy may issue a warrant to federal or State officials to act as agents of the United States for the purpose of taking custody of the person in the requested state for return to the United States.").

[124] "The Office of International Affairs (OIA) provides information and advice to Federal and State prosecutors about the procedure for requesting extradition from abroad. OIA also advises and provides support to Federal prosecutors handling foreign extradition requests for fugitives found in the United States. Every formal extradition request for international extradition based on Federal criminal charges must be reviewed and approved by OIA. At the request of the Department of State, formal requests based on State charges are also reviewed by OIA before submission to the Department of State." USAM § 9-15.210.

[125] Criminal Resource Manual (CRM) §§601-610, available on Mar. 17, 2010, at http://www.usdoj.gov/usao/eousa/foi_reading_room/usam/title9/crm00601.htm; USAM §§ 9-15.100 to 9-15.800.

The first step is to determine whether the fugitive is extraditable. The Justice Department's checklist for determining extraditability begins with an identification of the country in which the fugitive has taken refuge.[126] If the United States has no extradition treaty with the country of refuge, extradition is not a likely option.[127] When there is a treaty, extradition is only an option if the treaty permits extradition. Common impediments include citizenship, dual criminality, statutes of limitation, and capital punishment issues.

Many treaties permit a country to refuse to extradite its citizens even in the case of dual citizenship.[128] As for dual criminality, whether the crime of conviction or the crime charged is an extraditable offense will depend upon the nature of the crime and where it was committed. If the applicable treaty lists extraditable offenses, the crime must be on the list.[129] If the applicable treaty insists only upon dual criminality, the underlying misconduct must be a crime under the laws of both the United States and the country of refuge.[130]

Where the crime was committed matters; some treaties will only permit extradition if the offense was committed within the geographical confines of the United States.[131] Timing also matters. The speedy trial features of U.S. law require a good faith effort to bring to trial a fugitive who is within the government's reach.[132] Furthermore, the lapse of time or speedy trial component of the applicable extradition treaty may preclude extradition if prosecution would be barred by a statute of limitations in the country of refuge.[133] Some treaties prohibit extradition for capital offenses; more often they permit it but only with the assurance that a sentence of death will not be executed.[134]

Prosecutors may request provisional arrest of a fugitive without waiting for the final preparation of the documentation required for a formal extradition request, if there is a risk of flight and if the treaty permits it. The Justice Department encourages judicious use of provisional arrest because of the pressures that may attend it.[135] The Criminal Resource Manual contains the form for

---

[126] CRM § 603[A].

[127] *Id.*

[128] CRM § 603[B].

[129] CRM § 603[C].

[130] *Id.*

[131] CRM § 603[F].

[132] United States v. Corona-Verbera, 509 F.3d 1105, 1114-1116 (9ᵗʰ Cir. 2007);United States v. Blanco, 861 F.2d 773, 778 (2d Cir. 1988); United States v. Leaver, 358 F.Spp.2d 255, 265 (S.D.N.Y. 2004). *Cf.*, Doggett v. United States, 505 U.S. 647, 656-58 (1992).

[133] CRM § 603[F].

[134] ABBELL, *supra* footnote 21, at § 6-2(25).

[135] USAM § 9-15.230 ("... Once the United States requests provisional arrest ... [it] must submit as formal request for extradition, supported by all necessary documents, duly certified, authenticated and translated into the language of the country where the fugitive was arrested, within a specified time (from 30 days to three months, pending on the treaty).... Failure to follow through on an extradition request by submitting the requested documents after a provisional arrest has been made will result in release of the fugitive, strains on diplomatic relations, and possible liability for the prosecutor. The Office of International Affairs (OIA) determines whether the facts meet the requirement of urgency under the terms of the applicable treaty. If they do, OIA requests provisional arrest; if not, the prosecutor assembles the documents for a formal request. The latter method is favored when the defendant is unlikely to flee because the time pressures generated by a request for provisional arrest often result in errors that can damage the case ...").

collection of the information that must accompany either a federal or state prosecutor's application for a Justice Department request for provisional arrest.[136]

Although treaty requirements vary, the Justice Department suggests that prosecutors supply formal documentation in the form of an original and four copies of:

> - a prosecutor's affidavit describing the facts of the case, including dates, names, docket numbers and citations, and preferably executed before a judge or magistrate (particularly if extradition is sought from a civil law country)[137]
>
> - copies of the statutes the fugitive is said to have violated, the statutes governing the penalties that may be imposed upon conviction, and the applicable statute of limitations[138]
>
> - if the fugitive has been convicted and sentenced: identification evidence; certified documentation of conviction, sentence, and the amount of time served and remaining to be served; copies of the statutes of conviction; and a statement that the service of the remaining sentence is not barred by a statute of limitations[139]
>
> - if the fugitive is being sought for prosecution or sentencing: certified copies of the arrest warrant (preferably signed by the court or a magistrate) and of the indictment or complaint[140]
>
> - if the fugitive is being sought for prosecution or sentencing: evidence of the identity of the individual sought (fingerprints/photographs) and of the evidence upon which the charges are based and of the fugitive's guilt in the form of witness affidavits (preferable avoiding the use grand jury transcripts and, particularly in the case of extradition from a common law country, the use of hearsay).[141]

If the Justice Department approves the application for extradition, the request and documentation are forwarded to the State Department, translated if necessary, and with State Department approval forwarded through diplomatic channels to the country from which extradition is being sought.[142]

The treaty issue most likely to arise after extradition and the fugitive's return to this country is whether the fugitive was surrendered subject to any limitations such as those posed by the doctrine of specialty.

## Specialty

Under the doctrine of specialty, sometimes called speciality, "a person who has been brought within the jurisdiction of the court by virtue of proceedings under an extradition treaty, can only be tried for one of the offences described in that treaty, and for the offence with which he is charged in the proceedings for his extradition, until a reasonable time and opportunity have been

---

[136] CRM § 604; USAM § 9-15.230.

[137] CRM § 605; USAM § 9-15.240.

[138] CRM § 607; USAM § 9-15.240.

[139] CRM § 609; USAM § 9-15.240..

[140] CRM § 606; USAM § 9-15.240.

[141] CRM § 608; USAM § 9-15.240.

[142] ABBELL, *supra* footnote 21, at §7-1(8); USAM § 9-15.250.

given him after his release or trial upon such charge, to return to the country from whose asylum he had been forcibly taken under those proceedings."[143] The limitation, expressly included in many treaties,[144] is designed to preclude prosecution for different substantive offenses but does not bar prosecution for different or additional counts of the same offense.[145] And some courts have held that an offense whose prosecution would be barred by the doctrine may nevertheless be considered for purposes of the federal sentencing guidelines,[146] or for purposes of criminal forfeiture.[147] At least where an applicable treaty addresses the question, the rule is no bar to prosecution for crimes committed after the individual is extradited.[148]

---

[143] United States v. Alvarez-Machain, 504 U.S. 655, 661 (1992) (quoting United States v. Rauscher, 119 U.S. 407, 430 (1886)). *See also* United States v. Valencia-Trujillo, 573 F.3d 1171, 1173-1174 (11th Cir. 2009);United States v. Anderson, 472 F.3d 662, 671 (9th Cir. 2006); United States v. Garrido-Santana, 360 F.3d 565, 577 (6th Cir. 2004); United States v. Campbell, 300 F.3d 202, 209 (2d Cir. 2002); United States v. LeBaron, 156 F.3d 621, 626 (5th Cir. 1998); United States v. Tse, 135 F.3d 200, 204 (1st Cir. 1998); Jacques Semmelman, *The Doctrine of Specialty in the Federal Courts: Making Sense of* United States v. Rauscher, 34 Va. J. Int'l L. 71 (1993); *Application of Doctrine of Specialty to Federal Criminal Prosecution of Accused Extradited from Foreign Country*, 112 ALR Fed. 473 (1993 & Oct. 2006 Supp.); Bassiouni, *supra* footnote 4, at 537-603; Abbell & Ristau, *supra* footnote 3, at 331-35.

[144] Although the wording varies, the content of these provisions roughly corresponds to those in the *Jamaican Extradition Treaty*, art. XIV, entered into force July 7, 1991, S. Treaty Doc. 98-18:

> (1) A person extradited under this Treaty may only be detained, tried or punished in the Requesting State for the offence for which extradition is granted, or (a) for a lesser offence proved by the facts before the court of committal ... (b) for an offence committed after the extradition; or (c) for an offence in respect to which the executive authority of the Requested State ... consents to the person's detention, trial or punishment ... or (d) if the person (i) having left the territory of the Requesting State after his extradition, voluntarily returns to it; or (ii) being free to leave the territory of the Requesting State after his extradition, does not so leave within forty-five (45) days.... (2) A person extradited under this Treaty may not be extradited to a third State unless (a) the Requested State consents; or (b) the circumstances are such that he could have been dealt with in the Requesting State pursuant to sub-paragraph (d) of paragraph (1).

*See also* Extradition Treaty with Belize, art. 14, entered into force Mar. 27, 2001, S. Treaty Doc. 106-38; Polish Extradition Treaty, art. 19, entered into force Sept. 17, 1999, S. Treaty Doc. 105-14; Extradition Treaty with Uruguay, art. 13, entered into force Apr. 11, 1984, 35 U.S.T. 3197; Hungarian Extradition Treaty, art. 17, entered into force Mar. 18, 1997, S. Treaty Doc. 104-5; Extradition Treaty with Thailand, art. 14, entered into force May 17, 1991, S. Treaty Doc. 98-16; Bolivian Extradition Treaty, art. XII, entered into force Nov. 21, 1996, S. Treaty Doc. 104-22; Extradition Treaty with the Bahamas, art. 14, entered into force Sept. 22, 1994, S. Treaty Doc. 102-17; Jordanian Extradition Treaty, art. 16, entered into force Jul. 29, 1995, S. Treaty Doc. 104-3; Costa Rican Extradition Treaty, art. 16, entered into force Oct. 11, 1991, S. Treaty Doc. 98-17; Italian Extradition Treaty, art. XVI, entered into force Sept. 24, 1984, 35 U.S.T. 3023.

[145] Gallo-Chamorro v. United States, 233 F.3d 1298, 1305 (11th Cir. 2000)("Rather than mandating exact uniformity between the charges set forth in the extradition request and the actual indictment, what the doctrine of speciality requires is that the prosecution be based on the same facts as those set forth in the request for extradition"); United States v. Sensi, 879 F.2d 888, 895-96 (D.C.Cir. 1989); United States v. LeBaron, 156 F.3d 621, 627 (5th Cir. 1998)("the appropriate test for a violation of specialty is whether the extraditing country would consider the acts for which the defendant was prosecuted as independent form those for which he was extradited"); United States v. Andonian, 29 F.3d 1432, 1435 (9th Cir. 1994); United States v. Levy, 25 F.3d 146, 159 (2d Cir. 1994).

[146] United States v. Garrido-Santana, 360 F.3d 565, 577-78 (6th Cir. 2004); United States v. Lazsarevich, 147 F.3d 1061, 1064-65 (9th Cir. 1998)(also noting that the doctrine of specialty "exists only to the extent that the surrendering country wishes" and there was no evidence of a demand that the doctrine be applied).

[147] United States v. Saccoccia, 58 F.3d 754, 784 (1st Cir. 1995).

[148] United States v. Burke, 425 F.3d 400, 408 (7th Cir. 2005).

---

The doctrine may be of limited advantage to a given defendant because the circuits are divided over whether a defendant has standing to claim its benefits.[149] Additionally, one circuit has held that a fugitive lacks standing to allege a rule of specialty violation when extradited pursuant to an agreement other than treaty.[150] Regardless of their view of fugitive standing, reviewing courts have agreed that the surrendering State may subsequently consent to trial for crimes other than those for which extradition was had.[151]

# Alternatives to Extradition

The existence of an extradition treaty does not preclude the United States acquiring personal jurisdiction over a fugitive by other means, unless the treaty expressly provides otherwise.[152]

## Waiver

Waiver or "simplified" treaty provisions allow a fugitive to consent to extradition without the benefit of an extradition hearing.[153] Although not universal, the provisions constitute the least controversial of the alternatives to extradition.

---

[149] United States v. Puentes, 50 F.3d 1567, 1572 (11th Cir. 1995)(stating that "The question of whether a criminal defendant has standing to assert a violation of the doctrine of specialty has split the federal circuit courts of appeals", and noting decisions in favor of defendant standing, including United States v. Levy, 905 F.2d 326, 328 n.1 (10th Cir. 1990); United States v. Thirion, 813 F.2d 146, 151 n.5 (8th Cir. 1987); United States v. Najohn, 785 F.2d 1420, 1422 (9th Cir. 1986); and those holding to the contrary, United States v. Burke, 425 F.3d 400, 408 (7th Cir. 2005); United States v. Kaufman, 874 F.2d 242, 243 (5th Cir. 1989)). *See also* United States v. Antonakeas, 255 F.3d 714, 719-20 (9th Cir. 2001)(defendant has standing to object to substantive but not procedural noncompliance with applicable treaty requirements); United States *ex rel.* Saroop v. Garcia, 109 F.3d 165, 167-68 (3d Cir. 1997); Abbas v. Department of Homeland Sec., Civil Action No. 09-0169, 2009 WL 2512844, at *3-4 (U.S.W.D.La.,2009) (discussing conflicting jurisprudence and academic views regarding criminal defendant's standing to assert violation of specialty doctrine); Ha Kung Wong, Note, *The Extra in Extradition: The Impact of State v. Pang on Extraditee Standing and Implicit Waiver*, 24 J. LEGIS. 111 (1998); Mary-Rose Papandrea, Comment, *Standing to Allege Violations of the Doctrine of Specialty: An Examination of the Relationship Between the Individual and the Sovereign*, 62 UNIVERSITY OF CHICAGO LAW REVIEW 1187 (1995); BASSIOUNI, *supra* footnote 4, at 587-98.The Ninth Circuit has held that convictions for an offense in violation of the principles of dual criminality and/or specialty must be reversed. United States v. Anderson, 472 F.3d 662, 671 (9th Cir. 2006).

[150] United States v. Valencia-Trujillo, 573 F.3d 1171, 1179-1181 (11th Cir. 2009) (recognizing that "[t]he rule of specialty applies only to extraditions pursuant to treaty," and finding that defendant lacked standing to claim a rule of specialty violation when his extradition from Colombia was not pursuant to the U.S.-Colombian extradition treaty, but was instead effectuated by way of an informal agreement between the countries).

[151] United States v. Tse, 135 F.3d 200, 205 (1st Cir. 1998); United States v. Puentes, 50 F.3d 1567, 1575 (11th Cir. 1995); United States v. Riviere, 924 F.2d 1289, 1300-1301 (3d Cir. 1991); United States v. Najohn, 785 F.2d 1420, 1422 (9th Cir. 1986).

[152] United States v. Alvarez-Machain, 504 U.S. 655 (1992); United States v. Anderson, 472 F.3d 662, 666 (9th Cir. 2006); United States v. Mejia, 448 F.3d 436, 442-43 (D.C. Cir. 2006); United States v. Arbane, 446 F.3d 1223, 1225 (11th Cir. 2006); Kasi v. Angelone, 300 F.3d 487, 493-95 (4th Cir. 2002); United States v. Noriega, 117 F.3d 1206, 1212-213 (11th Cir. 1997); United States v. Matt-Ballesteros, 71 F.3d 754, 762-63 (9th Cir. 1995).

[153] E.g., Extradition Treaty with Thailand, art. 15, entered into force May 17, 1991, S. TREATY DOC. 98-16 ("If the person sought irrevocably agrees in writing to extradition after personally being advised by the competent authority of his right to formal extradition proceedings and the protection afforded by them, the Requested State may grant extradition without formal extradition proceedings"). *See also* Extradition Agreement with the European Union, art. 11, entered into force Feb. 1, 2010, S. TREATY DOC. 109-14 (applying in absence of a germane provision in an applicable bilateral treaty between the United States and an EU Member State); Extradition Treaty with the United Kingdom, art. 17, entered into force Apr. 26, 2007, S. TREATY DOC. 108-23; Extradition Treaty with Cyprus, art. 17, entered into force (continued...)

---

# Immigration Procedures

The removal of aliens under immigration law has traditionally been considered a practice distinct from extradition.[154] Unlike extradition, the legal justification for removing an alien via deportation or denial of entry is not so he can answer charges against him in the receiving State; rather, it is because the removing country has sovereign authority to determine which non-nationals may enter or remain within its borders, and the alien has failed to fulfill the legal criteria allowing non-citizens to enter, remain in, or pass in transit through the sovereign's territory.

Whether by a process similar to deportation or by simple expulsion, the United States has had some success encouraging other countries to surrender fugitives other than their own nationals without requiring recourse to extradition.[155] Ordinarily, U.S. immigration procedures, on the other hand, have been less accommodating and have been called into play only when extradition has been found wanting.[156] They tend to be time consuming and usually can only be used in lieu of extradition when the fugitive is an alien. Moreover, they frequently require the United States to deposit the alien in a country other than one that seeks his or her extradition.[157] Yet in a few instances where an alien has been naturalized by deception or where the procedures available

---

(...continued)

Sept. 14, 1999, S. TREATY DOC. 105-16; Austrian Extradition Treaty, art. 20, entered into force Jan. 1, 2000, S. TREATY DOC. 105-50, TIAS 12916; Costa Rican Extradition Treaty, art. 17, entered into force Oct. 11, 1991, S. TREATY DOC. 98-17; Jordanian Extradition Treaty, art. 17, entered into force July 29, 1995, S. TREATY DOC. 104-3 ; Hungarian Extradition Treaty, art. 18, entered into force Mar. 18, 1997, S. TREATY DOC. 104-5; Extradition Treaty with the Bahamas, art. 15, entered into force Sept. 22, 1994, S. TREATY DOC. 102-17; Bolivian Extradition Treaty, art. XIII, entered into force Nov. 21, 1996, S. TREATY DOC. 104-22; Italian Extradition Treaty, art. XVII, entered into force Sept. 24, 1984, 35 U.S.T. 3023; Jamaican Extradition Treaty, art. XV, entered into force July 7, 1991, S. TREATY DOC. 98-18. *See generally* ABBELL & RISTAU, *supra* footnote 3, at 143-46, 306-7.

[154] *See generally* BASSIOUNI, *supra* footnote 4, at 203-05. *See also* McMullen v. I.N.S., 788 F.2d 591, 596, *overruled on other grounds* (9th Cir. 1986) ("When extradition is the issue, the attempt to remove an individual from the requested country is initiated at the specific request of another sovereign, whom the individual contends is seeking to extradite him solely in order to prosecute him for his political beliefs. Thus, the analysis in an extradition case turns on the language of the particular treaty….[I]n contrast to extradition, deportation is a matter solely between the United States government and the individual seeking withholding of deportation. No other sovereign is involved….Moreover, the individual need not be deported to any country specifically seeking to extradite him; all the United States seeks is to expel him from its own borders.").

[155] United States v. Porter, 909 F.2d 789, 790 (4th Cir. 1990); United States v. Rezaq, 134 F.3d 1121, 1126 (D.C.Cir. 1998); ABBELL & RISTAU, *supra* footnote 3, §13-5-2(2) ("In recent years, it has not been uncommon for foreign officials, particularly in lesser developed countries, to put a person sought by the United States on an airplane bound for this country in the custody of either United States law enforcement agents or their own law enforcement agents. Such deportation takes place without the requested country resorting to its formal administrative or judicial deportation procedures. It occurs most frequently in narcotics cases, and generally takes place where there is a close working relationship between United States law enforcement officers posted in that country and the police authorities of that country.... In addition to informal deportation by airplane, there is a large volume of informal deportations from Mexico to the United States. Most of these informal deportations are based on informal arrangements among local United States and Mexican law enforcement officials along the United States-Mexico border ..."). *See also* USAM §§ 9-15.610, 9-15.640 (noting the possibility of immigration exclusion and deportation as an alternative to extradition and in the case of American fugitives the prospect of revoking a fugitive's U.S. passport in aid of such an alternative).

[156] *E.g.*, I.N.S. v. Doherty, 502 U.S. 314 (1992); James T. Kelly, *The Empire Strikes Back: The Taking of Joe Doherty*, 61 FORDHAM LAW REVIEW 317 (1992).

[157] *E.g.*, Kalejs v. I.N.S., 10 F.3d 441 (7th Cir. 1993)(deportation to Australia of a member of a German mobile killing unit in World War II who falsified immigration forms but who came to this country by way of Australia).

---

against alien terrorists come into play, denaturalization or deportation may be considered an attractive alternative or supplement to extradition proceedings.[158]

## Irregular Rendition/Abduction

Although less frequently employed by the United States, "irregular rendition" is a familiar alternative to extradition.[159] An alternative of last resort, it involves kidnaping or deceit and generally has been reserved for terrorists, drug traffickers, and the like.[160] Kidnaping a defendant overseas and returning him to the United States for trial does not deprive American courts of jurisdiction unless an applicable extradition treaty explicitly calls for that result.[161] Nor does it ordinarily expose the United States to liability under the Federal Tort Claims Act nor individuals involved in the abduction to liability under the Alien Tort Statute.[162] The individuals involved in the abduction, however, may face foreign prosecution, or at least be the subject of a foreign extradition request.[163] Moreover, the effort may strain diplomatic relations with the country from which the fugitive is lured or abducted.[164]

Besides receiving persons through irregular rendition, the United States has also rendered persons to other countries over the years, via the Central Intelligence Agency and various law

---

[158] The United States has denaturalized and deported former Nazi death camp guards who gained entry into the United States and/or American citizenship by concealing their pasts. *E.g.*, United States v. Balsys, 524 U.S. 666 (1998); United States v. Stelmokas, 110 F.3d 302 (3d Cir. 1997). *See also* John Francis Stephens, Note, *The Denaturalization and Extradition of Ivan the Terrible*, 26 RUTGERS L. J. 821 (1995); BASSIOUNI, *supra* footnote 4, at 203-71 (summarizing alternatives and criticizing their use in some instances).

[159] *See generally* CRS Report RL32890, *Renditions: Constraints Imposed by Laws on Torture*, by Michael John Garcia.

[160] United States v. Mejia, 448 F.3d 436 (D.C. Cir. 2006); United States v. Rezaq, 134 F.3d 1121 (D.C. Cir. 1998); United States v. Yunis, 924 F.2d 1086 (D.C. Cir. 1991); United States v. Noriega, 117 F.3d 1206 (11th Cir. 1997).

[161] United States v. Alvarez-Machain, 504 U.S. 655 (1992); United States v. Torres Gonzalez, 240 F.3d 14, 16 (1st Cir. 2001); United States v. Mejia, 448 F.3d 436, 442-43 (D.C. Cir. 2006); United States v. Arbane, 446 F.3d 1223, 1225 (11th Cir. 2006); Kasi v. Angelone, 300 F.3d 487, 493-500 (4th Cir. 2002). *See also* United States v. Anderson, 472 F.3d 662, 666 (9th Cir. 2006)("a court is deprived of jurisdiction over an extradited defendant, if either (1) the transfer of the defendant violated the applicable extradition treaty, or (2) the United States government engaged in 'misconduct of the most shocking and outrageous kind,' to obtain his presence").

[162] Sosa v. Alvarez-Machain, 542 U.S. 692, 699-738 (2004). Yet if the abducted defendant is entitled to protections under the Constitution, the U.S. officials involved may face civil liability. *Id.* at 736-37.

[163] Kear v. Hilton, 699 F.2d 181 (4th Cir. 1983); Jeffrey J. Carlisle, Comment, *Extradition of Government Agents as a Municipal Law Remedy for State-Sponsored Kidnaping*, 81 CAL. L. REV. 1541 (1993); Kristofer R. Schleicher, Note Update, *Transborder Abductions by American Bounty Hunters—The Jaffe Case and a New Understanding Between the United States and Canada*, 20 GA. J. INT'L & COMP. L. 489 (1990). In 2009, an Italian court convicted 22 CIA operatives and a U.S. military colonel in absentia for their purported role in the irregular rendition of an Egyptian cleric from Italy to Egypt. The Italian Ministry of Justice apparently has yet to request the United States to extradite these persons so that they may serve their criminal sentences. *See* Craig Whitlock, *Italian Court Convicts 23 Americans in CIA Rendition Case; Extradition Undecided*, WASH. POST, November 4, 2009.

[164] USAM § 9-15.620 (If the fugitive travels outside the country from which he or she is not extraditable, it may be possible to request his or her extradition form another country. This method is often used for fugitives who are citizens in their country of refuge. Some countries, however, will not permit extradition if the defendant has been lured into their territory. Such ruses may also cause foreign relations problems with both the countries from which and to which the lure takes place"); USAM §9-15.630 ("A lure involves using a subterfuge to entice a criminal defendant to leave a foreign country so that he or she can be arrested in the United States, in international waters or airspace, or in a third country for subsequent extradition, expulsion, or deportation to the United States.... As noted above, some countries will not extradite a person to the United Stats if the person's presence in that country was obtained through the use of a lure or other ruse. In addition, some countries may view a lure of a person form its territory as an infringement on its sovereignty ...").

---

enforcement agencies. During the George W. Bush Administration, there was controversy over the use of renditions by the United States, particularly with regard to the alleged transfer of suspected terrorists to countries known to employ harsh interrogation techniques that may rise to the level of torture. Little publicly available information from government sources exists regarding the nature and frequency of U.S. renditions to countries believed to practice torture, or the nature of any assurances obtained from them before rendering persons to their custody. It appears that most, if not all, cases in which the United States has irregularly rendered persons have involved the transfer of non-citizens seized outside the United States,[165] perhaps because persons within the United States (and U.S. citizens outside the country[166]) are provided procedural protections against being summarily transferred to another country under federal statute and the Constitution.[167] The legal limitations against the rendition of non-citizens seized outside the United States are much more limited, though it would be a violation of both CAT and U.S. criminal law for a U.S. official to conspire to commit torture via rendition.[168]

## Foreign Prosecution

A final alternative when extradition for trial in the United States is not available, is trial within the country of refuge. The alternative exists primarily when extradition has been refused because of the fugitive's nationality and/or where the crime occurred under circumstances that permit prosecution by either country for the same misconduct.[169] The alternative can be cumbersome and expensive and may be contrary to U.S. policy objectives.[170]

---

[165] Although the deportation or exclusion of an alien under immigration laws may have the same practical effect as an irregular rendition (especially if the alien is subject to "expedited removal"), this practice is arguably distinct from the historical understanding of what constitutes a rendition, as alien removal is governed by statute and regulation. Nonetheless, certain alien removals have been popularly characterized as "renditions." Perhaps the most notable case of alleged rendition involved Maher Arar, a dual citizen of Canada and Syria. Mr. Arar filed suit in January 2004 against certain U.S. officials that he claims were responsible for rendering him to Syria, where he was allegedly tortured and interrogated for suspected terrorist activities. Arar was allegedly first detained by U.S. officials while waiting in New York's John F. Kennedy International Airport for a connecting flight to Canada after previously flying from Tunisia. According to U.S. officials, Mr. Arar's removal to Syria was done pursuant to § 235(c) of the Immigration and Nationality Act, which authorizes the "expedited removal" of arriving aliens suspected of terrorist activity. U.S. Department of State, U.S. Views Concerning Syrian Release of Mr. Maher Arar, October 6, 2003, available at http://2001-2009.state.gov/r/pa/prs/ps/2003/24965.htm; *see also* 8 U.S.C. § 1225(c). The U.S. District Court for the Eastern District of New York dismissed Arar's civil case on a number of grounds, including that certain claims raised against U.S. officials implicated national security and foreign policy considerations, and assessing the propriety of those considerations was most appropriately reserved to Congress and the executive branch. Arar v. Ashcroft, 414 F.Supp.2d 250 (E.D.N.Y. 2006). The district court's dismissal was upheld by a three-judge panel of the Court of Appeals for the Second Circuit, and upon rehearing, the appellate court sitting *en banc*. Ashcroft, 532 F.3d 157 (2d Cir. 2008), *rehearing en banc*, 585 F.3d 559 (2d Cir. 2009).

[166] *See, e.g.*, Reid v. Covert, 354 U.S. 1, 6 (1957) ("When the Government reaches out to punish a citizen who is abroad, the shield which the Bill of Rights and other parts of the Constitution provide to protect his life and liberty should not be stripped away just because he happens to be in another land.").

[167] *See* 18 U.S.C. §§ 3181-3196; *In re* Kaine, 55 U.S. 103, 113 (1852) ("an extradition without an unbiased hearing before an independent judiciary [is] highly dangerous to liberty, and ought never to be allowed in this country").

[168] Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT), art. 4, entered into force for U.S. on Oct. 21, 1994, S. TREATY DOC. 100-20 (requiring parties to criminalize all acts of torture, as well as attempts to commit and complicity or participation in torture); 18 U.S.C. § 2340A(a) (making it a criminal offense to conspire to commit torture outside the United States).

[169] *See, e.g.*, Hungarian Extradition Treaty, art. 3(2), entered into force Mar. 18, 1997, S. TREATY DOC. 104-5 ("If extradition is refused solely on the basis of the nationality of the person sought, the Requested State shall, at the request of the Requesting State, submit the case to its authorities for prosecution"); Austrian Extradition Treaty, art. 3(2), (continued...)

---

# Appendix A. Countries with Which the United States Has a Bilateral Extradition Treaty

| Country | Citation | Entry into Force |
|---|---|---|
| Albania | 49 Stat. 3313 | 11/14/1935 |
| Antigua and Barbuda | S. Treaty Doc. 105-19 | 7/01/1999 |
| Argentina | S. Treaty Doc. 105-18, TIAS 12866 | 6/15/2000 |
| Australia | 27 UST 957 | 5/08/1976 |
|  | S. Treaty Doc. 102-23 (Protocol) | 12/21/1992 |
| Austria | S. Treaty Doc. 105-50, TIAS 12916 | 1/01/2000 |
|  | S. Treaty Doc. 109-14 (Agreement to ensure conformity with U.S.-EU Extradition Treaty) | 2/01/2010 |
| Bahamas | S. Treaty Doc. 102-17 | 9/22/1994 |
| Barbados | S. Treaty Doc. 105-20 | 3/03/2000 |
| Belgium | S. Treaty Doc. 104-7 | 9/01/1997 |
|  | S. Treaty Doc. 109-14 (Agreement to ensure conformity with U.S.-EU Extradition Treaty) | 2/01/2010 |
| Belize | S. Treaty Doc. 106-38 | 3/27/2001 |
| Bolivia | S. Treaty Doc. 104-22 | 11/21/1996 |
| Brazil | 15 UST 2093 | 12/17/1964 |
|  | 15 UST 2112 (Protocol) | 12/17/1964 |
| Bulgaria | S. Treaty Doc. 110-12 | 5/21/2009 |
| Burma | 47 Stat. 2122 (U.S.-U.K. treaty) | 11/1/1941 |

---

(...continued)

entered into force Jan. 1, 2000, S. Treaty Doc. 105-50, TIAS 12916; Extradition Treaty with Cyprus, art. 3(2), entered into force Sept. 14, 1999, S. Treaty Doc. 105-16; Bolivian Extradition Treaty, art. III(3), entered into force Nov. 21, 1996, S. Treaty Doc. 104-22; Extradition Treaty with Thailand, art. 8(2), entered into force May 17, 1991, S. Treaty Doc. 98-16; Costa Rican Extradition Treaty, art. 8(3), entered into force Oct. 11, 1991, S. Treaty Doc. 98-17; Jamaican Extradition Treaty, art. VII(2)-(3), entered into force July 7, 1991, S. Treaty Doc. 98-18 (similar, but also requiring extradition if a fugitive is a national of both the Requesting and Requested State).

[170] USAM § 9-15.650 ("If the fugitive has taken refuge in the country of which he or she is a national, and is thereby not extradited, it may be possible to ask that country to prosecute the individual for the crime that was committed in the United States. This can be an expansive and time consuming process and in some countries domestic prosecution is limited to certain specified offenses. In addition, a request for domestic prosecution in a particular case may conflict with U.S. law enforcement efforts to change the 'non-extradition of nations' law or policy in the foreign country ...").

*Extradition To and From the United States: Overview of the Law and Recent Treaties*

| Country | Citation | Entry into Force |
|---|---|---|
| Canada | 27 UST 983 | 3/22/1976 |
| | 27 UST 983 (Amending agreement through exchange of notes) | 3/22/1976 |
| | S. Treaty Doc. 101-17 (Protocol) | 11/26/1991 |
| | S. Treaty Doc. 107-11 (Second Protocol) | 4/30/2003 |
| Chile | 32 Stat. 1850 | 6/26/1902 |
| Colombia[a] | S. Treaty Doc. 97-8 | 3/04/1982 |
| Congo | 37 Stat. 1526 (U.S.-France treaty) | 7/27/1911 |
| | 46 Stat. 2276 (Supplementary agreement) | 5/19/1929 |
| | 50 Stat. 2276 (Supplementary agreement) | 9/24/1936 |
| | 13 UST 2065  (Exchange of notes concerning continued application of treaties between U.S. and France) | 8/05/1961 |
| Costa Rica | S. Treaty Doc. 98-17 | 10/11/1991 |
| Cuba | 33 Stat. 2265 | 3/02/1905 |
| | 33 Stat. 2273 (Protocol) | 3/02/1905 |
| | 44 Stat. 2392 (Additional treaty) | 6/181926 |
| Cyprus | S. Treaty Doc. 105-16 | 9/14/1999 |
| | S. Treaty Doc. 109-14 (Agreement to ensure conformity with U.S.-EU Extradition Treaty) | 2/01/2010 |
| Czech Republic | 44 Stat. 2367 (Czechoslovakia) | 3/29/1926 |
| | 49 Stat. 3253 (Czechoslovakia, supplementary agreement) | 8/28/1935 |
| | S. Treaty Doc. 109-14 (Agreement to ensure conformity with U.S.-EU Extradition Treaty) | 2/01/2010 |
| Denmark | 25 UST 1293 | 7/31/1974 |
| | S. Treaty Doc. 109-14 (Agreement to ensure conformity with U.S.-EU Extradition Treaty) | 2/01/2010 |
| Dominica | S. Treaty Doc. 105-19 | 5/25/2000 |
| Dominican Republic | 36 Stat. 2468 | 8/02/1910 |
| Ecuador | 18 Stat. 199 | 11/12/1873 |
| | 55 Stat. 1196 (Supplementary agreement) | 5/29/1941 |

| Country | Citation | Entry into Force |
|---|---|---|
| Egypt | 19 Stat. 572 | 4/22/1875 |
| El Salvador | 37 Stat. 1516 | 7/10/1911 |
| Estonia | S. Treaty Doc. 109-16 | 2/01/2010 |
| Fiji | 47 Stat. 2122 (U.S.-U.K. treaty) | 6/24/1935 |
| | 24 UST 1965 (Exchange of notes concerning continued application of U.S.-U.K. treaty) | 8/17/1973 |
| Finland | 31 UST 944 | 5/11/1980 |
| | S. Treaty Doc. 109-14 (Agreement to ensure conformity with U.S.-EU Extradition Treaty) | 2/01/2010 |
| France | S. Treaty Doc. 105-13 | 2/01/2002 |
| | S. Treaty Doc. 109-14 (Agreement to ensure conformity with U.S.-EU Extradition Treaty) | 2/01/2010 |
| Gambia | 47 Stat. 2122 (U.S.-U.K. treaty) | 6/24/1935 |
| Germany | 32 UST 1485 | 8/29/1980 |
| | S. Treaty Doc. 100-6 (Supplementary agreement) | 3/11/1993 |
| | S. Treaty Doc. 109-14 (Agreement to ensure conformity with U.S.-EU Extradition Treaty) | 2/01/2010 |
| Ghana | 47 Stat. 2122 (U.S.-U.K. treaty) | 6/24/1935 |
| Greece | 47 Stat. 2185 | 11/01/1932 |
| | 51 Stat. 357 (Protocol) | 9/02/1937 |
| | S. Treaty Doc. 109-14 (Agreement to ensure conformity with U.S.-EU Extradition Treaty) | 2/01/2010 |
| Grenada | S. Treaty Doc. 105-19 | 9/14/1999 |
| Guatemala | 33 Stat. 2147 | 8/15/1903 |
| | 55 Stat. 1097 (Supplementary agreement) | 3/13/1941 |
| Guyana | 47 Stat. 2122 | 6/24/1935 |
| Haiti | 34 Stat. 2858 | 6/28/1905 |
| Honduras | 37 Stat. 1616 | 7/10/1912 |
| | 45 Stat. 2489 (Supplementary agreement) | 6/05/1928 |
| Hong Kong (China) | S. Treaty Doc. 105-3 | 1/21/1998 |
| Hungary | S. Treaty Doc. 104-5 | 3/18/1997 |
| | S. Treaty Doc. 109-14 (Agreement to ensure conformity with U.S.-EU Extradition Treaty) | 2/01/2010 |

*Extradition To and From the United States: Overview of the Law and Recent Treaties*

| Country | Citation | Entry into Force |
|---|---|---|
| Iceland | 32 Stat. 1096 (U.S.-Denmark treaty) | 5/16/1902 |
| | 34 Stat. 2887 (U.S.-Denmark treaty) | 2/19/1906 |
| India | S. Treaty Doc. 105-30, TIAS 12873 | 7/21/1999 |
| Iraq | 49 Stat. 3380 | 4/23/1936 |
| Ireland | S. Treaty Doc. 98-19, TIAS 10813 | 12/15/1984 |
| | S. Treaty Doc. 109-14 (Agreement to ensure conformity with U.S.-EU Extradition Treaty) | 2/01/2010 |
| Israel | 14 UST 1707 | 12/05/1963 |
| | 18 UST 382 (Exchange of notes amending textual error) | 4/11/1967 |
| | S. Treaty Doc. 109-3 (Protocol) | 1/10/2007 |
| Italy | 35 UST 3023 | 9/24/1984 |
| | S. Treaty Doc. 109-14 (Agreement to ensure conformity with U.S.-EU Extradition Treaty) | 2/01/2010 |
| Jamaica | S. Treaty Doc. 98-18 | 7/07/1991 |
| Japan | 31 UST 892 | 3/26/1980 |
| Jordan | S. Treaty Doc. 104-3 | 7/29/1995 |
| Kenya | 47 Stat. 2122 (U.S.-U.K. treaty) | 6/24/1935 |
| | 16 UST 1866 (Exchange of notes concerning continued application of U.S.-U.K. treaty) | 8/19/1965 |
| Kiribati | 28 U.S.T. 227 (U.S.-U.K. treaty) | 1/21/1977 |
| Korea, South | S. Treaty Doc. 106-2, TIAS 12962 | 12/20/1999 |
| Latvia | S. Treaty Doc. 109-15 | 4/15/2009 |
| Lesotho | 47 Stat. 2122 | 6/24/1935 |
| Liberia | 54 Stat. 1733 | 11/21/1939 |
| Liechtenstein | 50 Stat. 1337 | 6/28/1937 |
| Lithuania | S. Treaty Doc. 107-4 | 3/31/2003 |
| | S. Treaty Doc. 109-14 (Agreement to ensure conformity with U.S.-EU Extradition Treaty) | 2/01/2010 |
| Luxembourg | S. Treaty Doc. 105-10, TIAS 12804 | 2/01/2002 |
| | S. Treaty Doc. 109-14 (Agreement to ensure conformity with U.S.-EU Extradition Treaty) | 2/01/2010 |

*Extradition To and From the United States: Overview of the Law and Recent Treaties*

| Country | Citation | Entry into Force |
|---|---|---|
| Malawi | 47 Stat. 2122 (U.S.-U.K. treaty) | 6/24/1935 |
| | 18 UST 1822 (Exchange of notes concerning continued application of U.S.-U.K. treaty) | 4/04/1967 |
| Malaysia | S. Treaty Doc. 104-26 | 6/02/1997 |
| Malta | S. Treaty Doc. 109-17 | 2/01/2010 |
| Marshall Islands | State Dept. No. 04-181 (Executive agreement concluded pursuant to section 175 of the amended Compact of Free Association, P.L. 99-239, Title II) | 5/1/2004 |
| Mauritius | 47 Stat. 2122 (U.S.-U.K. treaty) | 6/24/1935 |
| Mexico | 31 UST 5059 | 1/25/1980 |
| | S. Treaty Doc. 105-46 (Protocol), TIAS 12897 | 5/21/2001 |
| Micronesia | State Dept. No. 04-152 (Executive agreement concluded pursuant to section 175 of the amended Compact of Free Association, P.L. 99-239, Title II) | 6/25/2004 |
| Monaco | 54 Stat. 1780 | 3/28/1940 |
| Nauru | 47 Stat. 2122 (U.S.-U.K. treaty | 6/24/1935 |
| Netherlands | S. Treaty Doc. 97-7, TIAS 10733[b] | 9/15/1983 |
| | S. Treaty Doc. 109-14 (Agreement to ensure conformity with U.S.-EU Extradition Treaty) | 2/01/2010 |
| New Zealand | 22 UST 1 | 12/08/1970 |
| Nicaragua | 35 Stat. 1869 | 7/14/1907 |
| Nigeria | 47 Stat. 2122 (U.S.-U.K. treaty) | 6/24/1935 |
| Norway | 31 UST 5619 | 3/07/1980 |
| | S. Treaty Doc. 109-14 (Agreement to ensure conformity with U.S.-EU Extradition Treaty) | 2/01/2010 |
| Pakistan | 47 Stat. 2122 (U.S.-U.K. treaty) | 6/24/1935 |
| Palau[c] | TIAS _ (Executive agreement concluded pursuant to section 175 of the amended Compact of Free Association, P.L. 99-239, Title II) | 10/01/1994 |
| Panama | 34 Stat. 2851 | 5/08/1935 |
| Papua New Guinea | 47 Stat. 2122 (U.S.-U.K. treaty) | 8/30/1935 |
| | TIAS ____ (Exchange of notes concerning continued application of U.S.-U.K. treaty) | 2/23/1988 |

| Country | Citation | Entry into Force |
|---|---|---|
| Paraguay | S. Treaty Doc. 106-4, TIAS 12995 | 3/09/2001 |
| Peru | S. Treaty Doc. 107-6 | 8/25/2003 |
| Philippines | S. Treaty Doc. 104-16 | 11/22/1996 |
| Poland | S. Treaty Doc. 105-14 | 9/17/1999 |
| | S. Treaty Doc. 109-14 (Agreement to ensure conformity with U.S.-EU Extradition Treaty) | 2/01/2010 |
| Portugal | 35 Stat. 2071 | 11/14/1908 |
| | S. Treaty Doc. 109-14 (Agreement to ensure conformity with U.S.-EU Extradition Treaty) | 2/01/2010 |
| Romania | S. Treaty Doc. 110-11 | 5/8/2009 |
| Saint Kitts and Nevis | S. Treaty Doc. 105-19, TIAS 12805 | 2/23/2000 |
| Saint Lucia | S. Treaty Doc. 105-19 | 2/02/2000 |
| Saint Vincent & the Grenadines | S. Treaty Doc. 105-19 | 9/08/1999 |
| San Marino | 35 Stat. 1971 | 7/08/1908 |
| | 49 Stat. 3198 (Supplementary agreement) | 6/28/1935 |
| Seychelles | 47 Stat. 2122 (U.S.-U.K. treaty) | 6/24/1935 |
| Sierra Leone | 47 Stat. 2122 (U.S.-U.K. treaty) | 6/24/1935 |
| Singapore | 47 Stat. 2122 (U.S.-U.K. treaty) | 6/24/1935 |
| | 20 UST 2764 (Exchange of notes concerning continued application of U.S.-U.K. treaty) | 6/10/1969 |
| Slovak Republic | 44 Stat. 2367 (Czechoslovakia) | 3/29/1926 |
| | 49 Stat. 3253 (Czechoslovakia, supplementary agreement) | 8/28/1935 |
| | S. Treaty Doc. 109-14 (Agreement to ensure conformity with U.S.-EU Extradition Treaty) | 2/01/2010 |
| Slovenia | S. Treaty Doc. 109-14 (Agreement to ensure conformity with U.S.-EU Extradition Treaty) | 2/01/2010 |
| Solomon Islands | 28 UST 227 (U.S.-U.K. treaty) | 1/21/1977 |
| South Africa | S. Treaty Doc. 106-24 | 6/25/2001 |

*Extradition To and From the United States: Overview of the Law and Recent Treaties*

| Country | Citation | Entry into Force |
|---|---|---|
| Spain | 22 UST 737 | 6/16/1971 |
| | 29 UST 2283 (Supplementary agreement) | 6/02/1978 |
| | S. Treaty Doc. 102-24 (Supplementary agreement) | 7/02/1993 |
| | S. Treaty Doc. 105-15 (Supplementary agreement) | 7/25/1999 |
| | S. Treaty Doc. 109-14 (Agreement to ensure conformity with U.S.-EU Extradition Treaty) | 2/01/2010 |
| Sri Lanka | S. Treaty Doc. 106-34 | 1/12/2001 |
| Suriname | 26 Stat. 1481 | 7/11/1889 |
| | 33 Stat. 2257 | 8/28/1904 |
| Swaziland | 47 Stat. 2122 (U.S.-U.K. treaty) | 6/24/1935 |
| | 21 UST 1930 (Exchange of notes concerning continued application of U.S.-U.K. treaty) | 7/28/1970 |
| Sweden | 14 UST 1845 | 12/03/1963 |
| | TIAS 10812 (Supplementary agreement) | 9/24/1984 |
| | S. Treaty Doc. 109-14 (Agreement to ensure conformity with U.S.-EU Extradition Treaty) | 2/01/2010 |
| Switzerland | S. Treaty Doc. 104-9 | 9/10/1997 |
| Tanzania | 47 Stat. 2122 (U.S.-U.K. treaty) | 6/24/1935 |
| | 16 UST 2066 (Exchange of notes concerning continued application of U.S.-U.K. treaty) | 12/06/1965 |
| Thailand | S. Treaty Doc. 98-16 | 5/17/1991 |
| Tonga | 47 Stat. 2122 (U.S.-U.K. treaty) | 8/01/1966 |
| | 28 UST 5290 (Exchange of notes concerning continued application of U.S.-U.K. treaty) | 4/13/1977 |
| Trinidad and Tobago | S. Treaty Doc. 105-21 | 11/29/1999 |
| Turkey | 32 UST 2111 | 1/01/1987 |
| Tuvalu | 28 UST 227 (U.S.-U.K. treaty) | 1/21/1977 |
| | 32 UST 1310 (Exchange of notes concerning continued application of U.S.-U.K. treaty) | 4/25/1980 |
| United Kingdom | S. Treaty Doc. 108-23 | 4/26/2007 |
| | S. Treaty Doc. 109-14 (Agreement to ensure conformity with U.S.-EU Extradition Treaty) | 2/01/2010 |

| Country | Citation | Entry into Force |
|---|---|---|
| Uruguay | 35 U.S.T. 3197 | 4/11/1984 |
| Venezuela | 43 Stat. 1698 | 4/14/1923 |
| Zambia | 47 Stat. 2122 (U.S.-U.K. treaty) | 6/24/1935 |
| Zimbabwe | S. Treaty Doc. 105-33 | 4/26/2000 |

**Source:** Table produced using information provided by State Department and via independent research by CRS.

a.  In 1986, the Supreme Court of Colombia declared that the law ratifying the U.S.-Colombian extradition treaty was invalid. While extraditions from the United States to Colombia continue to be governed by the treaty, extraditions from Colombia to the United States have often been pursuant to a legal authority other than the agreement. *See* United States v. Valencia-Trujillo, 573 F.3d 1171 (11th Cir. 2009) (recognizing Colombian fugitive's extradition as being pursuant to Colombian constitution and laws rather than the U.S.-Colombian treaty).

b.  Treaty entered into force for: Kingdom in Europe, Aruba, and Netherlands Antilles.

c.  Although not specifically identified in the State Department's TREATIES IN FORCE (2009), the United States apparently has an extradition agreement with the Republics of Palau. *See In re* Extradition of Lin, 915 F.Supp. 206, 207 (D.Guam 1995); P.L. 99-239, 99 Stat. 1770 (1986); H.Rept. 99-188 (Pt.1) 192 (1985).

# Appendix B. Countries with Which the United States Has No Bilateral Extradition Treaty

| | | |
|---|---|---|
| Afghanistan | Georgia | Qatar |
| Algeria | Guinea | |
| Andorra | Guinea-Bissau | |
| Angola | | Russian Federation |
| Armenia | | Rwanda |
| Azerbaijan | Indonesia | |
| | Iran | |
| | | Sao Tome & Principe |
| Bahrain | | Saudi Arabia |
| Bangladesh | Kazakhstan | Senegal |
| Belarus | Korea, North | Serbia and Montenegro[a] |
| Benin | Kuwait | |
| Bhutan | Kyrgyzstan | Somalia |
| Bosnia and Herzegovina[a] | | Sudan |
| Botswana | | Syria |
| Brunei | Laos | |
| Burkina Faso | Lebanon | Taiwan[b] |
| Burundi | Libya | Tajikistan |
| | | Togo |
| | Macedonia[a] | Tunisia |
| Cambodia | Madagascar | Turkmenistan |
| Cameroon | Maldives | |
| Cape Verde | Mali | |
| Central African Republic | Mauritania | Uganda |
| Chad | Moldova | Ukraine |
| China | Mongolia | United Arab Emirates |
| Comoros | Montenegro[a] | Uzbekistan |
| Croatia[a] | Morocco | |
| Ivory Coast (Cote D'Ivoire) | Mozambique | Vanuatu |
| | | Vatican City |
| Djibouti | Namibia | Vietnam |
| | Nepal | |
| | Niger | |
| Equatorial Guinea | | Western Samoa |
| Eritrea | | |
| Ethiopia | Oman | |
| | | Yemen, Republic of |
| | | |
| | | Zaire |

a. The United States had an extradition treaty with the former Yugoslavia prior to its breakup (32 Stat. 1890). Since then, it has recognized at least some of the countries which were once part of Yugoslavia as successor nations, *see, e.g.,* *Arambasic v. Ashcroft*, 403 F.Supp.2d 951 (D.S.D. 2005) (Croatia); *Sacirbey v. Guccione*, 2006 WL 2585561 (No. 05 Cv. 2949(BSJ)(FM))(S.D.N.Y. Sept. 7, 2006)(Bosnia and Herzegovina), overruled on other grounds by 589 F.3d 52 (2d Cir. 2009).

b. The United States severed official relations with Taiwan in 1979, when it recognized the People's Republic of China as the sole legal government of China. Certain agreements entered prior to the termination of official relations, as well as relations contemplated under multilateral agreements since then, are administered on a nongovernmental basis by the American Institute in Taiwan, which was established pursuant to the Taiwan Relations Act (P.L. 96-8).

## Author Contact Information

Michael John Garcia
Legislative Attorney
mgarcia@crs.loc.gov, 7-3873

Charles Doyle
Senior Specialist in American Public Law
cdoyle@crs.loc.gov, 7-6968