# EXHIBIT  G

1

```
 1                  UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
 2                        MIAMI DIVISION

 3                 Case No. 11-MJ-6030-ROSENBAUM

 4   THE UNITED STATES OF AMERICA,

 5               Plaintiff,

 6                                   FORT LAUDERDALE, FLORIDA
     vs.                             MARCH 2, 2011
 7

 8   CHRISTOS BAGIOS,

 9
                 Defendant.
10   _____

11         TRANSCRIPT OF PRETRIAL DETENTION HEARING AND
                       PRELIMINARY EXAMINATION
12         BEFORE THE HONORABLE ROBIN S. ROSENBAUM,
                    UNITED STATES MAGISTRATE JUDGE
13
     APPEARANCES:
14

15   FOR THE GOVERNMENT:

16                           UNITED STATES DEPARTMENT OF JUSTICE
                             TAX DIVISION/NCES
17                           P.O. BOX 972
                             Ben Franklin Station
18                           Washington, D.C.
                             BY: MARK F. DALY
19

20                           UNITED STATES DEPARTMENT OF JUSTICE
21                           TAX DIVISION
                             601 D. Street, N.W.
22                           Room 7334
                             Washington, D.C. 20044
23                           BY: MICHELLE PETERSEN

24
     REPORTED BY:            JERALD M. MEYERS, RPR
25                           TELEPHONE: 954-431-4757
```

1

2

FOR THE DEFENDANT:

3

4

5

6

7                          KOBRE & KIM, LLP
                           2 Biscayne Boulevard
8                          35th Floor
                           Miami, Florida 33131
9                          BY: MATTHEW I. MENCHEL, ESQ.

10

11

12

13

14                         RICHARDS KIBBE & ORB, LLP
                           One World Financial Center
15                         New York, NY 10281
                           BY: ARTHUR S. GREENSPAN, ESQ.

16

17

18

19

20

21

REPORTED BY:               JERALD M. MEYERS, RPR.
22                         J.M. COURT REPORTING, INC.
                           1601 N.W. 109th Terrace
23                         Pembroke Pines, Florida
                           Telephone: 954-431-4757
24                         E-mail Address: CRJM@AOL.COM

25

3

1                         TABLE OF CONTENTS

2

Witness:  Special IRS Agent Guy Ficco                    PAGE

3

4       Cross-Examination by Mr. Menchel ...................... 16

5       Redirect Examination by Mr. Daly ..................... 35

6       Recross-Examination by Mr. Greenspan ................. 38

7   Reporter's Certificate ................................... 64

8

9                           EXHIBITS

10  Exhibits                    Marked for        Received
                                Identification    in Evidence

11

Description                     Page    Line    Page    Line

12

13  Government's Exhibit 1 ........... 6        16

14

15

16

17

18

19

20

21

22

23

24

25

4

1    (Call to order of the court)

2              THE CLERK:  All rise.

3              THE COURT:  Please be seated.  All right.  Just one

4    moment, please.

5              THE CLERK:  Okay.

6              THE COURT:  Thank you.  All right.  Good morning.

7    This is case number 11-6030, United States versus Christos

8    Bagios.

9              Would counsel, please, state their appearances for the

10   record.

11             MR. DALY:  Your Honor, for the United States, Mark

12   Daly and Michelle Petersen, trial attorneys with the Tax

13   Division of the U.S. Department of Justice.

14             THE COURT:  Good morning.

15             MR. DALY:  Good morning, Your Honor

16             MS. PETERSEN:  Good morning, Your Honor.

17             MR. MENCHEL:  Your Honor, on behalf of Christos

18   Bagios, Matthew Menchel of Kobre & Kim.

19             MR. GREENSPAN:  And Arthur Greenspan of Richards Kibbe

20   & Orb.

21             THE COURT:  Thank you.  All right.  This matter is set

22   for a pretrial detention hearing and a preliminary examination.

23             Is the government ready to proceed?

24             MR. DALY:  We are, Your Honor.  We did just want to

25   clarify one thing before we proceeded with this aspect.

5

1    There was some confusion, at least on the government's

2 side yesterday as to timing regarding when an indictment needs

3 to be returned, because it seemed that as to when the clock

4 ends.

5    Specifically, we are talking about the 10 additional

6 days that the government would get to bring an indictment.

7    Is it 40 days in total or is it 10 days from

8 yesterday's hearing?  Because if we look at it --

9    THE COURT:  It is not 10 days from yesterday's

10 hearing.

11    MR. DALY:  Fair enough.  That answers my question.

12    THE COURT:  All right.

13    MR. DALY:  And we are ready to proceed, Your Honor.  A

14 question about procedure.

15    We have Special Agent Ficco here.  The government will

16 proffer facts that he will adopt, as well as his prior

17 affidavit.

18    Should we at this time proffer facts for both the

19 preliminary hearing and the detention hearing so as not to

20 duplicate?

21    THE COURT:  Yes.

22    MR. DALY:  Okay.  Perfect.

23    We also have, Your Honor, one exhibit which I think

24 will at least save a little time, and I have provided a copy to

25 counsel, which is the statement of facts from the UBS deferred

6

1    prosecution agreement.

2            THE COURT:  All right.

3            MR. DALY:  This document sets out basically the scheme

4    that the government alleges Mr. Bagios was involved in.

5            Rather than repeating it here, I will summarize it,

6    but it does give the details and it would shorten this hearing

7    a little bit.

8            THE COURT:  All right.  But, of course, the defense is

9    free to cross-examine on any of the facts that you might offer,

10   including the ones in the statement of facts from the UBS

11   deferred prosecution agreement.

12           MR. DALY:  Understood, Your Honor.  May I approach?

13           THE COURT:  You may.

14           Government's Exhibit 1 marked for identification

15           THE COURT:  Thank you.  Let me ask you something:

16           Does this statement of facts mention Mr. Bagios either

17   by name or by reference anywhere?  And, if so, would you point

18   out where, please.

19           MR. DALY:  Your Honor, it does not name any

20   individual.  However, it does, I believe, talk about UBS

21   sending 45 to 60 bankers.

22           It is on page 3, Paragraph Number 6 where it talks

23   about, it is the 1, 2, 3, 4, 5, 6, 7, it is the 5th line, the

24   sentence that begins almost all the way to right side.

25           "This U.S. cross border business with service

7

1    primarily from service desks located in Zurich, Geneva and

2    Lugano which employed about 45 to 60 Swiss bank based bankers

3    or client advisors who specialized."

4            That paragraph then goes on to talk about some of the

5    activities that those bankers engaged in.

6            Mr. Bagios would be incorporated within that group.

7            THE COURT:  All right.  Thank you.

8            MR. DALY:  Just to briefly summarize the UBS scheme,

9    Your Honor, and Special Agent Ficco will adopt these, it ran

10   from at least 2000 to 2007.

11           As we just discussed, it involved Swiss based bankers

12   traveling to the United States to conduct unlicensed and

13   unregistered banking, in violation of both U.S. securities law,

14   tax law and a qualified intermediary agreement, which is a

15   contract entered into between UBS, A.G. and the IRS.

16           Specifically, that QI agreement called for UBS to give

17   its U.S. clients two options.  They could either give the bank

18   a W-9 and to have themselves declared to the IRS, or they could

19   sell all U.S. securities and not have their identities declared

20   to the United States.

21           UBS and its bankers developed a scheme whereby they

22   created sham entities in offshore tax haven jurisdictions where

23   they would claim that those sham entities were the true owners

24   of the accounts rather than the U.S. persons.

25           In so doing, the bankers and the bank could keep false

8

1  forms W-8BEN which is essentially an identification form saying

2  that the individual who owns the account is not a U.S. tax

3  payer.

4      They should have been filing a W-9 which the bank

5  would have kept which would have identified the individual,

6  their social security and their residence in the United States.

7      The UBS bankers accepted these and kept them in their

8  files, and that was the heart of the scheme at that point.

9      It was used to conceal their assets.  It was done year

10  after year.  The bankers would then enter the United States,

11  often under guise of being here for personal vacation or

12  travel, meet with their U.S. clients, conduct banking, show

13  statements, and they would also have the individuals come to

14  Switzerland to meet with them there where they would conduct

15  transactions.

16      As is referenced in the complaint, Mr. Bagios serviced

17  at least one client who has been indicted, a Bernard Goldstein

18  who is indicted in the Southern District of California.

19      He is a fugitive.  Right after the deferred

20  prosecution agreement was entered into, he fled the United

21  States and to date has not returned.

22      Mr. Bagios, conducted banking for Mr. Goldstein.  He

23  did wire transfers.  His signature is authorized --

24      THE COURT:  I need you to slow down just a little bit.

25  Okay?

9

1          MR. DALY:  Certainly, Your Honor.

2          THE COURT:  All right.

3          MR. DALY:  His signature, noting that documents were

4   received are on foreign corporation documents that were in UBS'

5   files for those sham entities.

6          THE COURT:  Meaning Mr. Bagios' signature.

7          MR. DALY:  Mr. Bagios' signature is on them, and his

8   UBS stamp is on them as well that identifies who he is and what

9   his responsibilities are.

10         MR. MENCHEL:  I am sorry, Your Honor.  I missed that

11  last portion because it was a little fast.  Can you repeat

12  that?

13         MR. DALY:  Certainly.  In the files there are the

14  corporation documents for the sham entities that are signed and

15  registered in, I believe in Mr. Goldstein's case, it is Panama.

16         UBS would keep those to document, to perpetuate the

17  fraud that the foreign entity was the true owner of the

18  account.

19         Mr. Bagios' signature is on these indicating that they

20  were received by UBS, and his stamp stating his name, his

21  position and where he sat is on some of them as well.

22         Mr. Bagios received faxes from Mr. Goldstein directing

23  him to transfer money back to the United States.

24         Further there is a notation in UBS' records --

25         THE COURT:  I am sorry.  I just need you to slow down

10

1   a little bit.  All right.  Thank you.

2            MR. DALY:  There are --

3            THE COURT:  Mr. Bagios received?

4            MR. DALY:  Mr. Bagios also received faxes --

5            THE COURT:  Right.

6            MR. DALY:  -- from Mr. Goldstein directing him to

7   transfer funds from his undeclared account in Switzerland back

8   to the United States for him, repatriating the funds.

9            There are notes in UBS' records that Mr. Goldstein was

10  approached to sign a W-9 then and refused and was not forced to

11  sell his U.S. securities.

12           The IRS has received information from many other

13  taxpayers who had undeclared accounts who Mr. Bagios was their

14  personal banker for as well as Mr. Goldstein.

15           Six other of those clients reported that they, too,

16  used sham entities in order to defraud the United States.  All

17  of these individuals have entered the voluntary disclosure

18  program.

19           THE COURT:  Let me ask you a question.

20           MR. DALY:  Yes, Your Honor.

21           THE COURT:  The 6 individuals who said they also used

22  sham entities, did they also identify the defendant as having

23  been involved in some way?

24           MR. DALY:  They identified him as their banker.

25           THE COURT:  All right.

11

1          MR. DALY:  Those people identified that they had

2     meetings with Mr. Bagios in the United States and Switzerland

3     as well.

4          THE COURT:  All right.

5          MR. DALY:  To go along with that, Renzo Gadola who has

6     pled guilty and is awaiting sentencing here in the district

7     provided additional information about basically the agreement

8     that --

9          THE COURT:  I am sorry.  One more time.  Lorenzo

10     Gadola --

11          MR. DALY:  Who has pled guilty.

12          THE COURT:  Right.  But is he one of Mr. Bagios'

13     clients?  All right.

14          MR. DALY:  He is referenced in the complaint --

15          THE COURT:  Right.

16          MR. DALY:  -- as a former colleague.  He has provided

17     additional information about how banking was coordinated from

18     UBS showing that they worked together in a similar fashion;

19     namely that he was part of a team involving at least three

20     other bankers, one of home was a supervisor; that they met

21     quarterly to discuss their assets under management and their

22     banking activities.

23          THE COURT:  I am sorry.  Mr. Gadola was a part of a

24     team involving Mr. Bagios?

25          MR. DALY:  And at least two other bankers --

12

1           THE COURT:  All right.

2           MR. DALY:  -- that serviced the West Coast U.S.

3   clients in the West Coast with undeclared accounts.

4           They met quarterly to go over their banking

5   activities.  When Mr. Bagios and Mr. Gadola left UBS, they

6   handed off their clients to these other bankers on the team who

7   then continued the scheme and perpetuated the fraud, and in

8   some instances Mr. Gadola and his successor met with the

9   clients in the United States and introduced themselves as this

10  individual would be your next client.  The same thing happened

11  with Mr. Bagios.

12          Mr. Bagios was interviewed shortly after he was

13  arrested in New York City where he stated that he understood

14  that there were clients with declared accounts.

15          Just to step back, Your Honor, the clients, the IRS

16  has received information from 17 clients who identified

17  Mr. Bagios as their banker at UBS.

18          MR. MENCHEL:  Can I just interrupt and ask, Your

19  Honor, just so I understand, earlier Mr. Daly referenced many

20  other tax payers using Mr. Bagios.  Are those the same 17?

21          MR. DALY:  Yes.

22          MR. MENCHEL:  Okay.

23          MR. DALY:  And within that 17 is the subset of 6 that

24  used sham entities.

25          THE COURT:  All right.

13

1        MR. DALY:  Those taxpayers have estimated their assets

2    under management, and that is between 38 and $90,000,000.

3        Now, Mr. Gadola, as stated in the complaint, who had a

4    much better understanding of his practice, gave a much higher

5    figure for the total client base.

6        MR. MENCHEL:  How much was that, if I may ask?

7        MR. DALY:  It is, if you go to --

8        MR. MENCHEL:  Is it in the complaint?

9        MR. DALY:  It is in the complaint.  If you go to --

10        MR. MENCHEL:  Then that's all right.

11        MR. DALY:  It is in Paragraph 15.  He stated that

12    Mr. Bagios had approximately 100 to 150 undeclared U.S. clients

13    with 400 to $500,000,000 in undeclared assets under management.

14        The government would also proffer that the total tax

15    loss for the scheme, which UBS has admitted to, was over

16    $400,000,000 which they paid over to the United States.

17        Moving on to Mr. Bagios personally, the facts are that

18    he and his attorneys have repeatedly stated to us that he has

19    no ties to the United States.  No friends.  No family.  No

20    business connection.

21        Further, he has no assets here in the United States.

22    His pretrial report identifies two luxury automobiles that he

23    keeps in Switzerland, a Porsche and a Jaguar as well as a boat.

24        He owns a condominium there.  His nuclear family lives

25    in Switzerland.  His extended family is in Greece.

14

1        He has substantial assets outside of the United

2   States.   Further, the pretrial report shows that he has

3   conducted extensive travel throughout the world.

4        We would also proffer that Credit Suisse maintains a

5   banking a private banking office in Nassau which is only 80

6   miles from Fort Lauderdale.

7        MR. MENCHEL:   I am sorry.   If I can just interrupt.

8   Where are you getting the basis for the Jaguar?

9        MR. DALY:   I believe it is -- the Pretrial Services

10  report is a little unclear.   If you look at the statement of

11  assets --

12       MR. MENCHEL:   Is actually an Audi.   I think that

13  should be corrected.

14       MR. DALY:   It is German.

15       Further, when Mr. Bagios was arrested, the contents

16  that he had on him were inventoried.   Among those were various

17  bank statements for his current clients at his current

18  position.

19       The IRS has gone back and run the names on those

20  statements, and on one account with $14,000,000, the individual

21  identified in the statement is a U.S. taxpayer and has not

22  filed an FFAR declaring the account.

23       We would also proffer that Mr. Bagios is a Greek

24  citizen with a Greek passport, and that according to the Office

25  of International Affairs, Greece will not extradite its

15

1  nationals.

2          He has been a Swiss resident since 1993, and

3  Switzerland will not extradite for tax crimes.

4          I think at that time, Your Honor, those are all of the

5  additional facts that we would proffer.

6          THE COURT:  All right.  Mr. Menchel and Mr. Greenspan,

7  do you wish to cross-examine the agent?

8          MR. MENCHEL:  Yes, Your Honor.

9          THE COURT:  All right.

10          MR. DALY:  Special Agent Ficco.

11          THE CLERK:  Please raise your right hand.

12   SPECIAL AGENT GUY FICCO WAS DULY SWORN BY THE CLERK OF COURT

13          THE COURT:  All right.  Please state your name and

14  spell your last name for the record.

15          THE WITNESS:  Guy Ficco.  F-i-c-c-o.

16          THE COURT:  All right.  Agent Ficco, did you hear

17  everything that Mr. Daly just said in his proffer?

18          THE WITNESS:  I did.

19          THE COURT:  And I also note that you are the affiant

20  on the affidavit.

21          Do you have any modifications to anything that was

22  said or corrections to anything that was said by Mr. Daly or

23  that is in the affidavit?

24          THE WITNESS:  I do not.

25          THE COURT:  Do you have any corrections to anything in

16

1   the statement of facts that Mr. Daly has provided the court

2   with?

3         THE WITNESS:  I do not.

4         THE COURT:  Do you adopt all of these things as your

5   testimony here today?

6         THE WITNESS:  Yes.

7         THE COURT:  All right.  You may go ahead and

8   cross-examine the agent.

9         MR. MENCHEL:  Thank you, Your Honor.  Is it all right

10  if I do it from counsel table?

11        THE COURT:  Of course.

12                    CROSS EXAMINATION

13  BY MR. MENCHEL:

14  Q.  Agent Ficco, good morning.

15  A.  Good morning.

16  Q.  There was reference made to this statement of facts which,

17  as I understand it, was part of the UBS deferred prosecution

18  agreement; is that correct?

19  A.  Yes.

20  Q.  All right.  And as part of the UBS deferred prosecution

21  agreement, was UBS required to identify all of its own

22  individuals that it believed were part and parcel of this

23  conspiracy?

24  A.  I do not believe so.

25  Q.  They were not?

Guy Ficco - Cross

17

1    A.  I do not believe so.

2    Q.  So then I take it that nobody from UBS has affirmatively

3    identified Mr. Bagios as a member of this conspiracy as part of

4    the deferred prosecution agreement entered into with the United

5    States?

6    A.  Not as part of the deferred prosecution agreement, correct.

7    Q.  And you heard I believe Mr. Daly proffer that the only

8    reference by I guess implication to Mr. Bagios in this

9    statement of facts would be on Paragraph 6 with respect to the

10   sentence, "This U.S. cross border business was serviced

11   primarily from service desks located in Zurich, Geneva and

12   Lagano which employed by 45 to 60 Swiss based private bankers

13   or client advisors who specialized in servicing U.S. clients,

14   correct?

15   A.  What was the question?

16   Q.  Is it correct that the only reference to Mr. Bagios in this

17   entire statement of facts would be that one sentence?

18   A.  I believe that's correct.

19   Q.  Now, do you have a copy of the complaint in front of you?

20   A.  I do not.

21   Q.  I think it might be helpful if you did because what I want

22   to do is just sort of walk through the paragraphs.

23            MR. DALY:  May I approach, Your Honor?

24            THE COURT:  You may.

25            THE WITNESS:  Thank you.  I have it.

18

1          MR. MENCHEL:  Okay.

2    BY MR. MENCHEL:

3    Q.  And have you familiarized yourself with it since swearing

4    to it in front of have Judge Rosenbaum?

5    A.  I have.

6    Q.  I want to direct your attention starting on Paragraph 12.

7    Let me know when you are there.

8    A.  I am there.

9    Q.  Do you see it says, "According to a statement of facts

10   agreed to by UBS, private bankers in UBS' United States cross

11   border business typically travel to the United States within

12   encrypted laptop computers?

13   A.  Yes.

14   Q.  Okay.  First of all, any evidence that Mr. Bagios was one

15   of those individuals who traveled to the U.S. with an encrypted

16   laptop?

17   A.  I am not sure if Mr. Gadola, the other UBS banker, stated

18   how they traveled.  So I am not sure whether or not there is

19   reference to Mr. Bagios there.

20   Q.  So your answer today is you don't know?

21   A.  I am not sure.

22   Q.  Okay.  And there is nothing inherently illegal about a

23   banker wanting to protect bank secrecy rules and regulations of

24   a bank traveling with an encrypted laptop, is there?

25   A.  I don't believe so.

Guy Ficco - Cross

19

1    Q.  Now, I believe just a moment ago Mr. Daly proffered that

2    Switzerland will not extradite for tax crimes.  Do you recall

3    him saying that?

4    A.  Yes.

5    Q.  Is that something that you also know of your own knowledge?

6    A.  Yes.

7    Q.  What is that based on, your own knowledge?

8    A.  Well, I have, in addition to this assignment, I am actually

9    one of the international -- I am in international operations

10   for IRS C.I. and I have seen other instances, for example, Mark

11   Rich who is a tax fugitive who Switzerland would not extradite.

12   Q.  When was that?

13   A.  For Mark Rich?

14   Q.  Yes.  It was years ago, wasn't it?

15   A.  Years ago.

16   Q.  It was under the Clinton Administration, I believe, right?

17   A.  Yes.

18   Q.  Okay.  And do you know whether or not Swiss extradition

19   laws have changed since the Mark Rich case?  Have you kept

20   abreast of that?

21   A.  I am not aware that they have changed.

22   Q.  You are not aware of the fact that under Swiss law it is

23   actually within the discretion of the Swiss Government as to

24   whether or not they are going to extradite?

25   A.  I am not.

Guy Ficco - Cross

20

1    Q.  Okay.  Do you know whether or not the Swiss Government

2    makes a distinction between extraditing one of its own citizens

3    as opposed to a resident simply living there but with another

4    citizenship?

5    A.  I do not.

6    Q.  You don't know?

7    A.  I don't know.

8    Q.  Okay.  Am I right that Mr. Gadola has told the government

9    that Mr. Bagios knew that some of his clientele had undeclared

10   accounts?

11   A.  That's correct.

12   Q.  Did Mr. Gadola happen to tell you how it was he knew that

13   Mr. Bagios knew that his clients didn't have or had undisclosed

14   or undeclared accounts?

15   A.  As Mr. Daly said, they would, being part of the same team,

16   they would meet quarterly and discuss each other's clients

17   base, and it was openly discussed that these accounts were

18   undeclared.

19   Q.  Openly discussed?

20   A.  Amongst the group.

21   Q.  Amongst the members?

22   A.  Yes.

23   Q.  Okay.  And Mr. Gadola specifically identified Mr. Bagios as

24   being one in that group that was openly discussing whether or

25   not these accounts were undeclared or not?

Guy Ficco - Cross

21

1    A.  I don't know that he specifically said Mr. Bagios said the

2    accounts were undeclared, but it was discussed amongst this

3    group of 4 or 5 gentlemen that the accounts were undeclared,

4    and my distinction is I don't know if Bagios actually said or

5    the words came out of his mouth, but it was openly discussed in

6    the meetings.

7    Q.  Meetings that Mr. Bagios would have attended?

8    A.  Yes.

9    Q.  Thank you.  I believe the complaint also makes reference to

10   the fact that according to Mr. Gadola, Mr. Bagios actively

11   assisted clients in evading U.S. income taxes.  Am I fairly

12   stating that?

13   A.  Please refer me to a paragraph.

14   Q.  It may be in 15 or 16.  Let me just take a look.  Maybe

15   later on.  I will see if I can find it.

16        That doesn't ring a bell with you, what I just said?

17   A.  Can you repeat the question?

18   Q.  That's all right.  No.  We will move on and I will circle

19   back to it.  I will find it in my notes.

20   A.  Okay.

21   Q.  Going to Paragraph 19, which is under the manner and means

22   used to carry out the conspiracy, do you see that page?  It is

23   page 7.

24   A.  Yes.  I am there.

25   Q.  Okay.  In Paragraph 19 it says, "It was part and an object

Guy Ficco - Cross

22

1    of the conspiracy that Christos Bagios and others would and did

2    market undeclared Swiss bank accounts and Swiss bank secrecy to

3    wealthy United States clients who were interested in attempting

4    to evade United States income taxes."  Do you see that?

5    A.   I do.

6    Q.   What does that actually mean?  How was it that Mr. Bagios

7    and others marketed this service?

8    A.   As part of their position at UBS, Mr. Gadola and Mr. Bagios

9    and other bankers would service these undeclared accounts, and

10   there was conversations where they would actually set up or

11   facilitate or help the set up of nominee entities to hold these

12   accounts, and this was discussed by the bankers with the U.S.

13   taxpayers.

14   Q.   Okay.  And again with respect to Mr. Bagios in particular,

15   because that's who we are here for --

16   A.   Yes.

17   Q.    -- do you have any evidence, either from Mr. Gadola, or

18   otherwise, that Mr. Bagios himself had full knowledge and

19   understanding that he was helping to assist and evade U.S.

20   taxpayers?

21   A.   With respect to Bernard Goldstein, Mr. Bagios was

22   Mr. Goldstein's banker while Mr. Goldstein's' UBS account was

23   in his name personally, and then he continued to be his banker

24   once the account was transferred to a nominee Panamanian

25   corporation.

Guy Ficco - Cross

23

1        I don't know what conversations Mr. Goldstein had with

2   Mr. Bagios specifically, but the inference is there that he was

3   aware that a W-9 was not filed for Mr. Goldstein's' Panamanian

4   corporation.

5   Q.  And he was aware of that because I think Mr. Daly said

6   there was some reference to it in the file?

7   A.  There are notes in the file of documents UBS had turned

8   over to the United States Government which reflect that.

9   Q.  Whose notes are they?

10  A.  The banker.  The UBS banker.

11  Q.  Would that be Mr. Bagios or somebody else?

12  A.  It is unclear as to whether or not it was Mr. Bagios or it

13  was another UBS banker, but Mr. Bagios was the named

14  relationship manager.

15  Q.  Okay.  And there was reference I think by Mr. Daly that

16  Mr. Goldstein, am I getting the name right?

17  A.  Yes.

18  Q.  That he has fled the jurisdiction of the United States?

19  A.  As far as I know, that is correct.

20  Q.  Just so we are clear, there is no evidence linking his

21  fleeing of the country to Mr. Bagios in any way, correct?

22  A.  I don't believe so.

23            THE WITNESS:  May I trouble you for a glass of water?

24            THE COURT:  Sure.

25            THE WITNESS:  Thank you, Your Honor.

Guy Ficco - Cross

24

1    BY MR. MENCHEL:

2    Q.   In Paragraph 20 it says, "According to the statement of

3    facts entered into by UBS and according to information provided

4    by Lorenzo Gadola, it was further a part of the conspiracy that

5    Christos Bagios and others would and did travel to the United

6    States to provide investment advice to United States clients

7    and to conduct banking with United States clients."

8    A.   Yes.

9    Q.   There is nothing inherently illegal about that, is there?

10   A.   Just those two sentences?

11   Q.   Yes.

12   A.   Or just that sentence?

13   Q.   Yes.

14   A.   No.

15   Q.   Okay.  How about the sentence that follows:

16            "Christos Bagios and others would and did conduct

17   banking with United States clients with undeclared accounts

18   from Switzerland and elsewhere via mailings, e-mails and

19   telephone calls to and from the United States."  Do you see

20   that?

21   A.   I do.

22   Q.   Okay.  And so is the inference that we are supposed to draw

23   here that once again Mr. Bagios knew that the clients he was

24   dealing with had undeclared accounts?

25   A.   Yes.

Guy Ficco - Cross

25

1  Q.  Okay.  And as I understand your testimony so far, the only

2  basis for that is Mr. Gadola's testimony is that they had these

3  quarterly meetings or so where they would openly discuss this;

4  is that right?

5  A.  Well, there is the recordings in the Goldstein's file.

6  There is Mr. Gadola, and there are 17 voluntary disclosure

7  files that were filed by U.S. taxpayers which for undeclared

8  accounts which identify Mr. Bagios in meeting with Mr. Bagios

9  in the United States to discuss these accounts.

10  Q.  Okay.  And that's actually getting to my next question.

11        The 17 taxpayers who have come forward under the

12  voluntary disclosure program, have they specifically said, or I

13  assume they have been interviewed?

14  A.  They have provided statements under penalties of perjury.

15  Q.  Okay.  And did anyone of those 17 taxpayers specifically

16  say that Mr. Bagios was aware at the time that the account

17  holders he was dealing with had undeclared accounts?

18  A.  They did not use those words.

19  Q.  Paragraph 22 discusses a UBS marketing event at Art Basil

20  in Miami, Florida.  Do you see that?

21  A.  I do.

22  Q.  Okay.  What is your basis for that paragraph?

23  A.  The basis is that UBS solicited clients at this event and

24  had meetings with existing clients at this event in Miami.

25  Q.  Okay.  And was it openly discussed at this event in Miami

Guy Ficco - Cross

26

1    that UBS was marketing ways of evading U.S. tax?

2    A.  I am not aware as to what was actually discussed in terms

3    of the marketing strategies at this event.  I am aware that UBS

4    bankers typically would go to this event to solicit new

5    clients.

6    Q.  I am sorry.  I apparently cut you off.

7    A.  I was just going to say solicit new clients and also

8    maintain existing client relationships.

9    Q.  And there is nothing inherently illegal about that,

10   obviously?

11   A.  Just in the fact of meeting with clients and soliciting new

12   clients, no, there is nothing inherently illegal.

13   Q.  Well, is there anything else in that paragraph that I

14   should be discerning from it other than what it says?

15   A.  Well, I am unsure as to the undeclared accounts if there

16   have been clients who have been interviewed that stated this

17   was openly discussed.  I am not aware of that.

18   Q.  Okay.  By the way, just going back to Paragraph 20, I meant

19   to ask you if it references mailings, e-mails, telephone calls

20   to and from the United States?  Have you seen those mailings

21   and e-mails?

22   A.  Are you talking about the second sentence there?

23   Q.  Yes.

24   A.  I believe Mr. Gadola stated that.

25   Q.  So is the answer to my question that you have not seen that

Guy Ficco - Cross

27

1   documentation?

2   A.  I have not seen that documentation, correct.

3   Q.  In your knowledge of this investigation, which I am

4   assuming is fairly far-reaching, is that fair to say?

5   A.  Yes, I guess so.

6   Q.  Okay.  Have you seen any document that would in any way

7   indicate or prove that Mr. Bagios was aware in real time that

8   he was dealing with U.S. taxpayers that had undeclared

9   accounts?

10   A.  Again, I refer back to Mr. Goldstein.

11   Q.  The documents that show that there was an account, a

12   corporation opened; is that right?

13   A.  The documents that previously showed Mr. Goldstein having

14   an account in his name in California and Mr. Bagios as his

15   relationship manager; the incorporation of the company in

16   Panama, the shifting of the opening up of an account at UBS

17   under that Panamanian corporation and Mr. Bagios assisting a

18   transfer for Mr. Goldstein's personal account to the Panamanian

19   corporation.

20   Q.  Is that the only event you can think of?

21   A.  Off the top of my head, that's the event are triggers it in

22   my mind, yes.

23   Q.  Okay.  Thank you.  Okay.  Moving on to Mr. Goldstein, do

24   you know when he began his relationship with UBS?

25   A.  I have seen documents that say 1992.

Guy Ficco - Cross

28

1    Q.   Okay.  And do you know who is private banker was at that

2    time?

3    A.   You know, I have seen the document.  I cannot recall off

4    the top of my head.

5    Q.   Not Mr. Bagios?

6    A.   I do not believe it was Mr. Bagios in 1992.

7    Q.   At any time was Mr. Bagios ever the private banker of

8    Mr. Goldstein?

9    A.   I believe he was.

10   Q.   You saw documents that indicated that?

11   A.   I have seen his name on the files, and to me that indicated

12   he was the relationship manager.

13           As a matter of fact, I think I saw an account

14   statement where it actually identifies client advisor, Christos

15   Bagios.

16   Q.   Okay.  Now, I think there has been a proffer made, and it

17   is actually also as well, it is in the complaint in Paragraph

18   24 that this Kasler Management Corporation, I am assuming

19   that's the company we have just been talking about; is that

20   right?

21   A.   Yes, it is.

22   Q.   Okay.  That it was a sham bearer corporation.  Okay.  What

23   evidence do you have that Mr. Bagios was aware at the time of

24   its creation that it was a sham bearer corporation?

25   A.   Other than -- well, I think it is important to go back to

Guy Ficco - Cross

29

1    the time frame.

2    Q.   Sure.

3    A.   Mr. Daly talked about the IRS and the QI initiative; the QI

4    program coming into effect in the 2000 time frame.

5    Q.   Right.

6    A.   And that this corporation, it was incorporated October 23,

7    2000.  The evidence is that this corporation did nothing except

8    hold an account at UBS.

9    Q.   Okay.  And it references in Paragraph 25, the complaint

10   references, it says, "Christos Bagios, Goldstein and their

11   co-conspirators established a bank account at UBS in

12   Switzerland in the name of Kasler."

13            Who would be the co-conspirators?

14   A.   I believe it is the incorporation company in Panama and

15   other bankers at UBS who were involved in the account opening.

16   Q.   And am I correct that you are seeing Mr. Bagios' name on

17   the account opening documents; is that right?

18   A.   I don't know that his name is on the account opening

19   documents.  His name is on the actual incorporation of the

20   Panamanian corporation.

21            He signs the bottom of it, and it appears to be that

22   he is accepting it on behalf of UBS.

23   Q.   Okay.

24   A.   Well, his name is clearly spelled out in his signature.

25   Q.   The way this is written it says, "Christos Bagios,

Guy Ficco - Cross

30

1   Goldstein and their co-conspirators established a bank

2   account."

3   A.  Right.

4   Q.  And I guess my question then is what exactly did Mr. Bagios

5   do in the establishing of that account?

6   A.  Well, he accepted the Panamanian corporation on behalf of

7   UBS.  And when he did that, then shortly thereafter the account

8   was opened in the name of Kasler Management at UBS.

9           So his role was to act as really the accepting

10  official at UBS and then facilitate the account being opened.

11  Q.  Okay.  Thank you.  Going on to Paragraph 26, it says,

12  "According to records maintained by UBS and produced pursuant

13  to the DPA, which affiant has reviewed in or about December of

14  2000 Christos Bagios, Goldstein and their co-conspirators

15  caused UBS to maintain in its records in an IRS form W-8BEN.

16  Do you see that?

17  A.  I do.

18  Q.  Okay.  And what was it exactly that Mr. Bagios did in that

19  regard?

20  A.  Mr. Bagios was -- is it Bagios for Bugios or Biaos?

21          THE DEFENDANT:  Bagios.

22          THE WITNESS:  Bagios.  Okay.  I apologize.

23          Mr. Bagios was Mr. Goldstein's' relationship manager.

24  He was the relationship manager on the account.

25          He accepted the W-8BEN in the name of Kasler

31

1   Management knowing that Bernard Goldstein was the true owner of

2   that account.

3   BY MR. MENCHEL:

4   Q.   And what is your understanding as to why the account was

5   not or the fact that there was an assertion that the account

6   was not subject to U.S. taxation, why was that false?

7   A.   Because the account was truly owned by U.S. tax payer

8   Bernard Goldstein and not the Bahamian corporation.

9   Q.   Okay.  And just so we are clear, your basis for Mr. Bagios

10  knowing that would be that there was an account --

11  A.   Previous.

12  Q.   -- previously?

13  A.   Yes.

14  Q.   All right.

15  A.   Yes, and then he facilitated or was involved with the

16  transfer of money from Mr. Goldstein's' personal account to

17  Kasler Management at UBS.

18  Q.   Paragraph 29 references Mr. Goldstein withdrawing

19  approximately $15,000 in cash from the Kasler account.  Do you

20  see that?

21  A.   I do.

22  Q.   Okay.  Was Mr. Bagios involved in that in any way, to your

23  knowledge?

24  A.   The files were unclear.

25  Q.   What does that mean?

Guy Ficco - Cross

32

1    A.   That means the UBS documents pursuant to this account that

2    were turned over that I reviewed were unclear as to whether or

3    not any UBS personnel were involved with this withdrawal.

4              THE COURT:  Mr. Menchel, just so you know, the

5    microphone picks up whispering, which if you want to whisper,

6    just maybe turn off the microphone.

7              MR. MENCHEL:  Just give me one moment, please, Your

8    Honor.

9              THE COURT:  Sure.

10             MR. MENCHEL:  I just want to review my notes.

11             THE COURT:  All right.

12             MR. MENCHEL:  How do I turn it off?

13             THE COURT:  There is a little button at the base.

14   BY MR. MENCHEL:

15   Q.   Okay.  Under the paragraphs that are entitled "other

16   clients" beginning on page 10, do you see that?

17   A.   I do.

18   Q.   Okay.  It says, "according to a sworn statement" -- I am in

19   Paragraph 31 now -- "provided to the IRS by C.L. a U.S. tax

20   payor known to the government maintained an undeclared account

21   at UBS in or about 1999 and again in or about 2000, Christos

22   Bagios met with C.L. in a hotel in San Francisco to discuss the

23   undeclared account."

24   A.   I see that.

25   Q.   And I think I had asked you earlier whether or not you had

33

1   any knowledge of what was actually discussed with respect to

2   it.  I assuming he is a part of those 17 people?

3   A.  They are.  They are.

4   Q.  Okay.  So I just want to be clear.  Did the tax payer

5   provide to you that there was overt references made to

6   Mr. Bagios that he was aware that the account at that time was

7   undeclared?

8   A.  What the tax payer provided was a statement saying that the

9   account was undeclared.  The tax payer then said that they had

10  meetings with Mr. Bagios to discuss the account.

11  Q.  That's it?

12  A.  Well, the inference is that him as the relationship manager

13  would know that the account was undeclared.

14  Q.  That's the inference?

15  A.  Yes.

16  Q.  Okay.  And am I right that is also going to be true for

17  Paragraph 32?

18  A.  I believe that will be the case for Paragraphs 32 and 34.

19  I hesitate to say these were statements that were produced by

20  the public signed under penalties of perjury.  Some were more

21  descriptive than others.

22          So I would have to specifically review these

23  individual voluntary disclosures to tell you exactly what was

24  said.

25  Q.  All right.  That's fair.  I appreciate that.  Let me just

Guy Ficco - Cross

34

1    look at my notes from what was just proffered because,

2    obviously, I haven't had a great deal of time to digest that.

3           Directing your attention back to the complaint in

4    Paragraph 33 --

5    A.  Yes.

6    Q.   -- it does not mention Mr. Goldstein at all, but rather

7    references an unindicted co-conspirator.

8    A.  Yes.

9    Q.  Does this have anything to do with Mr. Bagios?

10   A.  Other than it was another UBS banker that was allegedly

11   part of the conspiracy.

12   Q.  That's it?

13   A.  That's the inference, yes.

14   Q.  The same question as to 35.  It does not mention

15   specifically Mr. Bagios by name.  In fact, it talks about

16   Mr. Gadola.

17          Did Mr. Bagios have any direct involvement in this

18   particular relationship?

19   A.  I do not believe so.

20   Q.  In terms of the time frame relating to Mr. Bagios, what is

21   the latest event that you can point to that puts his

22   involvement into this conspiracy?

23   A.  The UBS conspiracy?

24   Q.  Yes.  Just so we are clear, is there any other conspiracy

25   that you are alleging that Mr. Bagios is a member of?

Guy Ficco - Redirect

35

1  A.  I am not, no.

2  Q.  Okay.

3  A.  I was just clarifying your question.

4  Q.  That's fine.  I just wanted to make sure I understand.

5  A.  Well, Mr. Goldstein, who is, again as we have discussed,

6  Mr. Bagios was his relationship manager, continued to utilize

7  the Panamanian corporation through his 2007 tax return which

8  was filed in 2008.  That would be the most recent event.

9  Q.  And based on the review of those records and files, when

10  was the last time you saw any involvement by Mr. Bagios in

11  relationship to that account?

12  A.  I am not sure if it was the Goldstein account, but I have

13  seen statements by other tax payers which indicate 2005.

14  Q.  2005 would be the latest?

15  A.  I believe so.

16          MR. MENCHEL:  One second, please.  Thank you, Your

17  Honor.  I have no further questions.

18          THE COURT:  All right.  Is there any redirect?

19          MR. DALY:  I have just a few questions, Your Honor.

20          THE COURT:  All right.

21                    REDIRECT EXAMINATION

22  BY MR. DALY:

23  Q.  Special Agent Ficco, if I may approach?  I am just going to

24  hand him the exhibit 1, Your Honor.

25          THE COURT:  All right.

Guy Ficco - Redirect

36

1          THE WITNESS:  Thank you.

2    BY MR. DALY:

3    Q.  If you would turn to page 4, paragraph 9.

4    A.  Yes.

5    Q.  In that paragraph which discusses the forms that you UBS

6    provided to its U.S. clients, in that paragraph does it state

7    that in 2000 roughly at the time that Mr. Goldstein formed his

8    sham entity, that UBS changed its form to saying, to changing

9    it to say, "I would like to avoid disclosure of my identity to

10   the U.S. Internal Revenue Service under new tax regulations to,

11   "I am aware of the new tax regulations?"

12   A.  I see that in the statement, yes.

13   Q.  And was Mr. Bagios part of a larger scheme involving many

14   bankers coming to the United States engaging in very similar

15   behavior?

16   A.  Yes.

17   Q.  Now, Mr. Menchel asked you if there is anything wrong about

18   coming to the United States to conduct banking.

19         At the time that Mr. Bagios worked for UBS, A.G., was

20   he registered with the SEC?

21   A.  I don't believe so.

22   Q.  Okay.  And is registration a requirement in order to

23   conduct banking in the United States?  Excuse me.  To provide

24   investment advice?

25   A.  To provide investment advice, yes, I believe so.

Guy Ficco - Redirect

37

1   Q.  And at that time was UBS, A.G. registered as a broker

2   dealer to provide investment advice?

3   A.  I don't believe so, but I am not sure.

4   Q.  Okay.  All right.  And Mr. Menchel noted in the statement

5   of facts that the only reference to Mr. Bagios there was the 45

6   to 60 bankers, and the inference was that Mr. Bagios was one of

7   those, correct?

8   A.  Yes.

9   Q.  Did Renzo Gadola identify Mr. Bagios as a fellow banker

10  with undeclared accounts?

11  A.  Yes, he did.

12  Q.  And did Mr. Gadola estimate that 80 percent of Mr. Bagios'

13  clients in the United States maintained undeclared accounts?

14  A.  That is what Mr. Gadola said.

15          MR. DALY:  One moment, Your Honor.

16          THE COURT:  All right.

17  BY MR. DALY:

18  Q.  Special Agent Ficco, when Mr. Bagios left UBS, A.G., where

19  did he go?

20  A.  I believe he went to another company inside UBS called

21  Swiss Financial Advisors.

22  Q.  And what was that?

23  A.  That was an entity that serviced declared accounts.

24  Q.  When you say "declared accounts," what do you mean by that?

25  A.  Accounts that were declared to the United States

38

1   Government.

2   Q.   According to Mr. Gadola, did Mr. Bagios take any of his

3   undeclared accounts to Swiss Financial Advisors?

4   A.   I don't believe he did.

5   Q.   And, in fact, at Swiss Financial Advisors was he allowed to

6   keep any of those undeclared accounts?

7   A.   He was not.  He would not have been.

8            MR. DALY:  Nothing further, Your Honor.

9            THE COURT:  All right.  Mr. Menchel?

10           MR. GREENSPAN:  Your Honor, could we just have a brief

11  cross on some new information that Mr. Ficco gave?

12           THE COURT:  Yes.

13                     RECROSS EXAMINATION

14  BY MR. GREENSPAN:

15  Q.   Mr. Ficco, I believe Mr. Daly just asked you about the

16  travel to the United States and whether UBS was registered with

17  the SEC as a broker or investment advisor, correct?

18  A.   He asked that, yes.

19  Q.   And you stated that you believe UBS was not?

20  A.   Well, he asked the question about UBS, A.G., and I said I

21  was unsure whether UBS, A.G. was.

22  Q.   Okay.  And you stated that you don't believe Mr. Bagios was

23  registered as a broker or an investment advisor, either?

24  A.   I have seen nothing that indicates that Mr. Bagios was

25  registered in the time frame he was working for UBS, A.G.

39

1  Q.  Okay.  So was he engaged in a securities law violation in

2  your mind?

3  A.  I am not an expert in security law.

4  Q.  Was anything that he was doing with respect to the failure

5  to be registered have anything to do with the tax laws?

6  A.  As far as I know, no.  They are separate.  They could be

7  separate violations, but as I said, I am not an expert on

8  securities law.

9           MR. GREENSPAN:  Okay.  Thank you.  That's it.

10           THE COURT:  All right.  You may step down.

11           THE WITNESS:  Should I leave these documents here,

12  Judge?

13           THE COURT:  Yes.  Thank you.

14                [The witness was excused].

15           THE COURT:  All right.  Does the defense have any

16  evidence that it wishes to present?

17           MR. MENCHEL:  Not at this time.  Thank you, Your

18  Honor.

19           THE COURT:  All right.  I will hear argument from the

20  government.

21           MR. DALY:  Your Honor, addressing I assume solely the

22  preliminary hearing at this point or both the preliminary

23  hearing and the pretrial detention?

24           THE COURT:  Why don't we do both.  I think it will be

25  more expeditious.

40

1    MR. DALY:  Okay.  Certainly.

2    Your Honor, when Special Agent Ficco was first sworn

3    out, the government, by your own calculation, made a showing of

4    probable cause.

5    We have added additional information to bolster that

6    UBS' statement of facts clearly shows that it has admitted to

7    engaging in a long running scheme to defraud the United States

8    by sending its bankers who are not registered into the United

9    States to conduct secret banking with United States citizens

10   who maintain accounts that they did not declare to the IRS.

11   A central portion of that scheme was the use of these

12   sham entities in tax aid jurisdictions.  Mr. Bagios was no

13   different from any of the other bankers who he is or is

14   basically included here as co-conspirators, in that he assisted

15   others in forming these sham entities and maintained and

16   managed accounts using those sham entities.

17   It was part of, as is stated in the statement of

18   facts, it was a company-wide effort to do this, starting in

19   2000, which is exactly the time that Mr. Goldstein himself

20   engaged in this or Mr. Bagios himself engaged in this conduct

21   with Mr. Goldstein.

22   It continued even when he left UBS, A.G. for the

23   registered part of Swiss Financial Advisors.  The fraud

24   continued.

25   Mr. Bagios has Pinkerton liability.  There is no legal

41

1    withdrawal.  There is no indication that he came clean and made

2    a clean breast of things and told everything.

3           Instead, he handed off his clients to the next UBS

4    banker, and the next UBS banker continued it on until the U.S.

5    Government cracked down on it.

6           In, fact even though they brought it up themselves,

7    there are at least, alleged in the complaint, affirmative acts

8    up through May of 2005, which given the 6 year Statute of

9    Limitations for a client conspiracy, is still within the

10   statute.

11          As far as the detention portion, Your Honor, the

12   government considers Mr. Bagios to be a flight risk.

13          There is, you know, a four part test.  The nature of

14   circumstances of the offense, the weight of the evidence, the

15   history and characteristics of the defendants and the nature

16   and seriousness and danger posed by their release.

17          The government has to meet this by a preponderance.

18   Looking at the nature and circumstances of the offense, we are

19   looking at a very broad ranging conspiracy.

20          It carries a maximum penalty of 5 years and twice the

21   loss.  The loss here is enormous.  UBS itself has admitted and

22   paid $400,000,000.

23          It was a brazen fraud.  These bankers actively sought

24   to conceal U.S. ownership.  It was huge, involving 45 to 60

25   people.

42

1    Within the statement of facts you will see the

2   thousands of trips each year taken by UBS bankers to enter the

3   United States and conduct the secret banking.

4    According to Mr. Gadola, Mr. Bagios himself had a

5   large portion of these; you know, approximately 400,000,000.

6    In IRS taxpayers who have come forward, looking at it

7   at the high end would be about 89,000,000, the low end

8   38,000,000.

9    So as far as if Mr. Gadola is convicted, he faces a

10   substantial portion, if not the statutory maximum in prison.

11    If we look at the weight of the evidence, UBS itself

12   has admitted what it did and admitted what its bankers did.

13    Renzo Gadola, his former co-worker in this West Coast

14   team has admitted what he did.  He is in Florida.  He provided

15   this information.

16    This is unlike any other case we have probably seen

17   here involving offshore banking, where if someone who is

18   engaging in the exact same conduct, who has admitted it, who

19   has stated it for interviews and who will be there to testify,

20   it is unlike any other case where the entity that organized

21   this behavior has admitted it in the district and said that it

22   was a concerted attack to violate U.S. tax laws.

23    The weight of the evidence clearly favors the

24   government.  The history and circumstances and characteristics

25   of the defendant, if we look at whether the defendant is a

43

1    flight risk, it is clear that there is no set of circumstances

2    that could guarantee his presence.

3              THE COURT:  Well, nothing has to guarantee it.  It

4    just has to reasonably insure.

5              MR. DALY:  Reasonably insure.  I have reached too far.

6    He has no ties to the United States.  No friends.  No family.

7    No money.  No assets.

8              He doesn't work here.  He has nothing here other than

9    this outstanding criminal charge.

10             Everything he owns is abroad.  If he were to leave the

11   jurisdiction, and the Bahamas is only 80 miles away, there is a

12   Credit Suisse office there.  There is no guarantee.  In fact,

13   there is little likelihood whatsoever that he would ever be

14   compelled to return to the United States.

15             Greece will not extradite him.  While Mr. Menchel made

16   great effect of the fact that it is at the discretion of

17   Switzerland to extradite individuals, I can think, and I don't

18   know if Mr. Menchel can think of any tax offender who has ever

19   been extradited from Switzerland to the United States.

20             I mean, it is a canard to think that they actually

21   would extradite a tax offender.  And if one looks at the

22   lengths that the United States had to go to to bring UBS to

23   justice, it is highly doubtful that they would ever, ever agree

24   to send him back.

25             It is also the case law that the prospect of civil

44

1    enforcement and government enforcement in a volatile business

2    situation are grounds to detain.  That's in United States

3    versus Levine, 77 F.Supp 460 out of the Northern District of

4    Indiana in 1991.

5              Clearly, considering his past activity, if Mr. Bagios

6    is convicted, or even if he is not convicted based upon the

7    voluntarily disclosures that have been disclosed here, he will

8    face or he will likely face enforcement proceedings brought by

9    the Securities & Exchange Commission, if not FINRA which would

10   be further reason to leave.  Extensive prison time.

11             THE COURT:  I am sorry.  What is the basis of your

12   saying that he may face -- I mean, there is no evidence that

13   was offered to that effect, was there?

14             MR. DALY:  There is no evidence of that, but since

15   each of these --

16             THE COURT:  Well, how can I accept that then?

17             MR. DALY:  Well, I guess it would be an inference that

18   he would face it, given that 17 taxpayers have come and said

19   that Mr. Bagios was here unregistered helping them commit tax

20   evasion.  The inference is --

21             THE COURT:  Have you spoken to someone at the SEC?

22             MR. DALY:  I have not, Your Honor.

23             THE COURT:  All right.  I am not going to accept that

24   part of the proffer.

25             MR. DALY:  Okay.  Certainly, Your Honor.

1    As far as the prospect of electronic monitoring, it is

2    no guarantee that an individual will stay here.

3    I think in the Cohen case which we recently tried

4    here, Judge Snow commented that all that is going to do is let

5    you know a little bit earlier that they have left the

6    jurisdiction, and I think that's where we stand as far as

7    detention goes, Your Honor.

8    THE COURT:  All right.  Thank you.  Defense?

9    MR. MENCHEL:  Thank you, Your Honor.

10    I think it is important to start with the proposition

11    that the Bail Reform Act favors pretrial release.  We start

12    from that premise, and that detention is really limited to a

13    group of offenders who the court finds, you know, would likely

14    flee.

15    If you look rather all of the factors that counsel

16    just went through, I think actually all of them favor

17    Mr. Bagios being released, with obviously a reasonable bond,

18    and I know of a number of cases that I can proffer to the

19    court, including one that I am involved in out of D.C.

20    involving FCPA violations, frankly, holding much more serious

21    penalties than what Mr. Bagios is facing, which as counsel has

22    correctly pointed out, has a 5 year cap, where all of the

23    foreign nationals, and I have the orders, and I am happy to

24    hand them up, were actually allowed to go home to their

25    countries after posting a sizable bond, agreeing to pretrial,

46

1    you know, obviously to pretrial monitoring and the like;

2    surrendering of their passports and waiving extraditions.

3              This man has an unblemished record.  Prior to this

4    case there has been no evidence that he has been involved in

5    anything criminal whatsoever.

6              And, again, in terms of the nature and circumstances

7    of the offense, while I am not pooh-poohing it as not being

8    serious, it is not a 20 year drug case, and he is just as

9    incentivised to not flee and face these charges for precisely

10   the same reason and even more so than what counsel suggested.

11             He holds several U.S. licenses.  He holds a Series 7,

12   I believe, and a Series 66, and we got a letter from counsel

13   suggesting, and I would like to hand it up to the court, from

14   Swiss counsel.  I have a copy for you.  May I approach?

15             THE COURT:  You may.

16             MR. MENCHEL:  Thank you.

17             THE COURT:  Thank you.

18             MR. MENCHEL:  I believe the letter speaks for itself,

19   Your Honor, so I am not going to obviously read the entire

20   thing, but this was a letter by a Swiss lawyer that we employed

21   in connection with this particular issue, and it lays out what

22   the likely result would be of Mr. Bagios' career should he flee

23   the jurisdiction of the United States and fail to come back and

24   face these charges.

25             It is likely, and we also have a letter, by the way,

47

1    from Credit Suisse which I would like to hand up.

2           THE COURT:  Thank you.

3           MR. MENCHEL:  It is likely that were he not to comply

4    with U.S. law, he would lose his job at Credit Suisse.

5           It is likely were he not to comply with U.S. law, he

6    would lose basically his broker's license and his investment

7    advisor licenses, and so he is just as incentivised not to flee

8    and to face these charges appropriately so that he can maintain

9    his career.

10          It is also important to understand that the government

11   has repeatedly says he had no U.S. ties and no U.S. business

12   relationships to the United States.  That's patently untrue.

13          By the government's own proof, most of his clientele

14   is U.S. based.

15          Okay.  If he were to flee this jurisdiction and lose

16   these licenses, it would be very unlikely that he would ever be

17   employable again.

18          Also, contrary to what counsel says --

19          THE COURT:  Well, in the United States, right?

20          MR. MENCHEL:  In the United States, and he likely

21   would lose his job at Credit Suisse.  So that is what those two

22   letters basically tell you.

23          One is from Credit Suisse, basically telling you that

24   they expect their employees to follow the law of the United

25   States, and that they obviously have the discretion to

48

1    terminate him if he should not do so.  Do you want to amplify

2    on that?

3              MR. GREENSPAN:  I would just add that the letter from

4    the Swiss lawyer also explains that there would be employment

5    consequences within Switzerland beyond just termination by

6    Credit Suisse; that under the standard of reasonable behavior,

7    he would basically be unemployable.

8              There is a Swiss financial supervisory authority that

9    he cites called FINMA that would likely take action, or

10   certainly he would really be jeopardizing his financial future

11   were he to violate the law and flee.

12             MR. MENCHEL:  And the other distinction that I think

13   it is important noting, which was glossed over by the

14   government, is that because Mr. Bagios is not a Swiss citizen,

15   a different standard would apply to him with respect to

16   extradition.

17             In the last page of this opinion letter that we

18   provided to you, it is discussed in detail that, in fact, he

19   may face extradition to the United States in the case of a bail

20   violation, or even due to the underlying tax fraud charges.

21             So I don't think it is necessarily the case that just

22   because no one to date that we know of, and in the Mark Rich

23   example, which was quite a while ago, means that if we executed

24   an extradition waiver in this case, the Swiss Government would

25   not extradite him.  I think that that's a reach, and I don't

1    think the court can make that conclusion.

2         Really, what this case comes down to, Your Honor, is

3    that they are simply saying that because he is not a U.S.

4    citizen and because he is, in fact, a Swiss resident, that he

5    automatically is a flight risk.

6         There have been a number of courts that have held that

7    under that analysis that any non-U.S. citizen with no ties

8    would automatically be detained.

9         If Congress had intended that to be the result, they

10   could have written that into the statute like they have with

11   other types of crimes.

12        They could have made it at least a rebuttal

13   presumption, like they have with certain types of offenses,

14   such as drug offenses, but Congress has not done that, and I

15   don't think this court should come to the hasty conclusion that

16   just because the man resides in Switzerland means he is

17   automatically a risk of flight.

18        He has the opportunity to flee.  I agree with that,

19   and citing the Supreme Court case of, and I am going to butcher

20   this, but I am going to do my best, Trun Dean Hung versus

21   United States of United States at 439 U.S. 1329, a 1978 Supreme

22   Court decision authored by Justice Brennan.

23        The Court made note of the fact this was a person who

24   was a permanent resident -- I am sorry -- who was a resident of

25   Vietnam; that just because he has the means to procure, the

50

1    government does not necessarily have the means to procure his

2    return doesn't suggest that just because he has the

3    opportunities for flight, they hardly establish any inclination

4    on the part of the applicant to flee.

5           Okay.  And that's the point I am trying to make.  You

6    cannot just make the leap inferentially that because he is a

7    Swiss national that he automatically ought to be detained, and

8    I can hand up to the court if you would like those FCPA cases

9    where citizens from all over the world --

10          THE COURT:  I mean, that's not going to have any

11   bearing.  You know, we look at each case on its own merits.

12          MR. MENCHEL:  Well, I think that's the point, and when

13   you compare Mr. Bagios to those other cases --

14          THE COURT:  Well, let me ask you something:

15          What would you suggest in order to reasonably insure

16   his appearance as required?

17          MR. MENCHEL:  Okay.  We have present in court his

18   father-in-law.  We are suggesting a $1,000,000 bond which would

19   be backed by his father-in-law who has come and provided

20   $300,000 U.S.

21          THE COURT:  A $1,000,000 cash bond?

22          MR. MENCHEL:  No.  It would be a $1,000,000 personal

23   surety bond backed by $300,000 cash collateral, okay, and then

24   there is also another friend.

25          THE COURT:  What about a corporate surety bond?

51

1        MR. MENCHEL:  We are open to that, Your Honor.

2   Whichever way in which the court wants to structure the bond is

3   not really as concerning to us.

4        The point is we have about $345,000 in cash that we

5   can offer to the court.  300 comes from his father-in-law who

6   has flown in from Switzerland and is here in the courtroom

7   today standing in the back with two other friends of Mr. Bagios

8   who have also flown in, one who has made a pledge of an

9   additional $45,000 in U.S., all three of which are willing to

10  co-sign on the bond in support of Mr. Bagios.

11       We also have letters of recommendation from family

12  members in friends we would like to hand up to the court

13  attesting to the man's good character, and we would suggest

14  that he surrender his passport in Switzerland; that he execute

15  extradition waivers.

16       THE COURT:  I am sorry.  Surrender his passport.  It

17  is in Switzerland now?

18       MR. MENCHEL:  No, no.  I am saying that it will be

19  returned to him.  He will be allowed to go home.  He can

20  surrender it in Switzerland, which is what has been done in

21  other cases.

22       Okay.  Execute extradition waivers in both Greece and

23  Switzerland and require constant monitoring by Pretrial

24  Services.

25       THE COURT:  Let me ask you something:  If he executes

52

1    extradition waivers in Greece and Switzerland, will those just

2    be meaningless pieces of paper?

3         I mean, I am hearing that Greece does not extradite

4    its citizens.  So what is the value of an extradition waiver

5    from Greece?

6         MR. MENCHEL:  I have to tell you other than proffering

7    that, I don't know that to be the case, but the reality is the

8    man does not live in Greece.  He lives and his family

9    lives with his two children

10        THE COURT:  But he could go back and live in Greece if

11   he wished to do so.  I mean, he has extended family there,

12   right?

13        So to the extent that an extradition waiver from

14   Greece is a meaningless piece of paper, I am not sure that that

15   is really helpful to me, but maybe it is not.  I don't know.

16   That's why I am asking you what is your view on this?

17        MR. MENCHEL:  I am not going to tell the Court I have

18   looked into that specific issue with respect to Greece.  I have

19   not.

20        The lives and resides and has lived, how many years

21   have you lived there?  Yes, 20 years in Switzerland, but if

22   that is determinative to the court, I am happy to do the

23   research.

24        I don't want to take the government at face value on

25   that because I think they are wrong with respect to Switzerland

53

1    when it comes to the issue of extradition, and that we did

2    provide you with an opinion on.

3              THE COURT:  All right.  Go ahead.

4              MR. MENCHEL:  So that would be our position with

5    respect to this case.  Mr. Bagios intends to see this case

6    through.

7              THE COURT:  Let me ask you a question:  Is there a

8    possibility that he would be willing to stay here on electronic

9    monitoring?

10             MR. MENCHEL:  Obviously our first request would be

11   that he be allowed to return home to his wife and two children.

12             If the Court is not willing to do that, I think I even

13   made mention of it the other day, we would be open to that

14   idea, and we have already started to look at and made

15   arrangements for housing in the United States if that's what

16   the Court desires.

17             THE COURT:  All right.  Thank you.

18             MR. MENCHEL:  Thank you.

19             THE COURT:  Mr. Daly, anything further?

20             MR. DALY:  Well, Your Honor, I think while they have

21   presented this letter about Swiss extradition, it is filled

22   with conditional language that does not I believe support the

23   assertion that they make that he could be extradited.

24             I think Your Honor correctly stated that if he were to

25   flee to Switzerland, all he needs to do is take a plane to

54

1    Greece where there is no guarantee of him ever returning.

2              As far as a cash bond of $345,000, that the people

3    would sign up to a million, they have all flown in here from

4    foreign jurisdictions.

5              I can't imagine it would be easy to collect on a

6    $1,000,000 bond on Swiss nationals through the U.S. courts.

7              THE COURT:  Let me tell you what my concern is.  I do

8    have a concern about Mr. Bagios not returning and not being

9    extraditable.

10             On the other hand, if the only reason I have to hold

11   him here is because he doesn't have ties to this country and he

12   is a foreign national, I am not sure that that is really

13   enough.

14             I mean, I guess I could do it, but I don't feel

15   comfortable doing it.  So I need you to tell me --

16             MR. DALY:  Well, he has great incentive to flee, Your

17   Honor.  The man is facing 5 years imprisonment and a  massive

18   fine.

19             It is not just simply that he is a foreign national is

20   a reason to flee.  It is that he faces, quite frankly, the end

21   of his career as a banker and long term imprisonment here in

22   the United States.

23             THE COURT:  Although if we take the defenses' position

24   at face value and the letter from Credit Suisse, they would

25   argue that if he fled he would face the end of his career as a

55

 1  result of fleeing.

 2          MR. DALY:  At Credit Suisse.

 3          THE COURT:  That's true.

 4          MR. DALY:  There are many other Swiss banks and many

 5  other clients outside of the United States who he could easily

 6  service at another institution out of Switzerland or Greece.

 7          While he may lose his instant employer, he does hold a

 8  fairly senior position at Credit Suisse.

 9          One could draw the inference that other banking

10  institutions who might not have the same standards of Credit

11  Suisse would love to snap up someone like that.

12          MR. GREENSPAN:  Your Honor, if I may?

13          THE COURT:  Yes.

14          MR. GREENSPAN:  I think, as I said before, that the

15  letter from our Swiss counsel indicates that he would have

16  very, very limited employment opportunities in Switzerland

17  generally.

18          So I think it is wild speculation that some other

19  nefarious Swiss bank would love to snap him up.

20          THE COURT:  And I hear what you are saying, but I mean

21  I am also somewhat reluctant to take as the letter of the law

22  an opinion by counsel for, I guess it is counsel.  Is it

23  counsel for UBS?  I don't know who this is.

24          MR. DALY:  This is counsel for his father-in-law.  The

25  first line says, "The father-in-law of the detained

56

1   Mr. Christos Bagios."

2           THE COURT:  All right.  So I mean I am a little bit

3   reluctant, you know, look at the source here.

4           So I am a little bit reluctant to take that as what

5   the actual law is.  It may well be.  I just don't know.  You

6   know, although there is a procedure for determining what

7   foreign law is, and it involves the court determining what it

8   wishes to rely upon in that respect, I mean obviously I would

9   be reluctant to rely solely upon a statement of the law from

10  Mr. Bagios' own father-in-law's attorneys.

11          Having said that, as I indicated previously, I am not

12  entirely comfortable with the idea of detaining him solely

13  because he lacks ties.  I think I could do it.

14          I think that the statute allows me to do it, but I am

15  wondering if there is some kind of bond that would be

16  appropriate.

17          I would require him to stay in the United States.  I

18  can tell you that right now.

19          MR. MENCHEL:  Okay.  Well, we have put together right

20  now, you know, $345,000.  These are not people of tremendous

21  means.

22          If you look at his assets, we are not talking about

23  somebody that has the wherewithal to do anything he wants.

24          There is another friend in the courtroom that is also

25  trying to procure funds.  We may be able to up the ante a bit,

1   but it is not going to be in the millions of dollars.  I can

2   tell you that right now.

3           We just don't have those funds available to us, but

4   these are people that obviously are standing behind Mr. Bagios

5   who have flown here and are willing to put their money up,

6   okay, as real collateral at real risk should he not return for

7   this court hearing.

8           There is another case that I would like to bring the

9   Court's attention to very similar called U.S. versus Bogner.

10  The West Law cite is 2004 West Law 169790, and the court made

11  the very point that I think this court is making.

12          THE COURT:  I don't want to punish him being for being

13  a foreign national is basically what I am saying.

14          MR. MENCHEL:  And that is what this court said, that

15  should not be the only basis to detain somebody.

16          There ought to be more, and I really think, Judge,

17  with all due respect, we saw a little bit of it yesterday, that

18  what is really going on here a little bit is a little bit of

19  using the bond, the detention hearing as a way to squeeze

20  Mr. Bagios maybe into doing so something that he is not

21  prepared to do.

22          THE COURT:  I think there is good faith.  I think

23  there is a good faith basis for seeking detention.

24          In no way do I mean to suggest that there isn't.  I

25  mean, the fact that Mr. Bagios has no ties whatsoever in the

58

1   way of family, friends, et cetera, to this country I think in

2   itself certainly lays a good faith basis for the government to

3   proceed in that regard, and I don't think this is an easy

4   decision either way, in view of the questions regarding

5   extradition.

6           Having said that, however, I am just concerned about

7   detaining him pretty much solely because of his status as a

8   foreign national without ties to the country.

9           So let me ask you, Mr. Daly, what are your suggestions

10  if I were going to go in the direction of a bond?

11          MR. DALY:  Well, Your Honor, first of all, the

12  $345,000, while substantial, pales in comparison to what he is

13  ultimately, if the government is correct and prevails, what he

14  is ultimately liable for, and so we don't think that is, first

15  of all, is a sufficient bond to guarantee his presence,

16  particularly given the fact that it would be guaranteed by

17  individuals who are again outside of the United States with no

18  ties to the United States.

19          THE COURT:  I am thinking corporate surety bond.  That

20  is what I am thinking, and maybe some other kind of bond as

21  well, with electronic monitoring and a residence set up here.

22          MR. DALY:  I was going to say, Your Honor, if you were

23  to going to release him, we certainly should have arrangements

24  for him to be housed prior to any release and being monitored.

25          THE COURT:  I agree.

59

1          MR. DALY:  I agree, Your Honor.

2          MR. MENCHEL:  We have done that.

3          THE COURT:  All right.

4          MR. MENCHEL:  I don't know if the court cared.  My

5     office is in downtown Miami.  I would prefer that Mr. Bagios be

6     in that part of the district for my convenience.

7          THE COURT:  As long as he is in the district, I don't

8     think it matters where in the district he is.

9          MR. MENCHEL:  We have arranged for that, Your Honor.

10    We have a corporate housing apartment already lined up and, you

11    know, I don't know how long that lease will last for, but then

12    we will obviously always make sure he has appropriate housing,

13    with the Court's permission and also obviously with pretrial

14    being made aware of it.

15          THE COURT:  Mr. Daly?

16          MR. DALY:  If the court is entertaining the bond, then

17    certainly the corporate housing along with the conditions that

18    the court finds acceptable would be acceptable to us, but we do

19    believe that if the court is going to entertain a bond, which

20    we urge the court not to, that they set a higher amount and a

21    corporate surety.

22          THE COURT:  All right.  Just a moment.  All right.

23          I think, once again, it is a close call, but I am

24    going to deny the motion for pretrial detention.

25          I am going to impose a $500,000 corporate surety bond,

60

1    a $150,000 cash bond which is to be deposited in the registry

2    of the court and returned upon Mr. Bagios' successful

3    completion of his bond period.

4              I am going to require electronic monitoring to be paid

5    for by the defendant, and Mr. Bagios must reside in the

6    Southern District of Florida.

7              All right.  So that let me ask the government in

8    addition to the standard conditions which I will read in a

9    moment, are there any other conditions that the government is

10   requesting?

11             I understand that you object to my release of him, but

12   in view of the fact that I am going in this direction, is there

13   anything further that you request?

14             MR. DALY:  I don't think there are any other

15   additional conditions of release.

16             THE COURT:  All right.  Mr. Bagios, in addition to the

17   bond that I have just set, I am going to require you to comply

18   with each and everyone of the following conditions.  Please

19   listen carefully.

20             First, you must appear before the court and such other

21   places as you may be required to appear at the times and places

22   that you are required to appear.

23             Your travel is restricted to the Southern District of

24   Florida.  That extends from Key West in the south to Vero Beach

25   in the north.

61

1          If you need to leave this area for any reason, you

2    must speak with your attorney who can file a motion with the

3    court.  Only if the court grants the motion may you leave the

4    area.

5          You may not change your address without prior

6    permission in writing from the court.  You shall commit no act

7    in violation of local, state or federal law.

8          You shall surrender all passports or travel documents

9    to the Pretrial Services Office.

10          Let me ask you what passports and travel documents you

11    have?

12          THE DEFENDANT:  Only a Greek passport.

13          THE COURT:  All right.  You shall surrender that to

14    the Pretrial Services Office and shall not come into possession

15    of any additional passports or travel documents while you are

16    out on bond.

17          You shall report to the Pretrial Services Office with

18    the frequency that they require and avoid all contact with

19    victims or witnesses to the alleged offense, except through

20    your attorney and in preparation of your defense.

21          You may not possess any firearms, destructive devices

22    or other dangerous weapons.  And if you have any of these

23    items, you must arrange immediately upon your release for the

24    transfer of them to the lawful custody of another individual.

25          You shall refrain from the consumption of illegal

62

1    narcotics or excessive alcohol and only if deemed required or

2    appropriate by Pretrial Services, then you shall submit to

3    random urine analysis.

4            Have I missed any conditions, Mr. Daly?

5            MR. DALY:  No, Your Honor.

6            THE COURT:  Did you understand each and everyone of

7    these conditions as have I just explained them to you,

8    Mr. Bagios?

9            MR. MENCHEL:  I did, Your Honor.

10           THE COURT:  All right.  I need to let you know that

11   for any failure to comply with any one of these conditions or

12   for many failure to appear, a warrant could be issued for your

13   immediate arrest.

14           The government could come after you for the full

15   amount or could keep the $150,000.  The bondsman could come

16   after you for the rest of the $500,000 and an additional

17   charges could be filed against you with additional jail time.

18           There is actually one other condition.  I will require

19   the signing of the extradition waivers for Greece and for

20   Switzerland for whatever value they may have.

21           After all of these conditions are satisfied, and only

22   after they are all satisfied Mr. Bagios should be released.

23           Is there anything further we need to address here with

24   respect to Mr. Bagios' case?

25           MR. DALY:  Just, Your Honor, on the record do you need

63

1   to announce a finding that the government has made probable

2   cause?

3            THE COURT:  Yes.  Thank you.  I do make a finding of

4   probable cause in this case.  Is there anything further?

5            MR. MENCHEL:  No, Your Honor.  Thank you.

6            THE COURT:  All right.  Thank you, gentlemen.

7            MR. DALY:  Thank you, Your Honor.

8            (Whereupon the proceedings were concluded)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

64

1          C E R T I F I C A T E

2          I hereby certify that the foregoing is an accurate

3    transcription of proceedings in the above-entitled matter.

4

MARCH 4, 2011              S/JERALD M. MEYERS

5    _____        _____

DATE                   JERALD M. MEYERS, RPR.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25