# EXHIBIT I

FAMLNGC1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                        15 CR 706 (VSB)

 5   NG LAP SENG,

 6                   Defendant.

 7   ------------------------------x

 8                                   New York, N.Y.
                                     October 22, 2015
 9                                   1:48 p.m.

10
     Before:
11
                        HON. VERNON S. BRODERICK,
12
                                        District Judge
13

14                        APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     DANIEL RICHENTHAL
17   JANIS ECHENBERG
     RAHUL MUKHI
18        Assistant United States Attorneys

19   BRAFMAN & ASSOCIATES, P.C.
          Attorneys for Defendant
20   BY:  BENJAMIN BRAFMAN
          JACOB KAPLAN
21        -and-
     THE LAW FIRM OF HUGH H. MO, P.C.
22   BY:  HUGH H. MO

23   ALSO PRESENT:  JOHN LAU, Cantonese Interpreter
                    MICHAEL JONES, Pretrial Services
24

25
```

Case 2:16-cr-20394-SFC-APP  ECF No. 48-10  filed 02/24/17  PageID.539  Page 3 of 92
Case 1:15-cr-00706-VSB  Document 82  Filed 11/09/15  Page 2 of 91

2

FAMLNGC1

1           MR. BRAFMAN:  Your Honor, we're ready.

2           THE COURT:  All right.  If at any point in time,

3    Mr. Ng, something happens and you can't understand or can't

4    hear, just let your attorney know and we'll stop the

5    proceedings and we'll try and fix the problem.  Okay?

6           THE DEFENDANT:  Thank you.

7           THE COURT:  Thank you.  All right.

8           So let me just review for the parties what I have in

9    connection with the bail appeal.  I have the October 16 letter

10   that Mr. Brafman wrote to Judge Fox, the October 21 letter of

11   the government to me, the October 22 letter, earlier today,

12   from Mr. Brafman which also attached a letter from the

13   government dated September 29 that was filed in connection with

14   Mr. Yin.  I have the transcript from the bail hearing that

15   occurred, both the bail hearing before Magistrate Judge

16   Netburn, which I believe was September 21, and the bail hearing

17   before Judge Fox on October 16.

18          Are there any other documents that I should have in

19   connection with today's bail argument?

20          I have a copy, just so everybody knows, of the

21   presentence services report which was prepared by Pretrial and

22   updated to note the bail that was granted by Judge Fox.

23          Is there anything else?

24          MR. BRAFMAN:  I don't believe so, your Honor.

25          MR. RICHENTHAL:  No.  Those are all the materials I

FAMLNGC1

 1    think the parties submitted, your Honor.

 2              THE COURT:  I do have some questions.  Obviously, I've

 3    read through the transcripts.  I've read through the parties'

 4    letters and looked at the case law that's been cited.  In

 5    connection with the case law that's been cited, I know that,

 6    Mr. Richenthal, you had argued that the granting of bail was

 7    inappropriate as a matter of law and I think you had said that

 8    several times during the proceedings before Magistrate Judge

 9    Fox.  And I just want you to clarify exactly what you mean by

10    that because as I understand it, the granting of bail and the

11    permitting of a defendant to retain private security for

12    purposes of bail is something that isn't prohibited by the

13    Second Circuit.  My colleagues have gone both ways on this, so

14    I just want to get a sense of exactly what the government's

15    position is on that with regard to the legality.

16              MR. RICHENTHAL:  Your Honor, it's our view, and I

17    think the Second Circuit has said what I'm about to say, that

18    the Court need not even consider such an application but that

19    the Court may.  Then the question is does the Court have to.

20    As I said, the Second Circuit essentially said the Court does

21    not.  It is our view that neither the Eighth Amendment nor the

22    Bail Reform Act contemplates this kind of scenario and it does

23    not require your Honor to consider it.  That is what we meant

24    by inappropriate as a matter of law.

25              It seems fairly clear your Honor has the discretion to

FAMLNGC1

1   consider it, although that issue was actually not joined in

2   front of the Second Circuit.  The parties didn't even argue

3   that point.  So even that I think is a little muddled.  But our

4   view is consistent with the several cases we cited that neither

5   the Bail Reform Act nor the Constitution requires your Honor to

6   consider it and never mind requires your Honor to grant it.

7           THE COURT:  But is it fair to say that what I am

8   required to consider are issues that might ameliorate any

9   concern that I might have that Mr. Ng might pose a risk of

10  flight?

11          MR. RICHENTHAL:  Certainly, and that's our argument,

12  your Honor, that Mr. Ng should be detained because the risk

13  here is severe and cannot be mitigated.  And our argument, as

14  the Court no doubt is aware from reading the transcript, is

15  that putting aside the interesting questions raised as a matter

16  of law that this is simply inappropriate factually.  The very

17  few cases in which this has occurred are reasonably new.

18  They're extraordinarily rare.  They're readily distinguishable.

19  This is not a case in which this is appropriate factually in

20  any way, shape, or form, irrespective of how the Court may come

21  out in what frankly appears to be a divide among various

22  district courts both in this district and outside this

23  district.

24          THE COURT:  Let me ask this, and I'll give you an

25  opportunity, Mr. Brafman.  Run through me the scenarios under

FAMLNGC1

1    which you would see, assuming the conditions that have been

2    proposed and approved by Magistrate Judge Fox, the scenarios in

3    which you would see and envision that Mr. Ng would be able to

4    flee.

5           MR. RICHENTHAL:  So I will, your Honor, but I also

6    want to note one of the issues here and I think that our

7    principal concern is we don't really know what's going to

8    happen.  This is a relatively new thing.  It is relatively

9    untested.  It has happened in very few cases that are very

10   different from this case.

11          And let me give you an example of what happened in a

12   particular case that shows why this is a special scenario and

13   doesn't belong in this case, the Brooks case.  This is one of

14   the cases that Mr. Brafman analogized to his client.  Among

15   other things --

16          THE COURT:  That's an Eastern District case?

17          MR. RICHENTHAL:  Yes, your Honor.  It's an Eastern

18   District case.

19          In the Brooks case the defendant was released on

20   conditions including that he be monitored by private security

21   guards.  Let me note the bond there was approximately

22   $400 million, not 50.  It was secured by approximately

23   $50 million, not 48, excuse me, not 20 as in this case.  And it

24   had to be cosigned by, if memory serves, ten people, not zero.

25   So it's actually a very different set of conditions from what

FAMLNGC1

1    Judge Fox ordered.

2              In the Brooks case the defendant was bailed under that

3    set of conditions and he lived essentially under the monitoring

4    of private security guards.  And he managed to convince one of

5    those security guards who he was paying, of course, that he was

6    actually a good guy and not a flight risk and that security

7    guard actually submitted an affidavit to the court and

8    essentially became a member of the defense team seeking to

9    change those conditions, which were in fact changed.

10             That's an example of the kinds of concerns we have.

11   These are not sworn law enforcement officers.

12             THE COURT:  Wait.  Let's back up.  I just want to make

13   sure I have the facts right.  So someone, a member of the

14   security detail, first of all, what company was providing that

15   security?

16             MR. JONES:  This is a case across the river.  I only

17   learned of it when I saw Mr. Brafman's letter and I don't

18   recall.  I don't recall if it was the same company or not, your

19   Honor.  I was only able to glean a brief amount of information

20   this morning.

21             THE COURT:  As I understand what you said, in

22   connection with that case, a member of the detail submitted an

23   affidavit or a letter or something to the Court detailing facts

24   about his -- I guess, well, detailing facts and as part of an

25   application to change Mr. Brook's bail conditions.

Case 2:16-cr-20394-SFC-APP  ECF No. 48-10  filed 02/24/17  PageID.544  Page 8 of 92
Case 1:15-cr-00706-VSB  Document 82  Filed 11/09/15  Page 7 of 91

7

FAMLNGC1

1          MR. RICHENTHAL:  Yes.  I have not seen the affidavit.

2     I have only been told about it.  But that's my understanding,

3     that it was part of an application to amend those bail

4     conditions to remove the very restriction of which that member

5     of the security detail was a part.

6          I'm raising this because I think it's an example of

7     how very thorny this is.  These people are not federal law

8     enforcement officers.  If you assault them, we cannot prosecute

9     it as assault on a federal law enforcement officer.  There

10    probably wouldn't be federal jurisdiction over that assault.

11    If Mr. Ng were to escape --

12          THE COURT:  Why wouldn't that be a violation of his

13    bail conditions?

14          MR. RICHENTHAL:  It certainly would be, your Honor.

15    But the point I'm making is there are lots of things that are

16    very different in a private jail from a not private jail.  One

17    is these people are not federal law enforcement officers.

18    Their salary, their livelihood, both the current one and the

19    future one, depends in no small part on keeping the defendant

20    happy.  Brooks is an example of a case in which that went awry.

21          THE COURT:  When you say went awry, so the application

22    was made and what happened with the application?

23          MR. RICHENTHAL:  The application I think was granted

24    after extensive hearings and other litigation.

25          THE COURT:  I guess my question is when you say it

FAMLNGC1

1   went awry, he provided an affidavit of some sort, but the

2   affidavit I understand was presented to a court and the court

3   modified the conditions?

4           MR. RICHENTHAL:  Ultimately, yes.  After lots of back

5   and forth and some hearings, apparently the court ultimately

6   modified the conditions.  I don't have all the details.

7           THE COURT:  Did Mr. Brooks violate?

8           MR. RICHENTHAL:  He then did and was remanded

9   actually, yes.

10          THE COURT:  That would be going awry.  Look, I don't

11  know the facts and circumstances surrounding the affidavit.

12  But it may be or it could be that if the defense wanted to make

13  an application to modify his bail, they could request that he

14  be present and subpoenaed to testify.  It may have been

15  voluntary, I don't know.  He may have made a friend.  I know a

16  little bit about the Brooks case and I doubt -- well, first of

17  all, as I understand, Mr. Ng doesn't speak English, so I'm not

18  sure and I don't know whether any of the security folks at

19  Guidepost speak Chinese.  So that sort of an issue, I think to

20  the extent it is an issue, I'm not sure would necessarily

21  arise, in other words, where he's able to curry favor, at least

22  in speaking to somebody as opposed to through monetarily.

23          MR. RICHENTHAL:  I'm not sure we agree, your Honor.

24  Mr. Ng has a lot of interlocutors and a lot of interpreters all

25  throughout our city and our country.

FAMLNGC1

1          THE COURT:  But to the extent -- and I'm not saying

2      that I would -- to the extent that any conditions would be set,

3      I think it would be fair to have with regard to interpreters

4      and people there.  One thing I did note that was part of the

5      package is you have people who are security there and there was

6      no provision for having someone there who actually speaks

7      Mr. Ng's language, which I think is something, A, that would be

8      needed, and, B, it wouldn't certainly be somebody that would be

9      at his choosing.  So I understand the concern and the access

10     concern also, but I'm sorry, I interrupted you.

11         MR. RICHENTHAL:  No, your Honor.  What I was going to

12     say is at a minimum, yes, there should certainly be something

13     like that.  But on the present package, anyone can come and go

14     to the apartment, anyone, and that's exactly the point.  It

15     would be very easy for Mr. Ng to either offer financial

16     incentives or any kind of other incentives to these people.

17         The point I'm making about Mr. Brooks, and then I want

18     to expand on my answer to your Honor's question, is it would be

19     to say the least highly unusual for a BOP employee to engage

20     with a defendant the way that plainly occurred in the Brooks

21     case and then to file an affidavit because these people are

22     trained, among other things, about how to interact with

23     prisoners who pose risks of flight.  The people at Guidepost

24     may well have had honorable law enforcement careers.  We don't

25     suggest otherwise.  But that's not their training, that's not

FAMLNGC1

```
 1    their experience, that's not their background.  That's not the

 2    world they inhabit.  They would be paid by these people.

 3             Let me expand to a higher level because that's one

 4    example of the Brooks case.  Mr. Ng has literally more money

 5    than one can fathom and it's liquid and available to him in

 6    wire form and cash form.  It would be all to easy and all too

 7    tempting for him to try to pay people off to look the other

 8    way.  It would be very difficult to monitor that in realtime.

 9    Because, again, these are not federal law enforcement officers.

10    They do not report to the United States government.  They do

11    not work for the Federal Bureau of Prisons.

12             On the present package, not only can anyone come and

13    go freely, Mr. Ng could have 25 cell phones, internet access,

14    any other kinds of means of communication.  He doesn't need to

15    tell anyone about it.  He doesn't need to give the phone

16    numbers he's using.  Anything can be brought into the

17    apartment.  And I don't mean a weapon; I mean money.  This

18    isn't even a private jail.  But even if a private jail could be

19    constructed, there are all these unanswered questions about the

20    legality of use of force against Mr. Ng if he tried to flee,

21    the legality of the use of force against others were they to

22    try to help Mr. Ng free.

23             THE COURT:  Let's take a step back because I had

24    thought about this and this goes to the question I asked about

25    what the scenarios would be.  Wouldn't that be a danger to the
```

FAMLNGC1

1    community?  Is there any evidence that Mr. Ng has utilized his

2    wealth to hire people to injure others?

3           MR. RICHENTHAL:  There is no evidence that Mr. Ng has

4    used his wealth to injure others.  There's significant evidence

5    Mr. Ng would use his wealth to get his way and advance his

6    interest.  His interest here is returning to China where we

7    will never be able to get him back, ever.  Not just because

8    he's Chinese, although that is in and of itself the most severe

9    problem because we do not have an extradition treaty with

10   China.  By his own representations, he is a member of the

11   Chinese government.  If he hits Chinese soil, he will never

12   return.

13          So the question is are there scenarios, as your Honor

14   is asking, in which that's possible.  The answer is yes.

15   Mr. Ng may be able to convince someone to look the other way.

16   Mr. Ng may be able to pay people to look the other way.  Mr. Ng

17   may be able to get people to do those things for him since,

18   among others things, there's no restriction on who can visit

19   him, no restrictions on who he can call.

20          The amount of money he has at his disposal, the

21   private planes he has at his disposal, the proven fact that he

22   has purchased citizenship in a foreign country --

23          THE COURT:  Now, you made that statement before.  I

24   want to hear the facts surrounding that.

25          MR. RICHENTHAL:  So various countries, some lawfully,

FAMLNGC1

```
 1    some not lawfully, have programs in which wealthy individuals
 2    can essentially purchase citizenship.  Mr. Ng availed himself
 3    to that with respect to the country of Dominica.  Mr. Ng was in
 4    the process of exploring that with the country of Antigua and
 5    Barbuda.  Mr. Ng also has connections to the Dominican
 6    Republic, and Mr. Ng has a passport of Portugal.
 7            Specifically with respect to purchasing citizenship,
 8    there are countries that permit that, either legally or under
 9    the table, and Mr. Ng availed himself of those programs in the
10    past.  Given his extensive international --
11            THE COURT:  Are you disputing that the money was
12    given, even if he got citizenship on the basis of contributing
13    the money, was the money used in connection with a storm that
14    had occurred in Dominica?
15            MR. RICHENTHAL:  I don't have a ledger of how the
16    money was used, but we can tell your Honor that the evidence
17    indicates that it was a business transaction.  Mr. Ng was
18    engaged in what Mr. Ng is engaged in, which is real estate
19    transactions and gambling transactions.  At the hearing before
20    Judge Fox, Mr. Ng painted himself as a philanthropist.  That's
21    not what the payments to Dominica were about.  There may have
22    been other payments.  We don't have his bank records.
23            One thing I wanted to comment on apropos of that,
24    there's a reason we don't have them -- it's because they're in
25    China.  Mr. Ng could provide documentation to the Court about
```

FAMLNGC1

1    his wealth, about his alleged inability to turn that wealth

2    into liquid assets, which is one of the arguments he made to

3    Judge Fox.  He hasn't produced that documentation.  We don't

4    have that documentation.

5            What we know is he owns a private airplane.  He has

6    access to private airplanes.  He is deeply connected to one

7    foreign government at a minimum, his own, and connected to

8    multiple other foreign governments and will not hesitate to

9    bribe people to do what's in his interest.  We know he's worth

10   more than a billion dollars and that wealth is in the same home

11   country in which he's a member of the government.

12           So the risk of flight is severe and the means to try

13   to do something is there, whether it's bribery or influence or

14   other kinds of things.  Can we know for sure that that risk

15   will materialize, of course not.  We can't.  Your Honor can't.

16   But the question is can your Honor have confidence, reasonable

17   confidence, to speak in the language of bail, that the proposed

18   private jail will ameliorate those risks.  No.  In every single

19   case in which that's happened, at least the cases I'm aware of,

20   they are markedly different.  They are either American citizens

21   with American families whose assets were tied up.

22           Bernie Madoff, let's use that as an example.

23   Mr. Madoff confessed to his crime.  He literally called up law

24   enforcement and said I did it.  That's a little different from

25   a man arrested on his way to a private airplane.  Mr. Madoff

Case 2:16-cr-20394-SFC-APP   ECF No. 48-10   filed 02/24/17   PageID.551   Page 15 of 92
Case 1:15-cr-00706-VSB   Document 82   Filed 11/09/15   Page 14 of 91

14

FAMLNGC1

```
 1    was a American citizen.

 2               THE COURT:  At the time he was on his way to the

 3    private airplane, was he aware that he was wanted in connection

 4    with this case?

 5               MR. RICHENTHAL:  No, absolutely not.  There were a lot

 6    of arguments made in front of Judge Fox that somehow Mr. Ng

 7    knew he was under surveillance.  Unless he is very, very good

 8    at detecting surveillance, no, he did not.  This was an

 9    entirely covert case.  And to be clear, because Mr. Brafman

10    made this argument before Judge Fox, the government didn't

11    arrange for him to be arrested at the airport so I could stand

12    up in front of judges and say he was at the airport.  The

13    reason he was arrested at the airport, it's a private plane.

14    We get essentially no notice that someone is on their way out.

15    And when we got notice he was on his way out, we went into

16    action because we thought we'd never get him back.

17               THE COURT:  My question actually went to because you

18    were equating the Madoff situation.  I just want it to be

19    clear, it wasn't like he was fleeing.  He was just going to

20    take his airplane back to China, I guess.

21               MR. RICHENTHAL:  Absolutely.  I'm not suggesting he

22    was fleeing.  The point I'm making is there are a lot of facts

23    that make, for example, the Madoff case very different.  One is

24    citizenship, the other is family, the other is ties to the

25    United States, and the other is essentially coming to law
```

FAMLNGC1

```
1    enforcement and saying I did it, charge me.  This is a whole

2    different universe.  This is a man who literally has zero

3    connections to the United States.  Yes, he purchased an

4    approximately $4 million apartment roughly four weeks ago.  He

5    then effectively gifted it to a coconspirator.

6         THE COURT:  Again, I saw the use of the term

7    "effectively."  What exactly was the transaction because I

8    didn't see in the papers what that transaction was to

9    Mr. Lorenzo.

10        MR. RICHENTHAL:  Mr. Ng purchased an apartment that

11   remains in his name, which is why Mr. Brafman is right that

12   technically it's his.  He never lived there.  He didn't do

13   anything with it.  Here's what he did.

14        On September 18, 2015, so roughly a month ago, after

15   wiring, as is his practice, millions of dollars to the United

16   States from Macau, he purchased through codefendant Francis

17   Lorenzo an approximately $4 million apartment in midtown

18   Manhattan.  It's actually two apartments and they combined

19   them.  It's a very nice apartment.  Mr. Ng didn't appear at the

20   transaction.  Mr. Lorenzo did, allegedly as his agent.  Mr. Ng

21   did not sign the documents.  Mr. Lorenzo did, allegedly as his

22   agent.  Mr. Ng didn't live there.  Mr. Lorenzo did.

23        Mr. Lorenzo decided the apartment, though nice, needed

24   to be nicer.  Mr. Lorenzo, in his own name, putting down as his

25   address this apartment, then engaged a construction company to
```

Case 2:16-cr-20394-SFC-APP   ECF No. 48-10   filed 02/24/17   PageID.553   Page 17 of 92
Case 1:15-cr-00706-VSB   Document 82   Filed 11/09/15   Page 16 of 91

16

FAMLNGC1

1   do some work in the tune of approximately $125,000 to that

2   apartment.  It was gifted to him.  As a formal matter, no, it

3   was not.  Mr. Brafman is right, the deed remains in the name Ng

4   Lap Seng.  As a practical matter, this was a bribe.

5               September 18, 2015, is telling for another reason.  On

6   the same day, Mr. Ng --

7               THE INTERPRETER:  I have a hard time hearing counsel.

8               THE COURT:  Look.  I hesitate to say this -- we have

9   time.  Take it slow because I want to make sure that everything

10  gets translated appropriately.

11              MR. RICHENTHAL:  I'll back up and, please, tell me

12  again if I speak too quickly.

13              September 18, 2015, was not a random date.  Also on

14  September 18, 2015, Mr. Ng and his codefendant, Mr. Yin, met

15  with Francis Lorenzo here in New York and executed yet another

16  agreement to pay Francis Lorenzo tens of thousands of dollars

17  more a month, specifically $20,000 a month, as a consultant for

18  Mr. Ng's company.

19              On the same day, Mr. Ng and Mr. Yin also met with

20  codefendant John Ashe and executed another agreement to pay

21  Mr. Ashe tens of thousands of dollars a month, specifically,

22  again, $20,000 a month.

23              So in the same day, in the same meeting or meetings,

24  Mr. Ng agrees to give Francis Lorenzo $20,000 a month, he

25  agrees to give Mr. Ashe $20,000 a month, and he further agrees

FAMLNGC1

```
 1     to give Mr. Lorenzo a $4 million apartment.  That's why we're

 2     saying it's effectively gifted.  But even if your Honor were to

 3     ignore everything I just said, that is not a tie to the United

 4     States.  That's roughly four weeks ago.

 5              THE COURT:  You don't have to argue that.  I'm not

 6     considering that as a tie.

 7              MR. RICHENTHAL:  Yes, but our concern about the

 8     apartment is this is ongoing --

 9              THE COURT:  Let me take a step back.  When I say I'm

10     not considering it as a tie, obviously, it would be a place

11     where he could live.  But I'm not considering it as a tie in

12     terms of an anchor, as an incentive for him to remain in the

13     country, no matter how nice the apartment might be.

14              But I'm sorry.  Go ahead.

15              MR. RICHENTHAL:  Look, we agree.  I think to be frank

16     here, there is no reason for him to remain.  Literally zero.

17     $50 million bond is meaningless to him.  $20 million is

18     meaningless to him.  A $4 million apartment that he never lived

19     in and he used to bribe someone and is subject to forfeiture is

20     meaningless.  He has no ties here.  He has no family here.  He

21     has business associates here who would love to see him flee

22     because they're inculpated in some of these crimes.

23              I think everything I'm saying, everything Mr. Brafman

24     says and will say, literally all of this comes down to one

25     thing, is your Honor okay as a matter of law allowing him to
```

FAMLNGC1

1    buy his way out and, if so, as a matter of law --

2              THE COURT:  Wait a second.  The Second Circuit doesn't

3    prohibit it, right?

4              MR. RICHENTHAL:  No, but --

5              THE COURT:  Yes, but has any other circuit prohibited

6    it?

7              MR. RICHENTHAL:  I'm not aware of any circuit that

8    prohibited it.

9              THE COURT:  Has the Supreme Court prohibited it?

10             MR. RICHENTHAL:  I don't think it's ever gone there.

11             THE COURT:  All I'm trying to get a sense of is what

12   the law is.  I understand your argument.  But if the situation

13   is that any defendant who has the wherewithal to place a

14   certain amount of money up, because this happens every day in

15   this courthouse, I guess you could frame it that he's buying

16   his or her way out, but they have the means to do that.

17             But I'm sorry.  Go ahead.

18             MR. RICHENTHAL:  That's right, your Honor, but our

19   view of the Bail Reform Act is that's exactly what's

20   contemplated by it and, frankly, the Eighth Amendment too.

21   What these are about are restrictions on the government's

22   ability to demand too much from a defendant.  That's what the

23   Eighth Amendment says, excessive bail.  We can't demand too

24   much.  It doesn't require we give into his demands that because

25   he can afford a private security guard, that's okay, even

FAMLNGC1

1    though they're not federal law enforcement, even though it

2    wouldn't be escape from a facility, even though it doesn't

3    remotely have bars on the windows.  That's not what the Eighth

4    Amendment requires nor does the Bail Reform Act.

5           I think at the end of the day this argument can leave

6    the legalities aside and the question is is someone with this

7    incredible ability to flee, someone with this incredible

8    incentive to flee, and someone who literally has no reason, no

9    reason to stay, can we trust that the proposal that he live in

10   a luxury apartment surrounded by guards he pays will keep him

11   here and our view is no.

12          The limited cases in which that has happened are cases

13   in which that trust at least has some basis in fact like an

14   American family, American citizenship, American property.  So

15   the Eastern District case that Mr. Brafman cites was a foreign

16   citizen.  I believe the man's name is Webb.  That's true.  He

17   was a citizen of Cayman Islands and the United Kingdom, but we

18   have extradition treaties in both those countries.  And that

19   individual had a home that he regularly lived in in the

20   southern United States where he was required to live when he

21   was released from the Eastern District.  That's nothing like

22   this case.

23          This would be the most extreme example that one can

24   possibly fathom of permitting this.  We think it is so extreme

25   on these facts it shouldn't be permitted factually.  Put aside

Case 2:16-cr-20394-SFC-APP   ECF No. 48-10   filed 02/24/17   PageID.557   Page 21 of 92
Case 1:15-cr-00706-VSB   Document 82   Filed 11/09/15   Page 20 of 91

20

FAMLNGC1

1    the law.  We cannot trust that Mr. Ng will return.  That's

2    especially true because there are no cosigners on the bond.

3    There are no restrictions on who can visit him.  There are no

4    restrictions on communications.  It's not even home

5    incarceration.  It's home detention.

6         THE COURT:  Look, I thought that what people were

7    going for was in essence what would be house arrest.  That's

8    what I thought the idea was.  It didn't seem like that is

9    exactly what the wording ended up being, but that might be

10   just -- I'm sorry.  Go ahead.

11        MR. RICHENTHAL:  Look, if it were all the things I

12   just said, restrictions on visitors, communications, a

13   significantly larger bond, multiple cosigners, etc., it would

14   be a way stronger package.  My argument certainly would be

15   weaker.  It would be silly for me to pretend otherwise.  But

16   ultimately at the end of the day, even that cannot in our

17   judgment reasonably assure -- and that's the standard -- the

18   appearance of a man who has every means to flee, every

19   incentive to flee, and no reason to remain.

20        I want to be clear.  It's not because he's wealthy.

21   There are lots of wealthy people given bail.  It's because he

22   is wildly wealthy, connected to a foreign government, resides

23   in a country with which we do not have extradition treaties,

24   has already demonstrated an ability to purchase citizenship in

25   other countries, even if it's lawful, simply the ability again.

Case 2:16-cr-20394-SFC-APP   ECF No. 48-10   filed 02/24/17   PageID.558   Page 22 of 92
Case 1:15-cr-00706-VSB   Document 82   Filed 11/09/15   Page 21 of 91

21

FAMLNGC1

1      THE COURT:  I was going to come back to that since you

2   mentioned it again.  Is there some citation to, in other words,

3   in Dominica, what this program is called, do you know?

4      MR. RICHENTHAL:  I don't have it at my fingertips.

5   There's a more stringent variant of it in the United States

6   where you can invest a certain amount of money in a plant and

7   make capital expenditures over time, you can get a green card.

8   Obviously, if you comply with the restriction on a green card,

9   eventually that can become citizenship.  Our own country has a

10  version of this, but it's far stricter, takes far more time,

11  and I hope it's far better vetted.  There are certain countries

12  in this world where there are few, if any, restrictions.

13  Essentially, write a check and a passport is yours.

14      The truth is our real fear is not that Mr. Ng goes to

15  Dominica.  That's an example of his ability to buy his way

16  around the world.  Our real fear is he goes to China and he'll

17  never return ever.  There's no reason for him to return and

18  there's every reason for him to go back.

19      At the end of the day, like I said, I think this case

20  boils down to one question.  Put aside the law, put aside

21  Dominica.  Do we think he's going to come back if he sits in

22  his apartment in Midtown under the present proposal or any

23  proposal?  Can your Honor be reasonably assured about that

24  given no connections here of any kind, every means to leave,

25  every incentive to leave, every resource to leave,

Case 2:16-cr-20394-SFC-APP   ECF No. 48-10   filed 02/24/17   PageID.559   Page 23 of 92
Case 1:15-cr-00706-VSB   Document 82   Filed 11/09/15   Page 22 of 91

22

FAMLNGC1

1    coconspirators, again, deeply connected to foreign countries,

2    officials of multiple foreign countries, cash that still has

3    not appeared, more than $4 million since 2013, only a very

4    small portion of which we've seen.

5           Mr. Brafman is probably going to stand up and tell you

6    that cash went to gambling because in our letter in a footnote

7    we told Judge Netburn, some of it appears to have gone to

8    gambling.  A very small percentage, yes.  But Mr. Ng actually

9    brought in more than $10 million in the past few years, more

10   than $4 million in the past two years.  We have no idea where

11   that is.  We recovered approximately $430,000.  That's it.

12   Where is that money?  Our best guess, it's with coconspirators

13   who are still here, who really want to see that man anywhere

14   but at that table.

15          The end of the day, our argument is very simple.

16   There's no reasonable conditions that can assure his return to

17   court except one, that he's detained.

18          THE COURT:  All right.  Mr. Brafman.

19          MR. BRAFMAN:  Yes, Judge.  This is my first case with

20   Mr. Richenthal and he was beginning to grow on me.  But to be

21   candid with you, Judge, I found part of his arguments today

22   offensive.  I found part of them just absurd, and I found part

23   of them to be patently inaccurate.  I don't want to make this

24   personal.

25          THE COURT:  And actually, quite frankly, counsel, I'll

FAMLNGC1

 1    ask you not to make it personal.

 2              MR. BRAFMAN:  I'm not.

 3              THE COURT:  To the extent the factual might upset

 4    Mr. Richenthal, that's just the nature of what we're up to.

 5              MR. BRAFMAN:  I'm never in a personal fight with any

 6    prosecutor and I don't mean to make it personal.  But I want to

 7    make it clear for the record some of the things he said, why I

 8    found them offensive.

 9              I'm very familiar with the Brooks case.  The Brooks

10    case to my knowledge never involved Guidepost.  Guidepost is

11    run by Bart Schwartz.  Bart Schwartz is a former chief of the

12    criminal division in the Southern District.

13              THE COURT:  I don't know Mr. Schwartz personally.  I

14    know of Guidepost.  I know folks who have worked there.  And so

15    I have perhaps not the entire background, but I am familiar

16    with Guidepost.

17              MR. BRAFMAN:  And Joseph Jaffe, who is a former

18    assistant United States attorney in the Southern District of

19    New York and is chief compliance officer, is present in the

20    courtroom.

21              And the argument that Mr. Richenthal makes in

22    substance is how do you trust these guys and how, why are they

23    are not bribeable.  Well, you know, he says this is not a

24    federal law enforcement officer in the Bureau of Prisons.  And

25    I actually saw your Honor wince because I've read every day

FAMLNGC1

```
 1    almost for the last two years how corrections officers on both

 2    the state and federal level are in fact corrupted on occasion

 3    and they allow people to get contraband, they allow people to

 4    do something.  We can't guarantee absolute perfection in a

 5    prison.  You had two prisoners escape from a maximum security

 6    prison upstate New York because they corrupted a prison

 7    official.

 8            So perfection, I can't offer you perfection.  What I

 9    can offer you is Guidepost.  Under Guidepost's watch, there has

10    never been a prisoner who they have lost.  You're talking about

11    getting him to China.  He's not going to be able to get to

12    Madison Avenue without two armed law enforcement people.  And

13    they are not rent-a-cops.  They are all current federal or

14    state law enforcement officers or retired federal or state law

15    enforcement officers from either the FBI, Secret Service,

16    Customs, or New York City Police Department.  Each one is

17    vetted, each one is bonded, each one is armed.

18            Now, do I know if they have the legal authority to

19    shoot Mr. Ng if he tries to overpower them?  They have the

20    right to use reasonable force to defend themself and reasonable

21    force to keep him from escaping.

22            I will also say, most respectfully, that when the

23    conditions of bail were set by Magistrate Judge Fox, we agreed

24    to stay the bail order because we knew he had to satisfy all of

25    the conditions of bail before he hit the street anyway and we
```

Case 2:16-cr-20394-SFC-APP   ECF No. 48-10   filed 02/24/17   PageID.562   Page 26 of 92
Case 1:15-cr-00706-VSB   Document 82   Filed 11/09/15   Page 25 of 91

25

FAMLNGC1

```
 1    wanted the argument that we would make before the Court that
 2    would have the case.
 3           This is a specious argument by Mr. Richenthal, quite
 4    frankly, because the government bears the burden of
 5    establishing risk of flight by a preponderance of the evidence.
 6    They have zero evidence.  This is a defendant who each time he
 7    came into the United States in the last year carrying large
 8    sums of cash, he disclosed it to Customs.
 9           THE COURT:  I understand that he disclosed it and
10    that's fair.  My understanding is the allegation is that some
11    of the disclosure, some of it may have been accurate, in other
12    words, what he was going to do with the money.  Some of it may
13    not have been.  But you're right, he disclosed that he had a
14    significant amount of cash.
15           MR. BRAFMAN:  Judge, if you're coming into the country
16    for the purposes of bribing a government official, the last
17    thing you need to do is expose yourself to Customs, who never
18    searched his plane except on one occasion, and volunteer you
19    have huge sums of cash.
20           And the man is detained, quite frankly, because Judge
21    Netburn, Magistrate Judge Netburn, at the first presentment was
22    provided with facts that have proven to be patently inaccurate.
23    And the lawyer who appeared before Magistrate Netburn on behalf
24    of Mr. Ng, his principal experience was that he spoke fluent
25    Mandarin and he didn't have a chance to do any investigation.
```

FAMLNGC1

1    And one of the things before Judge Netburn in a sworn affidavit

2    was the argument that the money was claimed by Mr. Yin -- and

3    Mr. Ng speaks no English, so it was Mr. Yin who spoke to the

4    FBI, to Customs -- the argument was the money was for gambling

5    and the FBI had him under surveillance and he never went to a

6    casino.

7            Later in the letter that your Honor has, eight days

8    later, lo and behold, they followed up the investigation.  They

9    find a receipt that shows that during the period they had him

10   under surveillance, he actually went to a casino where he lost

11   $300,000 or deposited $300,000.  There are bribes that are

12   alleged in this indictment total $500,000 and most of them are

13   through wire transfer.  If you look at the complaint, sir, and

14   I know you have, the complaint which preceded this case tracks

15   the wires.  There are emails not by Mr. Ng, who doesn't speak

16   any English whatsoever, and they detail the nature of the

17   bribes that are being discussed.

18           So the cash that he came into the United States with,

19   we can't, we don't have the burden of establishing what was

20   done with that.  And the defendant certainly has shown complete

21   candor to Pretrial Services, complete candor when he was

22   interviewed and the wealth that he has as we've established or

23   explained to Magistrate Judge Fox.

24           And, your Honor, I want to say this with great respect

25   for everyone in the courtroom.  We had the same bail argument

FAMLNGC1

 1    before Magistrate Fox and I think Magistrate Fox recognized the

 2    following which I ask the Court to recognize as well.  We're

 3    not suggesting that he has a right under the Eighth Amendment

 4    to have private security guards.  What he does have a right

 5    under 3142 is for the Court to fashion and see if he can

 6    fashion a series of conditions that will ensure the defendant's

 7    appearance when required.  And Magistrate Judge Fox, after

 8    hearing the exact same arguments and more by Mr. Richenthal and

 9    our arguments in response, fashioned a series of very serious,

10    stringent arguments.  And what we've done in the last four or

11    five business days is we've moved heaven and earth, quite

12    frankly, to get these conditions satisfied.

13         So we have proposed, subject to your Honor's approval

14    of the bail package, to post $20 million with the clerk of the

15    court by tomorrow, funds that are in Mr. Mo's escrow account.

16    The apartment has been certified by Guidepost who went through

17    it, videotaped it, made certain there's no way he could escape.

18    The windows in the apartment only open 12 or 15 inches so they

19    only open for fresh air.  They're prepared to bolt those shut

20    if that's what the government wants.

21         THE COURT:  Assuming we're able to reach a package, I

22    think bolting them shut would create other issues.

23         MR. BRAFMAN:  Yes, it's a fire hazard.

24         THE COURT:  Go ahead.

25         MR. BRAFMAN:  We're not talking about putting two kids

Case 2:16-cr-20394-SFC-APP   ECF No. 48-10   filed 02/24/17   PageID.565   Page 29 of 92
Case 1:15-cr-00706-VSB   Document 82   Filed 11/09/15   Page 28 of 91

28

FAMLNGC1

1    in the apartment and giving them the responsibility.  Guidepost

2    has certainly guidelines.  They have certain standards.  They

3    are very strict.  There is a log maintained of every person who

4    enters the premises.  And to the extent that the government has

5    a watch list and they want us to say these people should not

6    come in, we're willing to look at it.  But we are able to bring

7    witnesses in or to my office so that he can be present when

8    they are interviewed.

9         This is a massive case.  It is virtually inconceivable

10   to me as an officer of the court to try and imagine trying to

11   actually investigate and defend this case if Mr. Ng remains

12   remanded.  And I don't think that's the primary consideration

13   for a district court, obviously.  The primary consideration is

14   are you going to be satisfied that the conditions we have

15   proposed will ensure that he will appear when required.

16        And right now all they've got is he's rich and the

17   rest is speculation.  He could bribe someone.  He could kill

18   someone.  He could overpower someone.  Yes, and I could start

19   the World Series for the New York Mets, but that's not going to

20   happen.

21        THE COURT:  Let's hope not, Mr. Brafman.  I'm not

22   impugning your baseball skills, but I understand.

23        MR. BRAFMAN:  Actually, I was a pretty good pitcher

24   when I was little.

25        THE COURT:  Fair enough.

Case 2:16-cr-20394-SFC-APP   ECF No. 48-10   filed 02/24/17   PageID.566   Page 30 of 92
Case 1:15-cr-00706-VSB   Document 82   Filed 11/09/15   Page 29 of 91

29

FAMLNGC1

1          MR. BRAFMAN:  Your Honor, I'm not trying to make light

2    of it.  I'm saying that whatever he can conceive of we can't

3    address.  The impossible is hard to predict.  Could he escape

4    from the MDC, sure.  Could he escape from the apartment by

5    killing the Guidepost people, yes.  But there's zero violence

6    in his background.

7          The thing that's interesting is the cases the

8    government cites are cases that are distinguishable on the

9    facts either on the nature of the crime -- a child pornography

10   case where Judge Bianco said that the house arrest with guards

11   would not satisfy the potential risk to the community.  In the

12   Judge Pauley case, the Cilins case, the Court was concerned

13   because in that case, the nature of the defendant's crimes were

14   that he interfered with investigations, he made up things.  He

15   constructed obstructive behavior.

16         THE COURT:  And I also thought that I read that Judge

17   Pauley was also concerned with the lack of candor that the

18   defendant displayed in connection with his disclosure to

19   Pretrial Services, I think.

20         MR. BRAFMAN:  And that's why the defendant Yin is

21   remanded, even though he originally had bail, because they

22   found out that he lied to Pretrial, apparently, or lied to the

23   government about having extra passport.  Mr. Ng, to his credit,

24   and, quite frankly, I'm stunned by the candor, told Pretrial

25   Services everything.

FAMLNGC1

1          I also want the Court to, again, I want to make the

2     point that I made to I think Judge Fox who I think recognized

3     it.  When you talk about his wealth, when you look at the

4     wealth, the wealth that's listed is primarily in the real

5     estate and in antiques and art.  These are heavily encumbered

6     properties.

7          And in terms of an incentive to resolve this matter

8     and not be a fugitive, if Mr. Ng disappears, even if he gets

9     back to China, if he is a fugitive from justice in the United

10    States, all of the banks he deals with would not be able to

11    deal with him.  Even in China it is frowned upon to be a

12    fugitive.  They may not give you back, but they're not going to

13    let you borrow billions of dollars.  He has every incentive in

14    the world to stay here and resolve this case.

15          THE COURT:  I apologize for interrupting, but I did

16    notice that in your letter you did, or maybe it was in

17    connection with the argument before Judge Fox, you did indicate

18    that there would be ramifications to Mr. Ng were he to be a

19    fugitive.

20          MR. BRAFMAN:  Correct.

21          THE COURT:  I guess my question is are there specific

22    things -- I understand if someone is convicted.  So in this

23    country, if you are convicted, you might not be able to be part

24    of the gaming industry, for example, of a felony.  Is there

25    something that you can point to specifically with regard to

FAMLNGC1

1    being a fugitive that would somehow impinge upon his

2    livelihood, his work?

3          MR. BRAFMAN:  I can only tell you from my own personal

4    experience as a lawyer, who I think as an officer of the court

5    prides myself on my honesty, I am dealing with people who are

6    now fugitives who I'm trying to bring back who never were here,

7    they just don't want to come back.  And I'm dealing with them

8    both in the country of Namibia, I'm dealing with people in

9    Israel, and they have no banking relationships anywhere because

10   of that.  Banks will not deal with you.  They don't need to

11   deal with you and they can close your account under the banking

12   act without giving you a reason and you get bounced from bank

13   to bank to bank.  So I don't have anything specific because

14   I've never been to Macau.  I didn't have the time between now

15   and the last hearing to go there, and everything is in the

16   island of Macau.

17         Your Honor, we don't need to go there.  We don't need

18   to go there because of the following.  Judge Fox fashioned a

19   very serious bail package.  The apartment was never gifted to

20   Mr. Lorenzo.  That's just fabrication.  Whether it was one day

21   going to be used by Mr. Lorenzo, my investigation indicates

22   that he visited it, that he never slept there.  I have a

23   notarized power of attorney by Lorenzo that Mr. Ng gave to him

24   because Lorenzo speaks English, he's here.  Mr. Ng is in China,

25   work had to be done.  We have the deed.  The deed is going to

FAMLNGC1

```
 1    be filed, if your Honor approves the bail package, in the
 2    clerk's office down the street in New York County.  The only
 3    person listed as the owner is Mr. Ng.  The value of the
 4    apartment is $4 million.
 5            But Mr. Richenthal said something which I agree with.
 6    You could make up a number and if you give to Pretrial
 7    Services, someone is worth a billion dollars, so a hundred
 8    million doesn't mean anything.  500 million doesn't mean
 9    anything.  That's not the point.  The point is absent the
10    security guard proposal, the electronic monitoring.  If what
11    your Honor wants to use is the word house arrest rather than
12    home detention, that was not intended by us as sleight of hand.
13    It might have gotten lost in the translation.
14            THE COURT:  I recognize that.
15            MR. BRAFMAN:  House arrest, electronic monitoring by
16    itself the government generally thinks it's adequate.  In this
17    case it's not.  We offered the security guard to the government
18    before we came to Judge Fox.  We met with them and said we
19    would propose it.  They ran it up the chain in the office, came
20    back, said no.  We picked Guidepost not because they were the
21    cheapest and not because they were the most expensive, but
22    because their reputation for integrity is just perfect and
23    there is zero example.
24            I also want to mention about the Brooks case because
25    that's really a red herring.  What Brooks did was after living
```

Case 2:16-cr-20394-SFC-APP   ECF No. 48-10   filed 02/24/17   PageID.570   Page 34 of 92
Case 1:15-cr-00706-VSB   Document 82   Filed 11/09/15   Page 33 of 91

33

FAMLNGC1

 1    with these guards for a long time, there's a guy who thought

 2    Brooks was a nice guy.  And having met Mr. Brooks, he speaks

 3    English, he's charming.  And I don't want to get sued, but

 4    there are certain issues that he has that are unique to

 5    Mr. Brooks.  Mr. Brooks was ultimately remanded.  He didn't

 6    bribe his way out.  He didn't buy his way out.  There were

 7    allegations brought to my attention in that case that he also

 8    was being investigated by the government for trying to kill his

 9    own lawyers.  So you're dealing with someone who at the end of

10    the day I think ultimately --

11            THE COURT:  Hopefully you're not suggesting we're

12    going anywhere near there.

13            MR. BRAFMAN:  I hope not.  I hope not.  But we're

14    talking about someone when he was remanded, I believe the

15    determination by Judge Seybert was not only that the bail

16    conditions weren't adequate, but because of what the government

17    was now investigating him for, they thought he was very

18    dangerous.  So I think that's what ultimately prompted him to

19    be remanded.

20            I'm asking your Honor to do something, quite frankly,

21    that I think the law permits.  And if the law didn't permit it,

22    then all of the judges who have granted it would have violated

23    the law and I don't think for a minute you think that your

24    colleagues did that.

25            If you read the transcript, Judge, and I read it.  I

FAMLNGC1

 1   was kind of stunned because I read it.  I heard it at the time

 2   and I read it again.  If you read the transcript, what

 3   Mr. Richenthal was implying to Magistrate Judge Fox, that if he

 4   granted bail and allowed him to construct a private jail, he

 5   was doing something that the law did not permit.  And you can

 6   say what you want of how skillfully he said that, but he made

 7   it seem that that would be illegal.  And if it was illegal, we

 8   wouldn't propose it and I wouldn't insult your Honor by

 9   suggesting that you do it and your Honor wouldn't do it.

10            So everyone in this courtroom knows that you have the

11   authority and the discretion to do this.  The real question is

12   does your Honor feel that by posting the bond, which we're

13   prepared to do, by having them vetted the apartment.  Pretrial

14   has been called.  They are prepared tomorrow morning to go to

15   the apartment.  They didn't want to do it until they knew that

16   the bail conditions were affirmed, but we've been in touch with

17   them.  They will meet at the apartment.  They will inspect the

18   apartment.  Guidepost not only inspected the apartment, they

19   videotaped it in case the government had any questions.  It's

20   two apartments combined.  But it's two armed officers there all

21   day, all night.

22            And to the extent that, like I said, people get into

23   the MDC as visitors.  The government has no right to exclude

24   them.  They have to fill out a form, and the government has no

25   idea who many of these people are.  So if Mr. Ng wanted people

Case 2:16-cr-20394-SFC-APP   ECF No. 48-10   filed 02/24/17   PageID.572   Page 36 of 92
Case 1:15-cr-00706-VSB   Document 82   Filed 11/09/15   Page 35 of 91

35

FAMLNGC1

```
 1    to meet him in the MDC, so long as they're not on a government

 2    watch list or on separation, they get in to visit him so long

 3    as they don't have a criminal record.  And if Mr. Richenthal

 4    wants to give us a list of people who they have identified as

 5    some connection to this case and if we look at that and that's

 6    good faith and these are not important witnesses that need to

 7    see Mr. Ng at his apartment, we'll figure it out.  We're not

 8    going to look to foul this up once your Honor grants it.

 9            Guidepost on its own keeps a log of every person when

10    they go in, what time they arrive, and they're not allowed to

11    bring in weapons.  They can be and often are subject to search.

12    They are scanned.  These people know what they're doing.  And

13    this is not a private jail, Judge.  This is a private apartment

14    where the defendant can't leave.  And the only conclusion you

15    need to make, sir, is whether the government has established by

16    preponderance of the evidence the risk of flight.  And all they

17    say over and over and over again is a rich man shouldn't be

18    able to do that and that's not the law.

19            And as Judge Rakoff very aptly pointed out, your

20    Honor, it's often because of a defendant's wealth that he or

21    she is detained to begin with because if it wasn't for his

22    wealth, he would have made bail already and they wouldn't be

23    asking for his detention.  And if you look at the original bail

24    application, it was he's super wealthy, super wealthy, and

25    while they didn't say it today, if your Honor reviews the
```

FAMLNGC1

1    transcript before Magistrate Judge Netburn, that was the

2    implication the government left there that he was on his way

3    out of country on a private plane as if he was fleeing.

4            I point out, sir, respectfully, he was in the United

5    States five separate times back and forth in 2014.  Each time

6    Customs was informed of him being there, and each time Customs

7    was knew when he was leaving.  And what we learned from the

8    complaint originally is that, well, whether Mr. Ng knew it or

9    not, the government had him under surveillance.  They could

10   have arrested him the first time he left by private plane, the

11   second, third, fourth or the fifth time.  They choose when to

12   arrest him.

13           And the only change today from what happened before

14   Magistrate Judge Fox is, one, we've established beyond question

15   that the conditions have been met, hopefully, to the

16   satisfaction of the Court.  And government has added the money

17   laundering count, which could have been in the complaint if

18   they wanted to because the allegations are exactly the same.

19   There are no new charges.  That charge, I submit, was added to

20   the indictment because it ups the ante, quite frankly, and

21   whether it's appropriate or not could have been in the

22   complaint and that was not the argument.

23           He's 68 years old.  Whether he's facing 15 years or 25

24   years, it's essentially a life sentence if he is convicted

25   whether it's money laundering or bribery and conspiracy.  So

FAMLNGC1

1    the answer is there's no mandatory minimum, as was the case in

2    many of the cases that the armed guards were not permitted.

3    There's no risk of flight.  There's no danger to the community,

4    as was the case with Judge Bianco.  The crimes that were

5    defined in the Judge Pauley case are very different than the

6    crimes here.

7         And, Judge, this is a case where under normal

8    circumstances, the defendants are granted bail, and under

9    normal circumstances, there is no presumption about flight.

10   There is no presumption against bail.  And to the contrary, I

11   think the only law that really matters is 3142.  And I think

12   one of the most experienced judges in this building hearing the

13   same argument your Honor heard set very onerous conditions, the

14   same conditions we propose to the Court with the added change

15   that it be called house arrest as opposed to detention in the

16   home.

17        And if the Court wants Guidepost to maintain a log of

18   who visits, we have no objection to that.  We would ask, your

19   Honor, that if in fact it becomes apparent to us that the log

20   is essentially providing the government with a road map into

21   the defense case and we need to modify that because we bring in

22   experts, we bring in other dignitaries, we would then come to

23   the Court for an application in that event to modify it.

24        One last comment just so we take the mystery out of

25   this buying a passport.  He didn't buy a passport, A.  B, the

FAMLNGC1

```
 1   passport is expired, so it's worthless.  Second, it's not the

 2   Dominican Republic.  It's the island of Dominica.  And it was

 3   given to him and I understand 2,000 other people as an honorary

 4   award, if you will, or as a medal or as you give a certain

 5   amount of money to the Olympics.  They didn't give him money.

 6            What he agreed to do, and I stand corrected, is he

 7   agreed to build a $20 million development project in the island

 8   of Dominica because it was a storm ravaged area and he was

 9   being courted to build there because of his reputation for

10   building in ravaged areas and his ability to bring large

11   construction crews.  And in order to incentivize him and thank

12   him -- it's not a bribe.  It's like getting a plaque.  When we

13   were in the DA's office, what you wanted was something for your

14   car so you could park on Centre Street.  Is it wrong now,

15   maybe.

16            THE COURT:  Probably.

17            MR. BRAFMAN:  But not then.  Not then.  Then everybody

18   wanted it.  And you got it if you were a star assistant in the

19   office, which was obviously a very difficult discussion.

20            THE COURT:  Now, Mr. Brafman, hopefully there are not

21   any former assistants who are here who didn't get the plaque

22   because then they'll be upset.

23            MR. BRAFMAN:  I understand.  They make it seem like he

24   bought his citizenship.  He didn't become a citizen.  They gave

25   him an honorary passport.  And having dealt with an
```

FAMLNGC1

1    international case a couple years ago involving the man who

2    would have been president of France, perhaps, if not for an

3    indiscretion on his part, he was courted by every country in

4    the world who wanted him to be an honorary ambassador, if you

5    will, as is the case with many of our own ambassadors.

6            So there's no mystery about buying citizenship.  And

7    he's not going to buy citizenship from within Dag Hammarskjold

8    Plaza, which is across the street from the U.N. and down the

9    block from my office, and he's not going to be able to leave

10   the apartment anyway.  The Portuguese passport, the other

11   passport, they have the passports.  They have the passports.

12   They have the passport from China, they have the Portuguese,

13   and that's what we have.

14           THE COURT:  Okay.  Just, Mr. Richenthal, you'll be

15   able to speak.  The only thing I ask is no repetition, if

16   possible.

17           MR. RICHENTHAL:  It will not be, your Honor.

18           THE COURT:  I just need to check because I have

19   another matter on.  I'm sorry.  It was on for 2:30 and they're

20   probably waiting.  Don't worry about it.  We're adjourning

21   that.  We have all the time here.

22           But, Mr. Richenthal, go ahead.  But, again, please, no

23   repetition to the extent you can avoid it.

24           MR. RICHENTHAL:  I'm just going to respond to a couple

25   points Mr. Brafman made.  I think this is a thoroughly argued

Case 2:16-cr-20394-SFC-APP   ECF No. 48-10   filed 02/24/17   PageID.577   Page 41 of 92
Case 1:15-cr-00706-VSB   Document 82   Filed 11/09/15   Page 40 of 91

40

FAMLNGC1

1    case.  It's been thoroughly argued previously.  There's lots of

2    paper and your Honor has to make the decision.  But I do want

3    to respond to a couple small points.

4         First, Mr. Ng does not have to make it to China,

5    although we fear he will.  He just has to make it to the

6    Chinese consulate.  He's a member of the Chinese government.

7         THE COURT:  Let me ask you this.  I have no idea; I

8    haven't looked at the law on this.  Could he agree to

9    extradition?  In other words, could he agree, A, agree,

10   obviously, not to go to the Chinese consulate, but agree that

11   he would agree to be extradited from anywhere he was in the

12   world, but specifically from China?

13        MR. RICHENTHAL:  I'm sure Mr. Ng and his counsel could

14   execute that agreement.  I have no confidence it would be valid

15   in foreign legal systems, particularly the Chinese system in

16   which he's a member of their government.  We can explore that.

17   I can't answer it right now, but I think we would have a lot of

18   concern that the Chinese government would recognize that and,

19   frankly, would Mr. Ng continue to stand by it or would he say

20   he was forced into it.  We have no control.  He is a member of

21   a foreign government.  So Mr. Ng could execute that.  I don't

22   think the Court should have confidence it would do the job.

23        THE COURT:  My initial thought was whether it would be

24   legal here.  And the enforceability of it in China, I

25   completely understand.

FAMLNGC1

1          MR. RICHENTHAL:  I think extradition to be

2     distinguished from say immunity I think is waivable on a

3     personal basis.  So I think that the law here would permit

4     Mr. Ng to execute that so long as it was knowing and voluntary

5     and there would be a colloquy with him about that.  But I think

6     it would be meaningless or at least the Court can have no

7     confidence it wouldn't be meaningless.

8          The other points I want to respond to, but I want to

9     start with that -- he doesn't have to make it to China.  He

10    just has to make it to the Chinese consulate and that's only a

11    few miles from where we're talking right now.

12          In terms of defending the case, this is not the first

13    case in which a white collar defendant may be detained and has

14    to defend himself.  It happens all the time in this district

15    and in this country.  Before coming here, we reached out to the

16    Bureau of Prisons, specifically one of the in-house staff to

17    ask about things like reviewing discovery on CDs, reviewing

18    discovery on computers.  We were told all of that is possible.

19          THE COURT:  Just to be clear, my decision is not going

20    to be based on the inability -- and I understand Mr. Brafman's

21    point.  There's no question that having a client who is not

22    detained makes it easier to prepare a defense.  Having said

23    that, I also recognize that there are many people who are

24    detained in cases here all the time who speak another language

25    and who are detained and their attorneys and their

FAMLNGC1

1    representatives still have to prepare a defense.

2            So I understand the difficulties.  I understand the

3    reason and the points that you made.  But that is not going to

4    be the thing that tips the balance because I'm not -- I guess

5    just to put a finer point on it, to the extent that he is

6    detained or anybody else is detained under similar

7    circumstances, I don't believe it's a Sixth Amendment violation

8    that they're detained and they have difficulty, it's more

9    difficult for them to prepare their defense than it would

10   otherwise be.  Just to be clear on just that issue.

11           So if you want to continue to that, I don't think I

12   need to hear that.  I understand it as an argument, but that's

13   not something that's going to tip the balance here.

14           MR. RICHENTHAL:  Let me move on to a couple small

15   points.

16           Mr. Brafman is right, he didn't have a burden in this

17   case at this stage, at this proceeding.  We do.  But the burden

18   is not that hard to meet here.  The burden is preponderance to

19   show risk of flight.  I don't think your Honor can seriously

20   come to the view, respectfully, that we haven't shown it's at

21   least more likely than not there's a risk that Mr. Ng might

22   flee.  I think the real question is are there conditions that

23   can mitigate that risk.  That's what this argument is really

24   about in our judgment.

25           THE COURT:  I don't dispute that.  I know there was an

FAMLNGC1

1    argument before Judge Netburn and I think, quite frankly, based

2    on the facts before Judge Netburn, I don't opine one way or the

3    other concerning the attorney that was representing Mr. Ng at

4    the time.  I think it was an appropriate decision at that time

5    that he be detained.  And I understand that the issue is,

6    you're right, I think, are there conditions that could assure

7    his return here because without the conditions, I think clearly

8    without conditions or with normal conditions, there is a risk

9    of flight because of the lack of connections to the United

10   States and otherwise.

11          But, I'm sorry, go ahead.

12          MR. RICHENTHAL:  Let me make two points apropos of

13   that.  First, Mr. Brafman is therefore also right he doesn't

14   need to tell your Honor where the cash is, but we know it's

15   here and we don't know where it is.  And it's not just he

16   brought cash in.  It's he brought cash in and then met with a

17   man he was paying bribes to, Francis Lorenzo, and he did it

18   repeatedly.  And when we say he brought in $300,000 of cash,

19   $500,000 of cash, $900,000 in cash, that is big and heavy.  You

20   don't do it unless you have a reason.  And when on occasion you

21   do it and immediately go to a meeting with a man you're bribing

22   by wire, why not just pay him more by wire.  The answer, of

23   course, is wires can be tracked.  And if you want to give him

24   more than the $500,000 by wire, that's how you pay him.  That

25   is what we believe occurred here.

FAMLNGC1

 1          It is true Mr. Ng also likes to gamble, except every

 2     time save one that we know about he also gambles using wires.

 3     He wires hundreds of thousands of dollars when he gambles.  The

 4     cash he used on one occasion, it appears to have been a lark.

 5          THE COURT:  It appears to be a lark?

 6          MR. RICHENTHAL:  A lark.  He decided to go gambling --

 7          THE COURT:  I understand what a lark is.  I wasn't

 8     sure whether you were using that word.

 9          MR. RICHENTHAL:  And the reason I say that, to be

10     clear, it's not just because it's a funny term, frankly.  It's

11     because typically Mr. Ng gambles by wire.  So, for example,

12     when he went to Las Vegas, we have records talked about in one

13     of the complaints, he sent a couple hundred thousand dollars

14     there, used a marker and gambled.  When he decides on occasion

15     to go gambling and he hasn't sent a wire, he uses cash.  The

16     night before his arrest, for example, he decided again on a

17     lark to drive to Foxwoods in a limo and gambled to four in the

18     morning and spent a couple hundred thousand dollars.  That's

19     fine.  That's his right.  That's not a crime.

20          But the point is that's a very, very small percentage

21     of the money he brought here.  And on multiple occasions after

22     he brought it here, he was surveilled in meetings with his

23     coconspirator that he was bribing, the same coconspirator he

24     effectively gifted the apartment to while retaining technical

25     ownership of, the same coconspirator he executed a $20,000 a

FAMLNGC1

 1   month contract.  We have that contract.  That's not just a

 2   proffer, although we're entitled to proceed by proffer.  So I

 3   wanted to respond to the cash point.

 4        Ultimately, let me also say, Mr. Brafman suggested on

 5   multiple occasions that while not a private jail, this is

 6   nearly as good.  No, it's not.  The BOP vets the people who

 7   visit.  Yes, we don't get to say whether they get to go, but

 8   the BOP does.  They run them.  That doesn't happen under the

 9   present order.  The BOP does not permit people to bring cell

10   phones into prison.  Not just weapons, they can't bring cell

11   phones.  You can't bring cash.  That's not true under the

12   present order.

13        There are all kinds of things that occur when one is

14   incarcerated that don't happen and, frankly, are difficult to

15   happen, even if your Honor were to order them, because there's

16   a huge one Mr. Brafman omitted from his list -- monitoring of

17   Mr. Ng's phone calls and communications.  There's a reason the

18   BOP does that and it's not only for defendants deemed

19   dangerous.  It's for all defendants who are detained.  And the

20   reason they do it is because we worry that people who either

21   are so dangerous or so likely to flee or both that they need to

22   be detained may try to do things while they're detained.  So we

23   keep a log of their phone calls.  We only permit one way they

24   can email, through the BOP court link system, and it's

25   monitored.  They can't get attachments on that system.  They

FAMLNGC1

 1    can't have cell phones.  Mr. Ng can have as many cell phones as

 2    he wants.  He can have internet access.  His phone calls are

 3    not monitored.  His communications are not monitored.

 4            These conditions are in fact things other judges have

 5    ordered in cases in which this arrangement was blessed, none of

 6    which were ordered here, all of which are absolutely

 7    appropriate.  But they're not sufficient in our judgment.

 8            So I'm not going to repeat myself.  I just wanted to

 9    respond to those points.

10            THE COURT:  Okay.

11            MR. RICHENTHAL:  The risk is severe.  It's not

12    equivalent to the BOP, nor can it be made equivalent to the

13    BOP, and it's not appropriate on the facts of this case putting

14    aside any legal argument.

15            THE COURT:  Okay.  Briefly, Mr. Brafman.

16            MR. BRAFMAN:  You can never replicate nor should we be

17    required to replicate the conditions in the BOP because we're

18    talking about a defendant's right to bail on conditions that

19    will assure his appearance.  I've discussed with the BOP

20    officials for 20 years why they have the rules concerning cell

21    phones -- because it's contraband within a prison.  And the

22    reason they monitor phone calls is because they want to make

23    sure that they don't have security risk concerning inmates who

24    they perceive to be dangerous.

25            But whenever you impose bail, in virtually every case

FAMLNGC1

1 in which you impose bail, once they're outside of the prison,

2 without any of the conditions we're agreeing to, they have a

3 right to talk to who they want to because they're presumed

4 innocent and because they're not risks to the community and I

5 think that's a substantial distinction.

6   The only thing that your Honor must fashion is

7 conditions that will ensure that the defendant is here when

8 he's required and will not flee.  And I think what

9 Mr. Richenthal is saying is we could never replicate,

10 regardless of the conditions you impose, what the BOP and we're

11 not supposed to even try because it's humanly impossible.  And

12 if that's what was required, then none of the people who have

13 been granted bail in these cases in the past where they are

14 satisfying the court that the security there will keep them

15 here would ever have been able to get out.

16   Thank you for your patience, sir.

17   THE COURT:  I'm going to take five or ten minutes

18 because I'd like to organize my thoughts and I'll come back and

19 give my ruling.  Okay.  Thank you.

20   (Recess)

21   (Continued on next page)

22

23

24

25

FAMHNGC2

1              (In open court)

2              THE COURT:  Okay.  Can you hear, Mr. Ng?

3              Okay.  Look, the government cites to *Banki* –– and I'm

4     not sure if that's the way you pronounce –– where the Second

5     Circuit said they were troubled by this idea that someone might

6     be able to create a private jail and arguably gain their

7     release.  And while, yes, it may be troubling, they haven't

8     prohibited it.  And, in fact, as the government concedes,

9     granting bail is within my discretion.

10             So in connection with that, I do find that there are

11    conditions that could be imposed to assure Mr. Ng's appearance

12    at future court appearances.  However, those are not the

13    conditions that are currently imposed.  So I'm going to list a

14    series of additional conditions, then I'm going to open it up

15    for the parties to hear from them about –– first comments about

16    the conditions, the additional conditions I'm imposing, and

17    with regard to the government, any other conditions you think

18    that you would ask that I impose.  Not that I necessarily will,

19    but I just want to make sure there isn't anything that I've

20    missed, as we've gone through a number of different options.

21             First, Guidepost shall give a log of the visitors that

22    enter the apartment.  In addition, I think there was a

23    reference in prior argument to a plan, or something, that

24    Guidepost had prepared.

25             Mr. Brafman, I can't remember if it was a proposal or

FAMHNGC2

```
 1    what it was.

 2              MR. BRAFMAN:  It was the proposal which we submitted.

 3    The government has a copy, and it's the plan that they intend

 4    to enforce.

 5              THE COURT:  Okay.  And it may change somewhat, based

 6    upon what I'm about to say, but the videotape that Guidepost

 7    prepared, they should provide it to the government, a copy to

 8    the government, of the apartment.

 9              Visitors will be subject to search in order to gain

10    entry to the apartment.  And that's search by the Guidepost

11    security detail.

12              The government will be permitted to review the

13    credentials of the security professionals that will be part of

14    the security team.  And whether that's six or eight or however

15    many there are, the government will be able to review their CVs

16    and actually review, to their extent, whatever research they

17    want to do with regard to those individuals.  And I should say

18    that that process, in other words, the government's -- and

19    obviously, to the extent there's some dispute about whether

20    someone is adequate or not -- I hope that there will be some

21    agreement, but if not, I'll break the tie, so to speak.  And

22    that condition, in other words, the vetting, I think, needs to

23    occur prior to Mr. Ng being released.

24              Now, with regard to airplanes, Mr. Ng is to provide

25    all identification for the aircraft that he owns, that includes
```

Case 2:16-cr-20394-SFC-APP   ECF No. 48-10   filed 02/24/17   PageID.587   Page 51 of 92
Case 1:15-cr-00706-VSB   Document 82   Filed 11/09/15   Page 50 of 91

50

FAMHNGC2

1 the identification numbers that appear on the side of the

2 aircraft, as well as -- again, I am not by any sense of the

3 imagination an expert on aircraft, but the transponder numbers

4 for those airplanes.  To the extent that Mr. Ng has used in the

5 past companies, in other words, leasing companies, private

6 entities to arrange flights, he's to disclose those companies

7 that he's used in the past.  Why don't we say in the past five

8 years, the companies that he's used other than using his

9 private aircraft.

10   Mr. Ng is to agree and whoever is living in the

11 apartment is to agree to random, unannounced searches of that

12 apartment by Guidepost personnel with a representative of

13 pretrial.  Pretrial will determine the timing of those

14 searches.  But, again, they will be random, and they should be

15 unannounced.

16   And I saw as part of the conditions that Guidepost was

17 going to provide a supervisory person or agent.  Well, I think

18 that it makes sense for -- and whether that's one or more than

19 one person, it may be more than one person, that person will be

20 the liaison between pretrial and the United States Attorney's

21 Office, and they will be available 24/7.  In other words, they

22 will be the contact that pretrial and the government will have

23 to Guidepost.  And also to get a sense of scheduling and things

24 like that, whatever issues that may come up, that person should

25 be available 24/7.  And by "available," just to be clear, they

FAMHNGC2

1    should be reachable by phone and otherwise.

2              Mr. Ng will not be involved or informed of what the

3    composition of his security detail will be at any given time.

4    So, in other words, whoever they are will be randomly assigned

5    in such a way that makes sense.  And a certain amount of this

6    is going to be at the discretion of Guidepost.  But Mr. Ng is

7    to have no say in the timing or know who is going to be there

8    at any particular time.

9              Mr. Ng will have no cell phone.  He will not have use

10   of a cell phone.  And although there can be a hard line in the

11   apartment, it shouldn't have any features like call forwarding.

12   And I was also contemplating that there would be a log of

13   outgoing calls that are made.

14             MR. BRAFMAN:  Excuse me?

15             THE COURT:  Yes.

16             MR. BRAFMAN:  I didn't hear you.

17             THE COURT:  A log of outgoing calls that are made from

18   that phone.

19             There are a couple of these that I would like to hear

20   from the parties on, because what I intend to do with regard to

21   visitors is to do almost the inverse of what Mr. Brafman

22   suggested, the government provide a list, and then those people

23   will be persona non grata, so to speak.  What I'm going to

24   impose is that there be an approved visitor list, individuals

25   who are permitted to visit Mr. Ng while he is there.  And,

Case 2:16-cr-20394-SFC-APP   ECF No. 48-10   filed 02/24/17   PageID.589   Page 53 of 92
Case 1:15-cr-00706-VSB   Document 82   Filed 11/09/15   Page 52 of 91

52

FAMHNGC2

 1    obviously, these individuals have to agree to be subject to

 2    being searched.

 3         What that means, though, Mr. Brafman, in connection

 4    with preparing your defense, is that I would anticipate that

 5    much of your preparation will occur in your offices.  You're

 6    entitled to prepare your defense without the government,

 7    whatever defense that may be, necessarily being aware of the

 8    moves that you make.  So, as a practical matter, most of your

 9    prep, I would imagine, would occur outside -- if outsiders are

10    involved, would occur at your offices.  The only appointments

11    that Mr. Ng will be able to -- situation where Mr. Ng will be

12    able to leave the apartment are for attorney visits and for

13    medical appointments, all with the prior notice and approval by

14    pretrial.

15         Okay.  So those are the additional conditions that I

16    would impose that I feel are necessary to reasonably assure

17    Mr. Ng's appearance here in the future.  So, first, I'll hear

18    from the government with regard -- I understand you have --

19    your objection is noted, so you don't need to repeat yourself.

20    But I'll hear from you on those proposed additional conditions.

21         MR. RICHENTHAL:  Your Honor, may I have maybe two

22    minutes just to confer with my colleagues?

23         THE COURT:  Sure.  I'd like the parties to confer on

24    this issue, because I wasn't sure about -- the other issue I

25    was going to say is computer access.  And, in part, in this day

FAMHNGC2

```
 1    and age, to the extent that Mr. Ng is going to be somehow

 2    involved in his businesses, he has to have some means of

 3    communication.  And so I'm looking for some limitation on that,

 4    and I don't know what that would be.  If it's just he has to

 5    meet with people in person, then maybe that's the way it is.

 6    But I recognize that having access to a computer is like having

 7    access to a cell phone, almost, in particular since it would

 8    probably be a computer -- well --

 9              MR. BRAFMAN:  Your Honor?

10              THE COURT:  Yes, Mr. Brafman.

11              MR. BRAFMAN:  Maybe before Mr. Richenthal steps out or

12    confers, I could give the Court my initial reaction to most of

13    these conditions so that you don't have to deal with those

14    issues because I may be consenting.

15              THE COURT:  Did I mention the one thing I did want was

16    that I think -- and I apologize if I did mention this -- I

17    think there needs to be an interpreter there, an interpreter

18    that is vetted by pretrial and the U.S. Attorney's Office,

19    because I can't see how Mr. Ng can communicate with the

20    security detail, and vice versa, without that being the case.

21              MR. BRAFMAN:  Your Honor, it was our hope, because

22    she's present in the courtroom and she's going -- her plan was

23    to live with her father, is Mr. Ng's daughter, who is mother of

24    three children who are still in China being cared for by her

25    in-laws and her husband, she intends to live there.  She
```

FAMHNGC2

```
 1   speaks, obviously, fluent Mandarin and perfect English.

 2   And interaction with the detectives is going to be very

 3   minimal.  He's not going to be able to leave.  I don't think

 4   he's going to want to sit and engage them in conversation.  But

 5   if your Honor's --

 6           THE COURT:  I'm sorry, go ahead.

 7           MR. BRAFMAN:  If we could have the permission of his

 8   daughter to live there, serve as the interpreter between him

 9   and the detectives, in case they need to explain things to him.

10   And Mr. Mo, who will be spending a fair amount of time there,

11   also speaks Mandarin.  I just think having an interpreter live

12   there for 24/7 is an extraordinary expense.  I don't think I

13   can find someone who would want to do that.

14           THE COURT:  I don't know that it necessarily needs to

15   be 24 hours.  I thought about that also.  But here's the issue.

16   Guidepost is responsible for insuring that Mr. Ng not leave.

17   I'm not willing to put (a) the burden on his daughter for that,

18   although, I understand, I think -- was she going to be a

19   signatory on the bond?

20           MR. BRAFMAN:  Well, Judge Fox did not grant the

21   government's request that there be a surety, given the size of

22   the bond, unless you find someone who had their own independent

23   substantial assets.  She's happy to sign it, Judge.  And she is

24   his daughter.  She has no criminal record.  But if that's what

25   your Honor wants, we'll have her sign a bond.
```

FAMHNGC2

1    THE COURT:  Right.  There's different reasons for

2    having someone sign the bond.  And I don't know what her

3    financial situation is, but I would like her to be a signatory

4    on the bond.

5    MR. BRAFMAN:  I think she has agreed to do that.

6    Your Honor, I would also add, Mr. Mo explains to me

7    that there is what is called a language line that you can call

8    into an interpreter service, and they can talk to the police

9    and that person can then talk to Mr. Ng.  I'll get you more

10   information on that and see if that works with her being in the

11   apartment as well.

12   THE COURT:  Okay.  I mean, I'll tell you that my

13   initial reaction to that is that it be someone who is neutral.

14   It doesn't have to be 24/7, but during the hours that folks are

15   awake in the apartment, I don't know whether it's 8:00 to 5:00

16   or 9:00 to -- whatever it may be, because since Guidepost is

17   going to be responsible for him and, as I understand it -- and

18   you can confirm this if I'm wrong -- that Guidepost -- that

19   many, if not most -- if not all, I should say, of the security

20   officers don't speak -- and I apologize, Mr. Ng, is it

21   Mandarin?

22   MR. BRAFMAN:  Mandarin.

23   THE COURT:  Mandarin.

24   MR. BRAFMAN:  Judge, I think the government's argument

25   was you don't want him to be in a position where he can

FAMHNGC2

1    compromise a security person.  If he can't speak to that

2    person, it's very hard for him to engage in a compromising

3    conversation.  My suggestion is that we figure out a way that

4    they can be able to communicate to him, because the

5    communication is really going to be only if he has to leave to

6    go to a doctor or a lawyer's office, because otherwise it's

7    fairly simple.  An interpreter could show up, say these are the

8    agreements.  He hears them now.  You can't leave.  And I'm not

9    certain what other communication they need to have with him.

10        THE COURT:  The reason for me imposing this is that

11   Guidepost needs to know if he's on the phone, on the hard line,

12   sort of what is he saying.  In other words, is he saying, I'll

13   meet you on the corner of whatever and whatever?  Look, if the

14   parties can work out something else, because I understand the

15   compromise issue.  Quite frankly, that is not for me a concern

16   with regard to the folks at Guidepost if the government is able

17   to vet these individuals.  These are people who, I imagine --

18   and some of them sound like they're active, current law

19   enforcement; others are people who are former law enforcement.

20   There may be a situation where, for whatever reason, the

21   government reviews someone's background, and they decide that

22   maybe that's not the right person.  But having that in place, I

23   think, for me at least -- and, you know, I could be proven

24   wrong, and that's what I get paid for.  Not for being wrong,

25   but for making a decision.  And if turns out I've

Case 2:16-cr-20394-SFC-APP   ECF No. 48-10   filed 02/24/17   PageID.594   Page 58 of 92
Case 1:15-cr-00706-VSB   Document 82   Filed 11/09/15   Page 57 of 91

57

FAMHNGC2

```
 1   miscalculated, so be it.  I'm sorry.  Go ahead.

 2           MR. BRAFMAN:  Your Honor, I'm sorry.  I'm trying to

 3   save the Court some aggravation on this issue.  Perhaps we can

 4   talk to Guidepost; we can see what they suggest, how they would

 5   handle this.  I'm certain they've guarded other non-speaking --

 6   non-English-speaking people in the past.  Let me see what they

 7   suggest.  We'll confer with the government.  If we agree on

 8   this, we'll agree.  If not, we'll come back, tell your Honor

 9   what the proposal is.  I just don't want to have to have a

10   stranger, who's an interpreter, live in the apartment 24/7.

11           THE COURT:  That's fine.  Do you understand my -- I'm

12   sorry.  You don't have to stand.

13           MR. BRAFMAN:  This is Janet Ng.  She's going to be

14   living there, but she's his daughter.

15           THE COURT:  Okay.  And I'm fine, just to be clear, if

16   she lives there.  But, again, she has to be subject to the same

17   restrictions.  Well --

18            MR. BRAFMAN:  Yes, I understand.

19           THE COURT:  In other words, her restrictions, she's

20   subject to search.

21           MR. BRAFMAN:  Yes.

22           THE COURT:  But with regard to her coming and going,

23   obviously, she can come and go as she pleases.  But as to the

24   other restrictions, she's got to agree that there can be

25   searches --
```

FAMHNGC2

1          MR. BRAFMAN:  Yes.

2          THE COURT:  -- which will include any items that she

3    has in the apartment at any given time.

4          MR. BRAFMAN:  We understand.

5          THE COURT:  Okay.

6          MR. BRAFMAN:  Judge, if I could go through the extra

7    conditions that your Honor raised --

8          THE COURT:  Yes.

9          MR. BRAFMAN:  -- and tell you which I think, sir, are

10   not going to be difficult.

11         We do not oppose Guidepost's having a log of the

12   visitors.  They have a videotape of the apartment which I will

13   have them turn over to the government either today or by

14   tomorrow, but before the defendant is released.

15         We understand that the visitors will be searched, and

16   we will notify any visitors who want to go that they are going

17   to be searched.

18         We will work out some type of a mechanism where

19   Guidepost -- I assume they schedule these things in advance --

20   will e-mail the curriculum vitae or background of the proposed

21   guards to the government before they show up so that they know,

22   for example, this week these are who the people are going to

23   be.  And I think on a rolling basis we would have no problem

24   getting them that information.  And Mr. Jaffe, their chief

25   compliance officer, tells me that's not a problem.

FAMHNGC2

```
 1              I want to get back to the aircraft for a minute,

 2    because that's complicated.  I believe that we are agreeing

 3    that whoever lives in the apartment can be searched by

 4    Guidepost or pretrial randomly, without --

 5              THE COURT:  And it's not only -- I apologize.  It's

 6    not only the individuals who are there, but it's the apartment

 7    itself.

 8              MR. BRAFMAN:  Yes, I understand.

 9              THE COURT:  Okay.

10              MR. BRAFMAN:  That the place can be subject to random

11    search by Guidepost or pretrial.  I will leave it to Guidepost

12    to indicate who the supervisory personnel will be and also vet

13    them through the Southern District.  And how they liaison with

14    pretrial, I'll leave that to them.

15              I believe that the security personnel who will guard

16    that apartment are going to be assigned by Guidepost and not at

17    the request of the defendant and that we will play no part in

18    picking and choosing who these people are.  I see no reason for

19    us to want to do that.

20              I will accept the condition without discussion that

21    the defendant will not be permitted to have a cell phone.

22              I believe that having a hard line in the apartment is

23    going to be necessary, without the call forwarding feature.

24    They can have a log of outgoing calls.  I'd ask if the call is

25    to counsel that it be as if it were even in the prison, a
```

FAMHNGC2

 1   privileged call.

 2            THE COURT:  Yes.

 3            MR. BRAFMAN:  As long as they establish it's either to

 4   my office or Mr. Mo's office, that it not be a recorded

 5   conversation.

 6            THE COURT:  Mr. Brafman, I don't mean to in any way

 7   suggest that this might occur, but I want to just be clear

 8   that, you know, when there are such calls, no forwarding from

 9   your office.

10            MR. BRAFMAN:  Your Honor, I'm familiar with the

11   procedure.  I've been tested 500 times by inmates, and I've

12   never failed at this.

13            THE COURT:  No, I just wanted to be clear.

14            MR. BRAFMAN:  I don't intend to do it at this point in

15   my career.

16            THE COURT:  Okay.

17            MR. BRAFMAN:  And I have no problem that the people

18   who visit being vetted.  And, again, if there is a disagreement

19   over whether they can and cannot visit, we will either work it

20   out with the government or go to pretrial or go to the Court if

21   it's someone we think is important.

22            THE COURT:  Yes.

23            MR. BRAFMAN:  I accept, obviously, that he will be

24   escorted by Guidepost if there are attorney visits.  I'd like

25   the record to reflect that Mr. Mo 's office is downtown; my

FAMHNGC2

```
 1    office is midtown.  And because he speaks Mandarin, there's
 2    going to be a lot of the meetings between Mr. Ng and Mr. Mo,
 3    who is himself a former law enforcement person having worked as
 4    an assistant District Attorney.  So I just want the government
 5    to know that we will give Guidepost two offices because I can't
 6    be -- I also have a trial schedule that I need to deal with.  I
 7    may not have to be at every one of the meetings when they're
 8    speaking Mandarin to each other.  I feel like an exhibit at
 9    those meetings anyway.  So I will provide both addresses to the
10    government and pretrial.
11            Your Honor, the defendant operates businesses which,
12    by the government's own suggestion, are massive.  He employs
13    over a thousand people in Macau.  It's going to be essential
14    that there be a computer in the apartment, and it's going to be
15    essential that he be able to -- he has bank loans totaling over
16    $100 million that he needs to address, needs to monitor, and I
17    don't think we want those businesses to fail while he is still
18    presumed to be innocent.  And I think we need to figure out a
19    way for him to be able to have a computer, and I'll discuss it
20    with Mr. Richenthal and see if we can fashion something that's
21    acceptable to them.
22            I want to go back to the airplanes, because I think
23    your Honor is imposing on us a task that may not be doable.  If
24    the defendant -- and I need to verify this -- if the defendant
25    personally owns any airplane, we will provide the government
```

FAMHNGC2

```
 1    with the tail number, which is, I think, what your Honor asked

 2    for --

 3              THE COURT:  Yes.

 4              MR. BRAFMAN:  -- what the transponder numbers are and

 5    the location of the aircraft.  If it's not in the United

 6    States, we will let them know where it is and where it remains.

 7    There are times when he came into the United States not on his

 8    own plane.  It was a private plane, but it was not a plane he

 9    owned, to my knowledge.  And to the extent that it is a leased

10    plane, we will attempt to, through the particular leasing

11    company in question, try and find the identification of the

12    planes in question.

13              But, Judge, I want to also, as a practical matter --

14              THE COURT:  Actually, I think I made the distinction.

15    For purposes of his own planes, in other words, planes that he

16    owns, transponder/tail number.  For purposes of leased

17    airplanes, in other words, because as I understand it, unless

18    it's a long-term lease --

19              MR. BRAFMAN:  No, it's a trip lease.

20              THE COURT:  A company that he contracts on an

21    individual basis, you just have to provide the name of those

22    companies.

23              MR. BRAFMAN:  Okay.

24              THE COURT:  And if you can, to the extent possible,

25    the name of the companies and the approximate dates he used
```

FAMHNGC2

1    those companies.

2           MR. BRAFMAN:  Well, I don't have a problem identifying

3    the names of the companies if the concern is that he not be

4    able to contract with them to do this again, to the extent that

5    he ever did.

6           THE COURT:  I know what you're about to say.

7           MR. BRAFMAN:  But to give them a roadmap --

8           THE COURT:  No, I understand.  I understand.

9           MR. BRAFMAN:  If they want to subpoena those

10   companies --

11          THE COURT:  Hold on, you know, because I'm about to

12   rule in your favor.  I understand what you're saying.  And it

13   had not occurred to me that there may be some evidentiary value

14   to that, his comings and goings, that would be useful or could

15   be useful or the government might think might be useful.  So

16   what I'm going to require, though, is that you disclose the

17   names of the entities that he utilized for purposes of aircraft

18   flights.

19          MR. BRAFMAN:  He will do that, your Honor.

20          THE COURT:  Okay.

21          MR. BRAFMAN:  And to the extent he owns any planes

22   that are his, we will provide the identifying numbers.  I think

23   the other -- and Janet Ng will be here when conditions of bail

24   are satisfied, and she will cosign the bond as a suretor if

25   that's what your Honor requires.

FAMHNGC2

1            THE COURT:  I do.

2            MR. BRAFMAN:  And I ask the Court, with the exception

3    of these conditions -- and assuming the government doesn't

4    convince you to add any others, although it's inconceivable to

5    me that there might be others -- the other conditions set by

6    Magistrate Judge Fox remain the same?

7            THE COURT:  Yes.  Let me just take a quick look.

8    Obviously, there will still be monitoring.  I think the

9    restrictions on Mr. Ng's movement are, I think, more limited

10   than what the magistrate put.  Yes, I don't think there's

11   anything inconsistent with that, with what I've said.  So all

12   of those other conditions would remain, but let me just for a

13   moment take a look.  Actually, I think it's probably set forth

14   in a little bit more detail --

15           MR. BRAFMAN:  It's in the pretrial services report.

16   Your Honor, I could hand it up.

17           THE COURT:  It says travel restricted SDNY, EDNY.  Is

18   there any reason why Mr. Ng would need to go to the Eastern

19   District?

20           MR. BRAFMAN:  Your Honor, I think you can leave that

21   out.  I think the only movement that we were under the

22   impression he was entitled to with Guidepost was for legal

23   visits, approved medical visits, and to court.

24           THE COURT:  That's coming out.  Just that travel SDNY,

25   whatever, and it's supplanted by what I just said, in other

FAMHNGC2

```
 1    words, court, visits to you or Mr. Mo, and medical visits, all
 2    with disclosure to --
 3              MR. BRAFMAN:  Pretrial.
 4              THE COURT:  -- notice and disclosure to pretrial.
 5              MR. BRAFMAN:  Yes, sir.
 6              MR. JONES:  Your Honor?
 7              THE COURT:  Yes.
 8              MR. JONES:  Michael Jones from pretrial services.
 9              THE COURT:  Yes.
10              MR. JONES:  I just want to clarify.  Generally, when
11    somebody's under pretrial supervision, they're required to
12    report to our office.  Are we going to exclude that?
13              THE COURT:  We are going to exclude that, yes.  I
14    mean, obviously, to the extent you feel it's appropriate or
15    your office feels it's appropriate, when Mr. Ng is present for
16    a court appearance, if you want to meet with him about
17    something, feel free, obviously, to come to court.  I don't
18    think it's necessary, though, that he come to your office.  It
19    seems that would create, logistically, a little bit of an
20    issue.  But your contacts will be with the folks from Guidepost
21    concerning his comings and goings, and the like, and he will
22    still have the electronic monitoring.
23              MR. JONES:  Okay.
24              THE COURT:  Right?
25              MR. BRAFMAN:  Yes.
```

FAMHNGC2

1      THE COURT:  I understand you need a hard line for that

2  anyway.

3      MR. BRAFMAN:  Yes, pretrial has notified us and, I

4  think, also Mr. Richenthal that they intend to try and take

5  care of that tomorrow morning by inspecting the apartment and

6  putting in the landline or making sure it's there.

7      THE COURT:  Okay.  And, obviously, if pretrial wants

8  to -- is it possible for purposes of urinalysis -- I see that

9  was the subject of -- is that something that you could go to

10  his apartment to take a sample, or no?  I'm just not sure,

11  quite frankly, if it's necessary at all.

12      MR. BRAFMAN:  He's 68 and he's a diabetic, suffers

13  from hypertension, takes a great many approved medications.

14  There's never been any suggestion that he uses drugs.

15      THE COURT:  Yes, I'm going to not require that.

16      MR. BRAFMAN:  Thank you.

17      THE COURT:  I think it's typically part of the

18  standard requirement; but in this case, I don't think it's

19  necessary, especially in light of the fact that Mr. Ng's going

20  to be essentially under house arrest.

21      Okay.  That's covered.  I think all of the other

22  conditions, I think, Mr. Brafman, that I've just taken a look

23  at with the noted ones that I've removed are fine, in addition

24  to the ones I've just added.

25      Okay.  Anything else, Mr. Brafman?

FAMHNGC2

1          MR. BRAFMAN:  Just, your Honor, if the Court or the

2     government could order Mr. Ng to be produced tomorrow, in the

3     unlikely event that I'm able to get all of the conditions

4     satisfied by tomorrow?

5          THE COURT:  It's just that -- I apologize,

6     Mr. Brafman.  It may not have been clear -- with regard to what

7     we need to do first, though, is that the detail -- I understand

8     it's fine to let the government know who is going to be on the

9     detail.  But what I'm saying is in advance of Mr. Ng being

10    released, the government should get the CVs, and they should

11    vet -- and I think this should be done in short order.  So, in

12    other words, there will be a time frame that the government

13    has -- the individuals who will be part of the security detail

14    prior to Mr. Ng being released.

15         MR. BRAFMAN:  Your Honor, Mr. Jaffe, who's from

16    Guidepost, says to me that they've had this on their computer

17    system, that they could get it to the government by tonight, by

18    tomorrow morning.  I also represent to you we're not going to

19    offer them anyone who has any type of a checkered history or

20    past, because we're not looking for this to fail; we're looking

21    for this work.

22         THE COURT:  I understand that.  And, again, I don't

23    know who the individuals are, and I don't know what the

24    government might be able to uncover.  And I'm not suggesting

25    that any of them have "checkered pasts."

FAMHNGC2

1          MR. BRAFMAN:  Right.

2          THE COURT:  But there may be issues with regard to

3   certain of them that the government has concerns about.

4   Obviously, they can't unreasonably withhold -- in other words,

5   this is purely just to eliminate people they have concerns

6   about --

7          MR. BRAFMAN:  Right.

8          THE COURT:  -- for whatever reason.  So I do think

9   that if they get them tonight, I don't know, I think by close

10  of business Monday, they need to have done whatever vetting

11  they need to have done.  And failing that, failing that, and

12  absent some extraordinary circumstance, Mr. Ng can -- and

13  meeting the other conditions, can be released.

14         MR. BRAFMAN:  Can we order him produced on Monday,

15  then?

16         MR. RICHENTHAL:  We'll order him produced if the

17  conditions appear they'll be met on Monday.

18         MR. BRAFMAN:  I understand that.  But if we have a

19  disagreement whether you're withholding your agreement

20  unreasonably, we need to produce him to discuss it with the

21  Court.  And he's already been detained for a month, and my hope

22  is to have him released once the conditions are met.  My

23  expectation is that we will have all of these conditions met

24  within the next 24 hours, if humanly possible, certainly by the

25  end of the day Monday.  And I'd say 90 percent of the

FAMHNGC2

```
 1    conditions your Honor has asked us to agree to are available,

 2    essentially, tomorrow morning, when we will get whatever

 3    additional information we need.  I understand the tight window

 4    to do this tomorrow, but I would like that your Honor order him

 5    to be produced Monday.  At worst, if he doesn't meet the

 6    conditions, he won't get out; but at least if he meets the

 7    conditions, we're not dealing with another day.

 8             THE COURT:  Okay.

 9             MR. RICHENTHAL:  We have no problem with Mr. Ng being

10    produced on Monday.  But as the marshals, no doubt, would tell

11    your Honor, it's not a small task to be moving people around.

12    If Mr. Ng looks like he's not going to meet the conditions, he

13    doesn't need to be brought here.

14             MR. BRAFMAN:  If I thought he was --

15             MR. RICHENTHAL:  Excuse me, Mr. Brafman.  I'm still

16    speaking.

17             THE COURT:  Wait.  Wait.  First of all, you talk to

18    me; you don't talk to each other.  Okay.  And just one at a

19    time.  All right.  We've been here for a while.  So I'll hear

20    from you, Mr. Richenthal, then I'll hear from Mr. Brafman.

21             Go ahead.

22             MR. RICHENTHAL:  I'm sorry, your Honor.

23             THE COURT:  That's okay.

24             MR. RICHENTHAL:  We don't have a problem, in

25    principle, producing Mr. Ng.  We're not going to throw
```

Case 2:16-cr-20394-SFC-APP   ECF No. 48-10   filed 02/24/17   PageID.607   Page 71 of 92
Case 1:15-cr-00706-VSB   Document 82   Filed 11/09/15   Page 70 of 91

70

FAMHNGC2

```
 1    bureaucratic delays for the sake of bureaucratic delay.  My

 2    only point is, particularly in light of some of the concerns

 3    that we'd like to express about some of the conditions or

 4    amendments, it may well be he simply can't meet them by Monday.

 5    And I don't know that the marshals should be moving people

 6    around unnecessarily.  As a principle matter, of course we have

 7    no problem producing Mr. Ng.  If he meets the package, he

 8    should be released forthwith.  That's the Court's order.  We'll

 9    comply with that.

10              THE COURT:  Let me hear from Mr. Brafman and then hear

11    what additional things the government may have to say.

12              MR. BRAFMAN:  Well, unless the government withholds

13    reasonable consent to the conditions that your Honor has

14    proposed, we expect that we will meet those conditions by

15    Monday.

16              THE COURT:  Okay.

17              MR. BRAFMAN:  While I don't want to unnecessarily

18    impose on the marshals, it's not an easy feat for him to be

19    produced either.  He gets up at 4:00 o'clock in the morning,

20    and he doesn't get back till 8:00 o'clock at night.  So we're

21    not doing this just for practice.  I think we'll meet the

22    conditions by Monday, and I think they'll be met to your

23    Honor's satisfaction.  And my hope is that he would then be

24    released.  Otherwise, he gets housed for another 24 hours, and

25    those days count.
```

Case 2:16-cr-20394-SFC-APP   ECF No. 48-10   filed 02/24/17   PageID.608   Page 72 of 92
Case 1:15-cr-00706-VSB   Document 82   Filed 11/09/15   Page 71 of 91

71

FAMHNGC2

```
 1            THE COURT:  Okay.  Obviously, if he does get released
 2   on Monday, it will be Guidepost and Guidepost security
 3   personnel and the Guidepost vehicle that will be used to
 4   transport him.
 5            MR. BRAFMAN:  We will arrange for two of the
 6   Guidepost-approved people to be in the courtroom, and they also
 7   provide an approved driver and their own vehicle to handle all
 8   of these movements, just like they were marshals doing it for
 9   the court.
10            THE COURT:  Okay.  Mr. Richenthal.
11            Thank you, Mr. Brafman.
12            MR. RICHENTHAL:  Your Honor, I have a couple things in
13   mind, but if it's okay, can we have maybe two minutes just to
14   sort of confer?  Would that be all right?
15            THE COURT:  Yes.  You can have two minutes to confer
16   with your colleagues or confer with Mr. Brafman also if you
17   think -- well, why don't you do this:  Confer with your
18   colleagues, and if there are additional things, confer with
19   Mr. Brafman, see if you can agree on some of them.  And if you
20   can agree, we'll add those; and if you can't agree, I'll break
21   the tie.
22            All right.  Thank you.  Just knock when you're ready
23   to go, but I'm just going to step back.
24            (Recess)
25            THE COURT:  Okay.  Mr. Richenthal.
```

Case 2:16-cr-20394-SFC-APP   ECF No. 48-10   filed 02/24/17   PageID.609   Page 73 of 92
Case 1:15-cr-00706-VSB   Document 82   Filed 11/09/15   Page 72 of 91

72

FAMHNGC2

1          MR. RICHENTHAL:  The good news, your Honor, we have

2     several conditions the parties agree on.

3          THE COURT:  Okay.

4          MR. RICHENTHAL:  The bad news is you're going to have

5     to split the tie on two of them.

6          THE COURT:  That's fine.

7          MR. RICHENTHAL:  There's more that we agree on than we

8     don't agree.

9          THE COURT:  By what, three to two?

10         MR. RICHENTHAL:  No, it's a significant ratio.

11         THE COURT:  All right.  Go ahead.

12         MR. RICHENTHAL:  This is in no particular order, your

13    Honor.  This is just the order in which the parties talked

14    about them.  It's our understanding that the following

15    conditions are agreed upon between both sides:

16         First, that the hard line, that is, landline

17    telephone, that Mr. Ng will have in the apartment, he will

18    execute paperwork for what's colloquially known as a consensual

19    T-III or consensual Title III; that is, the phone calls will be

20    recorded and monitored.  The government will ensure and the

21    paperwork can reflect that there is auto-minimization of any

22    and all calls with counsel.  That his counsel will provide us

23    their office phone numbers, and whatnot.  And those will be

24    auto-minimized, that is, not recorded.

25         THE COURT:  Okay.

FAMHNGC2

1          MR. RICHENTHAL:  Second, it's our understanding from

2     speaking with pretrial that the following is technologically

3     possible, and the parties agree on it.  The defendant will be

4     permitted to have a computer with Internet access.  However,

5     that computer will be loaded with what I think is known as

6     monitoring software which will log all Web sites that he goes

7     to.  And the defendant will provide to the government and then

8     to pretrial a list of, essentially, approved sites, which we

9     understand will be sites known to contain his legitimate

10    businesses.

11         THE COURT:  Okay.

12         MR. RICHENTHAL:  We don't have that list at present,

13    but it's our understanding pretrial can essentially make that

14    work.

15         MR. BRAFMAN:  I have one question.

16         THE COURT:  Mr. Brafman, you have something to say on

17    that point?

18         MR. BRAFMAN:  Just want to ask a question on this

19    particular one.  I consent to it, but what I'd like to just

20    work out, because I don't know how pretrial does this

21    physically, if we satisfy all of the other conditions of bail

22    except this, could we have an understanding that he would get

23    released but that he wouldn't have access to a computer until

24    that site was approved by pretrial?

25         MR. RICHENTHAL:  If I'm understanding the proposal,

FAMHNGC2

1    it's that he can be released without the setup, provided

2    there's no computer?

3              MR. BRAFMAN:  Yes.

4              MR. RICHENTHAL:  Yes, we have no objection to that.

5              THE COURT:  That's fine.  Okay.  All right.

6              MR. RICHENTHAL:  Third -- and I think this is a nuance

7    to what the Court already ordered -- it's the government's

8    understanding that most of the private planes are actually

9    owned by Mr. Ng's company, as a technical matter, and he's

10   agreed to give us the tail numbers of those, not simply the

11   ones he personally owns.

12             THE COURT:  Well, look, yes, and I would have, had I

13   thought about it that way -- look, I mean, I've never owned my

14   own plane, so I don't know how it works.  But, yes, that makes

15   sense that if they're owned by the company, they're

16   effectively, in my view, owned by Mr. Ng.

17             Go ahead.

18             MR. RICHENTHAL:  I think I'm up to the fourth.

19             THE COURT:  Yes.

20             MR. RICHENTHAL:  The defendant does not object to the

21   government receiving the log that's kept of visitors, not

22   merely that the log be -- let me back up.

23             THE COURT:  Oh, receiving the log of the visitors.

24             MR. RICHENTHAL:  Actually receiving the log without

25   being asked for it.  Essentially, on a regular basis.

Case 2:16-cr-20394-SFC-APP   ECF No. 48-10   filed 02/24/17   PageID.612   Page 76 of 92
Case 1:15-cr-00706-VSB   Document 82   Filed 11/09/15   Page 75 of 91

75

FAMHNGC2

 1          THE COURT:  Yes.

 2          MR. RICHENTHAL:  We would propose daily, but we're

 3     open to something reasonable.  That the log be something

 4     transmitted to us and not simply something we have to ask for

 5     and occasionally get.

 6          Fifth, visitors to the apartment cannot bring to

 7     meetings with Mr. Ng phones, cash above a de minimis amount.

 8     Your Honor can define de minimis.  We, essentially, just don't

 9     want large sums of cash.  And travel documents.

10          MR. BRAFMAN:  Judge, what I agreed to is that since

11     everyone is subject to search when they enter, that they will

12     give the Guidepost people their phones who will keep custody of

13     it.  So, as if you're coming to a courthouse, you'll get it

14     back when you leave.

15          And to the extent that all they have is personal money

16     for -- you know, whatever it is people carry around with them,

17     that they will simply show Guidepost what they have.  Guidepost

18     will hold it until they leave if it's more than, you know,

19     $200.  I don't think they're worried about somebody coming in

20     with $80.  I think they're worried about a suitcase.

21          THE COURT:  Yes.

22          MR. BRAFMAN:  Second, Judge, just so the record should

23     reflect -- I don't think the government objects -- there are

24     other family members, daughter-in-law and godson, who live

25     there now; and they will continue to live with him, because

Case 2:16-cr-20394-SFC-APP   ECF No. 48-10   filed 02/24/17   PageID.613   Page 77 of 92
Case 1:15-cr-00706-VSB   Document 82   Filed 11/09/15   Page 76 of 91

76

FAMHNGC2

 1    they have no place else to live, and they want to help take

 2    care of him.  I don't think they care about that.  There are

 3    four bedrooms in the apartment, and they live there now.

 4            So, in addition to Janet Ng, these other family

 5    members, with the permission of the Court, would live there.

 6    Guidepost understands that, and it's his daughter-in-law and

 7    young man who's present in the courtroom who Mr. Ng has helped

 8    raise.  We'll give you the full names and background.  None of

 9    them have any criminal records and --

10            MR. RICHENTHAL:  Just a couple comments.  We also

11    think that Guidepost should hold on to any travel documents not

12    in the names of the residents.  In other words, we don't want

13    someone coming in with some sort of identification document in

14    Mr. Ng's name or various aliases that he's used.

15            MR. BRAFMAN:  Any travel documents that they come in

16    with will be deposited with Guidepost until they leave.

17            THE COURT:  Yes.  I mean, however Guidepost wants to

18    do it, I think that makes sense.

19            Let me just ask.  Obviously, anyone who lives there is

20    going to be subject to the same conditions as we discussed with

21    regard to Mr. Ng's daughter; in other words, there are going to

22    be random searches.  They've got to consent to the searches

23    that will be of the premises and also of their belongings that

24    may be in the premises.

25            MR. BRAFMAN:  Yes, your Honor.

FAMHNGC2

1           THE COURT:  So as long as that's the case and,

2    obviously -- and perhaps, just to be on the safe side, perhaps

3    requiring the execution of some document that memorializes that

4    would make sense.

5           MR. BRAFMAN:  We could just put it on the record now

6    to save time, and I can -- we'll get the government something

7    in writing.

8           THE COURT:  Here's the thing.  I suspect that to the

9    extent pretrial is being -- is conducting these searches of

10   others, other than Mr. Ng and the premises where he lives, in

11   other words, of people's personal items, I think that they

12   would want to have that; and I actually think Guidepost might

13   feel a little bit better if they had something along those

14   lines.

15          MR. BRAFMAN:  We'll get a document prepared, your

16   Honor.

17          THE COURT:  Okay.  Thank you.

18          MR. RICHENTHAL:  This is actually a good segue to the

19   final thing I think parties agree on, which is we think that

20   also, frankly, to give Guidepost comfort and the government

21   comfort, Mr. Ng should agree that reasonable force may be used

22   against him to prevent his flight.

23          THE COURT:  I'm sorry.  Yes, I apologize.  There was

24   an agreement and Mr. Brafman had agreed to -- and I don't

25   remember the language, Mr. Brafman, but in connection with the

Case 2:16-cr-20394-SFC-APP   ECF No. 48-10   filed 02/24/17   PageID.615   Page 79 of 92
Case 1:15-cr-00706-VSB   Document 82   Filed 11/09/15   Page 78 of 91

78

FAMHNGC2

1   argument before Judge Fox -- and that is one thing, I

2   apologize, I did forget -- is that there would be that

3   understanding that -- you know, reasonable force to prevent him

4   from fleeing.

5           MR. BRAFMAN:  Yes.

6           THE COURT:  Or whatever the language might be.

7           MR. BRAFMAN:  I think what I said was that Mr. Ng

8   consents and understands that Guidepost is permitted to use

9   reasonable force to keep him from fleeing or otherwise

10  violating the conditions of bail.  And he has agreed to that

11  before Judge Fox, and he's prepared to tell you, sir, through

12  his interpreter, that he agrees to that as well.

13          THE COURT:  Okay.

14          MR. RICHENTHAL:  And then, finally, I think the two

15  issues the parties do not agree on --

16          THE COURT:  Okay.

17          MR. RICHENTHAL:  So, first, the government

18  respectfully requests your Honor to order there be cosigners

19  beyond Mr. Ng's daughter.  So, at a minimum, we think everyone

20  living in the apartment should sign the bond.  We're now being

21  told there's at least three people living there.  We think they

22  should all have to sign the bond.

23          But, your Honor, we think others should sign the bond,

24  too.  I mean, the risk of flight is so tremendous.  Mr. Ng has

25  represented he is a man with great philanthropic and business

Case 2:16-cr-20394-SFC-APP   ECF No. 48-10   filed 02/24/17   PageID.616   Page 80 of 92
Case 1:15-cr-00706-VSB   Document 82   Filed 11/09/15   Page 79 of 91
79
FAMHNGC2

1    activities.  He should be able to find cosigners in the United

2    States.  To be clear, the cosigners do not have to have

3    $50 million in assets.  Financially responsible does not mean

4    $50 million in liquid assets; it just means financially

5    responsible.  And the purpose of that, of course, is for Mr. Ng

6    to understand that should he choose to flee, people who he

7    cares about or people who he has connections would suffer

8    financially.  That's completely appropriate.  It's ordered

9    regularly in this courthouse.  We don't think it should not be

10   ordered here.  We think it should be ordered here.

11          We don't have a particular number in mind.  Pretrial

12   recommended four cosigners.  We're not tied to the number four.

13   But we think there should be people independent of his family

14   members, particularly given that his family members are not

15   American and, to our knowledge, have no assets that are not, in

16   fact, his assets.

17          THE COURT:  All right.

18          MR. BRAFMAN:  Your Honor, we do not oppose the signing

19   of the bond by Mr. Ng's daughter, his daughter-in-law, and the

20   young man who he has raised who lives in the apartment.

21          He has spent the entire day telling you that Mr. Ng

22   has no ties to this community.  We could fill the courtroom

23   with suretors who are now in Macau and China and who have no

24   interest in flying here to become involved in the case where

25   the government would then, you know, subject them to God knows

Case 2:16-cr-20394-SFC-APP   ECF No. 48-10   filed 02/24/17   PageID.617   Page 81 of 92
Case 1:15-cr-00706-VSB   Document 82   Filed 11/09/15   Page 80 of 91

80

FAMHNGC2

```
 1   what.  So we don't have anybody in the United States as a

 2   suretor.

 3           But the principal reason I think your Honor correctly,

 4   in your discretion, has agreed to these conditions, as has

 5   Magistrate Judge Fox who denied their request for suretors, is

 6   because of the Guidepost conditions.  And we ask your Honor not

 7   to make us try and find someone, because we don't have anybody.

 8   We've tried.  We have a daughter.  We have a daughter-in-law.

 9   We have Mr. Ng.  And he's not going to become a fugitive and

10   make his daughter liable for $50 million, because although she

11   doesn't live in the United States, she does have three

12   children; she did go to school in Canada.  We don't have

13   anybody else to offer you, and we didn't have anybody else to

14   offer Judge Fox, and Judge Fox said no.  He didn't ask for any

15   additional suretors.

16           THE COURT:  Let me ask this.  And, Mr. Brafman, you

17   weren't representing Mr. Ng at the time.  My recollection was

18   that there were -- and it may be that the offer was actually

19   people who are involved in this case now -- officials from the

20   United Nations who I understood that prior counsel had

21   represented, and it may be that you've tried that, and that's

22   impossible.

23           MR. BRAFMAN:  It's impossible because, you know,

24   everybody at the UN who would come in here to offer to work as

25   a suretor is, in the whole universe of things, potentially
```

FAMHNGC2

1   suspect because their position is he bribed the head of the UN.

2   There are hundreds of people from the UN who travel to Macau.

3          The young lawyer who was here, just so your Honor

4   understands, he really didn't know Mr. Ng.  His family found

5   him because he was in Queens and he speaks Mandarin.  He's not

6   a criminal lawyer.  When he came here, he introduced himself to

7   Mr. Ng; and, in words of substance, Mr. Ng says, I know very

8   important people.  I can't offer them as suretors.  I don't

9   know who he was referring to.  But to the extent he was

10  referring to Mr. Lorenzo or Mr. Ashe, I'm not certainly going

11  to propose them as suretors.  And there isn't anybody, Judge.

12  Trust me, if there was, I would have just proposed it.

13         And I think the fact that someone else signs is not

14  the incentive that you need.  The incentive that you have is

15  that he can't go anywhere, and I think we've crossed that

16  bridge.

17         MR. RICHENTHAL:  I just want to respond briefly, your

18  Honor.

19         THE COURT:  Sure.

20         MR. RICHENTHAL:  First of all, there is a UN person

21  who signed a bond for a codefendant.  So it's not the case

22  people were unwilling, and it's not the case we're unwilling to

23  approve them.  But it's also not the case that Mr. Ng doesn't

24  have business connections in the United States.  First of all,

25  he's represented that he does.  But we also have contracts with

FAMHNGC2

1    multiple people -- I don't just mean Mr. Ashe and

2    Mr. Lorenzo -- as recently as last month, in which Mr. Ng's

3    U.S.-based foundation, called the San Kin Yip Group, agreed to

4    pay people different sums of money for different tasks, not all

5    of which are unlawful, for example, help them to set up a Web

6    site, be a consultant for various things.

7            We don't know everything about these people, but he

8    certainly seems to have, at a minimum, independent contractors

9    in New York who might be willing to sign a bond for him.

10   Whether they are or not, I don't know.  But we don't think it's

11   the case there's no one in New York City who he has any

12   connection to whatsoever.  There are people he has connections

13   to.  I don't think it prevents him from wanting to flee.

14   That's why we're arguing about it.  But I think, certainly,

15   there are people he could find willing to sign a bond.  I don't

16   think they're going to have $50 million, but I can represent to

17   your Honor, that's not going to hold up to the process.  We

18   just think there should be others on the bond.

19           (Continued on next page)

20

21

22

23

24

25

FAMLNGC3

1          MR. BRAFMAN:  If they don't have $50 million, the

2     signature is not worth anything unless they're very close to

3     Mr. Ng and he cares about them.  There are no such people in

4     the United States who I could refer now to you, sir, as suretor

5     or to Judge Fox without spending a significant amount of time

6     understanding the relationship and whether or not they themself

7     have any exposure, whether they themselves need lawyers.  We've

8     crossed that bridge.  The issue is really whether or not you

9     trust Guidepost and this issue, and I think your Honor does or

10    we wouldn't be having this discussion.  And when they asked

11    Judge Fox about this, I think they had a similar, and Judge Fox

12    just turned them down.  So what was said at the first bail

13    hearing, both by the government and by that defense lawyer, was

14    just inaccurate in part.

15         THE COURT:  Okay.  Let me ask this.  The individuals

16    who currently live in the apartment, what is their citizenship?

17         MR. BRAFMAN:  One of the young men is a citizen of the

18    United States.  I've talked to him about being a suretor.  His

19    family has some assets.  He doesn't have any personal assets.

20         THE COURT:  I hear what you're saying, Mr. Brafman,

21    about not being able to find additional people.  I do think

22    there's not going to be a suretor -- I think it would be very

23    difficult to find a suretor who would actually be able to make

24    good on the bond.  And the simple fact is that's oftentimes the

25    case in cases.  And to the extent that some, if they are able

FAMLNGC3

1    to make it, it's really something that will probably bankrupt

2    them.  And there's no question this is going to probably

3    bankrupt somebody.

4          MR. BRAFMAN:  So we will have the three people who

5    live in the apartment.

6          THE COURT:  I think it will be -- is it three or four

7    including Mr. Ng's daughter?

8          MR. BRAFMAN:  Three people and Mr. Ng.

9          THE COURT:  All right.  I'm going to require that.

10   I'm not going to require any additional people.

11         But, look, just to be clear, and I'm sure that this

12   will be explained to them.  What that means is for the people

13   who are going to be signing the bond is that although you won't

14   owe any money, you don't have to put any money up, all you have

15   to do is sign a piece of paper; but that piece of paper means

16   that if Mr. Ng violates the terms of his release -- and that

17   could be in a big way, it could be in a relatively small way --

18   you could be liable for the full amount of the bond, which in

19   this case is $50 million.  And, obviously, you may not have

20   $50 million, but the government can come after you for any

21   portion of that and any assets you may have.

22         MR. BRAFMAN:  Your Honor, I discussed this issue with

23   them in the event that the Court would require suretors.  I was

24   hoping you wouldn't, but they agree.  They understand.  They

25   will be here and sign the bond when the bond is executed at the

FAMLNGC3

1   magistrate's office.

2           THE COURT:  There was one more issue, as I understand

3   it, or is there another wrinkle to the cosigners issue?

4           MR. RICHENTHAL:  If the cosigners are going to be the

5   residents of the apartment and they intend to stay, would your

6   Honor consider asking Mr. Ng's daughter to surrender her

7   passport?

8           MR. BRAFMAN:  We offered that at the initial bail

9   hearing and it wasn't enough.

10          THE COURT:  To the extent the people who are living in

11  the apartment have passports and travel documents, they should

12  surrender them.  However, if they have travel plans in the

13  future, I will hear about getting them back their travel

14  documents so they can take whatever trips they're going to

15  take.  But they should surrender their travel documents when

16  they come to sign the bond.

17          MR. BRAFMAN:  That's fine, because one of them has

18  young children who she may have to travel to and would it be --

19  we'll surrender all the passports, your Honor.

20          THE COURT:  Look, Mr. Brafman, I'm not looking to --

21  if there are, you may speak with them and you may know that

22  there are specific times when they already have travel plans,

23  in which case it can be arranged that they get their travel

24  documents back.  But to the extent that there's going to be

25  travel to China, for example, I would expect there would be

FAMLNGC3

1   some planning with regard to that so we should be able to get

2   them their travel documents back.

3            MR. BRAFMAN:  Thank you, sir.

4            THE COURT:  Obviously, the travel documents -- I'm

5   looking over towards Pretrial -- would be held by Pretrial.

6            MR. BRAFMAN:  Yes, sir.

7            THE COURT:  All right.

8            MR. RICHENTHAL:  The final condition on which the

9   parties don't agree is we conferred with Pretrial briefly,

10  which is very helpful, about this distinguish in

11  characteristics between home detention versus home

12  incarceration and we're informed these have different meanings

13  within Pretrial's world.  The former, which is detention,

14  permits what I think your Honor is contemplating which is that

15  Mr. Ng be permitted to have meetings with counsel outside his

16  apartment.  The latter does not.  The latter is closer to

17  what's happening now -- Mr. Ng is incarcerated, he can meet

18  with counsel there, they can call him, but they can't be

19  together in a third spot.

20            To the extent that what your Honor wants to do is

21  replicate to the extent possible the current conditions of

22  incarceration, we respectfully request your Honor consider home

23  incarceration, meaning if they want to meet with him, it will

24  be in his apartment.  They are free to speak with him

25  telephonically or video conference.

FAMLNGC3

```
1        THE COURT:  No, and here's the reason why and it's
2   something I think we had discussed earlier.  You're going to be
3   receiving a log of people who come and go, which I can
4   understand the government wanting, but there will be times when
5   they may be meeting with people who are going to be witnesses
6   for them or who may not be witnesses in the future, but that is
7   part of any defense strategy which you're not entitled to.  The
8   defendant at trial, obviously, doesn't have to do anything.
9        So, and I also think with regard to that, this is
10  something that Mr. Brafman and his firm and Mr. Mo, it's on
11  them as attorneys and officers of the court that they're not
12  going to have Mr. Ng knowingly visit with people who are going
13  to assist him to flee the country.
14       So with that understanding and with that in mind, I'm
15  not going to order that all of the visits occur in the
16  apartment, not to mention which, since there are so many people
17  in the apartment, I'm not sure -- and there is an issue about
18  privilege.  I think it would be very difficult to -- it could
19  complicate things about having privileged conversations without
20  possibly waiving any communications.  Okay.
21       MR. RICHENTHAL:  I think the only issue left then is
22  one of the interpreter.  The parties I think need to speak
23  further and I think maybe speak with Guidepost and figure it
24  out.  We were told Guidepost may well have a Mandarin speaker,
25  but not necessarily one that can be available around the clock.
```

FAMLNGC3

```
 1    I think that's something we can work out, so we would ask the
 2    Court to kick that one down the line.
 3            THE COURT:  That's fine.  Just let me know.
 4    Obviously, I'm going to review the transcript and we're going
 5    to be preparing the conditions of release and have it in place,
 6    and perhaps we'll even share it with the parties in advance to
 7    make sure that we've included everything, but have it in place
 8    in case the parties are able to have everything in place by
 9    Monday.
10            MR. RICHENTHAL:  And is it then the Court's intention
11    that provided the money is posted, the property is posted, the
12    bond is signed, and the Guidepost officers are vetted, Mr. Ng
13    may be released even if there are conditions yet to be
14    fulfilled?  Because the one we would like in place before he is
15    released beyond monitoring is the consensual T3.
16            THE COURT:  The consensual T3.
17            MR. RICHENTHAL:  We'd like that paperwork executed so
18    we can promptly serve it on whatever phone company they're
19    using for the landline.
20            MR. BRAFMAN:  If he can get it to us, we'll have it
21    executed.  And if we can have Mr. Ng present on Monday, we
22    think we can satisfy the primary conditions.  And to the extent
23    we can't satisfy all of them, it will be understood that he's
24    not going to be able to do any of the things the conditions
25    would prevent him from doing.  For example, the computer log.
```

FAMLNGC3

```
 1   He won't use the computer until we've set up with Pretrial how

 2   they would be able to enforce that.

 3            THE COURT:  I also think that to the extent there

 4   is -- I don't know whether computers are already in the home,

 5   in the apartment.

 6            MR. BRAFMAN:  Judge, we will not burden you with

 7   having to figure this out.  We will try and figure it out.

 8            THE COURT:  I don't know why, Mr. Brafman.  I was

 9   planning on making a home visit myself.

10            MR. BRAFMAN:  Your Honor, if you spoke Mandarin, I got

11   a full-time job for you, in addition to the full-time job.

12            THE COURT:  Okay.

13            MR. BRAFMAN:  Thank you for your patience, your Honor.

14            MR. JONES:  Your Honor, I want to clarify some

15   conditions, the wording of it.  Home detention monitored by

16   GPS, is that what you're putting on the bond?

17            THE COURT:  That's correct.

18            MR. JONES:  And also just to clarify, Pretrial, we

19   cannot conduct the search ourselves.  It will need to be

20   conducted by Guidepost.  It can be in the presence of Pretrial.

21            THE COURT:  That's fine.

22            MR. JONES:  I want to make sure the wording on the

23   bond reflects that.

24            THE COURT:  That's fine.  And now that you mention

25   that, I think that when I've seen searches before, it's usually
```

Case 2:16-cr-20394-SFC-APP   ECF No. 48-10   filed 02/24/17   PageID.627   Page 91 of 92
Case 1:15-cr-00706-VSB   Document 82   Filed 11/09/15   Page 90 of 91

90

FAMLNGC3

```
 1    with somebody else.  That's fine.

 2              MR. JONES:  Okay.

 3              MR. RICHENTHAL:  The devil is always in the details.

 4    I think the language shouldn't be home detention.  I think it

 5    should be home incarceration with the following permitted --

 6    attorney, medical -- because I think home detention means more

 7    is permitted.  Your Honor may inadvertently be permitting more

 8    than the Court intends.

 9              MR. JONES:  The way our electronic monitoring

10    department is going to want it worded is home detention

11    monitored by GPS, allowed to leave the residence for medical or

12    attorney visits.

13              MR. RICHENTHAL:  We obviously defer to Pretrial.

14              THE COURT:  That's the way we'll word it.  I don't

15    want to create problems.

16              MR. BRAFMAN:  Thank you, sir.

17              MR. RICHENTHAL:  Nothing further from the government.

18              THE COURT:  All right.  So if anything does come up, I

19    am reachable tomorrow, but it may take a while for me to get on

20    the phone.  And anything comes up, obviously, you all have,

21    since I did email you, as Ms. Echenberg can attest to, I don't

22    necessarily have a problem with people emailing me if something

23    arises.

24              MR. RICHENTHAL:  I think the only thing that will have

25    to arise is your Honor has to sign the consensual T3 or the
```

FAMLNGC3

1   phone company won't execute it.  We'll do that properly.  If

2   your Honor isn't available, do we have permission to bring that

3   to the Part I judge?

4            THE COURT:  Yes, but there may be ways we can do it,

5   but yes.  Okay.  Thank you.

6                              o0o

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25