# EXHIBIT J

```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK

In re:                            :
                                     Docket #10m2424
  UNITED STATES OF AMERICA,       : 1:10-mj-02424-UA

                  Plaintiff,      :

   - against -                    :

  YVES BENHAMOU,                  : New York, New York
                                    November 17, 2010
                  Defendant.      :

------------------------------------ :


                    PROCEEDINGS BEFORE
              MAGISTRATE JUDGE FRANK MAAS,
        UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:      UNITED STATES DISTRICT ATTORNEY
                        BY:   PABLO QUINONES, ESQ.
                        One St. Andrew's Plaza
                        New York, New York 10007
                        (212) 637-2487


For the Defendant:      SKADDEN ARPS SLATE MEAGHER & FLOM
                        BY:   DAVID ZORNOW, ESQ.
                              STEVEN GLASER, ESQ.
                        Four Times Square
                        New York, New York 10036
                        (212) 735-2248
```

Transcription Service:  Carole Ludwig, *Transcription Services*
                        141 East Third Street #3E
                        New York, New York 10009
                        Phone:  (212) 420-0771
                        Fax:  (212) 420-6007


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service

2

<u>INDEX</u>

<u>E X A M I N A T I O N S</u>

| <u>Witness</u> | <u>Direct</u> | <u>Cross</u> | Re-<br><u>Direct</u> | Re-<br><u>Cross</u> |
|---|---|---|---|---|
| None | | | | |

<u>E X H I B I T S</u>

| <u>Exhibit<br>Number</u> | <u>Description</u> | <u>ID</u> | <u>In</u> | Voir<br><u>Dire</u> |
|---|---|---|---|---|
| None | | | | |

3

```
1          THE CLERK:   United States of America against Yves
2   Benhamou.  Counsel, state your names for the record.
3          MR. PABLO QUINONES:   Good afternoon, Your Honor,
4   Pablo Quinones on behalf of the United States.  With me is
5   Special Agent Mike Howard with the FBI.
6          THE COURT:   Good morning.
7          MR. DAVID ZORNOW:   Good morning, Your Honor, David
8   Zornow with Skadden Arps Slate Meagher & Flom.  I'm joined
9   today by my partner Steven Glaser on behalf of Dr. Yves
10  Benhamou.
11         THE COURT:   Good morning.  This matter is on for a
12  detention hearing.  I read the Pre-Trial Services report, and
13  I was a little delayed because I reading your letter, Mr.
14  Zornow and some of the attachments.  The one thing I haven't
15  read - give me just a moment to skim it - is the complaint.
16         (Pause in Proceeding)
17         THE COURT:   I haven't read all of it, but I get the
18  gist of it.  Mr. Quinones, tell me why I should continue to
19  have the defendant be detained.
20         MR. QUINONES:   Good morning, Your Honor.  I know
21  you've read defense counsel's letter and the complaint, and
22  let me sort of put it in perspective.  The Government is
23  seeking detention.  It is not seeking detention based on
24  dangerousness on the community.  It's seeking detention based
25  on risk of flight.  Our burden is under preponderance of the
```

4

1  evidence, and we do not think that there are any conditions

2  that the Court could set that would reasonably assure his

3  appearance in this case.  We're not asking for any guarantees,

4  but we don't there are any reasonable conditions that could be

5  set.

6          And let me start by referring to some of what's in

7  defense counsel's letter.  It sort of juxtaposes a notion that

8  we are solely seeking detention because the defendant is a

9  French national and his country will not extradite him.  I

10  don't think that's the case.  That's not the sole reason we're

11  seeking detention.  And it also seems to suggest that they're

12  seeking his bail solely because he is a doctor, and I think

13  that would be reading too much into what it is defense counsel

14  is trying to argue.  Clearly, his medical profession is a

15  factor that the Court can consider, but I would not suggest,

16  nor do I think defense counsel is suggesting, that the Court

17  should rely on that fact in granting him bail.

18          Nor do I think defense counsel is correct in

19  suggesting that we are solely relying on the fact that France

20  does not extradite its nationals.

21          In that regard, I have for the court a letter that

22  is from a judicial attaché - if I can approach - to the U.S.

23  Embassy in Paris, France that explains why it is a concern for

24  us and a factor that the Court should consider.  It makes

25  clear that the law in France will not extradite its nationals,

5

1  that the treaty between France and the United States says it

2  would not extradite its nationals, that there's a more recent

3  treaty that suggests that, if the defendant consents, it may

4  extradite its nationals, but in practice that has meant that

5  France has not extradited any of its nationals.  And perhaps

6  most renown amongst its nationals that have not been

7  extradited to the United States is Roman Polanski.

8         THE COURT:  Okay, so, yeah, that case occurred to

9  me as I was reading Mr. Zornow's letter.

10         MR. QUINONES:  So it is - sorry - it is clearly a

11  factor that the court should consider where an individual

12  where an individual who is in that case admitted to having

13  raped someone is still not extradited from France and lives in

14  plain sight in France.

15         THE COURT:  But the case also shows I guess that,

16  in effect, someone would be under house arrest in France if

17  they travel to another country, notwithstanding what happened

18  in Switzerland, that did have an extradition treaty, they

19  might well find themselves back here.

20         MR. QUINONES:  It may, but, for example, if they go

21  to another country that doesn't have an extradition treaty,

22  like Roman Polanski did with Switzerland, he would not be

23  extradited here.

24         So it clearly lends in favor of risk of flight

25  because it, in effect, this defendant, unlike many other

6

1  defendants, has the benefit of a safe haven in his home.  And

2  that brings me to some of the factors that the court should

3  think about.  He's lived in France for the last 35 years.

4  He's resided in France.  His wife is in France, his children

5  are in France.  His siblings don't reside in the United

6  States.  Two sisters live in London; one brother lives in

7  Paris.

8        He has substantial assets.  His home is worth

9  approximately $2 million, and he has checking accounts and an

10 investment portfolio roughly approximately $100,000.  He has

11 nearly $600,000 in equity in a business.  He owns shares in

12 publicly traded companies worth about a million dollars.  So,

13 in addition to having a safe haven, he also has the means to

14 flee to that safe haven and to enjoy the comfort of his home

15 rather than face criminal charges in this case.

16        The criminal charges in this case is one of the

17 factors the Court should consider of the nature and

18 circumstances of the offense charged.  In this particular

19 case, I think the evidence is substantial.  Defense counsel

20 claims it's merely circumstantial.  Circumstantial evidence

21 has the same value as direct evidence, and juries in this

22 district convict on circumstantial evidence.

23        I could draw the Court's attention to United States

24 v. McDermott, where the Second Circuit upheld an insider

25 trading case, and I'm quoting, it says, "Although the

7

1   Government was unable to produce direct evidence of the

2   contents of any conversations during which the defendant

3   transferred material non-public information, we find that

4   rationale minds could infer such a conclusion from the above

5   evidence.  Circumstantial evidence is a legitimate form of

6   evidence in this circuit, and in a fact-intensive case such as

7   this requiring careful examination of trading records and

8   myriad of public information, the jury is the appropriate body

9   to determine a defendant's guilt or innocence."

10          The circumstantial evidence in the complaint clearly

11  lays out a pattern of conduct in which the defendant was

12  conveying critical information about the process of a clinical

13  drug trial in he was employed by a publicly held company.  He

14  was required by his agreement with that company to keep that

15  information confidential.  And although the conversation

16  between this defendant and the hedge fund manager is not

17  recorded on some wiretap or on some recording between them, it

18  is clear by the circumstantial evidence and the timing of that

19  contact, that that contact precipitated trading in the very

20  company at which he worked, and that the hedge fund liquidated

21  its entire position in that company the night before the press

22  release came out disclosing the results of that clinical drug

23  trial with respect to a specific arm.  And that the defendant

24  played a critical role not only in the drug trial but in the

25  press release.

8

1          THE COURT:   Assuming that you prevail at trial,

2    what is the guidelines range?

3          MR. QUINONES:   The potential penalties under the

4    statute are 25 years, 5 years under the conspiracy count, 20

5    under the securities fraud count; fines up to $5 million.   The

6    guidelines would be, under our calculation, range from 121 to

7    151 months imprisonment based on avoided loss amount of $30

8    million which is what the hedge fund avoided.

9          So let me turn to his specific - so the case is

10   strong, Your Honor, the potential punishment is high, he has

11   the means to flee, and he has a country that's a safe haven.

12          Now, turning to his specific sort of character and

13   his tie to the community.   The Government doesn't dispute that

14   he's a well-known expert in hepatology.   In fact, it's that

15   expertise that gave him access to the information.   It's that

16   same expertise that caused individuals at the hedge fund and

17   the hedge fund to pay for information from him.   So it is that

18   expertise that he wants the Court to consider in realizing

19   him, but it is that same expertise that gave him the ability

20   to exploit the information that he received.

21          THE COURT:   You said that the hedge fund paid him.

22   What evidence is there of that?

23          MR. QUINONES:   The hedge fund paid a company that

24   paid the defendant to consult with the hedge fund.

25          THE COURT:   Okay.

9

1          MR. QUINONES:   And the relationship between them

2  was such that the defendant had an exclusive agreement with

3  this intermediary company, and the hedge fund directly

4  requested to speak to this defendant and paid based on having

5  had conversations with this defendant.

6          In addition to that, there is a reference in the

7  letter to there being no evidence of a benefit and that

8  somehow that being critical to the sort of strength of the

9  case.   It's clear under the case law that a gift of

10  information to a friend is sufficient, and in this case the

11  defendants were friends.  But aside from that, this defendant

12  also received benefits in the form of having expenses paid

13  for.   And he was asked about that in particular during his

14  appearance in France, he was questioned by investigators in

15  France, and in France he admitted that the individual at the

16  hedge fund had essentially expensed car expenses for his

17  daughter when she came to New York.

18          I want to probe that because I think it also relates

19  to part of what defense counsel is arguing in terms of ties to

20  this community.   He was shown a copy of an email.  On the

21  second page of the email, it says that he requested a

22  chauffeur for his daughter.   They asked him about that, and

23  here's his answer:

24          "I made this request because my daughter was

25      going to spend four days in New York and because I

10

1  was worried about her and for her comfort.  I

2  thought it preferable to schedule her roundtrip

3  between the airport and the hotel.  I approached the

4  individual at the hedge fund because he is one of

5  the rare people I know in New York."

6  And, again, one of the rare people he knows in New York is

7  significant I think because it shows that his ties to this

8  community are limited.

9  "Second, the individual at the hedge fund took

10  care of making a care available for the days and

11  hours communicated, and he took care of the

12  expenses.  I did not reimburse him."

13  So there are instances in which the defendant does receive

14  some benefit.  He clearly can gift information to another

15  person.  And this case, additionally the defendant had a

16  professional relationship, and in that regard I draw the

17  Court's attention to --

18  THE COURT:  Let's assume, for the sake of argument

19  for the case, even if circumstantial is strong, that the

20  defendant has no roots in the community here and that, if he

21  goes to France and doesn't leave France, he's home free.  The

22  question really is are any conditions I can set that makes the

23  risk that he will do that a reasonable one to take, right?

24  MR. QUINONES:  That is the question --

25  THE COURT:  Can we focus on that?

11

1        MR. QUINONES:   And our position is there are no

2   conditions, Your Honor.   The conditions of having people

3   cosign on a bond don't assure his appearance.   He can clearly

4   flee, and the people will be out of money, and given his

5   assets, he can reimburse them.   He would still be safe.

6            There's an argument that defense counsel raises that

7   it would have a collateral consequence on him if he returned

8   to his country.   The actual letter --

9        THE COURT:   There's a lot of waffle words in there

10  -- might, could, and the like.

11       MR. QUINONES:   Exactly right, Your Honor.   I think

12  the letter is far from definitive in terms of suggesting that

13  anything actually is going to happen to him.   And although the

14  case defendant cites, Bodmer I think it is, makes a reference

15  to that being something that Judge Schindlin considered.   In

16  that case, the defendant was a lawyer and a judge.   so clearly

17  there's more of a direct relationship between having a license

18  to practice law and committing a crime and fleeing a

19  jurisdiction, even if it's not your own.

20            In this particular case is, I would argue, less of a

21  direct relationship between this event and then providing

22  medical services in your country.   The importance of his

23  services doesn't vary based on his ability to sort of adhere

24  to U.S. law or may some disciplinary procedure.   It's value is

25  in what he can provide to patients in his country.   And it may

12

1   be that, because it's in a public health system and he works

2   for a public hospital, that they may decide that the benefit

3   of his services outweigh any disciplinary record based on

4   proven conduct in the United States.

5           With respect to home detention or electronic

6   monitoring, I think those also are insufficient.  He even

7   suggests he'll buy an apartment, in some respects he'll create

8   a prison outside of prison for himself because he has the

9   resources to do so.  I think that creates a dangerous

10  precedent, but, more importantly, I don't think it actually

11  controls his ability to flee.

12          THE COURT:    But the reality is rich people end up

13  with different conditions than poor people sometimes.

14          MR. QUINONES:    Reality, Your Honor, is that when

15  they do, it's because the court sets them.  And I would ask

16  the Court not to set them in this case.  And with respect to

17  home detention and electronic monitoring, he can flee, Your

18  Honor.  The bracelet can be cut off.  We wouldn't know that

19  he's gone, but we wouldn't be able to stop him once he left.

20          He would be in an apartment that they are suggesting

21  would have a family member 24 hours.  True, but I can't

22  imagine why they wouldn't both flee together.  The notion that

23  somebody that has times abroad is going to come here and

24  remain here to establish ties to the community doesn't add

25  anything, Your Honor, because both of them could flee and

13

1    neither one of them would be extraditable.

2           So for those reason I think, and I think Your Honor

3    sort of gets the point that I'm making, that despite sort of

4    his value to the medical profession, he's not someone for

5    which there are any conditions we think the Court could set

6    that will reasonably assure his appearance.

7           He does have patients, he does treat individuals,

8    but the services he provides are not unique, and what I mean

9    by not unique, Your Honor, is that he is part of a public

10   health care system that provides the care for patients,

11   whether it's him or another doctor.

12          Second, much of the article and publishing that he

13   does in this particular area is coauthored with other experts

14   in the field.  So the world of hepatology is not going to

15   crumble because he's not present.  Lastly, I think that even

16   the letters that are provided by the defendant are from

17   individuals that are hepatology experts in France.  So the

18   care of those patients could be transferred.

19          Now, there's suggestion that if I had a computer, if

20   I had a phone, I could care for those people.  Maybe he could,

21   maybe he couldn't, Your Honor, I'm not an expert in how he

22   could sort of provide telephonic care to people, but what I do

23   know is that if I was a patient, I would want more than

24   telephonic care if I had a critical disease.

25          THE COURT:   Thank you.  Mr. Zornow.

Q:\Documents and Settings\rjunck\Local Settings\Temporary Internet Files\OLK1\USA-Benhamou-11-17-10 (2).doc

J-14

14

1          MS. ZORNOW:   Your Honor, first of all, let me

2    apologize for a head cold, I'm a little bit congested.   But,

3    Your Honor, I think you put your finger on the issue here.

4    The Government's got the burden of demonstrating that there

5    are no conditions that would assure this defendant's presence

6    for this case, and in that connection I think they've failed

7    miserably.   And, frankly, it's appalling to me that in a white

8    collar case of this type, dealing with an individual like

9    this, of the character, of the background, of the history, the

10   notion that he would not be able to get bail under the strict

11   conditions that we've set forth is really disturbing.

12          Let me say, Dr. Benhamou is a truly extraordinary

13   human being.   He is not just a run-of-the-mill doctor.   He is

14   indispensable.   He is one of the top clinicians in this area.

15   He is dealing with a population that is seriously ill.   Put

16   the articles to the side, put the conferences to the side,

17   this is a man who treats literally hundreds of patients who

18   are seriously, seriously ill.   This is a population where it's

19   HIV, it's viral hepatitis --

20          THE COURT:   Isn't the argument you're making though

21   sort of a double-edged sword in the sense that it also might

22   give him more of an incentive to return to France and his

23   critically ill patients?

24          MS. ZORNOW:   Your Honor, I disagree because what I

25   have come to learn by spending time in prison with Dr.

15

1   Benhamou over the last ten days is he is very confident that

2   with access to a computer, with the phone, with Skype, which

3   is essentially an ability to communicate face to face with

4   patients, that he can contribute an awful lot.  I mean we're

5   talking – let me give you an example.

6           There is a drug that is about to become accessible

7   in France for the first time on an experiment basis, the drug

8   is called telepravir.  It's a new drug, and it's going to be

9   tested on patients who are either going to die or have to get

10  a liver transplant.  As we know, it's very difficult to come

11  by liver transplants.  He is one of a handful of doctors in

12  France who has familiarity and knowledge with respect to this

13  drug.  He has been involved in the development of this drug

14  from the beginning.

15          He has 50 patients who are lined up to begin

16  receiving this drug.  There will be very sensitive issues

17  about titration, about the use of the drug with other drugs,

18  and there's a constant flow of information.  And he assures

19  me, and that's where the character of the man comes in to

20  play, he assures me that he can contribute – obviously, he's

21  not going to be able to do everything he could if he were in

22  France, and we're not asking that he be sent back to France,

23  but what we are saying is it would truly be tragic to have

24  this man with his knowledge sitting in a prison when he could

25  be communicating and helping his patients.

                                                                16

1          I mean let me – you know, these are truly

2   extraordinary letters, Your Honor, and I commend them to you.

3   I ask you to take a look at them.   They are not only from

4   doctors in France.   They are from doctors literally all over

5   the world.   There are doctors in the United States.   There's a

6   professor of medicine at Emory University who's prepared to

7   cosign this bond and put his house up, his apartment.

8          But two letters struck me, and they're from

9   patients, and here's one of them from a Mrs. Pauline

10  Gainville:

11         "Dr. Yves Benhamou of PTA Sault Petrie Hospital

12         in Paris is my doctor, and he has been treating me

13         for hepatitis C since my liver operation in July of

14         2005.   Thanks to him, his encouragement, his care,

15         I've been able to bear treatment using interferon,

16         Pegasys and Copegus that is very onerous both

17         physically and mentally.   He is always available to

18         listen to me.   I have another spot on my liver which

19         is stable for the moment thanks to him.   Without my

20         doctor, Yves Benhamou, I do not know whether I would

21         continue to seek treatment.   I trust only him.

22         Today I am panicking and disheartened.   I am praying

23         for him and for me."

24  Another from a Mr. Liani, a letter to the doctor's wife:

25         "Not having had any news of Yves who I've been

17

```
 1        desperately trying to contact for over week now, I
 2        am writing to you now as the silence is damaging my
 3        mental and physical health.  It won't be news to you
 4        who I've interrupted at night and at the weekend the
 5        extent to which your husband is indispensable to me.
 6        My pains are increasing significantly and to date,
 7        and I have not found any other doctor who can treat
 8        me like he does."
 9             Now, my point is, Your Honor, to rupture that tie
10   between these patients who have been in his care and who trust
11   him would be tragic when we can, and we have offered a
12   combination of conditions that will assure his presence here,
13   and clearly the type of man who will face what he has to face
14   here, but also permit him to contribute.  He can get on the
15   phone, he can communicate by email, he can make that
16   transition.  It would truly be tragic.
17             Let me - I really want to be helpful to the court,
18   so if there are particular issues that you'd like me to
19   address, I mean I'm prepared to address the strength of the
20   Government's case.  I mean, Your Honor, I read the complaint,
21   this is the thin complaint, but I don't think there's any two
22   ways around it, it's purely circumstantial, there's an absence
23   of motive, it's ridiculous.  It, frankly, is ridiculous in a
24   manifestation --
25             THE COURT:   Well, the absence of motive is - I
```

18

1   don't want to tell you how to try the case – but it seems to

2   me is a better argument than strength of the circumstantial

3   evidence because it's not just one phone call.  It's more than

4   one communication and some emails that lend credence to what

5   the Government is saying.

6          MS. ZORNOW:   Some of them – well, none of those

7   emails, Your Honor, have any content that suggests that on

8   their face that there was a communication of confidential

9   information, and, indeed, the one email that they quote that

10  kind of has substance to it, instead of I'll call you or let's

11  get back and forth, is an email in which he's asking this guy,

12  this fund manager should I buy the stock, which is completely

13  inconsistent with the notion that at the same time he's giving

14  him confidential information that there's something negative

15  going on.  Why in the world would he be asking the guy should

16  I buy the stock?

17          What I was going to say, Your Honor, is this notion

18  that the guy who sent a Dial car literally to the airport to

19  pick up Dr. Benhamou's daughter from the airplane and that

20  that somehow presents a corrupt relationship of profit is

21  ridiculous.  And the firm that he was working for, under which

22  he was talking to this guy, he was paid a set amount to talk

23  to the guy.  There's no allegation here that there was some

24  Swiss bank account or anything like that.

25          Let me just address momentarily the letter that we

19

1  got from the counsel of state with regard to the jeopardy that

2  his license would be in if he – this is something that we got

3  really at the request of the Government.   It's a factor that

4  was cited by Judge Schindlin in the <u>Bodmer</u> case.   Nobody like

5  that is going to say it's an automatic disqualification.   The

6  point is he's saying it very likely could.   So if he were to

7  flee, he would be exposing himself to being revoked as a

8  doctor.

9        Let me also say with regard to the extradition

10  piece, I mean essentially what the Government is arguing for

11  is a revision of the bail statute to say that anytime you're

12  from a country that may not have extradition or may not

13  extradite an individual, you can't get bail.   And Judge

14  Schindlin explicitly rejected that in the <u>Bodmer</u> case, and it

15  makes no sense.   It's not the law.

16        Your Honor, the focus here should not be on what's

17  going to happen if he flees, is there extradition.   The focus

18  should be on aren't their conditions that will assure his

19  presence and reasonably assure his presence.   And if you look

20  at the conditions that we've offered, they do that.   They do

21  that very effectively, and they're consistent with the kinds

22  of conditions that have been imposed in other cases involving

23  non-U.S. citizens with even fewer contacts to the United

24  States.

25        I mean if you look at the <u>NatWest Enron</u> case, these

20

1  were three individuals with four extradition for four years

2  from England were finally extradited, they were arguing in the

3  court for the opportunity to go back to England.  The

4  Government said you can't do that but agreed to the same sorts

5  of conditions that we're arguing for here, precisely the same

6  conditions.  If you look at the Internet Gaming executive who

7  was picked up traversing, you know, changing airplanes in the

8  United States, exact same conditions.

9          I mean the notion that home detention or confinement

10  with electronic monitoring with his family here consistently

11  with cosignors, I mean the cosignors that we have are Dr.

12  Raymond Schnazi who I mentioned a few months ago who is a

13  Professor of Medicine at Emory University who's prepared not

14  only to cosign the million dollar bond but to put up his

15  apartment worth $300,000.  We have two other financially

16  responsible persons.

17          We're not talking about buying an apartment.  We've

18  offered two alternatives.  One is to rent an apartment, which

19  seems like the most feasible thing to do.  The family is

20  absolutely committed to having somebody here continuously.

21  His sister and his brother are here today.  They are geared up

22  for this.  Dr. Benhamou is completely clear-headed and

23  committed and resigned, in fact, to being in New York for the

24  length of this case.  He wants to get out of prison.  There is

25  no way in a case like this, white collar case, insider trading

21

1   case, that he would not be getting bail but for the fact of

2   this extradition thing.

3            And, by the way, on that, I mean we have an opinion,

4   I can hand it up to the Court, from a French law professor

5   saying that extradition is possible from France.  It may not

6   have occurred so far, but it is possible.  And he has executed

7   a waiver of extradition.

8            THE COURT:  Yeah, but the French will say that

9   that's not a voluntary waiver.  Take it as a given, I mean you

10  can hand it up and it'll be interesting reading for me, but

11  I'm going to operate on the assumption that effectively there

12  is no extradition for a French national from France.

13           MS. ZORNOW:  And I'm not - I kind of see this as a

14  red herring issue, and the reason I raise it now is not so

15  much because of what they will do or they won't do, but the

16  fact of what is his state of mind.  He's executed the consent

17  because he is that committed, he is fully committed to being

18  here.  He has no intention of leaving.

19           But to get back to the apartment.  So they can

20  either rent an apartment or a Professor of Medicine at NYU

21  School of Medicine, Dr. Hillel Tobias, who's the head of their

22  hepatology department, is willing to let him live in his

23  apartment with his wife.

24           So I just don't - I am, frankly, stunned in this

25  case that, given this entire constellation of factors, who

22

1  this man is, what he could contribute – if one life were

2  saved, wouldn't that be worth it?  And conversely, if any of

3  us had a child who had this disease and was in his care,

4  wouldn't we want him to be available by phone or internet or

5  Skype to confer with the doctors and make for transitions and

6  give the benefit of the years of expertise and trust that he's

7  developed?

8          It, frankly, shocks my conscience, and I've visited

9  this man now four times in prison, and it is about the most

10 tragic thing that I have had to do as a lawyer practicing in

11 this area to leave this man cut off from his patients, cut off

12 from any ability to help the world, to sit at the MDC when

13 there are conditions that other courts in similar situations

14 have found to reasonably assure.  It's not a guarantee.  The

15 law doesn't require a guarantee.  The law presumes that there

16 will be bail.

17         THE COURT:   Okay, I've heard enough.

18         MS. ZORNOW:   Thank you.

19         (Pause in Proceeding)

20         THE COURT:   The Bail Reform Act requires me to

21 consider a number of things, including the nature and

22 circumstances of the offense charged, in particular whether it

23 involves terrorism or drugs or firearms, none of which are

24 involved in this case; the weight of the evidence against the

25 person where Mr. Zornow disagrees that it's a strong case, but

23

1  certainly circumstantial cases are frequently strong cases,

2  sometimes stronger than cases with direct evidence.  And as I

3  said, I'm willing to assume that it is a relatively strong but

4  certainly not indefensible case, certainly the ability to take

5  this case to trial, if that's what the defendant chooses to

6  do.

7         I'm also required to consider the history and

8  characteristics of the person, including his physical and

9  mental condition, his family ties, all of which are strong,

10 his employment, financial resources, and the like, and

11 critically length of residence in the community and community

12 ties, both of which are totally or virtually totally lacking

13 except for the fact that he has some friends here and I gather

14 probably comes from time to time for conferences.  And

15 obviously danger to the community is not an issue.

16        The issue is, as Mr. Zornow posed it, are there any

17 conditions that can be imposed that creates a reasonable

18 likelihood that he would be here for trial.  There are no

19 guarantees in this case.

20        And my conclusion is that there are.  I am concerned

21 about aspects of the package that the defendant has proposed

22 because there is an element of what the Government suggested,

23 namely, you know, at a certain point you end up with something

24 being a cost of doing business.

25        What I am going to do is set bail.  It's going to be

24

1  in a larger amount than was proposed.  I'm going to fix bail

2  in the amount of a $3 million personal recognizance bond to be

3  cosigned by three financially responsible persons and to be

4  further secured by $1 million cash or property.  I thought

5  about making it a $5 million bond, but at a certain point

6  people who believe in the person whose presence they're

7  proposing to help guarantee will shy away, and it seems to me

8  3 million is a more reasonable amount than 5 million, which is

9  why I selected it.

10         Obviously, the defendant's travel would be

11  restricted to the Southern and Eastern Districts of New York,

12  and he's to surrender all travel documents.  He'd be subject

13  to Pre-Trial Services supervision, and in part because of the

14  reasons that Mr. Zornow identified, namely, that release on

15  bond would enable him through Skype and other means to

16  continue to assist his patients, something that can easily be

17  done from home.

18         Rather than home detention which would permit him to

19  be out and about during the daytime, I'm going to make it home

20  incarceration, such that he would have to remain in the

21  apartment, indicating that he's to rent a suitable apartment

22  in the New York City area where he will be subject to home

23  incarceration enforced by electronic monitoring.  And I

24  further indicated that all of the conditions I've outlined are

25  to be met before his release.

25

1       So, sir, if you're able to meet these conditions,

2   you'll remain out on bail, but if you thereafter do flee, you

3   could subject yourself in addition to bail jumping charges, a

4   separate criminal offense, and you and whoever cosigns the

5   bond with you will each become liable for the full $3 million

6   amount of the bond, and whoever posts the million dollars in

7   cash or property will surely lose that cash or property.

8       Do you understand all that, sir?

9       DR. YVES BENHAMOU:    Yes, Your Honor.

10      THE COURT:    Anything further from the Government?

11      MR. QUINONES:    Yes, Your Honor.  With respect to

12  the condition that the Court set that the bond be secured by

13  cash or property, we would request that that be property in

14  the United States.  We've had some conversations where defense

15  counsel suggested property outside of the United States --

16      THE COURT:    Oh, yeah.

17      MR. QUINONES:    I just want it to be clear.

18      THE COURT:    I'm perfectly happy to make that

19  modification.  That's what I had in mind.

20      MR. QUINONES:    And then with respect to Pre-Trial

21  supervision, we would request at least twice a week in-person

22  visits or daily phone contact to make sure that he's actually

23  in the jurisdiction.  We have some way to determine sort of in

24  an immediate way whether he's --

25      THE COURT:    I think you're better off - well, is

26

1   that necessary if you have an ankle bracelet?

2          PRE-TRIAL SERVICES:   If he's on home incarceration

3   with electronic monitoring, we wouldn't want him coming here.

4          THE COURT:   Yeah, so –

5          PRE-TRIAL SERVICES:   So he stays home, we monitor

6   him 24/7.

7          THE COURT:   Yeah, I mean if he, you know –

8          PRE-TRIAL SERVICES:   It goes against the idea of

9   home incarceration.

10         THE COURT:   I guess it's the TV show the "Good

11  Wife," I mean, you know, a couple of episodes ago, if he goes

12  past the threshold, bells and sirens go off someplace at Pre-

13  Trial Services.   And presumably the Government will be

14  notified almost immediately, but it would be worse to say

15  twice a week he can come somewhere, and the phone calls are

16  sort of superfluous given the electronic monitoring.

17         I thought about GPS, but that doesn't work very well

18  in Manhattan, correct?

19         PRE-TRIAL SERVICES:   You're right, Your Honor,

20  depending where he's living in Manhattan (inaudible).

21         MR. QUINONES:   I think that's it, Your Honor

22         MS. ZORNOW:   Your Honor, in view of the discussion

23  that you just had, let me raise an issue, it's something

24  that's been permitted in other cases of home incarceration,

25  and that is the opportunity to visit lawyers, us, and

27

1   religious services and medical appointments, which we're not

2   anticipating, for himself.

3          THE COURT:   Medical appointments I would assume

4   that arrangements can be made through Pre-Trial Services, and

5   I don't want this to become home detention rather than home

6   incarceration.   So presumably he'll rent someplace I guess

7   fairly close to your office, and you'll have the inconvenience

8   of going to him rather than the other way around.   But I'm

9   willing to take risks but only reasonable risks.

10         MS. ZORNOW:   Very well, Your Honor, we will

11  certainly accept that inconvenience and that's fine.

12         MR. QUINONES:   There's just one additional thing,

13  Your Honor.   I know that defense counsel has mentioned that

14  his client has signed a waiver in extradition.   I would just

15  prefer that the Court make it a condition, and we have it as

16  part of the conditions in this case.

17         MS. ZORNOW:   Sure.

18         MR. QUINONES:   Obviously, it's not something

19  typical to comply with, but we'd prefer it, Your Honor.

20         MS. ZORNOW:   We're happy to do it.   We've already

21  given Mr. Quinones a copy of it.

22         THE COURT:   I would predict it's mostly suitable

23  for framing, but I don't have a problem ordering that.

24         MR. QUINONES:   It's (indiscernible) as well, Your

25  Honor.

28

```
1              THE COURT:    Anything else from anyone?

2              MR. QUINONES:    No, Your Honor.

3              MS. ZORNOW:    No, Your Honor.

4              THE COURT:    Thank you.

5              MR. QUINONES:    Thank you, Your Honor.

6    (off the record)

7                    (Whereupon the matter is adjourned.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

29

CERTIFICATE

        I, Carole Ludwig, certify that the foregoing
transcript of proceedings in the United States District
Court, Southern District of New York, United States of
America v. Yves Benhamou, Docket #10m2424, was prepared
using digital electronic transcription equipment and is a
true and accurate record of the proceedings.

Signature_____

                    CAROLE LUDWIG
Date:  November 18, 2010

Q:\Documents and Settings\rjunck\Local Settings\Temporary Internet Files\OLK1\USA-Benhamou-11-17-10 (2).doc