# EXHIBIT  Z



# M A R T I N
## A S S O C I A T E S
| Barristers

February 14, 2017

The Honorable Sean F. Cox
United States District Judge
United States District Court for the Eastern District of Michigan
Theodore Levin U.S. Courthouse,
231 West Lafayette Boulevard,
Detroit, MI 48226

Dear Judge Cox

I have been asked by Mr. David Massey, counsel for Mr. Oliver Schmidt, to provide an expert opinion for this Honourable Court's consideration. In providing the following opinion, I confirm that I am aware of my duty to the Court to provide a truthful, accurate and complete opinion within the areas of my expertise. I have practiced criminal law in Canada for over thirty years, and am a member in good standing of the Law Society of British Columbia. I have particular expertise in advising individuals in matters with multi-jurisdictional and/or international criminal law dimensions, for example, foreign corrupt practices investigations, extradition requests, international arrest warrants, and mutual legal assistance procedures. I have attached as Appendix "A" a true copy of my curriculum vitae.

Mr. Massey has asked me to address the following issues:

1. Does the Canadian Border Services Agency ("CBSA") rigorously screen entry into Canada? Can German nationals enter Canada without a passport? What are the CBSA screening procedures for vehicles arriving at a land port of entry?

2. What happens when CBSA identifies a Red Notice issued against a foreign national seeking to enter Canada? Is that individual likely to be admitted to Canada?

3. If a foreign national covertly enters Canada, and is arrested in Canada, is that person likely to be released on bail?

4. Can someone without a passport fly from Canada to the EU or any other place?

I will address each of these issues in turn.

1

863 Hamilton Street  Vancouver, BC  V6B 2R7   |   604.682.4200   |   reception@martinandassociates.ca   |   www.martinandassociates.ca

Z-2



### 1. **CBSA Screening Procedures**

All international visitors must carry a valid passport and a valid visa (if arriving from a country for which a visa is required) when seeking entry to Canada. The Government of Canada requires international visitors to carry a valid passport because it is the "only reliable and universally-accepted travel and identification document for the purpose of international travel".[1] Passports are required for entry whether arriving by air, land, or water.[2] I have been unable to identify any exception to this requirement for German nationals/members of the European Union.

CBSA screens every person who is seeking entry into Canada, but the nature and extent of the screening will depend on a variety of factors, e.g. whether the visitor is at Primary or Secondary Inspection. The following comments apply solely to international visitors seeking entry by land. Different procedures are employed for international visitors arriving by air, as several major Canadian airports use a "pre-clearance" system not applicable to land ports of entry.

#### a. *Primary Inspection*

When arriving by land, international visitors must first present themselves to Primary Inspection, where a border services officer will examine identification and take a verbal declaration from the visitor.[3] This verbal declaration covers the same questions air travellers fill out on customs declaration cards: visitors describe the purpose of their trip to Canada, what they are bringing into Canada (e.g. currency, goods, food, alcohol, etc.) and certain other public health related questions.

Individuals may be "flagged" in the databases available to border officers in primary inspection. Although there is little public source information available on this issue, I am aware through experience that border officers in primary inspection have some limited access to a CBSA database called the Integrated Customs Enforcement System, or "ICES" (described in more detail below), which flags individuals who pose a security risk or immigration concern. When flagged, individuals are sent to secondary inspection.

#### b. *Secondary Inspection*

Border officers at primary inspection have broad discretion to send any individual for secondary inspection, regardless of whether or not they are flagged. No grounds are required to justify this

---

[1] Canada Border Services Agency, "Travel Documents – Identification requirements for international visitors", online at: <http://www.cbsa-asfc.gc.ca/travel-voyage/td-dv-eng.html>.
[2] Government of Canada, "Entering Canada", online at <https://travel.gc.ca/returning/customs/entering-canada>.
[3] *Ibid.*

2



decision to send an individual for secondary inspection.[4] Referrals may occur for a number of different reasons, including:

- Carrying out a random inspection;
- Verifying a declaration or documentation;
- Asking the visitor more in-depth questions and/or inspecting their goods;
- Determining the visitor's admissibility to Canada or the admissibility of goods in their possession;
- Having the visitor pay duty and taxes;
- Completing or processing paperwork to support the visitor's entry to Canada or the entry of their goods into Canada.[5]

If a visitor is referred to secondary inspection, the border security officer may:

- ask the visitor to provide detailed information about their plans while visiting Canada, or the time they spent abroad;
- make further enquiries, check records, or conduct research to verify the visitor's declaration;
- confirm the guardianship of children travelling with the visitor;
- process the payment of duty and taxes;
- inspect the visitor's luggage, purse or wallet, electronics (including laptops and cell phones), their vehicle and any additional goods they are transporting;
- examine visually the visitor's pet or any animals travelling with the visitor;
- ask the visitor to produce evidence of the money the visitor has available to fund their visit to Canada;
- request that the visitor produce receipts to account for expenses they incurred or purchases made abroad; or
- count the visitor's cash or travellers cheques.[6]

CBSA officers at secondary inspection have access to a much broader range of information than officers in primary inspection. While neither the CBSA nor the Canadian government publicizes precisely what information border officers have access to, Canadian courts have dealt with this issue (albeit rarely) and some facts can be gleaned from these decisions.  For example, in *Martin-*

---

[4] See, e.g. *R. v. Buss*, 2014 BCPC 16 at paras. 11-12, 20.
[5] Canada Border Services Agency, "Visitors to Canada – Referrals for secondary services and inspection", online at: <http://www.cbsa-asfc.gc.ca/travel-voyage/ivc-rnc-eng.html>.
[6] *Ibid*.

3



*Ivie v. Canada (Attorney General)*,[7] Justice Gleason of the Federal Court found that Canadian border security officers at secondary screening have access to the following information and databases:

- *Integrated Customs Enforcement System* [ICES]: a CBSA database that, amongst other things, contains information about Canadians who have come into contact with CBSA or individuals who might seek to enter the country and might pose a risk

- *Field Operations Support System* [FOSS]: Citizenship and Immigration Canada [CIC] and CBSA's shared database, which contains millions of records about all CBSA and CIC contacts with non-Canadian citizens

- *Canadian Police Information Center* [CPIC]: the database used by Canadian law enforcement agencies

- *National Crime Information Center* [NCIC]: a database used by American law enforcement agencies

- Both CPIC and NCIC contain information regarding existing and expired "wants and warrants", or details of individuals who are or were wanted for some reason by a law enforcement agency or for whom a warrant of arrest was or is outstanding. These two databases also contain significant additional information relevant to law enforcement, including details of individuals the law enforcement agencies consider to be armed and dangerous.[8]

**c. *Other Information-Sharing Between Canada and the U.S.***

In addition to the databases listed above, Canada and the U.S. share border security information through other methods. The recent "Entry/Exit Initiative" and the "Statement of Mutual Understanding on Information Sharing" are two examples.

Canada and the U.S. have recently entered into an "Entry/Exit Initiative", whereby the CBSA and the Department of Homeland Security exchange biographic entry information on third-country nationals (i.e. non U.S. or Canadian citizens) who are seeking entry to either country at land ports of entry. Under this system, an entry to Canada is considered an exit from U.S., and vice versa. The "biographic information" shared between CBSA and DHS includes: first name, middle name, last name, date of birth, nationality, sex, document type, document number, and

---

[7] *Martin-Ivie v. Canada (Attorney General)*, 2013 FC 772.
[8] *Ibid* at para. 25.

4



name of the country that issued the travel document. Information regarding the date and time of entry, as well as the port through which the traveller entered, is also exchanged.[9]

The Department of Citizenship and Immigration Canada, the U.S. Immigration and Naturalization Service and the U.S. Department of State have signed a "Statement of Mutual Understanding on Information Sharing". This agreement permits Canada and the U.S. to share information relevant to the administration and enforcement of the citizenship and immigration laws of both countries, and one of the purposes of the agreement is "to promote international justice and security by fostering respect for human rights and **denying access to the United States and Canada to persons who are criminals or security risks**" [emphasis added].[10] Pursuant to this agreement, the U.S. can on its own initiative share information with Canada if it has a reason to suspect that Canada needs to know the information for the purposes of enforcing or administering its citizenship and immigration laws.[11] In my opinion, if the U.S. had reason to believe that a person facing serious criminal charges in the U.S. might try to flee to Canada, it could provide that information to Canada on its own initiative. Such a person would generally be considered inadmissible to Canada on the basis of criminality (more on this below), thus bringing them squarely within the scope of this agreement.

## 2.  Travellers seeking entry to Canada who are the subject of a Red Notice

An individual who seeks entry to Canada and who is the subject of a federal arrest warrant in the United States (as shown in NCIC) and/or a Red Notice[12] will very likely be flagged within the databases available to CBSA officers at both primary and secondary inspection. Extradition or immigration consequences for the individual will result. In either case, the individual will almost

---

[9] Canada Border Services Agency, "Entry/Exit Initiative", online at: < http://www.cbsa-asfc.gc.ca/btb-pdf/ebsiip-asfipi-eng.html>.
[10] "Statement of Mutual Understanding on Information Sharing", Article 2(c), "Purpose and Scope". Available online at: <http://www.cic.gc.ca/english/department/laws-policy/smu/smu-ins-dos.asp>.
[11] *Ibid* at Article 4(d), "Procedure for the Exchange of Information".
[12] A "Red Notice" is a type of bulletin managed by the international police organization INTERPOL. Red Notices are used to locate and arrest international fugitives. Countries who have issued a domestic arrest warrant for an individual who is believed to have fled the jurisdiction may apply to INTERPOL to have a Red Notice distributed to the international law enforcement community with INTERPOL's assistance. In Canada, Red Notices are available to law enforcement and border security through the database Canadian Police Information Centre, or "CPIC". Some Red Notices are publically posted on INTERPOL's website but the vast majority are only available to law enforcement. Thus, a member of the public may search INTERPOL's website to try and determine whether someone is the subject of a Red Notice, but the absence of a Red Notice on INTERPOL's website does not mean that a Red Notice does not exist in respect of that individual. See <https://www.interpol.int/INTERPOL-expertise/Notices> for further information.



certainly be detained for an extradition committal hearing or an immigration admissibility hearing.

### a. *Extradition Consequences*

The Royal Canadian Mounted Police (the "RCMP") and/or the CBSA can only provisionally arrest individuals who are subject to a foreign arrest warrant for the purposes of extradition if they comply with the provisional arrest warrant requirements of the Canadian *Extradition Act*. Section 11 of the *Extradition Act* requires a request by an extradition partner for the provisional arrest of the individual to be made to the Canadian Minister of Justice, either directly or through Interpol.[13]

In practice, however, the RCMP will always have adequate time to obtain the required ministerial approval and judicial extradition arrest warrant, and the individual may be detained during this time period because the CBSA is fully empowered to detain an individual seeking entry to Canada who is inadmissible to Canada due to having committed an act of serious criminality in a foreign country. These provisions are discussed in detail in the next section, "Immigration Consequences".

### b. *Immigration Consequences*

The CBSA may consider the subject of a Red Notice inadmissible to Canada for serious criminality pursuant to section 36(1)(c) of the *Immigration and Refugee Protection Act*:

**Serious criminality**

**36 (1)** A permanent resident or a foreign national is inadmissible on grounds of serious criminality for

> **(c)** committing an act outside Canada that is an offence in the place where it was committed and that, if committed in Canada, would constitute an offence under an Act of Parliament punishable by a maximum term of imprisonment of at least 10 years.[14]

If the CBSA has reasonable grounds to believe that a person is inadmissible to Canada on the grounds of security, violating human or international rights, serious criminality, criminality or organized criminality, they may detain the individual and hold them in custody for a detention hearing before the Immigration and Refugee Board ("IRB").[15] An immigration detention hearing is similar to a criminal bail hearing in some respects. I will cover criminal bail hearings in more detail in Section 3, "Bail Hearing Outcomes", but in the immigration context, persons are

---

[13] *Extradition Act*, SC 1999, c 18 at s. 11.
[14] *Immigration and Refugee Protection Act*, SC 2001, c 27 [*IRPA*] at s. 36(1)(c).
[15] *IRPA* at s. 55(3)(b).

6



unlikely to be released from detention where the IRB is satisfied that "they are unlikely to appear for examination, an admissibility hearing, removal from Canada, or at a proceeding that could lead to the making of a removal order".[16] It is my opinion that a foreign national, with no ties to Canada, with outstanding criminal charges in the U.S., and who is in breach of U.S. judicial interim release terms, will almost certainly be held in detention pending the outcome of the admissibility hearing.

### 3. Bail hearing outcomes for a person who has fled the U.S. and illegally entered Canada

If a person was apprehended in Canada after fleeing criminal charges in the U.S. and covertly entering Canada, they would be arrested by the CBSA for violating the *Immigration and Refugee Protection Act*. In that case, the same considerations outlined in Section 2(b), "Immigration Consequences" would apply.

If a person covertly entered Canada after fleeing criminal charges in the U.S., and was subsequently arrested and charged with a criminal offence in Canada, they are extremely unlikely to be granted bail. Every individual accused of a crime, no matter how serious, is technically eligible for bail, but in my experience an individual with no ties to the community who has demonstrated a willingness to flee charges in the U.S. is almost never granted bail.

Canada's *Criminal Code* (the "*Code*") dictates that justices deciding whether or not to grant bail to an accused person must consider the "three grounds" for detention set out in the *Code*:

- "Primary" Ground, s. 515(10)(a): Where the detention is necessary to ensure the attendance of the accused in court to be dealt with according to law

- "Secondary" Ground, s. 515(1)(b): Where the detention is necessary for the protection or safety of the public, having regard to all of the circumstances including any substantial likelihood that the accused will, if released from custody, commit a criminal offence or interfere with the administration of justice

- "Tertiary" Ground, s. 515(10)(c): Where the detention is necessary to maintain confidence in the administration of justice, having regard to all of the circumstances, including the strength of the prosecutor's case, the gravity of the offence, the

---

[16] *IRPA* at s. 58(1)(b).



circumstances surrounding the commission of the offence, and the fact that the accused is liable, on conviction, for a potentially length term of imprisonment.[17]

In this case, the individual will almost certainly be detained on the primary ground. Individuals who have already fled justice will be considered a flight risk, unlikely to obey any further bail order, and unlikely to attend for trial or other mandatory court appearances. Similarly, individuals with no ties to the community are also considered a flight risk and unlikely to attend for trial or other mandatory court appearances, particularly when they are facing significant jail sentences.[18]

### 4.   Can someone without a passport fly from Canada to the EU or any other place?

An individual without a passport simply cannot board an international flight from Canada or the U.S. to the E.U. or any other international destination. As previously noted, the Government of Canada requires international visitors to carry a valid passport because it is the "only reliable and universally-accepted travel and identification document for the purpose of international travel".[19] Canadian airlines also generally require international travellers to present a passport before boarding.[20]

Yours truly,

David J. Martin

---

[17] *Criminal Code*, RSC 1985, c C-46 [*Code*] at s. 515(10).

[18] See, e.g., *R. v. Juan Martinez-Cabrera*, 2008 CanLII 41810 at para. 28, a decision of the Ontario Provincial Court of Justice deciding to detain the accused for flight risk concerns due to his "startling" lack of ties to the community.

[19] Canada Border Services Agency, "Travel Documents – Identification requirements for international visitors", online at: <http://www.cbsa-asfc.gc.ca/travel-voyage/td-dv-eng.html>.

[20] See, e.g. WestJet's (one of Canada's primary airlines) rules for international travel, which specifies that a valid passport is required for all adults, children and infants travelling internationally: WestJet, "ID Requirements", online at <https://www.westjet.com/en-ca/travel-info/check-in/id-requirements>.

8

## CANADA



**DAVID J MARTIN**
*Martin + Associates*
863 Hamilton St
Vancouver BC V6B 2R7
Tel: +1 604 682 4200
dm@martinandassociates.ca
www.martinandassociates.ca

Mr Martin has practised as a criminal defence counsel for 40 years - for 10 years as a partner at Pinkofsky, Lockyer, Martin; then Martin & Porter in Toronto; and, for the last 30 years at Martin + Associates in Vancouver. He studied at the University of Saskatchewan and took law at the University of British Columbia. Between 1990 and 2002 he acted as editor in chief of the Charter of Rights Newsletter, Canada Law Book's principle "Charter trend" national legal publication. Mr Martin has chaired and spoken at a multitude of Continuing Legal Education criminal, constitutional and transnational seminars.

Mr Martin and his associates are specialists in domestic and international white-collar criminal defence with broad experience in defending against multijurisdictional tax, securities, foreign corrupt practices, money laundering, internet gaming and fraud indictments. In addition they have deep experience in the management and conduct of internal investigations, in proactive pre-indictment advocacy and in resisting extradition and mutual legal assistance processes.

Mr Martin is an active member of the US National Association of Criminal Defense Lawyers and the crime and business law divisions of the International Bar Association. In addition, Mr Martin is the Canadian co-chair of the American Bar Association's white-collar criminal law subsection and serves as a North American regional representative of the business crime committee of the International Bar Association.

In addition to his work in the law Mr Martin has served his community from 1993 to 2008 as a founding director of the environmental advocacy and lending organisation Ecotrust Canada. Continuing, and since 2008, Mr Martin has been a founding director of the innovative medical research and advocacy organisation the Rare Disease Foundation.

WWL says: *Martin is well known with over three decades of accumulated expertise, which has earned him the status of "a go-to lawyer".*