# EXHIBIT EE

# The Eastern District of Michigan: How Does It Consistently Achieve High Release Rates?

Timothy P. Cadigan
Office of Probation and Pretrial Services
Administrative Office of the U.S. Courts
Marie VanNostrand
Luminosity, Inc.
Alan Murray
Chief U.S. Pretrial Services Officer
Eastern District of Michigan

**UNITED STATES PRETRIAL SERVICES** in the Eastern District of Michigan continually sets the standard in pretrial release rates in the federal system. The two authors of this article from outside the district have long marveled at how they do it and, perhaps more importantly, whether their results could be replicated in another district. The simple answer is that the Eastern District of Michigan has a strong culture of release that is maintained on a daily basis by all of the stakeholders in the release process, from the newest pretrial services officer to the United States attorney, the chief judge, and the bench generally. That culture is based on the need to balance the rights of the accused, including the presumption of innocence, with the need to protect the community and assure court appearance for pretrial defendants. That simple answer—"It's the culture, stupid"—also speaks to why it will be very difficult to replicate such results in another district.

This article is an amalgam of various efforts over nearly seven years to identify the root of this district's success with an eye toward replicating that success in one form or another. Timothy Cadigan, Pretrial Services Program Manager of the federal pretrial services system, has travelled to the district twice over the past seven years for that purpose. Dr. Marie VanNostrand was commissioned to do a formal assessment of the district, publishing the results in October 2010 as U.S. *Pretrial Services Performance and Outcome Assessment: Eastern District of Michigan*. Most recently, Federal Detention Trustee Michael Pearson travelled to the district in May 2012 with similar goals. All of those efforts have contributed to this article. While much is known, there remain some unknowns.

The U.S. District Court in the Eastern District of Michigan has long been recognized for its high release rates of pretrial defendants, which have significantly surpassed the national average for many years. In 2009, for example, the release rate for pretrial defendants excluding immigration cases was 79.3 percent in the district compared to 46.8 percent nationally, constituting a 32.5 percent higher release rate than the national average. Perhaps more important, the district has a history of pretrial release; in fact, one of the earliest federal initiatives on pretrial release sprang up in the Eastern District of Michigan in 1963. It was a relatively simple program, conducted by the United States attorney, in which the assistant United States attorneys prepared pretrial reports for the court with the goal of achieving release on the defendant's own recognizance, and the judges found those reports quite useful (Goldfarb, 1965:189). Apparently this early beginning planted strong seeds.

The Eastern District of Maryland's above-average pretrial release rates over the years are well known within and outside the district. In fact the bench—including both Article Three and magistrate judges—take great pride in the long history of pretrial release here. Less well known are the outcomes on pretrial supervision, so Dr. VanNostrand's assessment adds substantially to our understanding of actual success in the district's release practices.

## Summary of the Assessment of Pretrial Services in the Eastern District of Michigan

Pretrial release rates are an important measure of pretrial justice, as they reflect, in part, progress toward honoring the legal and constitutional rights afforded to accused persons awaiting trial. Yet the outcomes on release are just as important, because they reflect protection of the community, the integrity of the judicial process, and assurance of court appearance. The defendants released with pretrial services supervision had an overall success rate of 93 percent for the five-year period between 2004 and 2008. The pretrial supervision success rate in the district was higher than the national average of 87 percent for the same time period.

As it relates to the status of pretrial justice, the assessment revealed that the district released over 70 percent of pretrial defendants from 2006 to 2009 (excluding immigration cases) while achieving a 93 percent success

### FIGURE 1.
*Defendants Processed by Pretrial Services (FY 2002 to 2009)*

| Supervision | Year | 02 | 03 | 04 | 05 | 06 | 07 | 08 | 09 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| No | Count | 411 | 440 | 385 | 370 | 321 | 323 | 339 | 319 | 2908 |
|  | Percent | 31% | 31% | 30% | 31% | 28% | 28% | 33% | 26% | 30% |
| Yes | Count | 906 | 975 | 897 | 831 | 843 | 846 | 698 | 898 | 6894 |
|  | Percent | 69% | 69% | 70% | 69% | 72% | 72% | 67% | 74% | 70% |
| Total | Count | 1317 | 1415 | 1282 | 1201 | 1164 | 1169 | 1037 | 1217 | 9802 |

Data Source: Administrative Office of the U.S. Courts, Office of Probation and Pretrial Services, PACTS. All criminal defendants processed by Pretrial Services in the Eastern District of Michigan 10/1/2001 – 9/30/2009.

### FIGURE 2.
*Race/Ethnicity of Defendants Processed by Pretrial Services (FY 2002 to 2009)*

| Race/Ethnicity | E. Michigan | National |
|---|---|---|
| White Non-Hispanic | 37.2% | 26.8% |
| White Hispanic | 7.0% | 45.5% |
| Black Non-Hispanic | 53.1% | 22.2% |
| Asian | 1.7% | 2.4% |
| Another Race | 1.0% | 3.1% |

Data Source: Administrative Office of the U.S. Courts, Office of Probation and Pretrial Services, PACTS. All criminal defendants processed by Pretrial Services 10/1/2001 – 9/30/2009.

### FIGURE 3.
*Citizenship of Defendants Processed by Pretrial Services (FY 2002 to 2009)*



U.S. Citizenship 2002 - 2009

E.MI: 92.1%, 88.6%, 87.5%, 87.2%, 89.4%, 87.6%, 86.1%, 88.1%
National: 66.7%, 64.0%, 62.5%, 61.8%, 62.1%, 60.9%, 58.5%, 53.9%

Data Source: Administrative Office of the U.S. Courts, Office of Probation and Pretrial Services, PACTS. All criminal defendants processed by Pretrial Services 10/1/2001 – 9/30/2009.

ture." In this case, system culture refers to the beliefs and shared goals of the Pretrial Services Office, the U.S. Attorney's Office, the federal public defender, and the court. The system, including all stakeholders, shares the principle of pretrial justice as a primary goal and driving force during the pretrial process. All system stakeholders focus daily operations on attempting to balance the rights of the accused, including the presumption of innocence and the right to release on the least restrictive conditions, with the need to protect the community and assure court appearance for pretrial defendants. Thus, the extraordinary pretrial release rates and successful supervision outcomes are credited to the common goal of pretrial justice shared by the system stakeholders and the "system culture."

There were a total of 9,802 defendants processed during fiscal years 2002 and 2009, ranging from 1,037 to 1,415 defendants annually. The number of defendants and percent of cases released to pretrial services supervision can be found in figure 1.

The average age of the defendants processed during this time for the district was 36.4 years old, which was slightly older than the national average of 34 years old. Eighty-one percent of all defendants processed in the district were male, compared to 85 percent nationally. Figure 2 contains the distribution of defendants by race/ethnicity in the Eastern District of Michigan compared to the rest of the country.

Between 2002 and 2009, 88 percent of the defendants in the Eastern District of Michigan were United States citizens, compared to 61 percent of the defendants nationally. The percent of defendants who were U.S. citizens has changed over time, as can be seen in figure 3.

The education levels for defendants in the district compared to the population nationally appear in figure 4.

Approximately one-third of all defendants in the district had a primary charge (defined as the most serious determined by charge classification and potential penalty) that was categorized as a drug-related offense, while another one-third were charged with theft/fraud-related offenses. When examining primary charge alone, research has shown that defendants with a drug-related primary charge have the highest risk of failure if released pending trial compared to other primary charge categories (*Pretrial Risk Assessment in the Federal Court*, 2009). Most notably, the district received more theft/fraud-related cases and fewer immigration law violation-related cases when com-

rate for defendants released to pretrial supervision. The Eastern District of Michigan released 79.3 percent of pretrial defendants (excluding immigration cases) in the most recent year 2009; 32.5 percent above the national average. The district has consistently experienced release rates far above the national average for many years while achieving a 93 percent success rate for defendants released to pretrial supervision for the past five years. When asked the key question: "How does the district achieve such extraordinary release rates and pretrial outcomes?" the answer that stakeholders in the district give is "system cul-

**FIGURE 4.**
*Education Levels of Defendants Processed by Pretrial Services (FY 2002 to 2009)*

| Education | E. Michigan | National |
|---|---|---|
| Less than high school | 29% | 38% |
| High school/GED/Vocational | 60% | 53% |
| College degree or higher | 11% | 9% |

Data Source: Administrative Office of the U.S. Courts, Office of Probation and Pretrial Services, PACTS. All criminal defendants processed by Pretrial Services 10/1/2001 – 9/30/2009.

**FIGURE 5.**
*Primary Charge of Defendants Processed by Pretrial Services (FY 2002 to 2009)*

| Primary Charge | E. Michigan | National |
|---|---|---|
| Drug | 34% | 33% |
| Theft/Fraud | 34% | 17% |
| Immigration Law | 4% | 27% |
| Firearm | 12% | 9% |
| Violent | 5% | 6% |
| Other | 11% | 8% |

Data Source: Administrative Office of the U.S. Courts, Office of Probation and Pretrial Services, PACTS. All criminal defendants processed by Pretrial Services 10/1/2001 – 9/30/2009.

**FIGURE 6.**
*E. District of Michigan Recommendations for Release (FY 2006 to 2009)*



E. District of Michigan Recommendations for Release (Excluding Immigration) 2006 - 2009

Pretrial Services: 65.3% (2006), 71.4% (2007), 67.3% (2008), 73.5% (2009)
Assistant United States Attorney: 64.2% (2006), 68.6% (2007), 64.1% (2008), 72.4% (2009)

Data Source: Judicial Business of the United States Courts Annual Report of the Director – H Tables (2006-2009).

pared to the national population. The primary charge distribution can be found in figure 5.

One of the primary functions of pretrial services is to provide information to judicial officers to assist them in making the most appropriate pretrial release decision. The chief mechanism to provide information to judicial officers is the pretrial services report. During fiscal year 2009, pretrial services officers in this district interviewed 97.5 percent of all defendants, compared to 61.2 percent nationally, and provided a full or modified report for 98.9 percent of all defendants, compared to 96.9 percent nationally.

Recommendations for release are made by both pretrial services and the assistant United States attorney (AUSA). In 2006, the federal court system began distinguishing release rates by those that include and exclude immigration cases. For this reason, an examination of pretrial services and AUSA release rates was completed for fiscal years 2006 to 2009.

District recommendations for release by both pretrial services and the AUSA were significantly higher than the national average. For example, in 2009 pretrial services in the Eastern District of Michigan recommended 28 percent more pretrial defendants, excluding immigration cases, for release when compared to the national average; 73.5 percent vs. 45.5 percent respectively. Similarly, the AUSA recommended release for 72.4 percent of all pretrial defendants, excluding immigration cases, compared to 39.9 percent nationally.

Pretrial release rates are a measure of pretrial justice. Admittedly there is no magic number for release rate, yet the Supreme Court provides guidance regarding release rates. The preventive detention aspect of the Bail Reform Act of 1984 was challenged in *United States v. Salerno* in 1987.[1] In that case the court decided that the government's regulatory interest in community safety can, in appropriate circumstances, outweigh an individual's liberty interest. Pretrial detention in certain cases is not only appropriate but necessary to assure court appearance and community safety. Yet the court stated in its opinion: "In our society, liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." When considering this statement we can infer that, at a minimum, release pending trial should occur more than half the time.

In the Eastern District of Michigan, the release rate for pretrial defendants excluding immigration cases has exceeded 70 percent since the data began being captured this way in 2006. When looking at all cases (including immigration), the district has released at least 65 percent of all pretrial defendants for the past 10 years (FY 2000-FY 2009).[2] The pretrial

---

[1] *United States v. Salerno*, 481 U.S. 739 at 755 (1987).
[2] Judicial Business of the United States Courts Annual Report of the Director – H Tables (2000 - 2009). http://www.uscourts.gov/Statistics/JudicialBusiness.aspx

release rates for the district compared with the rest of the country can be found in figure 7 below.



**FIGURE 7.**
*Pretrial Defendants Released (Excluding Immigration) FY 2006 - 2009*

Data Source: Judicial Business of the United States Courts Annual Report of the Director – H Tables (2006-2009).

Most pretrial defendants are required to report in person to the pretrial services officer assigned to provide supervision. The reporting schedule is based on the nature of the alleged charges and the conditions of release set by the court. In addition, defendants are ordered with various conditions of release set by the court. To assist the defendant in meeting certain conditions of release, specifically those that are deemed to be alternatives to detention, the district expends alternatives to detention funding. In 2009, the district expended $307,468 in ATD funding.

In FY 2008, a total of 86.1 percent of defendants released to pretrial services supervision had no documented violation of supervision (conditions of release).[3] For the defendants that did violate supervision, 69 percent did so pre-adjudication, 28 percent did so pre-sentence, and 3 percent did so pending appeal/surrender. When a violation occurred, pretrial services submitted a violation report to the court 92 percent of the time. At the violation hearings the court released 32 percent of the defendants with or without changes in conditions, while the remaining 68 percent were detained due to the violation. Pretrial services 'supervision outcome is defined as the success or failure of a defendant released pending trial. The purpose of pretrial release with supervision is to assure court appearance and the safety of the community during the pretrial stage. The primary measures of pretrial failure are failure to appear and danger to the community. For the purposes of this assessment, failure to appear was measured by a defendant's failure to appear for a scheduled court appearance or absconding from pretrial services supervision while pending trial. Danger to the community was measured by a pretrial release revocation due to a new arrest for a crime that was allegedly committed while the defendant was released pending trial. In addition to failure to appear and danger to the community, pretrial failure also included technical violations. Failure due to technical violations was measured by defendants who had their pretrial release revoked for violating technical conditions (reasons other than failing to appear or danger to the community). As a result, pretrial failure included any defendant who: 1) failed to appear for a scheduled court appearance or absconded from pretrial services supervision; 2) had pretrial release revoked due to a new arrest for a crime that was allegedly committed while the defendant was released pending trial; or 3) had release revoked for violating technical conditions (reasons other than failing to appear or danger to community). Defendants who experienced none of these and remained in the community during the entire time pending trial were deemed successful.

In 2008, defendants released to pretrial supervision had a 97.7 percent court appearance rate and a no new alleged criminal activity rate (the measure of community safety) of 98.6 percent. After factoring in a technical violation rate of 1.9 percent, the success rate on pretrial services supervision in the district in 2008 was 94.4 percent. An examination of supervision outcomes for the past five years revealed similar outcomes. The district had a higher success rate on pretrial supervision when compared to the national average. The success rate on pretrial services supervision nationally in 2008 was 87.8 percent (2.6 percent FTA/abscond, 3.2 percent alleged new criminal activity, and 6.4 percent technical violation).

To aid in their continued pursuit of pretrial justice, the pretrial services office in the Eastern District of Michigan commissioned a performance and outcome assessment. For the purposes of the assessment, the two primary measures of pretrial justice were pretrial release rates and supervision outcomes. Pretrial release rates are an important measure of pretrial justice because they reflect, in part, progress toward honoring the legal and constitutional rights afforded to accused persons awaiting trial. Yet the outcomes on release are just as important, because they reflect community safety, the integrity of the judicial process, and court appearance.

The district release rate for pretrial defendants, excluding immigration cases, has exceeded 70 percent since the data began being captured this way in 2006. The release rates for the rest of the country were less than 50 percent during the same time period. The defendants released with pretrial services supervision had an overall success rate of 93 percent for the five-year period between 2004 and 2008. The pretrial supervision success rate in the district was higher than the national average of 87 percent for the same time period. The common goal of pretrial justice shared by the system stakeholders and the "system culture" is credited with the extraordinary pretrial release rates and successful supervision outcomes.

Any review of national statistics will show that Michigan Eastern is unique in obtaining release on a higher percentage of cases than virtually any other district in the United States. Dr. VanNostrand's assessment, summarized

---

[3] It is important to note that FY 2009 data was not used because too many cases referred during this time remained open and the outcomes have yet to be determined.

here, documents that success enjoyed over many years by the district. It could be argued that that is the easy part, not because the research is easy to do (it isn't), but because the remaining task seems almost daunting in comparison: trying to pin down why this district enjoys such a long history of successful release and how its "culture of release" could be successfully replicated in another district.

The assessment also makes clear several factors that seem to make the district unusual and thus might make it difficult to replicate the Michigan Eastern results in another district. First, while this is technically a border district because it shares a border with Canada, the Eastern District of Michigan handles very few immigration cases. Obviously the national case averages are highly influenced by the number of immigration charge cases handled by the five border districts (Texas Southern, Texas Western, Arizona, New Mexico, and California Southern). Therefore, we excluded the border districts and recalculated a non-border district national immigration charge rate. We then found that there are 39 districts with more immigration charges than the Eastern District of Michigan. This is relevant to the current discussion because immigration cases are detained 96 percent of the time (VanNostrand & Keebler, 2008, p. 4). Furthermore, 34 percent of the cases handled in the district are theft/fraud, compared to a national average of 17 percent. Again this caseload figure favors release, as defendants charged with theft/fraud are the most likely to be released (VanNostrand & Keebler, 2008, p. 40). Second, figure 6 shows the high correlation between the release recommendation made by the pretrial services officer and the Assistant United States Attorney (AUSA). In any other district when officer recommendations mirror AUSA recommendations it is almost always a bad thing for pretrial release, as AUSAs for the most part recommend detention more often than pretrial services officers. The AUSA's recommendations for release in more than 70 percent of the cases in the Eastern District of Michigan is thus likely to be a significant factor in the district's success, that would be very hard to replicate in another district. Finally, the Eastern District of Michigan handles a caseload comprising significantly more United States citizens (See Figure 3) than the national average and United States citizens are significantly more likely to be released than non-citizens (PTRA User Manual 2.2, p. 19).

Chief Pretrial Services Officer Alan Murray presented his thoughts on his district's success in achieving high rates of pretrial release at the 2010 National Association of Pretrial Services Agencies (NAPSA) conference. Before becoming the current chief in the district, Alan previously served 18 years as a pretrial services officer there, effectively on the front line of the pretrial release battle. In fact, during many of his years as an officer, Alan handled the location monitoring caseload, arguably the highest-risk caseload in any pretrial services office. Walking around the district with Alan makes it immediately apparent that he knows seemingly all the various pretrial release players: judges, USAs, defense bar, assistant federal public defenders, agents, deputy marshals, etc. In fact, they do not exchange polite hellos and dignified handshakes, but shared stories; they have rolled up their sleeves and worked with him. Those relationships, built and maintained over many years, offer the observer a first-hand glimpse of what makes the district successful: relationships that evolve to create a culture. There is a pervasive trust among the various players, stakeholders, and participants that is not seen in many, if any, other federal districts. Alan's remarks at NAPSA, excerpted below, begin by expressing gratitude to two crucial though not politically relevant players: pretrial services officers and support staff.

### Alan Murray's Remarks

The performance and outcome assessment that was conducted in the Eastern District of Michigan would not have been possible without the data itself. The individuals who made this data possible are the pretrial officers in the Eastern District of Michigan, who came before me and set the groundwork for the amazing data that is being presented today, the officers who currently work there, and the data entry clerks and support staff, who find errors and missing identifier information and get it corrected.

Historically, Detroit and Eastern District of Michigan are known for the Motown sound, cars, and we were the murder capital at one time. Now we lead the country in bankruptcy filings, unemployment, and federal release of defendants on bond. It is a very unique and wonderful thing to work in the Eastern District of Michigan as a pretrial officer. The first week of employment in 1987, they handed me the bail reform act of 1984, a copy of the Constitution, a federal criminal code book and kept using the words alleged and defendant in the same sentence.

No one was or is ever referred to as criminal or offender, by anyone in pretrial in the Eastern District of Michigan. The other things that are very special are that the magistrate judges, district court judges, federal prosecutors, and defense lawyers were and are willing to listen to pretrial services. It was not unusual for pretrial to meet with arresting agents, before court, or talk at side bar with the magistrate judge during an arraignment



**FIGURE 8.**
*Pretrial Services Supervision Outcomes by Type (FY 2004 – 2008)*

E. District of Michigan Pretrial Services Supervision Outcomes - 2004 - 2008*

| Year | Successful | FTA/Absconding | New Criminal Activity | Technical Violation |
|------|-----------|----------------|----------------------|---------------------|
| 2004 | 92.1% | 2.6% | 2.1% | 3.2% |
| 2005 | 91.9% | 3.0% | 1.7% | 3.4% |
| 2006 | 93.0% | 2.9% | .6% | 3.5% |
| 2007 | 93.3% | 2.4% | 1.6% | 2.7% |
| 2008 | 94.4% | 2.3% | 1.4% | 1.9% |

*FY 2009 data was not used to measure outcomes because too many cases referred during this time remained open and the outcomes have yet to be determined.

Data Source: Administrative Office of the U.S. Courts, Office of Probation and Pretrial Services, PACTS. All criminal defendants processed by Pretrial Services in the Eastern District of Michigan 10/1/2001 – 9/30/2009.

and come up with release conditions to ensure community safety or future appearance, and have those be the exact conditions of release that were ultimately imposed.

All pretrial services officers in this country are in the risk business. We should never be persuaded to not consider bond, just because a defendant is charged with a drug or gun offense.

In Detroit, we have historically seen a large number of drug distribution cases involving heroin, cocaine, and marijuana; we have always also had a lot of firearm and fraud cases; and we also share a border with Canada and we are a port city.

I believe that there are several reasons why defendants on bond in the Eastern District of Michigan show up for all court hearings, do not get arrested for new criminal activity while on bond, and routinely self-surrender to the Bureau of Prisons:

Most of the defendants charged in the Eastern District of Michigan have been residents of the city or state for at least 5 years or were born there. Most defendants that have charges brought against them are either unemployed or have financial challenges. Even though a defendant may have a prior felony conviction, we do not rule out release on bond. If a defendant has a history of substance abuse, we do not view them as a drug addict, but an individual, who should receive drug treatment.

Being in the risk business means taking chances and coming up with the least restrictive conditions to ensure community safety and appearance at future court dates. That being said, we embrace the Bail Reform Act and what it stands for: we always seek alternatives to detention.

We start off by recommending unsecured bonds, reporting to pretrial services in-person because face-to-face contact works and officers are able to make a connection with the person that they are supervising. In office visits we have officers discuss personal challenges that the individual might have been facing prior to being arrested and charged, and we have collateral contacts with family members that reside with the defendant. We inform defendants of court dates, and offer services of drug treatment, mental counseling, self-surrender program, and GED classes.

While on bond, we maintain contact with the prosecutor assigned to the case, report noncompliance to the judges, prosecutor, and defense lawyer in a timely fashion, and request violation hearings when we think they are necessary. Each individual that is on bond and supervised is dealt with on a case-by-case basis and given the attention and respect that everyone is deserving of, regardless of the allegations that they face.

As you leave this session, I encourage you to return to your court, embrace the Bail Reform Act, look past the charges a defendant faces, and come up with conditions of release that will ensure community safety and appearance at future court dates. We are all in the risk business to make a difference in the lives of others, because what we do is important to the criminal justice process.