## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 16-cr-20394 |
| Plaintiff, | HON. SEAN F. COX |
| v. | |
| | **Offense:** |
| D-6 OLIVER SCHMIDT, | 18 U.S.C. § 371 |
| | Conspiracy to Defraud the United States, to Commit Wire Fraud, and to Violate the Clean Air Act |
| Defendant. | **Maximum Penalty:** |
| | 5 years |
| | **Maximum Fine:** |
| | Not more than $250,000 or Twice the Gross Gain/Loss |
| | **Maximum Supervised Release:** |
| | 3 years |
| | |
| | **Offense:** |
| | 42 U.S.C. § 7413(c)(2)(A) |
| | False Statement Under the Clean Air Act |
| | **Maximum Penalty:** |
| | 2 years |
| | **Maximum Fine:** |
| | Not More than $250,000 or Twice the Gross Gain/Loss |
| | **Maximum Supervised Release:** |
| | 1 year |



GOVERNMENT EXHIBIT

# Rule 11 Plea Agreement

Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, Defendant OLIVER SCHMIDT and the United States Attorney's Office for the Eastern District of Michigan, the United States Department of Justice, Criminal Division, Fraud Section, and the United States Department of Justice, Environment and Natural Resources Division, Environmental Crimes Section (collectively hereafter, "the government") agree as follows:

1. **Guilty Plea**

    A. **Counts of Conviction**

    Defendant will enter a plea of guilty to Counts One and Two of the Fourth Superseding Information, which charge him, in Count One, with conspiracy to defraud the United States, to commit wire fraud, in violation of Title 18, United States Code, Section 1343, and to violate the Clean Air Act, in violation of Title 42, United States Code, Section 7413(c)(2)(A), all in violation of Title 18, United States Code, Section 371, and for which the penalty is a maximum term of imprisonment of five years and a fine of up to $250,000 or twice the amount of the gross gain or loss, whichever is greater; and, in Count Two, with a false statement under the Clean Air Act, in violation of Title 42, United States Code, Section 7413(c)(2)(A), for which the penalty is a maximum term of imprisonment of two

years and a fine of up to $250,000 or twice the amount of gross gain or loss, whichever is greater. Defendant is also subject to a special assessment of $200.

B. **Elements of Offense**

The Fourth Superseding Information charges Defendant SCHMIDT with: (A) in Count One, a conspiracy to: (1) defraud the United States by obstructing the lawful function of the federal government, in violation of 18 U.S.C. § 371; (2) commit wire fraud, in violation of 18 U.S.C. § 1343; and (3) violate the Clean Air Act, in violation of 42 U.S.C. § 7413(c)(2)(A); and (B) in Count Two, with a violation of the Clean Air Act pursuant to 42 U.S.C. § 7413(c)(2)(A).

(A) The elements for conspiracy to obstruct the lawful function of the federal government are as follows:

(1) That two or more persons conspired, or agreed, to defraud the United States, or one of its agencies or departments, in this case, the Environmental Protection Agency ("EPA"), by dishonest means;

(2) That the defendant knowingly and voluntarily joined the conspiracy; and

(3) That a member of the conspiracy did one of the overt acts described in the information for the purpose of advancing or helping the conspiracy.

(B) The elements for conspiracy to violate the wire fraud statute and Clean Air Act are as follows:

(1) That two or more persons conspired, or agreed, to commit a crime, in this case, a violation of the wire fraud statute (18 U.S.C. § 1343) and the Clean Air Act (42 U.S.C. § 7413(c)(2)(A)) as described in paragraphs (4) and (5) respectively, below;

(2) That the defendant knowingly and voluntarily joined the conspiracy;

(3) That a member of the conspiracy did one of the overt acts described in the information for the purpose of advancing or helping the conspiracy.

(4) *Object of Conspiracy – Wire Fraud - 18 U.S.C. § 1343*:

    (a) The defendant knowingly participated in, devised, or intended to devise a scheme to defraud in order to obtain money or property;

    (b) The scheme included a material misrepresentation or concealment of a material fact;

    (c) The defendant had the intent to defraud; and

    (d) The defendant used (or caused another to use) wire, radio or television communications in interstate or foreign commerce in furtherance of the scheme.

(5) *Object of Conspiracy - Clean Air Act - 42 U.S.C. § 7413(c)(2)(A)*:

(a) The defendant knowingly made (or caused to be made) a false material statement, representation, or certification, or omission of material information;

(b) The statement, representation, or certification that was made (or omitted), or caused to be made or omitted, was in a notice, application, record, report, plan or other document required to be filed or maintained under the Clean Air Act; and

(c) The statement, representation, or certification, or omission of information, was material.

The elements for violating the Clean Air Act, Title 42, United States Code, Section 7413(c)(2)(A), are as set forth above.

C. **Factual Basis for Guilty Plea**

The following facts are a sufficient and accurate basis for Defendant's guilty plea:

From in or about 2012 through in or about February 2015, Defendant OLIVER SCHMIDT was the General Manager in charge of the Environment and Engineering Office ("EEO") for VW Group of America ("VWGOA"), located in Auburn Hills, Michigan, in the Eastern District of Michigan. From in or about March 2015 through September 2015, SCHMIDT worked at Volkswagen AG ("VW AG") (together with VWGOA, "VW") headquarters in Wolfsburg, Germany, as one of three subordinates to the head of Engine Development for VW AG.

Between 2007 and 2014, VW submitted applications to the EPA and the California Air Resources Board ("CARB") (the "U.S. regulators") for 2.0 liter diesel vehicles for model years 2009 through 2015 that were sold in the United

5

States (the "Subject Vehicles"). VW represented to its U.S. customers, U.S. dealers, U.S. regulators and others that the Subject Vehicles met U.S. emissions standards. In addition, VW designed a specific marketing campaign to market the Subject Vehicles to U.S. customers as "clean diesel" vehicles.

In the spring of 2014, a non-governmental organization published the results of a study which identified substantial discrepancies in the nitrogen oxide ("NOx") emissions from certain VW vehicles when tested on the road compared to when these vehicles were undergoing EPA standard drive cycle tests on a dynamometer. Following the study, CARB, in coordination with the EPA, attempted to work with VW to determine the cause for the higher NOx emissions in the Subject Vehicles on the road as opposed to the dynamometer.

SCHMIDT agreed with other VW employees to mislead and defraud the United States and U.S. customers of the Subject Vehicles, and to violate the Clean Air Act. During the summer 2015, SCHMIDT was informed of the existence of cheating software in 2.0 liter diesel vehicles. Specifically, SCHMIDT was informed that VW employees had installed software in the Subject Vehicles that recognized whether the Subject Vehicles were undergoing standard U.S. emissions testing or being driven on the road under normal driving conditions (the "defeat device"). The defeat device accomplished this by recognizing the standard drive cycles used in EPA's emissions tests. SCHMIDT was informed that if a Subject Vehicle's software detected that it was being tested, the vehicle performed in one mode, which satisfied U.S. emissions standards for NOx. SCHMIDT was informed that if the defeat device detected that the vehicle was not being tested, it operated in a different mode, in which the vast majority of the vehicle's emissions control systems were reduced substantially, causing those vehicles to emit substantially higher amounts of NOx, sometimes thirty times higher than U.S. standards. In essence, SCHMIDT was told that VW had, for years, used software to cheat on its U.S. emissions tests in order to sell the Subject Vehicles in the United States.

In the summer 2015, SCHMIDT participated in discussions with other VW employees about how they could answer questions posed by U.S. regulators about the NOx emissions of the Subject Vehicles, without revealing the defeat device. SCHMIDT thereafter knew that VW employees were intentionally providing fraudulent and misleading explanations to U.S. regulators by failing to disclose the fact that the defeat device was the primary reason that there was a discrepancy in the NOx emissions of the 2012 model year Passat tested by CARB when driven on the road as opposed to when undergoing standard U.S. emissions tests.

6

By July 2015, U.S. regulators had informed VW that they were withholding regulatory approval for VW to sell its model year 2016 2.0 liter diesel vehicles until VW could respond to questions about the Subject Vehicles. VW supervisors requested a briefing on the situation in the United States. On or about July 27, 2015, other VW employees presented to VW management about the defeat device and SCHMIDT presented to VW management about the potential severe financial consequences to VW if the defeat device was discovered by U.S. regulators.

Following the July 27, 2015 meeting, VW management instructed SCHMIDT to seek a meeting with a senior-ranking CARB employee, with whom SCHMIDT had had a business relationship based on SCHMIDT's previous work in the United States. VW management instructed SCHMIDT not to disclose the defeat device or any intentional cheating by VW to the CARB employee during the meeting and rather to obtain the necessary U.S. regulatory approvals for the model year 2016 vehicles, which was Schmidt's primary assigned objective.

On or about August 5, 2015, in Traverse City, Michigan, SCHMIDT and a colleague met with a CARB employee to discuss the discrepancy of emissions of the Subject Vehicles. During the meeting, and as instructed by VW management, SCHMIDT intentionally did not use the term "defeat device" when describing the discrepancy of the emissions of the Subject Vehicles. In addition, Schmidt did not disclose that VW had intentionally installed software in the Subject Vehicles designed to cheat and evade emissions testing. On or about August 7, 2015, SCHMIDT and a colleague had a telephone conversation with another CARB employee and made the same omissions. SCHMIDT knew that his omissions were misleading and designed to conceal the existence of intentional cheating by VW.

On or about August 14, 2015, VW employees submitted to the EPA two Emissions Defect Information Reports (EDIRs) with respect to the Subject Vehicles. The reports were submitted pursuant to the Clean Air Act, under penalty of law, and indicated that "[u]nder certain real world driving conditions, the vehicles' engine management strategy for NOx reduction may not be performing as intended. Under the described conditions, the after treatment system may not reach optimal NOx reduction." SCHMIDT was aware that VW employees intended to, and did, submit these reports to the EPA in furtherance of the conspiracy, and that the reports were fraudulent and misleading because, as SCHMIDT knew at that time, the engine management strategy for NOx reduction was performing exactly as intended (because of the operation of the defeat device).

7

During his participation in the conspiracy, SCHMIDT knew that VW marketed VW diesel vehicles to the U.S. public as being compliant with U.S. environmental regulations and standards and environmentally-friendly, and promoted increased fuel economy. SCHMIDT knew that these representations made to U.S. customers were false, and that VW's diesel vehicles were not compliant with U.S. regulations and standards.

The co-conspirators caused defeat device software to be installed in all of the approximately 500,000 VW 2.0 liter diesel vehicles sold in the United States from 2009 through 2015. There were approximately 8,757 VW 2.0 liter diesel vehicles sold in the United States between July and August 2015.

2. **Sentencing Guidelines**

A. **Standard of Proof**

The Court will find sentencing factors by a preponderance of the evidence.

B. **Guideline Range**

The parties agree that Defendant's entire guideline range would be higher than eighty-four months, which represents the statutory maximum term of imprisonment for a violation of Title 18, United States Code, Section 371 and Title 42, United States Code, Section 7413(c)(2)(A). Accordingly, the 84-month statutory maximum becomes the relevant guidelines range.

The parties agree that the defendant's Total Offense Level pursuant to the United States Sentencing Guidelines is appropriately calculated as follows:

| Section | Description | Level |
|---|---|---|
| Section 2B1.1 (a)(2) | Base Offense Level | 6 |
| Section 2B1.1 (b)(1) | Loss Greater than $150 million | 26 |
| Section 2B1.1 (b)(2)(A) | More than Ten Victims | 2 |
| Section 2B1.1 (b)(10)(C) | Sophisticated Means | 2 |
| Section 3C1.1 | Obstruction of Justice | 2 |
| Section 3E1.1 | Acceptance of Responsibility | -3 |

8

**Total Offense Level:** **35**

3. **SENTENCE**

The Court will impose a sentence pursuant to 18 U.S.C. § 3553 and in doing so must consider the sentencing guideline range.

A. **Imprisonment**

Pursuant to Federal Rule of Criminal Procedure (11)(C)(1)(C) the sentence of imprisonment in this case may not exceed the top of the sentencing guideline range of eighty-four months, as determined in Paragraph 2.

B. **Supervised Release**

A term of supervised release is inapplicable here. Defendant consents to deportation as part of this agreement and therefore a term of supervised release is not warranted.

C. **Special Assessment**

Defendant will pay a special assessment of $200.00 at the time of sentencing.

D. **Fine**

The parties agree that the guidelines provide for a fine range of $40,000-$400,000 based on Defendant's Total Offense Level. The parties agree pursuant to Federal Rule of Criminal Procedure (11)(C)(1)(C) that the fine to be imposed, if any, cannot exceed the top of the guideline range. The government agrees to take no position on the fine to be imposed in this case other than its belief that imposition of a fine within the guideline range as determined by the parties is

appropriate.

### E. Restitution

The parties agree that Restitution is not appropriate in this case because "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process." 18 U.S.C. § 3663A(c)(3)(B).

### 4. Other Charges

If the Court accepts this agreement, the government will dismiss all remaining charges in this case against Defendant. The government further agrees not to bring any additional charges against Defendant based on any of the conduct known to the government prior to entry into this Rule 11 plea agreement.

### 5. Each Party's Right to Withdraw from This Agreement

The government may withdraw from this agreement if the Court finds the correct guideline range to be different than is determined in Paragraph 2B.

Defendant may withdraw from this agreement, and may withdraw his guilty plea, if the Court decides to impose a sentence higher than the maximum allowed by Paragraph 3. This is the only reason for which Defendant may withdraw from this agreement.

### 6. Consequences of Withdrawal of Guilty Plea, Vacation of Conviction or Breach of Agreement

If Defendant is allowed to withdraw his guilty plea or if any conviction entered pursuant to this agreement is vacated, the Court shall, on the government's request, reinstate any charges that were dismissed as part of this agreement. If additional charges are filed against Defendant within six months after the date of the order vacating Defendant's conviction or allowing him to withdraw his guilty plea becomes final, which charges relate directly or indirectly to the conduct underlying the guilty plea, Defendant agrees to waive his right to challenge the additional charges on the ground that they were not filed in a timely manner, including any claim that they were filed after the limitations period expired.

If the Court allows Defendant to withdraw his guilty plea for a "fair and just reason," pursuant to Fed. R. Crim. P. 11(d)(2)(B), Defendant expressly waives his rights under Fed. R. Evid. 410 and Fed. R. Crim. P. 11(f), and the government may use this Plea Agreement, including the factual basis contained herein and any statement made under oath at the change-of-plea hearing against him in any proceeding.

7. **Appellate Waiver**

Defendant waives any right he may have to appeal his conviction or sentence on any grounds except if the sentence were to exceed the maximum allowed by statute. This waiver does not bar a claim of ineffective assistance of counsel in court.

8.   **Padilla Waiver**

Defendant acknowledges that he is not a citizen of the United States, and that his guilty plea in this case may affect or even foreclose his eligibility to remain in this country following the imposition of sentence herein. Defendant has discussed these matters with his attorney in this case, but he expressly agrees that his decision to plead guilty is in no way conditioned upon or affected by the advice he has been given regarding any potential immigration consequences of his conviction.

Defendant further agrees that because his decision to plead guilty in this case is wholly independent of the immigration consequences of a conviction, Defendant agrees that he will not seek to challenge his guilty plea in any later proceeding via collateral attack on any basis relating to the immigration consequences of his plea.

9.   **Parties to Plea Agreement**

Unless otherwise indicated, this agreement does not bind any government agency except the United States Attorney's Office for the Eastern District of Michigan, the United States Department of Justice, Criminal Division, Fraud Section, and the United States Department of Justice, Environment and Natural Resources Division, Environmental Crimes Section.

10.  **Scope of Plea Agreement**

This agreement, which includes all documents that it explicitly incorporates,

is the complete agreement between the parties. This agreement supersedes all other promises, representations, understandings and agreements between the parties concerning the subject matter of this plea agreement that were made at any time before the guilty plea is entered in court. Thus, no oral or written promises made by the government to Defendant or to the attorney for Defendant at any time before Defendant pleads guilty are binding except to the extent they have been explicitly incorporated into this agreement.

Notwithstanding the previous paragraph, if Defendant enters into a cooperation agreement in writing with the government, this plea agreement does not supersede or abrogate the terms of such written agreement. This agreement also does not prevent any civil or administrative actions against Defendant by the United States or any other party.

11. **Acceptance of Agreement by Defendant**

This plea offer expires unless it has been received, fully signed, in the Office of the United States Attorney by 5:00 P.M. on July 24, 2017. The government reserves the right to modify or revoke this offer at any time before the government receives this agreement fully executed by Defendant and his attorneys.

DANIEL LEMISCH
Acting United States Attorney
Eastern District of Michigan

*/s/ John K. Neal*

John K. Neal
Chief, White Collar Crimes Unit

JEAN E. WILLIAMS
Deputy Assistant Attorney General
Environment and Natural Resources
Division
Department of Justice

*/s/ Jennifer Leigh Blackwell*

Jennifer Leigh Blackwell
Senior Trial Attorney
Environmental Crimes Section

SANDRA MOSER
Acting Chief, Fraud Section
Criminal Division
Department of Justice

*/s/ Benjamin D. Singer*

Benjamin D. Singer
Chief
Securities & Financial Fraud Unit
David Fuhr
Trial Attorney

Date: July 26, 2017

By signing below, Defendant acknowledges that he has read (or been read) this entire document, understands it, and agrees to its terms. He also acknowledges that he is satisfied with his attorneys' advice and representation. Defendant agrees that he has had a full and complete opportunity to confer with his lawyers, and has had all of his questions answered by his lawyers.

_____
David DuMouchel
George Donnini
Attorneys for Defendant

_____
David Massey
Paul Devlin
Attorneys for Defendant

_____
Oliver Schmidt
Defendant

Date: 7/24/17          Date: 7/24/17