UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,                  Hon. Sean F. Cox

v.                                    No. 16-CR-20394

D-6 OLIVER SCHMIDT,           Sentencing Date:  December 6, 2017

                Defendant.

_____/

## SENTENCING MEMORANDUM OF THE UNITED STATES AS TO DEFENDANT OLIVER SCHMIDT

The United States submits this memorandum regarding the sentencing of defendant Oliver Schmidt on December 6, 2017.  On August 4, 2017, the defendant pled guilty to two counts contained in a Fourth Superseding Information, including one count of conspiracy to defraud the United States, commit wire fraud and violate the Clean Air Act (18 U.S.C. § 371), and one count of violation of the Clean Air Act (42 U.S.C. § 7413(c)(2)(A)).  Probation has calculated the defendant's sentencing Guidelines range as 84 months, although but for the statutory maximum of the counts the defendant pled to, his Guidelines range would be substantially higher.  For the reasons discussed below, the United States requests that the Court impose a sentence of 84 months, a fine within the Guidelines range of $40,000 to $400,000, and a special assessment of $200.

## FACTUAL BACKGROUND

### I.      The Underlying Criminal Scheme

The defendant has been convicted of participating in one of the largest corporate fraud schemes in American history.  The underlying fraud involved Volkswagen (VW)'s importation and sale of approximately 600,000 vehicles into the United States equipped with illegal software, which enabled those vehicles to evade U.S. emissions requirements, and concealment of that fact from U.S. consumers and regulators for nearly a decade.  VW's German parent (VW AG) pleaded guilty on March 10, 2017 to three felonies arising out of this course of criminal conduct, and agreed to pay a $2.8 billion criminal fine.

The defendant was as senior manager at VW who headed the company's U.S. engineering and environmental office (EEO) from 2012 through early 2015. In this role, the defendant interacted with U.S. regulatory authorities on a regular basis, as one of his responsibilities was securing regulatory approval for VW vehicles to be sold on the U.S. market.  The defendant left this position in the United States in approximately February 2015 and returned to his native Germany, where he became an assistant to Heinz-Jakob Neusser, a senior VW executive named as a defendant in this case, who was responsible for powertrain development of VW AG and served as a member of VW brand's management board.

The conspiracy to evade environmental regulations was discovered after March 2014, when a third-party study identified substantial discrepancies in the emissions performance of VW diesel vehicles when undergoing U.S. emissions testing in the laboratory, as opposed to when those vehicles were driven on the road.  The true explanation for these discrepancies was that VW had installed software enabling the vehicles to recognize when they were being tested in laboratory conditions, and to reduce their emissions to acceptable levels during such testing.  Rather than admit this fraud to U.S. regulatory authorities, VW pursued a strategy to conceal the existence of the cheating software (termed a "defeat device") from U.S. regulators and the U.S. public.

Following publication of the third-party study, U.S. regulators attempted to engage with VW to understand the reasons for the elevated emissions when VW's diesel vehicles were operated in real-world conditions.  VW's strategy of obfuscation entailed providing regulators with documents and data suggesting that highly technical problems explained the discrepancies, while knowing that the cheating software was the reason for the differences in emissions performance.

In July 2015, Schmidt participated in an internal meeting with senior VW management at which the defeat device was discussed and described in detail.  At the time, VW was under considerable pressure to obtain the necessary regulatory approval to sell model year 2016 diesel vehicles in the United States – approval

that was delayed pending VW's responses to U.S. regulators' queries about the on-road emissions of the tested VW diesel models. Schmidt agreed to use his connections with U.S. regulators, forged during his tenure as the head of the VW environmental engineering office charged with securing regulatory approval for VW sales in the U.S., to persuade them to provide the necessary approvals for the MY 2016 vehicles.

On August 5, 2015, Schmidt flew from Germany to Michigan and met with a high-level official from the California Air Resources Board (CARB), a key U.S. emissions regulator that issues certifications required for vehicle sales in the United States. Despite being aware of the true reason for the observed differences in emissions performance between the laboratory and the road, Schmidt continued VW's strategy of concealing the existence of the cheating software and proffering bogus technical explanations of the issue. Schmidt repeated this fundamental deceit on August 7, 2015 in a telephone conversation with another senior CARB official, assuring that official that VW could fix the "irregularities" that explained the differential emissions. Lest there be any dispute about what occurred during these meetings, Schmidt sent detailed updates to VW management in Germany apprising them of precisely what he had said, and making it obvious that he was following the script of deception and deceit that VW, with Schmidt's input, had chosen.

4

## II.     Obstruction of the Government's Investigation

Despite Schmidt's and VW's best efforts, VW's cheating became known to U.S. regulators on August 19, 2015.  On August 29, 2015, the defendant was informed by VW AG legal staff that a litigation hold, ordering recipients to retain documents relevant to the emissions issue in light of anticipated litigation, would issue the following day.  In a meeting with a number of the engineers most heavily involved in the defeat device, the defendant informed them that a litigation hold would be coming the following day and that, in sum and substance, they could not delete documents after the litigation hold was issued.  As a result of the defendant's comments, several participants in that meeting began destroying documents, some in front of the defendant.

The defendant received a litigation hold on September 1, 2015.  Following his receipt of this litigation hold, he deleted a number of relevant documents. Subsequent forensic analysis by VW's internal investigators determined that documents the defendant deleted were relevant to the U.S. government's investigation of the emissions scandal and were covered by the litigation hold.

On November 14, 2015, the defendant voluntarily met with members of the prosecution team, including federal agents, in London.  The defendant stated that he had information that would be helpful to the investigation.  During the course of the interview, the defendant denied any personal wrongdoing, and portrayed

5

himself as someone who had tried to disclose the entire scheme. He informed

federal agents that he had only learned of the defeat device at the end of July 2015,

and that he had then been instructed to disclose it to U.S. regulators, and that he

had tried to in fact disclose it.

## **ARGUMENT**

In sentencing the defendant, the Court must first calculate the defendant's

sentence under the United States Sentencing Guidelines. Then, the Court must

consider the factors under Title 18, United States Code, Section 3553(a), which

requires the Court to impose a sentence which is sufficient but not greater than

necessary to comply with the purposes set forth in that section. *United States v.*

*Stone*, 432 F.3d 651, 655 (6th Cir. 2005) ("District courts, in cases such as these,

must, therefore, calculate the Guideline range as they would have done prior to

*Booker*, but then sentence defendants by taking into account all of the relevant

factors of 18 U.S.C. § 3553, as well as the Guidelines range."). In this

memorandum, the government (1) analyzes the appropriate Guidelines sentence for

the defendant and (2) summarizes the Section 3553 factors most applicable to the

defendant's case.

## I.     The United States Sentencing Guidelines

Pursuant to the Rule 11 Plea Agreement, the parties agreed that the

following Sentencing Guidelines applied to the defendant, and Probation has

concurred in that assessment:

| | | |
|---|---|---|
| Section 2B1.1 (a)(2) | Base Offense Level | 6 |
| Section 2B1.1 (b)(1) | Loss Greater than $150 million | 26 |
| Section 2B1.1 (b)(2)(A) | More than Ten Victims | 2 |
| Section 2B1.1 (b)(10)(C) | Sophisticated Means | 2 |
| Section 3C1.1 | Obstruction of Justice | 2 |
| Section 3E1.1 | Acceptance of Responsibility | -3 |
| | **Total Offense Level:** | **35**[1] |

### A. Loss

In this case, the government and the defendant have agreed that the loss

attributable to the defendant's conduct is greater than $150 million but less than

$250 million pursuant to Section 2B1.1(b)(1)(N).  During the course of the

conspiracy, the defendant and his co-conspirators caused defeat device software to

be installed in all of the approximately 500,000 VW 2.0 liter diesel vehicles sold in

the United States from 2009 through 2015.  Between July 2015 and August 2015

there were approximately 8,757 VW 2.0 liter diesel vehicles sold in the United

---

[1] Based upon a total offense level of 35 and a criminal history category of I, the guideline imprisonment range is 168 to 210 months.  However, the combined statutorily authorized maximum sentences are less than the minimum of the applicable guideline range; therefore, the guideline term of imprisonment is 84 months, pursuant to USSG § 5G1.2(a).

States.  Conservatively, it is estimated that each vehicle was sold at $25,000.00.

When calculated, 8,757 vehicles x $25,000.00 = $218,925,000.00.

### B. Victims

Section 2B1.1 (b)(2)(A) of the Guidelines provides an enhancement for

fraud offenses involving ten or more victims.  With respect to victims of the fraud,

there were over 600,000 individual victims, and VW has paid over $10 billion in

civil settlements relating to the fraud.  In addition, the defendant's scheme caused

serious harm to the environment and to the very air we breathe.

### C. Obstruction of Justice

In addition to committing the underlying criminal offense, the defendant has

admitted to obstruction of justice, as reflected in his plea agreement and his

agreed-upon Guidelines calculation. The defendant obstructed justice in several

ways.  First, on August 31, 2015, the defendant met with key engineers at VW

whom he knew were heavily involved in the defeat device scandal and:  (1)

informed them that they would receive a litigation hold the following day from

VW's legal department and (2) encouraged them to destroy documents before

receiving that litigation hold, or in the defendant's words, he told them, in sum and

substance, "you can't delete documents after you receive the hold."  According to

first-hand witnesses the government has found credible, his co-conspirators then

deleted documents relating to the diesel emissions scandal, including some who

8

literally did so in front of Schmidt. The defendant now describes this incident as him just "joking."

Second, according to VW's internal forensic investigation, Schmidt deleted documents relevant to the diesel emissions scheme. The defendant now claims that his deletions were "an accident."

Third, Schmidt met with federal agents in November 2015, near the outset of the investigation, and provided information that falsely exculpated himself and members of VW executive management. The information the defendant provided has since been discredited by numerous witnesses and Schmidt's contemporaneous emails, which the government subsequently obtained. Indeed, during a multi-hour interview, Schmidt disclaimed any personal wrongdoing, and portrayed himself as an innocent bystander who tried to do the right thing and was attempting to assist U.S. authorities. Schmidt has not reconciled how his statements to federal agents in November 2015 are consistent with his guilty plea and the accompanying statement of facts to which he has now agreed.

## II.   Application of Sentencing Factors under 18 U.S.C. § 3553(a)

### A. The Nature and Circumstances of the Offense (18 U.S.C. § 3553(a)(1))

The defendant has been convicted of participating in one of the largest corporate fraud schemes in American history. The scheme involved VW's importation and sale of approximately 600,000 vehicles into the United States

9

equipped with illegal software, which enabled those vehicles to evade U.S.

emissions requirements, and concealment of that fact from U.S. consumers and

regulators for nearly a decade.  VW AG pleaded guilty on March 10, 2017 to three

felonies arising out of this course of criminal conduct, and agreed to pay a $2.8

billion criminal fine.  During the March 10, 2017 plea hearing for VW AG, this

Court rightly referred to this crime as "very, very, very serious."  Transcript of Plea

Hearing at 50.  During the April 21, 2017 sentencing hearing for VW AG, this

Court further explained, "This is deliberate and massive fraud perpetrated upon the

American consumer, and it would seem consumers throughout the world. This is

also a case, and this is very, very, very troubling to anyone in the legal field. This

is a case of deliberate destruction of evidence by VW management …."  Transcript

of Sentencing Hearing at 26-27.

### B. Seriousness of Schmidt's Crimes, Just Punishment and Respect for the Law (18 U.S.C. § 3553(a)(2)(A))

The defendant had a leadership role within VW, and as a consequence of

that role, was literally "in the room" for important decisions during the height of

the criminal scheme, including when decisions were made to continue to hide the

fraud from U.S. regulators and the U.S. public.  From 2012 to 2015, the defendant

was the head of VW's environmental and compliance office in the United States.

During the critical time period in the summer of 2015, the defendant had received a

promotion to an even more senior role in Germany, reported directly to a VW

brand board member, and presented to the CEO of VW AG about the defeat device

and about the best strategy to pursue with U.S. authorities.  Indeed, according to

multiple government witnesses, Schmidt explained to executives at VW AG that

he could be useful to the overall strategy – which was to continue to conceal,

mislead and deceive U.S. regulators – during the diesel crisis precisely because he

had high-level connections with U.S. regulators, and could leverage those

connections into obtaining approval for additional model year vehicles without

revealing VW's criminal scheme.  Even after the defeat device scheme in the U.S.

became public, in 2016, while still denying his own involvement in any criminal

scheme, Schmidt testified in front of a parliamentary panel in the United Kingdom,

denying any similar diesel scheme in Europe.  In other words, Schmidt was

someone whom VW repeatedly trotted out to various regulators and lawmakers to

deny any wrongdoing on diesel emissions.

Nor was the defendant a reluctant or unwilling participant.  According to one

cooperating witness, "Schmidt was not forced to go to the US to meet with [a

senior U.S. regulator], Schmidt was a willing participant.  Schmidt volunteered his

relationship with [the senior U.S. regulator] from his previous time working in the

United States."  Another cooperating witness stated essentially the same thing,

"Schmidt suggested he was going to meet with [the senior U.S. regulator] because

they had a good working relationship and that Schmidt knew [the senior U.S.

regulator] from his time at EEO." In an email to co-conspirators, Schmidt himself praised a colleague, noting that together "we held off the authority for a year." Another cooperating witness stated that it was widely believed within VW that if Schmidt could help VW obtain certification of additional vehicles without disclosing the defeat device, it would lead him to obtain a senior position within the company.

In addition to committing the underlying criminal offense, the defendant obstructed justice – encouraging subordinates to delete documents, deleting documents himself, and lying to federal agents about his role and the role of other senior managers in the scheme during a critical period in the government's investigation.

### C. Deterring the Criminal Conduct of Others (18 U.S.C. § 3553(a)(2)(B))

Companies are legal fictions. They do not act. They commit crimes only through the actions of individuals – their employees and agents. While holding a company accountable for corporate wrongdoing is legally sound, by itself, it is insufficient to promote general deterrence. The best form of deterrence is deterrence aimed at the very individuals within corporations who actually make the decisions to commit crimes. It is rare that these individuals are held to account. It is rarer still that in the largest and most complex cases that these individuals are apprehended and available to be punished. The decisions of such corporate

managers and executives, when those decisions are driven by greed and by a bad purpose, can have tremendous negative consequences for the rest of society – decisions that affect consumers, shareholders, and the public; decisions that affect the economic and physical health of hundreds of thousands of people.  The enormous criminal and civil fines and settlements imposed on VW, along with the oversight of a corporate compliance monitor, hopefully will reorient VW's business priorities and serve as a message to other companies that might be inclined to cut similar ethical corners.  But unless individual actors are also punished, future corporate employees and contractors may be tempted to justify their criminal behavior as just "doing their jobs" or "following orders."  Holding VW AG accountable, but not the decision makers at VW AG, is insufficient.  The defendant is the first such decision maker to be held to account, the first person who was "in the room" when the decisions were made, the first person who was in a position to shape company policy.

### D. The Defendant's History and Characteristics (18 U.S.C. § 3553(a)(1))

The defendant had no criminal record before pleading guilty to these crimes. The defendant is a German national.  He has agreed to a judicial order of removal from this country following any term of imprisonment.

### E. Protecting the Public from Further Crimes (18 U.S.C. § 3553(a)(2)(C))

Since being charged, the defendant has shown little appreciation for the gravity of his crimes.  Before this prosecution, however, the defendant had no criminal history and his misconduct arose within a corporate context that likely will not be repeated.

### F. Sentences Contemplated by the Sentencing Guidelines (18 U.S.C. § 3553(a)(4)(A), (b)(1) & (c))

The government concurs with the findings and calculations in the presentence investigation report as outlined in Section I above. The defendant's guideline range of imprisonment is 84 months, which is the combined statutory maximum for the offenses.

### G. Avoiding Unwarranted Sentencing Disparities Among Similarly Situated Defendants (18 U.S.C. § 3553(a)(6))

In considering an appropriate sentence for the defendant, the Court must seek to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar crimes. The Court should look nationwide for such comparable defendants because subsection 3553(a)(6) "is concerned with national disparities among the many defendants with similar criminal backgrounds convicted of similar criminal conduct." *United States v. Benson,* 591 F.3d 491, 505 (6th Cir. 2010). The Court's careful review of the

guideline range "necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities." *Gall v. United States*, 552 U.S. 38, 54 (2007).

The government's recommendation of a sentence of 84 months imprisonment is the lowest Guidelines sentence available in this case. Indeed, but for the statutory maximum in the plea negotiated by the Government, the low-end of the defendant's Guidelines sentence would have been 168 months – twice as high.

The defendant will likely point to the 40-month prison sentence this Court imposed on his co-conspirator and co-defendant, James Liang, who admittedly participated in the conspiracy for a considerably longer duration than Schmidt.[2] However, a sentencing disparity between Liang and Schmidt is *warranted* for

---

[2] The defendant has given inconsistent statements to the government about when he became involved in the offense. In his November 2015 interview, he claimed that he became aware of VW's cheating only in late July 2015. In a more recent interview, the defendant claimed that he first learned of the scheme at the beginning of June 2015. A number of the defendant's contemporaneous communications suggest he knew of the cheating by at least 2013. (Schmidt now claims that while he "suspected" cheating in 2013, he was not sure at that point in time.) For example, on October 17, 2013, Schmidt wrote an e-mail commenting on a power-point presentation prepared by employees of Audi AG, describing Audi's own cheating software. In this e-mail, Schmidt wrote "It would be good if you deleted us from the cover page. If such a paper somehow falls into the hands of the authorities, VW can get into considerable difficulties." In another e-mail, dated June 10, 2014, the defendant wrote to another VW employee and commented that with respect to documents relating to emissions issues, "I only have mentioned documents on a flash drive and do not want to load them on to the computer." Regardless of the exact date that Schmidt became involved, his admitted involvement during the summer of 2015 lasted for the most critical and blatantly fraudulent months of the conspiracy and he played a key role in it.

several reasons.  First, from the outset of the investigation, Liang admitted to his

role in the conspiracy and cooperated with the government, which allowed

additional charges against more senior VW officials, including Schmidt.  Based on

that cooperation, the government filed a motion recommending a downward

departure pursuant to Section 5K1.1 of the Sentencing Guidelines, which the Court

granted at Liang's sentencing.  The government has not filed such a motion for

Schmidt precisely because Schmidt has not cooperated with the government's

investigation.  For that reason alone, the defendant is not similarly situated to

Liang.  *United States v. Worex*, 420 Fed. Appx. 546, 2011 WL 155734, at *5 (6th

Cir. Apr. 25, 2011) (holding that defendants were not similarly situated based on

the sole fact that one had cooperated with the government and one had not); *United

States v. Dexta*, 470 F.3d 612, 616 n. 1 (6th Cir. 2006) (finding a disparity between

coconspirators "reasonable because [the] co-conspirators chose to plead guilty and

cooperate with the prosecution" while the defendant did not); *see also United

States v. Phinazee*, 515 F.3d 511, 520 (6th Cir. 2008) (recognizing cooperation and

substantial-assistance motions as a basis for *warranted* sentencing disparities);

*United States v. Nelson*, 918 F.2d 1268, 1275 (6th Cir. 1990) ("Presumably,

authorizing a district court to depart from the guidelines for defendants

who cooperate with authorities was Congress' way of giving defendants an

incentive to cooperate.  Rewarding one who has not cooperated with authorities to

essentially the same degree as those who have cooperated strains the incentives inherent in reward and punishment.").

Second, the defendant is not similarly situated to Liang because, unlike Liang, who supervised no one at any time during the conspiracy, the defendant had a leadership role within VW as described in Section I.B above.

Third, after his involvement in the scheme, the defendant obstructed justice as described above in Section I.B above.

### H. Providing Restitution to Any Victims of the Offense (18 U.S.C. § 3553(a)(7))

As this Court has already held, an order of restitution is not appropriate in this case. *See* D.E. # 81 ("After careful deliberation, having considered the competing arguments, as well as all written motions and submissions to the Court, this Court finds, pursuant to 18 United States Code Section 3663A, that from the facts on the record, that determining complex issues of fact related to the cause or amount of victims' losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process.").

As this Court has previously noted, VW AG has already agreed to compensate purchasers of its fraudulent cars through the settlement of a class action, *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation,* No. 3:15-md-2672 (N.D. Cal.), in which more than 99% of

class members participated and which provided greater compensation than would be available through criminal restitution. Moreover, this Court cannot feasibly order restitution to the victims who chose to opt out of that class settlement because determining the actual loss of each such victim for purposes of criminal restitution would be a highly individualized and complicated effort that would needlessly prolong Defendant's sentencing to a degree that the need to provide restitution to any victim would be outweighed by the burden on the sentencing process. *See* D.E. #61 (Joint Motion in Support of Order Under 18 U.S.C. § 3663A(c)(3)).

## I. Fine Amount

The government recommends that the Court order a fine within the Guidelines range of $40,000 to $400,000. As the PSR notes, the defendant appears to have sufficient assets to pay such a fine. PSR at ¶ 97 ("[B]ased on his financial information, it appears the defendant would have the ability to make a lump sum payment toward a fine in this case.").

## <u>CONCLUSION</u>

Based on the foregoing, the government recommends that the Court impose a sentence of 84 months imprisonment, and a fine within the Guidelines range of $40,000 to $400,000.

Respectfully submitted,

DANIEL L. LEMISCH
Acting United States Attorney
Eastern District of Michigan

/s/ John K. Neal
Mark Chutkow
Chief, Criminal Division
John K. Neal
Chief, White Collar Crimes Unit


SANDRA MOSER
Acting Chief, Fraud Section
Criminal Division
Department of Justice

/s/ Benjamin D. Singer
Benjamin D. Singer
Deputy Chief
David M. Fuhr
Trial Attorney


JEAN E. WILLIAMS
Deputy Assistant Attorney General
Environment and Natural Resources
Division
Department of Justice

/s/ Jennifer Leigh Blackwell
Jennifer Leigh Blackwell
Senior Trial Attorney
Environmental Crimes Section


Dated:  November 29, 2017

## CERTIFICATE OF SERVICE

I hereby certify that on November 29, 2017, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification to counsel of record for the defendant.

/s/ Benjamin D. Singer

Trial Attorney

U.S. Department of Justice

Dated:  November 29, 2017