UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,
                              Plaintiff,

                                        Case No. 16-CR-20394
                                        Honorable Sean F. Cox

        -vs-

D-6 OLIVER SCHMIDT,
                              Defendant.
_____/

## **SENTENCING MEMORANDUM OF OLIVER SCHMIDT**

On December 6, 2017, Oliver Schmidt will be sentenced for the offenses to which he pled guilty on August 4, 2017, specifically (1) conspiracy and (2) violating the Clean Air Act ("CAA"). These charges carry a statutory maximum sentence of eighty-four (84) months (or seven years) imprisonment, and, pursuant to the Rule 11, a maximum fine of $400,000. Mr. Schmidt – who has been incarcerated since his arrest at the Miami-Dade International Airport on January 7, 2017 – accepts full responsibility for his role in the VW diesel emissions scandal.

Mr. Schmidt respectfully requests the Court to impose a sentence not to exceed forty (40) months imprisonment and a fine in the amount of $100,000. The requested sentence strikes an appropriate balance between the individualized considerations related to Mr. Schmidt and his limited role in the offense and the purposes of punishment articulated in 18 U.S.C. § 3553(a).

## I.    BACKGROUND

### A. Personal Background

Mr. Schmidt is a forty-eight year old engineer with no criminal history. Raised in a rural town in Lower Saxony, Germany, Mr. Schmidt grew up fascinated by motor vehicles, and all things mechanical.  After graduating from high school and completing military service, Mr. Schmidt studied mechanical engineering at the Hannover University of Applied Sciences in Germany, where he and his wife, Kerstin Gerdes, met as students.  Mr. Schmidt commenced his twenty-year career at VW, the only professional home that he has ever known, after completing his engineering degree.

### B. Offense Overview

The conspiracy indicted in this case began in May 2006, when upper-level decision-makers authorized VW engineers to explore the possibility of installing illegal defeat device software in VW 2.0 liter diesel engines.

Though the phrase "defeat device" may conjure images of a component vehicle part, VW's defeat device consisted of sophisticated software.  The software (the defeat device) contained (1) a test recognition feature keyed to the standard drive cycles used by U.S. regulators during official vehicle certification testing as well as (2) a function enabling the vehicles to switch between two operating modes – one

for the test and other for the road – with significantly different emissions profiles. (Rule 11 at 6.)

If a vehicle's software detected that it was undergoing testing, the vehicle performed in a mode that satisfied U.S. emissions standards.  If the software detected the absence of test conditions, it operated in a different mode in which the vast majority of the vehicle's emission control systems were reduced substantially, thereby causing the vehicle to emit substantially higher amounts of NOx,[1] sometimes thirty times higher than U.S. standards.[2]  (*Id.*)

The first vehicles equipped with the illegal software launched in the U.S. with the model year 2009 Jetta ("Gen 1").  VW introduced a second generation of diesel engines with a more modern exhaust after-treatment system with the model year 2012 VW Passat ("Gen 2").  The Gen 1 and Gen 2 vehicles used the EA 189 engine platform.  Production of the Gen 1 and Gen 2 vehicles ceased with the launch of the third generation 2.0 liter diesel engine beginning in model year 2015 ("Gen 3").  The Gen 3 vehicles contained a redesigned EA 288 engine.  Over the course of the conspiracy, VW marketed, imported, and sold approximately 500,000 vehicles

---

[1] Nitrogen oxides ("NOx") are a family of highly-reactive gases that interact with other compounds to produce ozone (smog), and are regulated by the CAA.

[2] At the time, the regulations governing emissions did not require road (in-use or off-cycle) emissions to equal emissions measured on a dynamometer for purposes of vehicle certification. Instead of setting values or limits for road emissions, the regulations promulgated under the CAA required that road emissions ███████████████████

equipped with the illegal software in the U.S., concealing this fact from American regulators and consumers for nearly a decade.

Alarm bells began to sound amongst those who were in the know about the defeat device at VW following the publication of a study in the spring of 2014 that revealed substantial discrepancies between the NOx emissions recorded during official vehicle testing and the emissions measured during real-world driving ("off-cycle emissions") in both Gen 1 and Gen 2 vehicles. When U.S. regulators began inquiring about the cause of the high off-cycle NOx emissions revealed by the study, VW decision-makers made a considered decision to engage in concealment, which carried on for over a year.   VW formally admitted using a defeat device on September 3, 2015.

Mr. Schmidt has pled guilty to helping cover up this complex conspiracy approximately nine years after it began, primarily due to his participation in a meeting with a high-ranking California Air Resources Board ("CARB") official on August 5, 2015, and a call with that official's deputy two days later.  (Rule 11 at 7.) Mr. Schmidt has accepted responsibility for his actions and expressed his sincere remorse for the poor choices that have brought him before the Court.  *See* Ex. A, Mr. Schmidt Letter.

### C. Legal Proceedings

4

Mr. Schmidt was arrested on a criminal complaint on January 7, 2017, as he was returning to Germany with his wife following their annual holiday vacation in the U.S.  After his arrest at the Miami-Dade International Airport and his initial appearance in the Southern District of Florida, Mr. Schmidt was detained pending a detention hearing set for January 12, 2017.

On January 11, 2017, a day before the detention hearing, Mr. Schmidt and five "higher-level executives" were charged in a second superseding indictment related to the VW diesel emissions scandal.  (Liang Sent'g Hrg. Tr. at 22.)  The U.S. Magistrate Judge in Miami ordered Mr. Schmidt's continued detention.

On February 2, 2017, the federal Bureau of Prisons ("BOP") transported Mr. Schmidt from southern Florida to Oklahoma, where he remained for about three weeks.  Since arriving in Michigan on February 24, 2017 (in time for his arraignment the following day), Mr. Schmidt has been detained in three separate correctional facilities, including two local jails.  Since the end of March 2017, Mr. Schmidt has primarily been confined at the Federal Detention Center ("FDC") in Milan, Michigan.

On August 4, 2017, Mr. Schmidt pleaded guilty two charges set forth in a Fourth Superseding Information issued on the same date.  Under Count 1, Mr. Schmidt pled to conspiring to defraud the United States, to commit wire fraud, to violate the Clean Air Act ("CAA"), 18 U.S.C. §§ 371, 1343, and 42 U.S.C. §

7413(c)(2)(A).  Under Count 2, he pled guilty to causing a violation of the CAA, 42

U.S.C. § 7413(c)(2)(A).  These charges carry a statutory maximum sentence of

eighty-four months imprisonment, and, pursuant to the Rule 11, a maximum fine of

$400,000.[3]

## II.   SENTENCING LAW

As has always been the case in this Court, the single most important aspect of

the sentencing analysis is the individual submitting to punishment.  Indeed,

> "[i]t has been uniform and constant in the federal judicial tradition for
> the sentencing judge to consider every convicted person as an
> individual and every case as a unique study in the human failings that
> sometimes mitigate, sometimes magnify, the crime and the punishment
> to ensue."

*Gall v. United States*, 552 U.S. 38, 52 (2007) (citing *Koon v. United States*, 518 U.S.

81, 113 (2007)).

"In imposing a sentence, neither the district court nor the parties are to focus

on the 'reasonableness' of the sentence, but rather on the sentence's ability to

accomplish the sentencing purposes of Sec. 3553(a)."  *United States v. Bolds*, 511

F.3d 568, 578 (6th Cir. 2007).  Courts engaging in this analysis may not presume

that the calculated sentencing range is reasonable, even when that range is supplied

---

[3] Because Mr. Schmidt will be deported following his sentence, the Court need not impose a term
of supervised release.  (Rule 11 at 9 ("A term of supervised release is inapplicable here[.]")).

6

by a statutory cap, because judges "must make an individualized assessment based on the facts presented." *Gall*, 552 U.S. at 49-50.

## III. DISCUSSION

Individualized consideration of the facts and circumstances present in this case, against this defendant, reveals that though authorized as the maximum possible sentence, an eighty-four month prison term is unwarranted. An eighty-four month sentence overstates the severity of Mr. Schmidt's misconduct given the limited nature and duration of his participation in the conspiracy. Specifically, Mr. Schmidt is substantially less culpable than Mr. James Liang and the numerous senior-level VW executives (most of whom will never appear in a U.S. courthouse) who initiated, designed, implemented, and refined the defeat device over nine years before Mr. Schmidt became involved. Mr. Schmidt joined the conspiracy during the summer of 2015, shortly before the intentional cheating was disclosed to regulators on August 19, 2015. His principal involvement consisted of omitting material information during two conversations with California environmental regulators on August 5 and 7, 2015. While Mr. Schmidt's actions are inexcusable, the nature of his primary wrongdoing is qualitatively different from his co-defendants.

An eighty-four month sentence also quantitatively overstates the magnitude of wrongdoing, as it is predicated upon a false equivalence. Mr. Schmidt's misconduct is unlike most frauds because it was not one of greed or theft. The

Sentencing Guidelines treat Mr. Schmidt as if he had stolen the entire loss amount attributed to the offending conduct, which is an inflated measure of Mr. Schmidt's culpability.  Mr. Schmidt's relative culpability is better illustrated by the fact that of the roughly 500,000 diesel vehicles sold in the U.S. during the conspiracy, he is being held accountable for the sale of 8,757 vehicles during his participation in July and August 2015, which amounts to less than two percent (2%) of the total vehicle sales at issue.

For these reasons, as well as those set forth below, an eighty-four month sentence is at odds with the directive that courts impose a sentence that is "sufficient, but not greater than necessary," to reflect the seriousness of the offense, promote respect for the law, provide just punishment, to afford adequate deterrence, and to avoid unwarranted sentencing disparities (among other objectives).

### A. Sentencing Considerations

#### 1. 18 U.S.C. § 3553(a)(4) & (a)(3): The Starting Point and the Kinds of Sentences Available

Pursuant to U.S.S.G. § 5G1.2(b), Mr. Schmidt's sentencing range is eighty-four months.  (Rule 11 at 8 ("The parties agree that [Mr. Schmidt's] guideline range would be higher than eighty-four months," however, "the 84-month statutory maximum becomes the relevant guidelines range.")); U.S.S.G. § 5G1.2 App. Note 3(B).  Because there is no statutory mandatory minimum and the guideline range is merely the starting point, *Gall*, 552 U.S. at 49, the Court may sentence Mr. Schmidt

to a lesser term.  Insofar as the Court sentenced Mr. Liang, the only other individual to submit to charges, to a term of forty (40) months, counsel respectfully urges the Court to sentence Mr. Schmidt as though the functional sentencing range here is forty to eighty-four months.

A forty-month floor is proper and appropriate.  Despite the superficial appeal of equating the number of counts with culpability, Mr. Schmidt differs from Mr. Liang.  Unlike Mr. Schmidt, Mr. Liang "was a key pivotal figure in this scheme from the very incipient stages, 2006 to the very end . . . in 2015."  (Liang Sent'g Hrg. Tr. 22.)  Mr. Liang's intimate involvement with the conspiracy from its inception – which included calibrating the first iteration of the defeat device as well as the subsequent recalibrations deceptively cast as "fixes" – renders his criminal misconduct objectively worse than Mr. Schmidt's.[4]  Although Mr. Schmidt out-ranked Mr. Liang in VW's corporate structure, he was not a VW executive, and, similar to Mr. Liang, Mr. Schmidt possessed no final decision-making authority.

A forty-month floor remains appropriate even when taking Mr. Liang's cooperation into account.  Mr. Liang met with investigators eight times, providing substantial assistance to the Government.  But the extent of Mr. Liang's cooperation cannot be untethered from the reality that he "was one of the few figures within

---

[4] This explains why Mr. Liang's calculated guidelines range was longer than Mr. Schmidt's even though Mr. Schmidt has pled guilty to an additional count.

9

Volkswagen [who] was there from the very start of the conspiracy to the very end of the conspiracy." (Liang Sent'g Hrg. Tr. 23; *see also id.* at 34.)

Counsel believes that a custodial sentence of forty months appropriately accounts for Mr. Schmidt's wrongdoing and comports with the myriad of sentencing considerations.

### 2. 18 U.S.C. § 3553(a)(1): History and Characteristics of the Defendant

In passing sentence, the Court is to consider "the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). This is because "the punishment should fit the offender and not merely the crime." *Williams v. New York*, 337 US. 241, 247 (1949). Mr. Schmidt's history and characteristics weigh in favor of a forty-month sentence. *United States v. Wachowiak*, 412 F. Supp. 2d 958 (D. Wis. 2006).

The numerous letters of support submitted with this Sentencing Memorandum are important to this analysis, as they provide critical insight into the totality of Mr. Schmidt's character that is not otherwise available to the Court.[5] As these letters attest, Mr. Schmidt is a loving and dedicated family man, a true friend in tough times, and a diligent engineer. They describe a person who will do whatever he can to help

---

[5] Many individuals have authored letters in support of Mr. Schmidt, though not all are cited in this Sentencing Memorandum. Exhibit B contains the letters referenced in the text of this document in the order in which they appear (e.g., B-1, B-2, etc.). Additional letters of support not cited herein appear in Exhibit C.

those in need, even virtual strangers.   Mr. Schmidt does not do this for self-aggrandizement or with the expectation of receiving anything in return.

Mr. Schmidt is deeply committed to his family, as his family is to him, and he has always been the rock in a family crisis.  Notwithstanding the heavy demands of his career, every time there has been a traumatic family event Mr. Schmidt has been the one to drop everything, provide care and support, and ensure that the crisis is well-managed.  *See* Ex. B-1, Dieter Schmidt Letter; Ex. B-2, Anja Adelt Letter; Ex. B-3, Elke Schmidt Letter.   For instance, he took leave from work when his mother had serious unexpected complications from surgery, and again when her partner died suddenly.  *See* Ex. B-3, Elke Schmidt Letter.  He guided his sister through a divorce, and he helped his step-mother deal with the untimely death of her father.  *See* Ex. B-1, Dieter Schmidt Letter; Ex. B-2 Anja Adelt Letter; Ex. B-4 Anneke Meitzler Letter. When his father was seriously ill in the hospital, Mr. Schmidt devoted much of his time to ensuring that the family business (his father's toy store) remained open, and did everything he could to support his step-mother and half-siblings during this trying time.[6]  *Id.*

Mr. Schmidt's family is determined to support him.  *See, e.g.*, Ex. B-8, ██████████ Letter. It is undeniable, however, that their lives have been turned

---

[6] Mr. Schmidt's three younger half-siblings, ranging in age from 14 to 19, have all submitted letters to the Court describing their close relationship to their "big brother."  Ex. B-5, ████████ Letter; Ex., B-6, ████████ Letter; Ex. B-7, ████████ Letter.

upside down, particularly Kerstin's.  Mr. Schmidt met his wife Kerstin while both were university students about twenty years ago, and the couple wed in Pompano Beach, Florida on December 28, 2010.  In her letter to the Court, Kerstin describes Mr. Schmidt as devoted and supportive, and details the ways he has prioritized her career and well-being.  *See* Ex. B-9, Kerstin Gerdes Letter.   The couple has faced their fair share of challenges, but they have risen to each challenge with love, determination, and humor.  For Kerstin, Mr. Schmidt's current situation has been unimaginably difficult.    Nevertheless, showing the spirit that defines their relationship, Kerstin uprooted her life and career without hesitation and relocated to Michigan to be close to her husband.  *Id.*  Mr. Schmidt is keenly aware of the toll the last eleven months has taken on Kerstin, and his primary concern is for her well-being.  *See* Ex. B-10, Lynn Banks Letter.   Taking this all into account, it is no surprise that Mr. Schmidt describes his relationship with Kerstin as "awesome." (PSR ¶ 51.)

Mr. Schmidt's good works are not restricted to his family.  Given the many letters submitted to the Court on Mr. Schmidt's behalf, it is impossible to catalog all of the many good deeds and kind acts over his lifetime.  The letters tell the story of a compassionate and selfless person who helps anyone in need without hesitation. *See* Ex. B-11, Janina Dietrich Letter; Ex. B-12, Alex Earle Letter; Ex. B-13, Michael Gerecke Letter; Ex. B-14, Gerd Teuber Letter.  The letters describe a decent person

who has heretofore led an upstanding life.  Mr. Schmidt is the kind of person who, upon receiving an unexpected call in the middle of the night, invites a Canadian business acquaintance visiting Germany into his home.  *See* Ex. B-15, Marcel Horn Letter.  He thinks nothing of helping his neighbors with, for example, the physically demanding job of repairing a roof, or fixing their children's bicycles.  *See* Ex. B-16, Dirk Kalis-Cloer Letter; Ex. B-17, Sabine Schroder Letter; Ex. B-18, Adrian Huth & Daniela Kohler Letter.  He is uniformly described as being, among other things, loyal, reliable, generous, and compassionate.

Mr. Schmidt worked for VW his entire career.  He joined VW Motorsports in 1997 as part of a team that designed components for gasoline engines.  This team, including Mr. Schmidt, transferred to VW AG in 1999, and he spent the next six years in positions related to gasoline engine development.

In 2005, Mr. Schmidt moved to California for an eighteen-month marketing position on a VW project called Project Moonraker.  This was Mr. Schmidt's first job in the U.S.  Many of Mr. Schmidt's Project Moonraker colleagues have written letters extolling Mr. Schmidt's professional and personal contributions.  *See* Ex. B-19, Stefan Liske Letter; Ex. B-20, Alexander Nolte Letter; Ex. B-21, Roberto Schettler Letter; Ex. B-22, Jens Berger Letter; Ex. B-23, Niclas Meyer Letter; Ex. B-24, Gregor Schimming Letter.

Between 2006 and early 2012, Mr. Schmidt worked in a strategic planning group at VW before taking a role in the powertrain management division. During this six-year period, Mr. Schmidt hoped he could return to the U.S. to work in some capacity, as he and Kerstin began planning to retire in the U.S. in the early 2000s. In 2009, Mr. Schmidt formally expressed this interest to VW.

In late 2011, Mr. Schmidt accepted a three-year contract to serve as the general manager of Volkswagen Group of America's ("VWGoA") Engineering and Environmental Office ("EEO"), a position he held from March 2012 through February 2015. During his EEO tenure, Mr. Schmidt and Kerstin immersed themselves into the local culture and became part of the local community. *See* Ex. B-12, Alex Earle Letter; Ex. B-25, Sebastien Mucherie Letter. Mr. Schmidt was an active member of the Michigan Chapter of the German American Chamber of Commerce, and was committed to growing VW's business activities in Michigan. *See* Ex. B-26, Martina Schlagwein Letter. Mr. Schmidt was also instrumental in VW's decision to support an apprenticeship program for young people introduced by the Michigan Economic Development Corporation. *Id.*

Mr. Schmidt and Kerstin returned to Germany in March 2015. Mr. Schmidt was under the impression that he had accepted a promotion to a newly-created position as the principal deputy to the Head of VW Group Powertrain Development, Dr. Heinz-Jakob Neusser. The promotion ultimately did not pan out. Thus, when

Mr. Schmidt returned to VW AG, he was one of three subordinates reporting directly to Dr. Neusser. Mr. Schmidt remained in the Group Powertrain position until April 2016, when he became the head of powertrain development for product line – small.

From the very beginning of his career at VW Motorsports, Mr. Schmidt impressed his colleagues with his diligence, and one describes him as a "blueprint of an engineer." *See* Ex. B-27, Ernst-Christian Bander Letter; Ex. B-28, Stefan Eissing Letter. Throughout his career, Mr. Schmidt garnered the respect and enjoyed the friendship of his superiors and subordinates, many of whom have written to the Court on his behalf. *See* Ex. B-29, Uwe Behlendorf Letter; Ex. B-28, Stefan Eissing Letter; Ex. B-30, Monika Kollinger Letter; Ex. B-31, Kai Langner Letter; Ex. B-32, Thomas Maier Letter; Ex. B-33, Christel Stute Letter; Ex. B-34, Matthias Tonn Letter.

Mr. Schmidt worked at Volkswagen for approximately twenty years. Apart from fifteen-months of compulsory military service and a brief stint as a construction supervisor, he has never worked elsewhere. Even away from work, VW figured prominently in his life. He was a VW aficionado before he joined the company, and one of his lifelong passions is restoring vintage VW vehicles. Ex. B-11, Janina Dietrich Letter; Ex. B-35, Olaf Ruprecht Letter; Ex. B-36 Dieter Brennecke Letter.

Many of the letters submitted by Mr. Schmidt's family, friends, and colleagues reference his loyalty as a laudable trait, and, ordinarily it is. *See, e.g.*, Ex.

B-3, Elke Schmidt Letter; Ex. B-34, Matthias Tonn Letter; Ex. B-36, Dieter Brennecke Letter; Ex. B-37, Jens Andersen Letter; Ex. B-38, Tanja Teiwes Letter; Ex. B-39, Mareike Kranz Letter; Ex. B-40, Frederic Shulz Letter.  However, as exemplified by this case, loyalty can be misguided.  None of this is to say that Mr. Schmidt does not bear responsibility for the actions bringing him before the Court, or that he blames others.  Mr. Schmidt now realizes that his loyalty went too far and that he must face the consequences.

### 3. 18 U.S.C. § 3553(a)(1): Nature and Characteristics of the Offense and Mr. Schmidt's Role In It

In multi-defendant cases such as this, courts "must sentence each defendant separately.  Though it should of course avoid disparities among defendants of equal culpability, the court must come to an independent determination of the appropriate punishment for each defendant[.]"  *United States v. Corsey*, 723 F.3d 366, 377 (2d Cir. 2013), *as corrected* (July 24, 2013) (citing 18 U.S.C. § 3553(c)).

Nothing in this section is meant to justify or in any way minimize Mr. Schmidt's actions.  Rather, the information is offered to properly situate Mr. Schmidt's misconduct within the "the nature and circumstances of the offense[.]" 18 U.S.C. § 3553(a)(1).  Gauging Mr. Schmidt's culpability is a necessary predicate to crafting an appropriate sentence, making it imperative to examine Mr. Schmidt's actions within the context of the entire offense.  This includes an individualized

assessment of his conduct and criminal history, as well as the circumstances relating to the commission of the offense and the impact of the crime on victims.

### a. The Conspiracy

In or around 2006, VW assembled a team of engineers to carry out VW's clean diesel pursuit. The team commenced working on a new 2.0 liter turbo direct injection ("TDI") diesel engine – internally referred to as the EA 189 engine – but soon ran into problems. Before long, those tasked with developing the engine realized that it would not be possible to satisfy consumer expectations and comply with increasingly stringent U.S. emissions standards. (Liang Sent'g Hrg. Tr. 27; VW Plea Ex. 2 at ¶ 33.)

In 2006, unwilling, or perhaps unable, to give up on the project, the idea of using software to address the high NOx emissions was born. The idea took root, eventually gaining sufficient support to be presented to VW management. Members of the development team informed their superiors of the emissions compliance issue, and were, in essence, told to find a solution. As a result, "[i]nstead of bringing to market a diesel vehicle that could legitimately meet the . . . restrictive U.S. NOx emissions standards," the EA 189 development team, "acting at the direction of" the two former Heads of VW Brand Powertrain Development and the General Manager of VW Brand Exhaust Aftertreatment Department, "designed, created, and implemented a software function to detect, evade and defeat U.S. emissions

standards." (VW Plea Ex. 2 at ¶¶ 33, 34; *see also id.* at ¶¶ 8-9, 12.)  To be sure, this was an intentional corporate act to cheat and evade U.S. environmental regulations.

In or around March of 2007, VW dispatched a group, including Mr. Liang, to meet with U.S. regulators about the EA 189 engine.  This group "misrepresented that VW diesel vehicles complied with United States emission standards" in order to obtain regulatory approval to sell the vehicles in the U.S.  (Liang Sent'g Hrg. Tr. 22, 29.)

VW obtained regulatory approval to sell the first generation of affected vehicles in the U.S. beginning with the model year 2009 Jetta.  Upper-level decision-makers, to say nothing of the "scores" of employees involved with the development and production of the engine, knew the engines did not comply with the regulations, but nevertheless signed on to a "clean diesel" advertising campaign.  (*Id.* at 21.)  The conspiracy continued for many years thereafter through the submission of false paperwork in connection with annual certifications and warranty claims, the authorization of improvements to the defeat device itself, and other misconduct.

In the spring of 2014, a study undertaken by West Virginia University's Center for Alternative Fuels, Engines and Emissions measured the real-world driving emissions of three randomly selected diesel vehicles using a portable emissions measurement system.  The study, commissioned by the International Council on Clean Transportation (the "ICCT Study"), tested a Gen 1 VW diesel, a

Gen 2 VW diesel, and a competitor's vehicle, and identified substantial discrepancies in the NOx emissions from the VW vehicles when emissions were measured on the road as compared to the emissions measured during official regulatory testing.[7]

In the wake of the ICCT Study, VW, acting through high-ranking officials with knowledge of the defeat device (not Mr. Schmidt) "decided to pursue a strategy of concealing the defeat device in responding to questions from U.S. regulators." (VW Plea Ex. 2 at ¶ 54.) That strategy was to be implemented by a post-ICCT Study "task force" assembled by VW for the purpose of "formulat[ing] responses to questions that arose from the U.S. regulators." (*Id.*)

Because Mr. Schmidt was not a member of this task force,[8] he did not have meaningful communications with the regulatory agencies on the diesel topic during his time at EEO (March 2012-Februrary 2015). As such, Mr. Schmidt had not yet joined the conspiracy when VW "falsely and fraudulently told" U.S. consumers, the Environmental Protection Agency ("EPA"), "and CARB that a voluntar[y] recall in or around early 2015 was intended the fix the issues that were causing the" excess NOx emissions when the vehicles were driven off-cycle. (Liang Sent'g Hrg. Tr. 31.)

### b. Mr. Schmidt's Role in the Conspiracy

[7] The Gen 1 vehicles emitted up to thirty times the NOx allowed under the pertinent environmental regulations, *see* note 3, *supra*, whereas the Gen 2 vehicles emitted up to fifteen times that level. The third vehicle performed the best, as the vehicle's NOx output was only three times over the levels authorized by the regulations.

[8] ████████████████████████████

Mr. Schmidt affirmatively joined the conspiracy during the summer of 2015, (Rule 11 at 6), "at the very later stages . . . when the conspiracy was unraveling and falling apart[,]" (Liang Sent'g Hrg. Tr. 23).   Though the agencies' suspicions of intentional cheating began months earlier, things took a decided turn for the worse on July 8, 2015.   On this date, a VW AG Certification Department employee and a VWGoA colleague attended one of many meetings regarding the high NOx emissions.   Mr. Schmidt, whose EEO contract had expired by this time, did not attend this meeting.   After the meeting, many at VW felt CARB had discovered the defeat device.

At the July 8, 2015 meeting, regulators "informed VW that they were withholding regulatory approval for VW to sell its model year 2016 2.0 liter diesel vehicles until VW" provided satisfactory answers "to questions about" the high NOx emissions.   (Rule 11 at 7.)   As a result of the "threat[] not to certify VW model year 2016 vehicles for sale in the United States, VW AG supervisors requested a briefing on the situation in the United States."   (VW Plea Ex. 2 ¶ 59.)

The briefing requested by VW's supervisors took place on July 27, 2015. Among the attendees were the highest-ranking, most senior members of VW's executive management team; that is, the decision-makers.   During this briefing, an unindicted co-conspirator presented certain technical aspects of the defeat device, after which, Mr. Schmidt presented the potential severe consequences to VW if

regulators discovered the cheating.  (Rule 11 at 7.)   Before the briefing ended, the highest-ranking executive at VW Group directed Mr. Schmidt to seek an informal meeting with a senior-ranking CARB official he knew from his time in the U.S.  (*Id.*)

Following this meeting, Mr. Schmidt understood that his task was to obtain certification for the model year 2016 vehicles, which were beginning to pile up in ports of entry.  (*Id.* (describing Mr. "Schmidt's primary assigned objective" as "obtain[ing] the necessary U.S. regulatory approvals for the model year 2016 vehicles").)  Although CARB had conditioned model year 2016 certification upon satisfactory answers to its concerns about the earlier generation diesels, VW's decision-makers implicitly assigned to Mr. Schmidt a secondary objective: to avoid answering CARB's technical questions.

On July 28, 2015, Mr. Schmidt, who was too low in VW's corporate hierarchy to act on the company's behalf absent express authorization from his superiors, sought and obtained approval for the "storyline" he intended to convey during his meeting with CARB.[9]   Among others, the Heads of VW Group and VW Brand Powertrain Development each signed off.

---

[9] The "storyline" was essentially a chronology of improvements to VW's diesels in the wake of the ICCT Study.  For example, VW promised to reduce emissions by half after the Study's release, and VW accomplished this.  The storyline also touched upon the software, after-treatment, and engine improvements over time.

On July 31, 2015, Mr. Schmidt presented the script he and other unindicted co-conspirators put together to a group that included the former Head of the powerful VW Product Safety Committee ("APS"), as well as a high-ranking VW AG attorney who sat on the APS Committee. Mr. Schmidt was instructed not to disclose the defeat device or any intentional cheating. With these limitations clearly articulated, Mr. Schmidt's script was formally approved.

On August 5, 2015, Mr. Schmidt and a colleague met with Dr. Alberto Ayala of CARB in Traverse City, Michigan in an effort to achieve their assigned objective of obtaining the model year 2016 certification. Mr. Schmidt adhered to the script approved by those at the very top of the VW corporate hierarchy. As planned, Mr. Schmidt walked through the chronology of the improvements VW had made since publication of the ICCT Study. He discussed the software "fixes" VW implemented to improve emissions performance, as well as the general trajectory of improvements to the technology from the lessons learned over time. Mr. Schmidt also made note of a software update under development to further reduce Gen 2 NOx emissions.

Consistent with his instructions, Mr. Schmidt did not say "defeat device" and he did not disclose the intentional cheating that had gone on at VW for almost a decade. (Rule 11 at 7.) Mr. Schmidt understands and admits that his intentional omission of these material facts was misleading and caused Dr. Ayala to be misled.

He also understands that if he had chosen to disregard his instructions and simply been forthright with Dr. Ayala, he would not be where he is today.

Per Dr. Ayala's request, Mr. Schmidt and his colleague spoke to Ms. Annette Hebert (CARB) on August 7, 2015. During this teleconference, Mr. Schmidt made the same misleading omissions. (*Id.*)

Exactly one week after the conversation with Ms. Hebert, VW submitted to the EPA, with Mr. Schmidt's knowledge, two fraudulent and misleading Emissions Defect Information Reports ("EDIR"). (*Id.*) These EDIRs, submitted pursuant to the CAA on August 14, 2015, form the basis for the charges in Count 2.

On August 19, 2015, five days after the submission of the false EDIRs and fourteen (14) days after Mr. Schmidt misled Dr. Ayala, VW met with CARB in yet another attempt to obtain the model year 2016 certification. Mr. Schmidt attended this meeting with four of his VW colleagues, including three others from VW AG's headquarters in Germany. VW had not authorized a confession of any kind, and none of the attendees held sufficient rank to alter the scope of the company's authorization. Unbeknownst to VW's decision-makers, the four VW AG employees (including Mr. Schmidt) privately agreed before the meeting that if pressed, they

would disclose intentional cheating, contrary to their instructions from VW executives.[10]

Toward the end of the two-hour meeting, a member of CARB's technical staff posed a question about a defeat device. In response, the VW representative presenting at the time acknowledged that VW had been cheating. His statements to CARB triggered VW's formal confession on September 3, 2015.

### c. Discussion

This is a delicate, but critically important point to make. Oliver Schmidt is guilty of the crimes to which he pled. He does not shirk from that, nor minimize the seriousness of those crimes in any way. But, his individual role in the overall conspiracy here must be looked at and considered for what it was – and was not.

Mr. Schmidt was not on the EA 189 development team; he had no role in the initial conception, creation, design, implementation, or refinement of the defeat device. The meetings where the defeat device was presented, discussed, and ultimately approved (discussed in detail in VW's plea) took place eight or more years

---

[10] According to a key Government witness, who, like Mr. Liang was involved with the diesel emissions scandal from its incipient stages:

before Mr. Schmidt joined the conspiracy. Mr. Schmidt played no role in obtaining the regulatory approval to sell model year 2009 VW Jetta TDIs, nor was he a member of the conspiracy when certifications were sought for model years 2010, 2011, 2012, 2013, 2014, or 2015.[11] Thus, unlike Mr. Liang and many others, Mr. Schmidt did not, over many years, repeatedly "falsely and fraudulently certify to the EPA and CARB that VW diesel vehicles" satisfied U.S. emissions requirements. (Liang Sent'g Hrg. Tr. 29.)

Mr. Schmidt was not even aware of the existence of an effort by VW and its top executives and engineers to create, utilize, and hide the existence of a defeat device for nine-plus years that this criminal activity went on. He was not a decision-maker, but rather a mid-level manager who learned of the cheating software months before the conspiracy ended—and he was a part of its termination. (Rule 11 at 6.)

His role was to delay disclosure of the defeat device to regulators by less than two months. If he had disclosed it to Dr. Ayala, as he clearly should have, that would have had zero effect on what had occurred over the past nine-plus years. Mr. Schmidt's eleventh-hour participation bears on his culpability and thus the seriousness of his offense, and his sentencing accountability should reflect that.

---

[11] Mr. Schmidt was the general manager of EEO when carry over certifications were sought for the Gen 1 and 2 vehicles in 2013 and 2014, as well as when the application for the model year 2015 Gen 3 vehicles with the EA 288 engine was filed. He did not, however, have knowledge of the defeat device when any of these certifications were submitted or approved.

As a "legal matter," of course, a co-conspirator is "in for a penny in for a pound."  However, as a matter of assigning actual culpability and applying the resulting sentencing considerations, the analysis is much different.  To draw an imperfect analogy, every drug case has numerous players with different roles.  The person who is contacted by law enforcement at the end of the multi-level conspiracy and continues to deny the existence of the conspiracy—and then less than two months later is part of a group that does disclose it—cannot be treated as if he was involved in the multi-year planning, packaging, deliveries of which he was unaware, and subsequent efforts to conceal, etc.  Again, as a legal matter, he is "as guilty"—but for sentencing purposes he is not "as culpable."

Mr. Schmidt is not Mr. Liang.  Mr. Schmidt is not as culpable, even if he is as guilty.  Given the system we have, Mr. Liang received U.S.S.G. § 5K1.1 credit for his cooperation; Mr. Schmidt did not.  That has nothing to do with culpability.

For the reasons above, individualized consideration of the facts and circumstances of the offense and Mr. Schmidt's role in it counsels in favor of the requested sentence of forty months.

### 4. 18 U.S.C. § 3553(a)(2)(A): The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and to Promote Respect for the Law

The VW diesel emissions scandal is undoubtedly a serious offense.  There is, however, no doubt that VW is the principal wrongdoer.  As the United States

Probation Officer in this matter opined, "[t]he overall conduct could *or should* be placed largely on the corporation in this case."  (PSR ¶ 92 (emphasis supplied).) This is because the cheat software was not the idea of a handful of rogue engineers. To the contrary, VW AG's plea resolves any doubt that certain members of VW's senior management directed the use, and subsequent concealment of, the defeat device.  Though successful prosecution of VW does not absolve Mr. Schmidt of responsibility for his role in the crime or mitigate its seriousness, fairness requires consideration of his individual misconduct.

Seriousness in fraud causes is typically measured by the amount of loss. Here, however, the loss amount is a poor proxy for Mr. Schmidt's culpability, as the calculated loss amount substantially overstates the seriousness of his conduct in furtherance of the offense.  *See, e.g.*, Frank O. Bowman, III, *Sentencing High-Loss Corporate Insider Frauds After* Booker, 20 Fed. Sent. Rep. 167, 168 (2008) ("For the small class of defendants . . . convicted of fraud offenses associated with very large guidelines loss calculations, the guidelines are divorced both from the objectives of Section 3553(a) and, frankly, from common sense.  Accordingly, the guidelines calculations in such cases are of diminished value to sentencing judges.").

"[T]he loss guideline . . . was not developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices.  As such, district judges can and should exercise their discretion whether or not to follow the

sentencing advice that guideline provides." *Corsey*, 723 F.3d at 379 (Underhill, J. concurring) (citing, *inter alia*, *Kimbrough v. United States*, 552 U.S. 85, 109-10 (2007) (holding that, because the sentencing guidelines for crack cocaine offenses were not developed using an empirical approach, a district court may vary downward "even in a mine-run case")). Such discretion is appropriately exercised in a case such as this where the loss calculation is disproportionately large compared to Mr. Schmidt's level and length of participation and lack of personal gain. *See* U.S.S.G. § 2B1.1, comment. (n.20(C)) (recognizing the limits of using loss amount as a proxy for culpability and providing that "[t]here may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense"); *see also* Mark H. Allenbaugh, "*Drawn from Nowhere": A Review of the Sentencing Commission's White-Collar Sentencing Guidelines and Loss Data*, 26 Fed. Sent. Rep. 19, 19 (2013) ("[T]he data suggests that loss is an unsound measure of the seriousness of many offenses, with the result that judges are increasingly willing to go below the Guidelines when they impose sentences in white-collar cases.").

A better measure of seriousness here relates to the limited nature and short duration of Mr. Schmidt's participation in the conspiracy, as by the time he joined the conspiracy in the summer of 2015, most of the harm against the American consumer had been completed. Though this does not make his actions less criminal,

it does make them less blameworthy. Of the roughly 500,000 diesel vehicles sold in the U.S. during the conspiracy, 8,757 vehicles were sold while Mr. Schmidt was a participant. (The July and August 2015 vehicle sales account for less than two percent (2%) of total vehicles sales.) This figure, used in the Rule 11, serves as an acknowledgement that Mr. Schmidt is not culpable for the entire conspiracy, unlike Mr. Liang, who was held accountable for the full half million vehicles.

The primary driver of Mr. Schmidt's offense level is the twenty-six (26) point enhancement for the loss amount, calculated by multiplying the number of vehicles (8,757) by an estimated value of $25,000 per car, for a total loss of $218,925,000.00. *See* U.S.S.G. § 2B1.1(b)(1)(N). Mr. Schmidt does not dispute the value assigned to the vehicles nor suggest that the calculation is erroneous.[12] But the calculated amount and corresponding enhancement have little to do with culpability here. This is evidenced by the fact that Mr. Schmidt's twenty-six point enhancement under U.S.S.G. § 2B1.1 is only four-points less than VW's thirty point enhancement (the maximum enhancement available under the guidelines). *Compare* U.S.S.G. § 2B1.1(b)(1)(N) (twenty-six level enhancement for losses exceeding $150 million) *with* § 2B1.1(b)(1)(P) (thirty level enhancement for losses exceeding $550 million).

---

[12] It should be noted, however, that imposing punishment based upon the value of the vehicles sold prejudices Mr. Schmidt's loss calculation. Because of his late involvement, the vehicles sold during his involvement were necessarily newer, and thus retained a higher manufacturer's suggested retail price ("MSRP") than those vehicles sold in earlier years.

This four-point spread is neither explained nor justified by the fact that the calculations examined different misconduct in an effort to reach individualized determinations of culpability. Rather, it illustrates "that loss is an unsound measure of [] seriousness[.]" Allenbaugh, *"Drawn From Nowhere"*, 26 Fed. Sent. R. at 19.

Finally, the loss amount fails to account for the fact that this case, though involving fraud and loss, is about the commission of an environmental crime involving the excessive emission of air pollutants regulated by the CAA. On this point, it is relevant that all of the 8,757 vehicles sold while Mr. Schmidt was a conspirator contained the Gen 3, EA 288 engine. Although these vehicles contained the illegal software, the emissions performance of these vehicles far surpassed the Gen 1 and Gen 2 emissions, with the result that far less NOx was released into the atmosphere. *See* Ex. D, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ [Exhibit D Filed Under Seal]

This is a serious case; Oliver Schmidt committed serious crimes, and nothing in this memorandum is intended to diminish that point. The seriousness is, however, tempered by the nature and circumstances of the offense as described above.

### 5. 18 U.S.C. § 3553(a)(2)(A): The Need for the Sentence Imposed to Provide Just Punishment for the Offense

#### a. Severity of Conditions of Confinement

As this Honorable Court contemplates what punishment is just, counsel urges the Court to take note of the relatively harsher conditions of confinement Mr.

Schmidt experienced prior to the imposition of his sentence.   He has served "harder time" in pretrial detention than he will serve after the Court's imposition of a sentence, and, even then, BOP guidelines prevent him, as a non-citizen, from serving his time in a minimum security facility (a prison "camp").  *See* Ex. E, BOP Program Statement P5100.08 Inmate Security Designation and Custody Classification Manual, Ch. 5 (Sept. 12, 2006) (deportable aliens "shall be housed in at least a Low security level institution").

Following his arrest on January 7, 2017, Mr. Schmidt was detained in Miami until February 2, 2017. The BOP then transported Mr. Schmidt to Michigan via Oklahoma.  Between his initial arrest and his arrival in the State of Michigan on February 24, 2017, Mr. Schmidt lacked medication to treat shingles.  Since arriving in Michigan, Mr. Schmidt has been housed at three separate correctional facilities.

Mr. Schmidt has served the majority of his pretrial detention at Milan FDC. Counsel requested this placement, and this Court provided crucial assistance in getting Mr. Schmidt there.  Yet, as a gateway to the federal prison system, a wide range of offenders, including violent offenders detained pretrial due to dangerousness, pass through the FDC.  In order to safely house these criminals, the FDC is set up in many respects like a maximum-security facility and the living conditions and restrictions on individual liberty are consistent with that designation.

The Court may consider, and give due credit to, the increased severity of punishment resulting from Mr. Schmidt's status as a non-citizen, as his "status as a deportable alien [has and] will . . . adventitiously . . . subject him to harsher conditions than an otherwise identical citizen." *United States v. Smith*, 27 F.3d 649, 650 (D.C. Cir. 1994), *see also, e.g.*, *United States v. Petrus*, 588 F.3d 347, 356 (6th Cir. 2009) ("[I]n the post-Booker era, [a] Defendant's immigration status could lead a sentencing court to [conclude] that potential deportation and few prison opportunities should be a reason for a downward variance.")  His "status as a deportable alien renders him ineligible for the benefits of 18 U.S.C. § 3624(c)" and forecloses the possibility that Mr. Schmidt will be assigned to a minimum security prison.  *Smith*, 27 F.3d at 650-51.

In sum, the increased severity of Mr. Schmidt's overall punishment has been substantial as compared to what he would have experienced as an American citizen, and even as compared to the time he will serve in a low-security facility following sentencing.  The significantly harsher conditions of confinement Mr. Schmidt has endured for the past eleven months merits crediting his time-served accordingly.

### b.  Proportionality of Punishment

Finally, to the extent that justice is capable of measurement, it is through the concept of proportionality, both relative and absolute. Imposing a sentence that is "sufficient, but not greater than necessary" to provide just punishment requires fair

resolution of the forces urging severity and those counseling leniency. It also requires consideration of the expressive function or "symbolic significance" of criminal sanction. Joel Feinberg, *The Expressive Function of Punishment*, 49 Monist 397, 400 (1965); Henry M. Hart, Jr., *The Aims of Criminal Law*, 23 Law & Contemp. Probs. 401, 404-05 (1958).

The prosecution of VW conveyed society's expectation that corporate actors, no less than individuals, abide by the rules of engagement. The breathtaking sanctions this Court imposed against VW sent a powerful message of condemnation for the offense. The $2.8 billion criminal fine, not to mention the additional $1.5 billion in civil penalties in the case, appropriately signaled that primary blame for the scandal's occurrence was being attributed to a corporate culture that tolerated rule-breaking. The imposition of a three-year term of probation and the installation of a corporate monitor evidenced the Court's concerns about the deep-rooted nature of the corporate failures that gave rise to Dieselgate.

No matter how egregious the corporate misconduct, corporations cannot be incarcerated. Corporations thus have an opportunity to rehabilitate their image and recoup their losses. Despite the breadth of criminal sanctions, VW already appears to be showing signs of recovery here in the form of increased sales, recovery of its share price, and other improvements to the corporation's economic performance.

Upon his arrest, Mr. Schmidt's life came to an abrupt halt. By the time of sentencing, Mr. Schmidt will have been behind bars for eleven months, with many more months and years to follow. Unlike the "scores" of indicted and unindicted co-conspirators whose lives have continued without interruption, Mr. Schmidt's life has been forever altered. Since the scandal broke, he is the only conspirator experienced in navigating the confines of an American prison. Mr. Liang had time to get his personal affairs in order and prepare for what will undoubtedly be a painful separation from his family. Mr. Schmidt, who has been in custody since being arrested by eight law enforcement officials in an airport restroom, had no such time.

In contrast to VW, Mr. Schmidt's life will never get back on track. The criminal-justice process has dramatically and irreversibly affected Mr. Schmidt's life; indeed, his life changed forever on January 7, 2017. Since that day, and despite the short duration of his involvement in the conspiracy, Mr. Schmidt has become one of the "faces" of Dieselgate. His photograph has appeared in publications across the globe.

Even with a forty-month sentence, Mr. Schmidt's term of incarceration will last significantly longer than VW's corporate monitor. And when Mr. Schmidt does return home, forever barred from entering the U.S.,[13] his engineering skills will be

---

[13] Mr. Schmidt and his wife have long planned to retire in southern Florida, and in 2003, purchased their first small rental property there. The couple wed in Florida in 2010, and they have invested a significant amount of their life savings in condominiums there.

stale.  As the human face of this scandal and a convicted felon, Mr. Schmidt will likely be unemployable in his field.  Mr. Schmidt's road to recovery will be an arduous journey.  While these consequences may well be deserved, they ought to be considered in fashioning a custodial sentence.

### 6. 18 U.S.C. § 3553(a)(2)(B): The Need for the Sentence Imposed to Afford Adequate Deterrence to Criminal Conduct

To the extent that general deterrence is a recognized purpose of sentencing, it necessarily involves a "sufficient but not greater than necessary" analysis.  That is particularly the case when trying to predict what punishment of one person is appropriate to deter a different person from committing a similar offense in the future.  And, of course, that entire concept has serious flaws when one looks at the conduct of those who are well aware of the serious consequences that are visited upon those who have done similar things but who are not deterred by such knowledge.  Is the fact that prior offender "A" was sentenced to a "mere" ten years for an offense rather than fifteen the reason that offender "B" was not deterred?  The incremental deterrent effect from ten to fifteen years, for example, is critical if this concept is to be utilized in fashioning a sentence.

To bring this point to bear upon this case, Mr. Liang received a sentence of forty months for his very long involvement in this conduct.  Will that serve to deter others similarly situated from committing such an offense?  Would a sentence of

twenty-four months, or would we need a sentence of sixty months, or . . . ?  Mr. Schmidt was much less involved but admittedly a participant in the criminal conduct here.  His plight has been widely publicized; he has been locked up in a foreign country (for him) for nearly a year; his life has been turned inside out; he faces up to seven years in prison and nearly half a million dollars in fines and is hardly a wealthy man; the personal toll on him and his family is devastating; when he gets out of prison, a significant part of his professional life also will be behind him and his employability will be severely hampered if not ruined.  All those things happen whether he is sentenced to forty months or sixty or eighty-four–or for that matter, two.  Is it at all realistic to think that a person in a similar position to Oliver Schmidt, contemplating criminal conduct such as Mr. Schmidt has admitted, would commit such a crime if he knew of all these consequences and that he also knew Mr. Schmidt was sentenced to seven years, or six, or five–but he would not commit the offense if he knew of all the other consequences but knew he would "only" be sentenced to forty months in a federal prison rather than sixty, or eighty-four?  That is hard to even imagine. The incremental deterrent effect is non-existent once we begin with what Mr. Schmidt already has gone through and then couple that with some significant custodial sentence.

There is not a request in this case for time served, or a year and a day, or any sentence that could be deemed "lenient."  Mr. Schmidt has not sought such a

sentence, and such a request would not have been realistic in counsels' view. That decision was made with "general deterrence" in mind.

A sentence of forty months is sufficient, but not greater than necessary, to afford adequate deterrence here. Acknowledging that there is no "scientific guide" to the question of deterrence, much has already been achieved in promoting general deterrence in this case.

This Court sent a strong deterrent message when it labeled VW a criminal and sentenced it to a stinging combination of monetary penalties and structural reform.

By indicting some high-ranking decision-makers along with VW, Mr. Liang, and Mr. Schmidt, the federal government made its intent to vigorously prosecute corporate criminals – companies and individuals alike – crystal clear. This case has also put foreign nationals squarely on notice that the United States will prosecute individuals for actions within the scope of their employment, even if at the direction of their superiors, if those actions are criminal.

To the extent corporate officials are more likely to be deterred by the possibility that their actions could result in individual criminal liability and imprisonment than by concerns about organizational culpability, Mr. Liang's and Mr. Schmidt's highly-publicized prosecutions have already served as warnings to would-be corporate criminals. *United States v. Peppel*, 707 F.3d 627, 637 (6th Cir. 2013) ("Because economic and fraud-based crimes are more rational, cool, and

calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence.") (quotation omitted). The deterrent message was sent and received well before formal imposition of this Court's sentence, and that message will be amplified by a forty-month sentence here. *Cf. United States v. Musgrave*, 647 F. App'x 529, 533 (6th Cir. 2016) (*Musgrave II*) (rejecting prosecution's argument that a *non-custodial* sentence failed to afford adequate deterrence).

### 7.  18 U.S.C. § 3553(a)(2)(C): The Need for the Sentence Imposed to Protect the Public from Further Crimes of the Defendant

Regarding specific deterrence, there is no risk that Mr. Schmidt will commit crimes in the future. Other than the offenses to which he has pled guilty here, Mr. Schmidt has an unblemished criminal record, both in the United States and Germany. He has accepted responsibility for his actions and expressed his sincere remorse for the poor choices that have brought him before the Court.

Mr. Schmidt has had no prior contact with the criminal justice system, and is therefore, among the class of defendants least likely to reoffend. *See* U.S. Sent'g Comm'n, *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders* (March 2017) (multi-year empirical study concluding that defendants with zero criminal history points *and* no prior contacts with criminal justice system are

statistically less likely to recidivate than defendants with zero criminal history points but some prior contact with criminal justice system).

Beyond statistics, Mr. Schmidt's friends and family have attested to his good moral character.  Reena Raggi, *Local Concerns, Local Insights: Further Reasons for More Flexibility in Guideline Sentencing*, 5 Fed. Sent. R. 306, 308 (1993) ("If any principle defines our society, it is that liberty belongs to individuals. No statistically-based sentencing model can encompass all the vagaries of individual behavior."). While Mr. Schmidt's behavior in this case did not live up to the high standards he has lived by, the letters submitted by those closest to Mr. Schmidt show that his misconduct was an aberration.  As demonstrated by the abundant heartfelt support from his family, friends, and co-workers, leaving aside the matter before the Court, Mr. Schmidt has led an exemplary life.  These letters, discussed in detail above, paint a portrait of a good, decent man with a documented history of giving his time to support others in times of need.

### 8. 18 U.S.C. § 3553(a)(6): The Need to Avoid Unwarranted Sentence Disparities among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct

In imposing a sentence, judges should avoid unwarranted sentencing disparities.  It is respectfully submitted that a custodial sentence of forty months would not result in an unwarranted sentencing disparity.  By emphasizing the need to avoid *unwarranted* disparities, Congress "did not did not seek to 'end' disparity,

nor would this be a desirable goal." Stephen J. Schulhofer, *Assessing the Federal Sentencing Process: The Problem Is Uniformity, Not Disparity*, 29 Am. Crim. L. Rev. 833, 835 (1992). "Disparity is often justified by real differences in culpability or other penologically relevant factors." *Id.*

The VW diesel emissions scandal is not a typical case, rendering it difficult to identify proper comparators. Insofar as VW is a corporate entity run by a group of individual decision-makers, it is hard to draw comparisons between VW's misconduct and that of Mr. Schmidt. To the extent distinctions can be drawn, an important one is that Mr. Schmidt, who lacked decision-making authority, was not one of those individuals.

With respect to Mr. Liang, who received a custodial sentence of forty months, this memorandum is replete with comparisons demonstrating fundamental differences between his misconduct and Mr. Schmidt's. Mr. Schmidt was a late entrant into the nearly decade-long conspiracy. By contrast, Mr. Liang was "a key pivotal figure in this scheme from the very incipient stages, 2006 to the very end . . . in 2015." (Liang Sent'g Hrg. Tr. 22.) Moreover, there are stark differences between the respective contributions to the conspiracy between these two men.

Although Mr. Liang and Mr. Schmidt have pled guilty to similar *crimes*, their underlying misconduct is dissimilar. Even accounting for Mr. Liang's cooperation,

a custodial sentence of forty months here would not result in an unwarranted disparity.

### 9.  18 U.S.C. § 3553(a)(7): The Need to Provide Restitution to any Victims of the Offense

Pursuant to 18 U.S.C. § 3663A(c)(3)(B), and consistent with the judgments entered against VW and Mr. Liang, the parties have agreed that restitution is inappropriate in this case because "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process."  (Rule 11 at 10.)

In addition, it bears mention that VW made in excess of $10 billion available in the civil class action/multi-district litigation related to the 2.0 liter vehicles at issue, *In re Volkswagen 'Clean Diesel' Marketing, Sales Practices, and Products Liability Litigation*, No. 3:15-md-2672 (N.D. Cal.), and further committed $4.7 billion to future clean air efforts.  (VW Plea at 14-15; *see also* Executive Summary of Final Class Settlement Program (2.0 Liter Engine Vehicles), *available at* http://www.cand.uscourts.gov/crb/vwmdl/final-settlement-2-Liter.)   These civil resolutions precluded the need to order criminal restitution, as "'restitution for harm done is a classic civil remedy' that is administered for convenience by the courts that have entered criminal convictions."  *United States v. LaGrou Distribution Sys., Inc.*, 466 F.3d 585, 593 (7th Cir. 2006) (quotation omitted).

### 10. Custodial Sentence Conclusion

As set forth above, virtually every statutory factor supports a reduced sentence and, considered together, they establish that a forty-month sentence is appropriate here.

### B. Fine

As provided in the Rule 11, the parties agree that the Court may impose a fine within the range of $40,000-$400,000, and further "agree pursuant to Federal Rule of Criminal Procedure 11([c])(1)(C) that the fine to be imposed, if any, cannot exceed the top of [that] range." (Rule 11 at 9.) Mr. Schmidt, through counsel, respectfully submits that a fine in the amount of $100,000 is sufficient, but not greater than necessary, "to reflect the seriousness of the offense (including the harm or loss to the victim and the gain to the defendant), to promote respect for the law, to provide just punishment and to afford adequate deterrence[.]" U.S.S.G. § 5E1.2(d)(1). It is, "taken together with other sanctions imposed," sufficiently "punitive." U.S.S.G. § 5E1.2(d).

Mr. Schmidt is not, nor was he ever, a VW executive. When he worked at EEO in the United States, he lived in a two bedroom apartment in Birmingham, Michigan. In Germany, he and his wife own a 1,600 square foot, three bedroom house. While Mr. Schmidt and his wife have managed to save for their retirement by investing in small condominiums in South Florida and other investments, those

assets were accumulated over both of their twenty-plus year careers as automotive engineers.  More importantly, those jointly-owned assets (*see* PSR ¶ 67) are not attributable or meaningfully tied to Mr. Schmidt's participation in the instant offenses.

Mr. Schmidt was not motivated by greed or personal gain, nor did he financially benefit from the conspiracy.  (PSR ¶ 92.)  The case is therefore distinguishable from those fraud cases in which a defendant misappropriates money to support a lavish lifestyle (yet another reason the amount of loss here fails to adequately capture culpability).

The case is also distinguishable from those in which the victims receive no compensation for their loss.  (*Cf.* VW Plea at 10-11 (enumerating "Relevant Considerations" in formulating VW's sentence and explicitly noting VW's agreement "to compensate members of the class in *In re Volkswagen 'Clean Diesel' Litigation*, No. 3:15-md-2672 (N.D. Cal.), which consists of victims of the underlying criminal conduct . . . , *and* to pay into a NOx remediation trust, in an aggregate amount of approximately $11 billion") (emphasis supplied).)  Though the expectation of compensation by VW does not excuse Mr. Schmidt's misconduct, the impact on the lives of victims is, according to the Sentencing Commission and Congress, undoubtedly relevant.  U.S.S.G. § 5E1.2(d)(1); 18 U.S.C. § 3572(a)(3) (directing judges to consider the "pecuniary loss inflicted upon others as a result of

the offense" in setting fine amount); 18 U.S.C. § 3572(a)(5) (enumerating "the need to deprive the defendant of illegally obtained gains from the offense" as a consideration in imposing criminal fines).

Because the victims have been compensated and because Mr. Schmidt did not financially benefit from his misconduct, imposition of a $100,000 fine sends a strong deterrent message (particularly when coupled with a significant deprivation of liberty).   In addition, Mr. Schmidt's future earning power will be substantially reduced as a result of his convictions and the staleness of his engineering skills upon release.

Finally, though imposition of a fine at or above the level imposed upon Mr. Liang might be contemplated given that Mr. Schmidt has pled guilty to an additional count, counsel respectfully reiterates that Mr. Liang, who joined the conspiracy at its inception, is the more culpable of the two.   Insofar as the fine amount should reflect the underlying misconduct (Mr. Liang's cooperation earned him a reduction in his custodial sentence), Mr. Schmidt should receive a smaller fine for his two-month long involvement in the conspiracy than Mr. Liang received following his nine years of conspiratorial misconduct.

For these reasons, counsel believes a custodial sentence coupled with a $100,000 fine comports with the statutory directives in 18 U.S.C. § 3553(a), as well as those set forth in 18 U.S.C. § 3572.

## C. Request for Judicial Recommendation Regarding Placement

Counsel respectfully requests the Court to recommend to BOP that Mr. Schmidt be assigned to the Federal Correctional Institution ("FCI") in Milan, Michigan. Mr. Schmidt has been at FDC Milan since the end of March 2017.[14] Since that time, his wife left her job in Germany and found one in the U.S. She moved from the couple's home in Germany to the metropolitan Detroit area, where she is currently renting an apartment, so that she could be close to Mr. Schmidt. *See* Ex. B-9, Kerstin Gerdes Letter. A placement at FCI Milan would allow the couple to continue to see and support one another during scheduled visitation hours while Mr. Schmidt serves his custodial sentence.

## IV.   CONCLUSION

In crafting a sentence that is sufficient, but not greater than necessary, it is respectfully urged that the Court consider Mr. Schmidt's limited durational involvement in the conspiracy; his lack of involvement in the design, implementation, or refinement of the defeat device; the fact that he did not benefit personally or financially from the offense; the severe conditions of confinement he has had to endure thus far; his acceptance of responsibility; and that, no matter the sentence imposed, Mr. Schmidt's life has been irreversibly impacted and altered as

---

[14] Mr. Schmidt has taken advantage of rehabilitative programming offered at FDC Milan during his time in custody.

a result of his participation in these offenses.  Though such consequences might be deserved, they should be considered in fashioning an appropriate sentence.  Counsel respectfully requests that the Court impose a sentence not to exceed forty months imprisonment and a fine in the amount of $100,000.

Respectfully submitted,



Dated: November 29, 2017

*/S/ David F. DuMouchel*
DAVID F DuMOUCHEL (P25658)
GEORGE B. DONNINI (P66793)
LAURA D. MAZOR (P76924)
150 West Jefferson Avenue, Suite 100
Detroit, Michigan 48226
(313) 225-7000
dumouchd@butzel.com
donnini@butzel.com
mazor@butzel.com
*Attorneys for Oliver Schmidt*


RICHARDS KIBBE & ORBE, LLP
David Massey
Paul J. Devlin
200 Liberty Street
New York, New York 10281
(212) 530-1800
dmassey@rkollp.com
pdevlin@rkollp.com
*Attorneys for Oliver Schmidt*

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send notification of such filing to all counsel of record. There are no unrepresented parties upon whom traditional service is required.

Respectfully submitted,


Dated: November 29, 2017          */S/ David F. DuMouchel*
                                  DAVID F DuMOUCHEL (P25658)